**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

DUNKIN' DONUTS FRANCHISED                  :
  RESTAURANTS LLC,
DUNKIN' DONUTS FRANCHISING LLC,            :
BASKIN-ROBBINS FRANCHISED
  SHOPS LLC                                :
DD IP HOLDER LLC,
BR IP HOLDER LLC and                       :
DB REAL ESTATE ASSETS I LLC,
                                           :

                        Plaintiffs,

                                           :  Case No. 08-CV-4218 (WCC)
            v.
                                           :
GANPATI DONUTS, INC.,
SHREE RAM DONUTS, INC.,                     :
LAXMI DONUTS, INC.,
KRISHNA DONUTS, INC.,                       :
GIATRI DONUTS INC.,
SHREEJI DONUTS, INC.,                       :
AMISH PATEL and
AMI PATEL,                                  :

                        Defendants.        :

-------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR A PRELIMINARY INJUNCTION**

RONALD D. DEGEN
SCOTT G. GOLDFINGER
KRISTIN M. LASHER
O'ROURKE & DEGEN, PLLC
Attorneys for Plaintiffs
225 Broadway, Suite 715
New York, New York 10007
(212) 227-4530

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    ii

**INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

**BACKGROUND FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

    Dunkin' Trademarks, Service Marks and Proprietary Marks . . . . . . .    1
    Baskin Trademarks, Service Marks and Proprietary Marks . . . . . . . .    2
    The Franchise Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2
    The Broadway Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4
    Monetary Obligations Under the Franchise Agreements and Lease . .    4
    The Default Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . .    4
    Termination of the Franchise Agreements and Lease . . . . . . . . . . . . .    4
    Obligations Following Termination of Franchise Agreements . . . . . .    5
    Relationship of Broadway Franchise Agreement and Lease . . . . . . . .    5
    Irreparable Harm to Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5
    Monies Owed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

    **POINT ONE** - PLAINTIFFS SATISFY THE CRITERIA FOR
    THE GRANTING OF PRELIMINARY INJUNCTIVE RELIEF. . . .    6

    **POINT TWO** - PLAIN
TIFFS HAVE A STRONG LIKELIHOOD
      OF PREVAILING ON THE MERITS IN THEIR CLAIMS
      AGAINST DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

      A.    Breach of Contract (Counts1-7). . . . . . . . . . . . . . . . . . . . . . . .    7
      B.    Trademark Infringement (Counts 19-20). . . . . . . . . . . . . . . .    8
      C.    Unfair Competition (Counts 21-22). . . . . . . . . . . . . . . . . . . .    10
      D.    Trade Dress Infringement (Counts 23-24) . . . . . . . . . . . . . . .    10

    **POINT THREE** - DEFENDANTS' INFRINGEMENT OF
    PLAINTIFFS' TRADEMARKS IS CAUSING THEM
    IRREPARABLE INJURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

    **POINT FOUR** - THE EQUITIES IN THE CASE WEIGH
    DECIDEDLY IN PLAINTIFFS' FAVOR . . . . . . . . . . . . . . . . . . . . .    13

    **POINT FIVE** - DB REAL ESTATE ASSETS I LLC IS ENTITLED
    TO A PRELIMINARY INJUNCTION REQUIRING GANAPATI
    DONUTS, INC. TO SURRENDER POSSESSION OF THE PREMISES
    OF ITS FORMER DUNKIN' DONUTS/BASKIN-ROBBINS
    FRANCHISE TO IT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

      A.    Likelihood of Success on the Merits . . . . . . . . . . . . . . . . . . . .    13
      B.    Irreparable Harm to Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . .    14

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

## TABLE OF AUTHORITIES

**Cases:**                                                                 **Pages**

**Federal**

*Adolph Coors Co. v. Al Genderson & Sons, Inc.*,
    486 F. Supp. 131 (D. Colo. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

*Bowmar Instrument Corp. v. Continental Microsystems, Inc.*
    497 F. Supp. 947 (S.D.N.Y. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . .    10,11

*Burger Chef Systems, Inc. v. MPG, Inc.*, 530 F. Supp. 1
    (N.D. Okla. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

*Burger King Corp. v. Hall*, 770 F. Supp. 633 (S.D. Fla. 1991) . . . . . . . . . .    9

*Burger King Corp. v. Majeed*, 805 F. Supp. 994 (S.D. Fla. 1992). . . . . . . . .    9

*Burger King Corp. v. Mason*, 710 F.2d 1480 (11th Cir. 1983),
    cert. denied, 465 U.S. 1102 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . .    8,9

By-Rite Distributing Co. v. Coca Cola Co.,
    577 F. Supp. 503 (D. Utah 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

*Church of Scientology v. Elmira Mission of Church of Scientology*,
    794 F.2d 38 (2d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

*Chrysler Corp. v. Thayer Plymouth Center, Inc.*,
    303 F. Supp. 543 (C.D. Ca. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . .    8,10

*Coit Drapery Cleaners, Inc. v. Coit Drapery Cleaners of New York, Inc.*,
    423 F. Supp. 975 (E.D.N.Y. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . .    7,8,12

*Costandi v. Aamco Automatic Transmissions, Inc.*,
    456 F.2d 914 (9th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8,12,13

*Dunkin' Donuts Incorporated v. Dowco, Inc.*, 1998 WL 160823
    (N.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

*Dunkin' Donuts Incorporated v. JAS Donut, Inc.*, 02-CV-857
    (N.D.N.Y. December 30, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

*Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.*,
    875 F. Supp. 966, 975 (E.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . .    9

*International Dairy Foods Ass'n v. Amestoy*,
    92 F.3d 67 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

*Matter of Vuitton et Fils, S.A.*, 606 F.2d 1 (2d Cir. 1979). . . . . . . . . . . . . . .    11

*Omega Importing Corp. v. Petri-King Co.*,
    451 F.2d 1190 (2d Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12,13

*Opticians Ass'n v. Independent Opticians*, 920 F.2d 187 (3d Cir. 1990). . . . .     9

*P. Daussa Corp. v. Sutton Cosmetic (P.R.) Inc.*,
    462 F.2d 134 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12

*Professional Golfers Assoc. v. Bankers Life & Casualty Co.*,
    514 F.2d 665 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8,10

*Prompt Electrical Supply Co., Inc. v. Allen-Bradley Co.*
    492 F. Supp. 344 (E.D.N.Y. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

*Rita's Water Ice Franchise Corp. v. DBI Investment Corp.*
    1996 WL 165518 (E.D.Pa.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14-15

*S & R Corp. v. Jiffy Lube International, Inc.*,
    968 F.2d 371 (3rd Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8,9,13

*Schroeder v. Lotito*, 577 F. Supp. 708 (D.R.I. 1983) . . . . . . . . . . . . . . . . . .     10

*Southland v. Froelich*, 41 F. Supp. 2d 227, 243 (E.D.N.Y. 1999) . . . . . . . . .     9

*Standard & Poor's Corp. v. Commodity Exchange*,
    683 F.2d 704 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11,11-12

*Stormor, A Div. of Fuqua, Inc. v. Johnson*,
    587 F. Supp. 275 (W.D. Mich. 1984 . . . . . . . . . . . . . . . . . . . . . . . . . . .     9

**Statutes, Rules & Treatises**

15 U.S.C. § 1065 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2,9

15 U.S.C. § 1114(1)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     8

15 U.S.C. § 1125(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

McCarthy, *2 McCarthy Trademarks and Unfair Competition* § 23.3. . . . . . .     9

McCarthy, *4 McCarthy Trademarks and Unfair Competition* § 25.31. . . . . .     10

## INTRODUCTION

Plaintiffs Dunkin' Donuts Franchised Restaurants LLC and Dunkin' Donuts Franchising LLC (collectively and individually "Dunkin' Donuts") are the franchisors of Dunkin' Donuts franchises and Plaintiff Baskin-Robbins Franchised Shops LLC ("Baskin-Robbins") is the franchisor of Baskin-Robbins stores.  Plaintiffs DD IP Holder LLC and BR IP Holder LLC are the holders of the Dunkin' Donuts and Baskin-Robbins trademarks.  Plaintiff DB Real Estate Assets I LLC ("DB Realty") leases real property to Dunkin' Donuts franchisees.  Defendants operated five Dunkin' Donuts shops and one Dunkin' Donuts/Baskin-Robbins combo shop in Orange County.  One of the Defendants leased the premises of the Dunkin' Donuts/Baskin-Robbins combo from DB Realty.

When Defendants ceased paying Dunkin' Donuts and Baskin-Robbins (collectively "Franchisors") franchise fees and advertising fees required by the Franchise Agreements and fell far behind in their payments to DB Realty of rent, taxes and percentage rent required by the Lease, Plaintiffs sent them notices to cure.  Because they failed to heed the notices, Franchisors terminated their Franchise Agreements and DB Realty terminated the Lease, pursuant to their terms.  Nevertheless, Defendants continue to operate their businesses, using the Dunkin' Donuts and Baskin-Robbins trademarks in violation of the Franchise Agreements and the *Lanham Act*, and occupy the subject premises without the right to do so.  For that reason, Plaintiffs seek a preliminary injunction enjoining Defendants from using their trademarks, trade names and Proprietary Marks and ordering them to vacate the subject premises and surrender possession of them to DB Realty.

## BACKGROUND FACTS

### DUNKIN' TRADEMARKS, SERVICE MARKS AND PROPRIETARY MARKS

DD IP Holder LLC has the license to use and to license others to use the Dunkin' Donuts marks and trade names.  (Certification of Jack Laudermilk, Exhibit 1, ¶ 9-10).  DD IP Holder LLC own numerous federal registrations for the mark "Dunkin' Donuts" and related marks that

1

are in full force and effect and are incontestable pursuant to 15 U.S.C. § 1065. (Exhibit A; *Id.* at ¶ 11).

Over the past 35 years Dunkin' Donuts and its franchisees spent more than $1,500,000,000 on advertising and promoting the Dunkin Donuts marks. Dunkin' Donuts spent approximately $167,000,000 in fiscal year 2005 alone on advertising and promotion. (Exhibit B; *Id.* at ¶ 13). Dunkin' Donuts' marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Dunkin' Donuts, representing and embodying its considerable goodwill and favorable reputation. (*Id.* at ¶ 12, 14-15).

## BASKIN TRADEMARKS, SERVICE MARKS AND PROPRIETARY MARKS

BR IP Holder LLC has the license to use and to license others to use the Baskin-Robbins marks and trade names. *Id.* at ¶ 16-17). BR IP Holder LLC own numerous federal registrations for the mark "Baskin-Robbins" and related marks that are in full force and effect and are incontestable pursuant to 15 U.S.C. § 1065. (Exhibit C; *Id.* at ¶ 18).

Baskin-Robbins' marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Dunkin' Donuts, representing and embodying its considerable goodwill and favorable reputation. (*Id.* at ¶ 19-22).

## THE FRANCHISE AGREEMENTS

On May 14, 2001, Dunkin' Donuts Incorporated, predecessor in interest of Dunkin' Donuts Franchised Restaurants LLC, Baskin-Robbins USA, Co., predecessor in interest of Baskin-Robbins Franchised Restaurants LLC, and Defendant Ganpati Donuts, Inc. entered into a Franchise Agreement (collectively with any amendments the "Broadway Franchise Agreement"). The Broadway Franchise Agreement (Exhibit D) authorized Defendant to operate a restaurant utilizing the Dunkin' Donuts and Baskin-Robbins Systems at 674 Broadway, Newburgh, New York (the "Broadway Premises"). (*Id.* at ¶ 23).

On November 8, 2004, Dunkin' Donuts Incorporated, predecessor in interest of Dunkin' Donuts Franchised Restaurants LLC, and Defendant Shree Ram Donuts, Inc. entered into a

2

Franchise Agreement (collectively with any amendments the "North Plank Road Franchise Agreement"). The North Plank Road Franchise Agreement (Exhibit E) authorized Defendant to operate a restaurant utilizing the Dunkin' Donuts System at 201 North Plank Road, Newburgh, New York (the "North Plank Road Premises"). (*Id*. at ¶ 24).

On November 8, 2004, Dunkin' Donuts Incorporated, predecessor in interest of Dunkin' Donuts Franchised Restaurants LLC, and Defendant Laxmi Donuts, Inc. entered into a Franchise Agreement (collectively with any amendments the "Vails Gate Franchise Agreement"). The Vails Gate Franchise Agreement (Exhibit F) authorized Defendant to operate a restaurant utilizing the Dunkin' Donuts System at 1002 Route 94, Vails Gate, New York (the "Vails Gate Premises"). (*Id*. at ¶ 25).

On November 8, 2004, Dunkin' Donuts Incorporated, predecessor in interest of Dunkin' Donuts Franchised Restaurants LLC, and Defendant Krishna Donuts, Inc. entered into a Franchise Agreement (collectively with any amendments the "Highland Falls Franchise Agreement"). The Highland Falls Franchise Agreement (Exhibit G) authorized Defendant to operate a restaurant utilizing the Dunkin' Donuts System at 184 Main Street, Highland Falls, New York (the "Highland Falls Premises"). (*Id*. at ¶ 26).

On September 14, 1998, Dunkin' Donuts Incorporated, predecessor in interest of Dunkin' Donuts Franchised Restaurants LLC, and Defendant Giatri Donuts Inc. entered into a Franchise Agreement (collectively with any amendments the "Cornwall Franchise Agreement"). The Cornwall Franchise Agreement (Exhibit H) authorized Defendant to operate a restaurant utilizing the Dunkin' Donuts System at 45 Quaker Avenue, Cornwall, New York (the "Cornwall Premises"). (*Id*. at ¶ 27).

On May 17, 2007, Dunkin' Donuts Franchising LLC and Defendant Shreeji Donuts, Inc. entered into a Franchise Agreement (collectively with any amendments the "South Robinson Avenue Franchise Agreement"). The South Robinson Avenue Franchise Agreement (Exhibit I) authorized Defendant to operate a restaurant utilizing the Dunkin' Donuts System at 122-126

3

South Robinson Avenue, Newburgh, New York (the "Cornwall Premises").  (*Id*. at ¶ 28).

### THE BROADWAY LEASE

On May 14, 2001, Third Dunkin' Donuts Realty, Inc., predecessor in interest of DB Real Estate Assets I LLC, and Ganpati Donuts, Inc. entered into a Lease (collectively with any amendments the "Broadway Lease").  The Broadway Lease (Exhibit J) authorized Defendant to occupy the Broadway Premises.  (*Id*. at ¶ 29).

### MONETARY OBLIGATIONS UNDER THE FRANCHISE AGREEMENTS AND LEASE

Pursuant to the Franchise Agreements, Defendants are required to pay franchise fees and advertising fees on a weekly basis.  (Exhibits D, E, F, G, H & I, Contract Data Schedules, ¶ E & F, ¶ 4.3, 4.4).  Defendants are also required to submit sales reports with their payments, because the amount of franchise fees and advertising fees is based upon gross sales.  (*Id*. at ¶ 5.2.1; Laudermilk, ¶ 30).

Pursuant to the Broadway Lease, Defendants are required to pay rent and taxes on the 15th day of the month immediately preceding the month for which the payments are due, and percentage rent equal to 9.25% of annual Baskin-Robbins sales in excess of $100,000 and 9.25% of all Dunkin' Donuts sales not later than 15 days after the close of each Lease Month.  (Exhibit J, ¶ 1.8, 3 & 6, First Amendment, ¶ 2; Laudermilk, ¶ 31).

### THE DEFAULT NOTICES

On April 1, 2008, pursuant to their Franchise Agreements and Lease, Plaintiffs sent Defendants notices to cure defaults in payment by overnight carrier.  More than fifteen (15) days passed after Defendants received the Notices to Cure without the defaults having been cured. (Exhibits K, L, M, N, O and P; Laudermilk, ¶ 32-37).

### TERMINATION OF THE FRANCHISE AGREEMENTS AND LEASE

On April 28, 2008, pursuant to their Franchise Agreements and Lease, Plaintiffs sent Defendants notices of termination by overnight carrier.  These Notices terminated the respective Franchise Agreements and Lease immediately, upon Defendants' receipt of them on April 29,

2008. (Exhibits Q, R, S, T, U and V; Laudermilk, ¶ 38-43).

## OBLIGATIONS FOLLOWING TERMINATION OF FRANCHISE AGREEMENTS

In the Franchise Agreements Defendants agreed that they would not do or perform, directly or indirectly, any act injurious or prejudicial to the goodwill associated with the Dunkin' Donuts and Baskin-Robbins Proprietary Marks and the Dunkin' Donuts and Baskin-Robbins Systems. (Exhibits D, E, F, G, H & I, ¶ 8.0.1; Laudermilk, ¶ 44).

The Franchise Agreements also contain acknowledgments and agreements concerning the use of the Dunkin' Donuts and Baskin-Robbins Proprietary Marks or any methods associated with the names "Dunkin' Donuts" and "Baskin-Robbins" (*Id.* at ¶ 9.4, 9.4.2). Defendants agreed that following the termination of their Franchise Agreements, they would not use the name or Proprietary Marks of Dunkin' Donuts and Baskin-Robbins. (*Id.* at ¶ 7.0, 7.1;); Laudermilk, ¶ 45).

## RELATIONSHIP OF BROADWAY FRANCHISE AGREEMENT AND LEASE

Pursuant to the Broadway Franchise Agreement:

The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

(Exhibit D, ¶ 1.1). The Lease states that the Premises may be used and occupied only for the operation of a Dunkin' Donuts/Baskin-Robbins combo shop. (Exhibit J, ¶ 1.7). It further provides that the Lease is subject to the Franchise Agreement remaining in full force and effect and that if the Franchise Agreement is terminated for any reason, then DB Realty shall have the right to terminate the Lease. (*Id.* at ¶ 14(a); Laudermilk, ¶ 46-47).

## IRREPARABLE HARM TO PLAINTIFFS

Defendants continue to use the Dunkin' Donuts and Baskin-Robbins names, trademarks and service marks in the operation of their six retail food businesses in Orange County. Defendants' continued operation of their businesses using the Dunkin' Donuts and Baskin-Robbins trademarks has caused and continues to cause Franchisors to suffer irreparable harm

5

and injury by reason of trademark dilution and damage to their reputation and goodwill. Franchisors no longer have the right to supervise, control or enforce their efforts to maintain high and uniform standards of quality, cleanliness, appearance and service. Moreover, the public is being misled into believing that Defendants' businesses are or were authorized Dunkin' Donuts and Baskin-Robbins Shops. (Laudermilk, ¶ 48-49).

## MONIES OWED

On April 1, 2008, when the notices to cure were sent, Defendants owed Franchisors and DB Realty (collectively "Dunkin' Brands") $133,962. (Exhibits K, L, M, N, O and P). On April 28, 2008, when Franchisors terminated Defendants' Franchise Agreements and DB Realty terminated the Broadway Lease, the amount of money that Defendants had owed Dunkin' Brands four weeks earlier had increased by more than $46,000 to $180,186. (Exhibits Q, R, S, T, U and V; Certification of Gary Zullig, Exhibit 2, ¶ 8-9).

The amount of money due Dunkin' Brands from each corporate Defendant on the dates that the notices to cure and the notices of termination were sent to Defendants is as follows:

| Franchisee | 04/01/08 | 04/28/08 |
|---|---|---|
| Ganpati Donuts, Inc. | $ 68,817 | $ 71,322 |
| Shree Ram Donuts, Inc. | 16,192 | 28,169 |
| Laxmi Donuts, Inc. | 24,032 | 36,506 |
| Krishna Donuts, Inc. | 7,165 | 10,952 |
| Giatri Donuts Inc. | 14,265 | 21,618 |
| Shreeji Donuts, Inc. | 3,491 | 11,619 |
| **TOTAL** | **$133,962** | **$180,186** |

(Exhibit W). On April 29, 2008, Dunkin' Brands received a payment of $7,400 and sales reports for a two-week period from one of Defendants' six franchises. Meanwhile, over the past week the other five franchises have reported no sales and made no payments and their receivables have increased by more than that amount. (*Id*. at ¶ 10-11).

## ARGUMENT

## POINT ONE

### PLAINTIFFS SATISFY THE CRITERIA FOR THE GRANTING OF PRELIMINARY INJUNCTIVE RELIEF.

By operating restaurants which appear to be or to have been Dunkin' Donuts and Baskin-

Robbins shops, Defendants are using the Dunkin' Donuts and Baskin-Robbins trade names and Proprietary Marks without authorization and are infringing upon the Dunkin' Donuts and Baskin-Robbins trademarks.  This continuous injury to Plaintiffs' trademarks cannot be remedied during the pendency of this action, unless this Court issues a preliminary injunction.  Courts have granted preliminary injunctions in cases where a former franchisee or licensee continues to use a mark without permission to do so.  *Coit Drapery Cleaners, Inc. v. Coit Drapery Cleaners of New York, Inc.*, 423 F. Supp. 975 (E.D.N.Y. 1976).

The grant or denial of a preliminary injunction rests in the sound discretion of the District Court.  The well-established factors that determine whether a court will grant a motion for a preliminary injunction are whether:

(a)    the plaintiff will suffer irreparable injury if the injunction is not granted; <u>and either</u>

(b)    there is a substantial likelihood that the plaintiff will succeed on the merits; <u>or</u>

(c)    sufficiently serious questions going to the merits exist to make them fair grounds for litigation and the balance of hardships weighs decidedly toward the party requesting the injunction.  *See*, *International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 70 (2d Cir. 1996).  It is respectfully submitted that the application of the facts herein to these factors, mandates the granting of an injunction in favor of Plaintiffs.

<u>**POINT TWO**</u>

**PLAINTIFFS HAVE A STRONG LIKELIHOOD OF PREVAILING ON THE MERITS IN THEIR CLAIMS AGAINST DEFENDANTS.**

**A.**    <u>**Breach of Contract (Counts 1-7)**</u>

It cannot be disputed that Defendants agreed that once the Franchise Agreements have been terminated, they must de-identify the premises of their shops, that is, remove any indicia that the same are or were Dunkin' Donuts and Baskin-Robbins shops.  (Exhibits D, E, F, G, H and I, ¶ 7.1 & 9.4).  Defendants cannot deny that Plaintiffs served them with written demands that they de-identify their shops, but that they have willfully refused to abide by the terms of

7

their Franchise Agreements requiring that they do so.  (Exhibits Q, R, S, T, U and V; Laudermilk, ¶ 38-43).

**B.**    **Trademark Infringement (Counts 19-20)**

Under Section 32(1) of the Lanham Act (15 U.S.C. §1114(1)(a)) the courts are authorized to grant injunctive relief where a person shall, without the consent of the registrant, use

> any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

When an unauthorized use of a mark occurs, the courts have found an infringement exists, even if the mark is neither a reproduction nor counterfeit.  *Adolph Coors Co. v. Al Genderson & Sons, Inc.*, 486 F. Supp. 131 (D. Colo. 1980).  A franchisor need only establish confusion in the mind of the public in order to prevail in a trademark infringement action.

Courts have held that the continued use of a trademark by a licensee or franchisee after the termination of the license constitutes trademark infringement.  *S & R Corp. v. Jiffy Lube International, Inc.*, 968 F.2d 371 (3d Cir. 1992); *Burger King Corp. v. Mason*, 710 F.2d 1480 (11th Cir. 1983) cert. denied, 465 U.S. 1102 (1984); *Professional Golfers Assoc. v. Bankers Life & Casualty Co.*, 514 F.2d 665 (5th Cir. 1975); *Costandi v. Aamco Automatic Transmissions, Inc.*, 456 F.2d 914 (9th Cir. 1972); *Coit Drapery Cleaners, Inc. v. Coit Drapery Cleaners of New York*, Inc., 423 F. Supp. 975 (E.D.N.Y. 1976); *Chrysler Corp. v. Thayer Plymouth Center, Inc.*, 303 F. Supp. 543 (C.D. Ca. 1969).

In *Prompt Electrical Supply Co., Inc. v. Allen-Bradley Co.*, 492 F. Supp. 344 (E.D.N.Y. 1980), the plaintiff continued to use the defendant's mark and advertising after the defendant had terminated plaintiff's distribution agreement for nonpayment.  The court stated:

> In the circumstances of this case, defendant has made a clear--and unrebutted-- showing that plaintiff's continuing unauthorized use of the Allen-Bradley sign and trademark presents a likelihood that the public will be confused or deceived into believing Prompt is an authorized Allen-Bradley distributor (492 F. Supp. at 349).

In the same vein, the court in *Burger King Corp. v. Mason*, 710 F.2d 1480 (11th Cir.

8

1983), cert. denied, 465 U.S. 1102 (1984) noted:

> [A] trademark infringement case need not just involve imitation of the registrant`s mark.  The unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement (710 F.2d at 1492; *see also*, *Stormor, A Div. of Fuqua, Inc. v. Johnson*, 587 F. Supp. 275, 278 [W.D. Mich. 1984]).

The marks of Dunkin' Donuts and Baskin-Robbins have been properly registered in accordance with the Lanham Act (Exhibits A and C; Laudermilk, ¶ 9, 11, 16, 18) and are thus valid and entitled to legal protection.  *See*, 15 U.S.C. § 1065.  *See also*, *Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.*, 875 F. Supp. 966, 975 (E.D.N.Y. 1994) ("The existence of a trademark registration is prima facie evidence of a valid trademark.").  Defendants have used, and continue to use, these marks in offering doughnuts, sandwiches and related products for sale.

Moreover, "'there is a great likelihood of confusion when the infringer uses the exact trademark' as the plaintiff."  *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992) (quoting *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 195 (3d Cir. 1990)).  In such cases, the "likelihood of confusion is inevitable."  *Opticians*, 920 F.2d at 195.

> Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports.  *Such cases are "open and shut"* and do not involve protracted litigation to determine liability for trademark infringement.

*Id*. (quoting *J. McCarthy, 2 McCarthy on Trademarks and Unfair Competition* § 23:3 (2nd ed. 1984)) (emphasis added); *see also*, *Southland v. Froelich*, 41 F. Supp. 2d 227, 243 (E.D.N.Y. 1999) ("[W]here the unauthorized user of the trademark continues to use the identical, previously licensed trademark, after revocation of the license, likelihood of confusion is established.").

Indeed, Defendants' status as "holdover" franchisees is <u>dispositive</u> of the infringement issue:

> Both *Burger King Corp. v. Hall*, 770 F. Supp. 633, 637 (S.D. Fla. 1991) and *Burger King Corp. v. Mason*, 710 F.2d 1480, 1494 (11th Cir. 1983) reflect well-settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement. *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1002-03 (S.D. Fla. 1992).
>
> Once a license contract is terminated, there is no doubt that the ex-licensee has no authorization or consent to continue use of the mark.  After the license has ended,

the ex-licensee must stop use of the mark.  Continued use by an ex-licensee of the licensor's mark constitutes a fraud on the public, since they are led to think that the ex-licensee is still connected with the licensor.  As the Eleventh Circuit observed:  "Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks."

. . . Understandably, many ex-franchisees and ex-licensees are reluctant to give up use of the mark.  Nevertheless, they clearly can be enjoined from any such further use.

McCarthy, *4 McCarthy on Trademarks and Unfair Competition* § 25.31 (4th ed. 1999).

Here, Defendants continue to operate their business using the Dunkin' Donuts and Baskin-Robbins trade names and trademarks without permission from Plaintiffs, the rightful holders of the trademarks.  Defendants persist in holding themselves out to the public as authorized present and/or former Dunkin' Donuts and Baskin-Robbins franchisees when, in fact, their Franchise Agreements were terminated and they voluntarily agreed, in that event, not to use Plaintiffs' marks.  The trademark laws were enacted to protect the public against just such deception and confusion.

## C.    Unfair Competition (Counts 21-22)

The law of trademark infringement is part of the law of unfair competition.  *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F. Supp. 947 (S.D.N.Y. 1980). Consequently, a valid claim of trademark infringement normally states a claim for unfair competition.  *Schroeder v. Lotito*, 577 F. Supp. 708 (D.R.I. 1983).  As in the trademark infringement situation, the basis of an action for unfair competition is the likelihood of confusion and the passing off of one's goods and services as the product of another.  *Professional Golfers Association v. Banker's Life & Casualty Co.*, 514 F.2d 665, 671 (5th Cir. 1975).  Defendants' infringement upon Plaintiffs' trademarks constitutes unfair competition.  *Bowmar Instrument Corp. v. Continental Microsystems*, *supra* at 959; *Chrysler Corp. v. Thayer Plymouth Center, Inc.*, 303 F. Supp. 543, 548 (C.D. Ca. 1969).

## D.    Trade Dress Infringement (Count 23-24)

The cause of action prohibiting the use of goods or services with a false designation of

origin is found in Section 43(a) of the Lanham Act (15 U.S.C. §1125(a)), which provides, in

relevant part:

> Any person who shall affix, apply, or annex, or use in connection with any goods
> or services, or any container or containers for goods, a false designation of origin,
> or false description or representation, including words or other symbols tending
> falsely to describe or represent the same, and shall cause such goods or services to
> enter into commerce . . . shall be liable to a civil action . . . by any person who
> believes that he is likely to be damaged by the use of any such false description or
> representation.

The touchstone of a claim under Section 43(a) is confusion of the public, just as it is for a

claim under Section 32(1). *Standard & Poor's Corp. v. Commodity Exchange*, 683 F.2d 704,

708 (2d Cir. 1982). The court in *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*,

497 F. Supp. 947 (S.D.N.Y. 1980) held that where the defendant used the Bowmar trademark on

unauthorized products, it violated Section 43(a), because "the consumer would be misled into

believing that Bowmar either manufactured the product or authorized the use of its mark." 497

F. Supp. at 957.

In the case at bar, by calling its establishments Dunkin' Donuts and Baskin-Robbins

franchises and using equipment bearing the trade dress of Dunkin' Donuts and Baskin-Robbins,

Defendants are deceiving the public into thinking that Franchisors authorized the sale of food

products at their six locations in Orange County and that Defendants meet the quality standards

of products and services associated with Plaintiffs' trademarks. *Bowmar Instrument Corp. v.*

*Continental Microsystems, Inc.*, *supra* at 957.

## POINT THREE

### DEFENDANTS' INFRINGEMENT OF PLAINTIFFS' TRADEMARKS IS CAUSING THEM IRREPARABLE INJURY.

It is well-settled law that the infringement of a trademark, in and of itself, gives rise to

irreparable injury. *Matter of Vuitton et Fils, S.A.*, 606 F.2d 1, 4 (2d Cir. 1979). "In the

preliminary injunction context, a showing of likelihood of confusion as to source or sponsorship

[of a party's products] establishes the requisite likelihood of success on the merits as well as risk

of irreparable harm." *Standard & Poor's Corp. v. Commodity Exchange*, 683 F.2d 704, 708 (2d

11

Cir. 1982).  Such a showing suffices, because "where there is, then, such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows."  *Omega Importing Corp. v. Petri-King Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971).  The threat of such irreparable injury warrants the issuance of a preliminary injunction. *P. Daussa Corp. v. Sutton Cosmetic (P.R.) Inc.*, 462 F.2d 134, 136 (2d Cir. 1972).

A number of years ago the Second Circuit stated that "in a licensor/licensee case the reasons for issuing a preliminary injunction for trademark infringement are more compelling than in the ordinary case."  *Church of Scientology v. Elmira Mission of Church of Scientology*, 794 F.2d 38 (2d Cir. 1986).  In *Scientology*, as in the present case, a licensee continued to use the marks of the licensor after the license had been terminated for non-payment of fees.  The Second Circuit held that irreparable injury automatically flows from trademark infringement, because: (1) unlawful use of a trademark injures the reputation and goodwill associated with the licensor's mark; and (2) the licensor must control the mark to avoid creating a risk of a later finding of abandonment (794 F.2d at 43).

Other courts have also held that irreparable injury occurs where a former franchisee or licensee continues to use a trademark without authorization.  *Costandi v. Aamco Automatic Transmissions, Inc.*, 456 F.2d 941 (9th Cir. 1972); *Burger Chef Systems, Inc. v. MPG, Inc.*, 530 F. Supp. 1 (N.D. Okla. 1979); *Coit Drapery Cleaners, Inc. v. Coit Drapery Cleaners of New York, Inc.*, 423 F. Supp 975 (E.D.N.Y. 1976).

In the *Burger Chef Systems* case the court noted:

> As to irreparable injury, the Court concludes that trademarks backed by national advertising and other promotional expenses constitute property which can be irreparably injured by unauthorized use (530 F. Supp. at 2).

Another judge, in *By-Rite Distributing Co. v. Coca Cola Co.*, 577 F. Supp. 503, 541 (D. Utah 1983), found:  "There are few things in our commercial life more valuable than a company's reputation, goodwill, and trademarks."

Franchisors have assiduously promoted their trademarks through extensive advertising

campaigns. One purpose of these programs is to assure consumers that when they visit Dunkin' Donuts and Baskin-Robbins Shops, they will be guaranteed the highest quality in products and service. Defendants' continued unauthorized use of the Dunkin' Donuts and Baskin-Robbins trademarks infringes upon both the trademarks and the goodwill and reputation that Franchisors have built up over the years. Injury to reputation and goodwill is irreparable and is extremely difficult to measure in damages. *Omega Importing Corp. v. Petri-King Co.*, *supra* at 1195.

### POINT FOUR

### THE EQUITIES IN THE CASE WEIGH DECIDEDLY IN PLAINTIFFS' FAVOR.

The equities always lie in favor of a party whose trademark rights are being violated. In this case, Franchisors have incurred substantial costs and have taken great care to promote their products and services, which are protected by their trademarks. Defendants' use of these trademarks is detrimental to Plaintiffs. As the court in *Costandi v. Aamco Automatic Transmissions, Inc.*, 456 F.2d 941 (9th Cir. 1972) stated: "It is an elementary rule of contract law that one cannot repudiate a contract and at the same time retain the consideration or any part thereof received under the contract." 456 F.2d at 942-943; *S & R Corp. v. Jiffy Lube International, Inc.*, *supra*, at 376. In operating as Dunkin' Donuts and Baskin-Robbins franchisees, even though the Franchise Agreements have been terminated and are no longer in effect, Defendants continue to wrongfully use Plaintiffs' valuable trademarks.

### POINT FIVE

### DB REAL ESTATE ASSETS I LLC IS ENTITLED TO A PRELIMINARY INJUNCTION REQUIRING GANPATI DONUTS, INC. TO SURRENDER POSSESSION OF THE PREMISES OF ITS FORMER DUNKIN' DONUTS/BASKIN-ROBBINS FRANCHISE TO IT.

**A.**    **Likelihood of Success on the Merits**

It cannot be disputed that the Lease of Defendant Ganpati Donuts, Inc. at 674 Broadway, Newburgh, New York was terminated for its failure to pay its obligations under its Lease (Exhibit Q) and that today it owes DB Realty more than $51,131 (Exhibit W); nor can it be

13

contested that the Franchise Agreement of Ganpati Donuts, Inc. was terminated for failure to pay franchise fees and advertising fees. Finally, no doubt exists that Ganpati Donuts, Inc. agreed to use the Premises solely for the operation of a Dunkin' Donuts/Baskin-Robbins restaurant, that the Lease is subject to the Franchise Agreement being in full force and effect, and that Ganpati Donuts, Inc. is required to surrender possession of the Premises to DB Realty upon the expiration of the Lease. (Exhibit J, ¶ 1.7, 8, 14(a); Laudermilk, ¶ 47). Therefore, DB Realty is highly likely to succeed on the eighth and ninth causes of action in the complaint based upon breach of contract.

In December 2002, Judge Lawrence E. Kahn granted Franchisors a preliminary injunction and awarded them the Premises of a franchised shop where the landlord was Third Dunkin' Donuts Realty, Inc. in a case on all fours with the present action. *See Dunkin' Donuts Incorporated v. JAS Donut, Inc.*, 02-CV-857 (N.D.N.Y. December 30, 2002). (Exhibit X). Although the defendants raised an affirmative defense and counterclaim that they relied upon Plaintiffs' misrepresentations, Judge Kahn granted Plaintiffs' motion for a preliminary injunction and the delivery of possession of the leased premises to the landlord.

In a situation in which Dunkin' Donuts had a lease option agreement, rather than a lease held by its subsidiary, the District Court ordered specific performance by the former franchisee. *See Dunkin' Donuts Incorporated v. Dowco, Inc.*, 1998 WL 160823 (N.D.N.Y.). (Exhibit Y). The Court required Dowco to deliver possession of the premises of the former Dunkin' Donuts shops that it was operating as Vermont Mountain Coffee Shoppes. Here, DB Realty is in a stronger position in that it is a landlord relying upon the explicit terms of the Lease.

**B.**     **Irreparable Harm to Plaintiffs**

Without a preliminary injunction, Plaintiffs will suffer irreparable harm. By enforcing the terms of the Lease, this Court will prevent customer confusion and the loss of goodwill that will necessarily flow from the elimination of the Premises as the site of a Dunkin' Donuts/Baskin-Robbins store. *See Rita's Water Ice Franchise Corp. v. DBI Investment Corp.* 1996 WL 165518

14

(E.D.Pa.).  (Exhibit Z).

## <u>CONCLUSION</u>

In sum, Plaintiffs have satisfied the conditions courts impose as a prerequisite for issuing an injunction.  Dunkin' Donuts and Baskin-Robbins have been and continue to be irreparably injured by Defendants' conduct.  Plaintiffs are likely to succeed on the merits or, alternatively, have established the existence of sufficiently serious questions going to the merits which, when coupled with the hardships facing them, militate in favor of an injunction.  Finally, Plaintiffs have no adequate remedy at law.  For these reasons Plaintiffs respectfully request that this Court grant their motion for a preliminary injunction.

Dated: New York, New York

      May 6, 2008

                                            Respectfully submitted,

                                            /s/ Ronald D. Degen
                                            **RONALD D. DEGEN**
                                            SCOTT G. GOLDFINGER
                                            KRISTIN M. LASHER
                                            O'ROURKE & DEGEN, PLLC
                                            Attorneys for Plaintiffs
                                            225 Broadway, Suite 715
                                            New York, New York 10007
                                            (212) 227-4530

15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

DUNKIN' DONUTS FRANCHISED     :
  RESTAURANTS LLC,
DUNKIN' DONUTS FRANCHISING LLC,   :
BASKIN-ROBBINS FRANCHISED
  SHOPS LLC                       :
DD IP HOLDER LLC,
BR IP HOLDER LLC and           :
DB REAL ESTATE ASSETS I LLC,

                                :

           Plaintiffs,

                        :  Case No. 08-CV-4218 (WCC)
      v.
                        :

GANPATI DONUTS, INC.,
SHREE RAM DONUTS, INC.,       :
LAXMI DONUTS, INC.,
KRISHNA DONUTS, INC.,        :
GIATRI DONUTS INC.,
SHREEJI DONUTS, INC.,         :
AMISH PATEL and
AMI PATEL,                   :

          Defendants.     :

-------------------------------------------------------------X

### PLAINTIFFS' CERTIFICATIONS AND EXHIBITS IN SUPPORT
### OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

1. Certification of Jack Laudermilk
2. Certification of Gary Zullig
    A.    Dunkin' Donuts Trademark Registration
    B.    Dunkin' Donuts Advertising Expenditures
    C.    Baskin-Robbins Trademark Registration
    D.    Franchise Agreement (Broadway) Ganpati Donuts, Inc.
    E.    Franchise Agreement (North Plank Road) Shree Ram Donuts, Inc.
    F.    Franchise Agreement (Vails Gate) Laxmi Donuts, Inc.
    G.    Franchise Agreement (Highland Falls) Krishna Donuts, Inc.
    H.    Franchise Agreement (Cornwall) Giatri Donuts Inc.
    I.    Franchise Agreement (South Robinson Avenue) Shreeji Donuts, Inc.
    J.    Lease (Broadway) Ganpati Donuts, Inc.
    K.    Notice to Cure and Status Report Ganpati Donuts, Inc.
    L.    Notice to Cure and Status Report Shree Ram Donuts, Inc.
    M.    Notice to Cure and Status Report Laxmi Donuts, Inc.
    N.    Notice to Cure and Status Report Krishna Donuts, Inc.
    O.    Notice to Cure and Status Report Giatri Donuts Inc.
    P.    Notice to Cure and Status Report Shreeji Donuts, Inc.
    Q.    Notice of Termination Ganpati Donuts, Inc.
    R.    Notice of Termination Shree Ram Donuts, Inc.
    S.    Notice of Termination Laxmi Donuts, Inc.
    T.    Notice of Termination Krishna Donuts, Inc.
    U.    Notice of Termination Giatri Donuts Inc.

V.       Notice of Termination Shreeji Donuts, Inc.
W.     Accounts Receivable Status Reports of Defendants
X.      *Dunkin' Donuts Incorporated v. JAS Donut, Inc.*
Y.      *Dunkin' Donuts Incorporated v. Dowco, Inc.*
Z.      *Rita's Water Ice Franchise Corp. v. DBI Investment Corp.*

Dated: New York, New York
      May 6, 2008

Respectfully submitted,

/s/ Ronald D. Degen
**RONALD D. DEGEN**
SCOTT G. GOLDFINGER
KRISTIN M. LASHER
O'ROURKE & DEGEN, PLLC
Attorneys for Plaintiffs
225 Broadway, Suite 715
New York, New York 10007
(212) 227-4530

2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

DUNKIN' DONUTS FRANCHISED           :
 RESTAURANTS LLC,
DUNKIN' DONUTS FRANCHISING LLC,     :
BASKIN-ROBBINS FRANCHISED
 SHOPS LLC                          :
DD IP HOLDER LLC,
BR IP HOLDER LLC and                :
DB REAL ESTATE ASSETS I LLC,
                                    :
               Plaintiffs,
                                    : Case No. 08-CV-4218 (WCC)
        v.                          :
                                    :
GANPATI DONUTS, INC.,
SHREE RAM DONUTS, INC.,             :
LAXMI DONUTS, INC.,
KRISHNA DONUTS, INC.,               :
GIATRI DONUTS INC.,
SHREEJI DONUTS, INC.,               :
AMISH PATEL and
AMI PATEL,                          :

               Defendants.          :

-------------------------------------------------------------X

## <u>CERTIFICATION OF JACK LAUDERMILK</u>

1.      I am Associate General Counsel for Dunkin' Brands Inc., which is the holding

company of Dunkin' Donuts Franchised Restaurants LLC (successor in interest to Dunkin'

Donuts Incorporated), Dunkin' Donuts Franchising LLC and Baskin-Robbins Franchised Shops

LLC (successor in interest to Baskin-Robbins USA, Co.), and since 1971 I have been employed

by Dunkin' Brands Inc. or its predecessors in interest.

2.      I am fully familiar with the facts herein and am submitting this Certification in

support of Plaintiffs' application for a preliminary injunction.

3.      My responsibilities include overseeing litigation involving Dunkin' Donuts

Franchised Restaurants LLC and Dunkin' Donuts Franchising LLC (collectively and individually

"Dunkin' Donuts") and Baskin-Robbins Franchised Shops LLC ("Baskin-Robbins") and their franchisees throughout the United States, including the instant case brought against Defendants herein.

4.     DB Real Estate Assets I LLC ("DB Realty") is a subsidiary limited liability company of Dunkin' Donuts.

5.     I am knowledgeable about the business of Dunkin' Donuts and Baskin-Robbins (collectively "Franchisors") and DD IP Holder LLC and BR IP Holder LLC, including the resources that they dedicate toward their intellectual property.

6.     This Certification is based upon my personal knowledge and Plaintiffs' books and records.

## PLAINTIFFS' BUSINESS RECORDS

7.     As Associate General Counsel for Dunkin' Brands, I am the custodian of and have access to executed copies of all Dunkin' Donuts and Baskin-Robbins Franchise Agreements, Leases, correspondence, and other related documents and records concerning each Dunkin' Donuts and Baskin-Robbins franchise, including the documents and records relating to the Dunkin' Donuts and Baskin-Robbins franchises operated by Defendants.

8.     The documents submitted with this motion are kept in the regular course of business by Plaintiffs and they have been required to keep these documents.

## DUNKIN' TRADEMARKS, SERVICE MARKS AND PROPRIETARY MARKS

9.     DD IP Holder LLC owns the trademark, service mark and trade name "Dunkin' Donuts," which is registered on the Principal Register of the United States Patent Office, to identify for the public the source of goods and services marketed under its name, as well as

2

related marks.

10.    Dunkin' Donuts has the license to use and to license others to use the Dunkin' Donuts marks and trade name and since approximately 1950 it and its predecessors in interest have used them continuously to identify its doughnut shops and the doughnuts, pastries, coffee and other products associated with those shops.

11.    DD IP Holder LLC owns numerous federal registrations for the mark Dunkin' Donuts and related marks.  Among these registrations are Registration Nos. 2,748,147, 1,148,165 and 1,159,354.  (Exhibit A).  Each of these registrations is in full force and effect and is incontestable pursuant to 15 U.S.C. § 1065.

12.    The Dunkin' Donuts trademarks and trade name are distinctive and famous, have acquired secondary meaning, and are utilized in interstate commerce.

13.    The Dunkin' Donuts marks have been widely advertised and promoted by Dunkin' Donuts over the years.  Over the past 35 years Dunkin' Donuts and its franchisees spent more than $1,500,000,000 on advertising and promoting the Dunkin Donuts marks.  Dunkin' Donuts spent approximately $167,000,000 in fiscal year 2005 alone on advertising and promotion. (Exhibit B).

14.    Dunkin' Donuts and its franchisees currently operate approximately 5,600 units in the United States and 2,000 outside the United States.  Dunkin' Donuts shops feature Dunkin' Donuts distinctive trade dress, including pink and orange color scheme, signage, menu boards, product selection and names, interior design and doughnut cases.  In the more than fifty years since the Dunkin' Donuts System began, hundreds of millions of customers have been served in Dunkin' Donuts shops.

15.     As a result of the extensive sales, advertising and promotion of items identified by the Dunkin' Donuts marks, the public has come to know and recognize the Dunkin' Donuts marks, and to associate them exclusively with the products and services offered by Dunkin' Donuts and its franchisees.  The Dunkin' Donuts marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Dunkin' Donuts and DD IP Holder LLC, representing and embodying Dunkin' Donuts' considerable goodwill and favorable reputation.

## BASKIN TRADEMARKS, SERVICE MARKS AND PROPRIETARY MARKS

16.     BR IP Holder LLC owns the trademark, service mark and trade name "Baskin-Robbins," which is registered on the Principal Register of the United States Patent Office, to identify for the public the source of goods and services marketed under its name, as well as related marks.

17.     Baskin-Robbins has the license to use and to license others to use the Baskin-Robbins marks and trade name and since approximately 1947 it and its predecessors in interest have used them continuously to identify its ice cream shops and the ice cream and other products associated with those stores.

18.     BR IP Holder LLC owns numerous federal registrations for the mark Baskin-Robbins and related marks.  Among these registrations are Registration Nos. 3,124,983, 3,124,982 and 3,035,845.  (Exhibit C).  Each of these registrations is in full force and effect and is incontestable pursuant to 15 U.S.C. § 1065.

19.     The Baskin-Robbins trademarks and trade name are distinctive and famous, have acquired secondary meaning, and are utilized in interstate commerce.

20.    The Baskin-Robbins marks have been widely advertised and promoted by Baskin-Robbins over the years.  As a result, the Baskin-Robbins marks have become famous throughout the United States.

21.    Baskin-Robbins and its franchisees currently operate approximately 2,500 stores in the United States and approximately 3,000 stores outside of the United States.  In the more than fifty-five years since the Baskin-Robbins System began, millions of consumers have been served in Baskin-Robbins stores.

22.    As a result of the extensive sales, advertising and promotion of items identified by the Baskin-Robbins marks, the public has come to know and recognize the Baskin-Robbins marks, and to associate them exclusively with the products and services offered by Baskin-Robbins and its franchisees.  The Baskin-Robbins marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Baskin-Robbins and BR IP Holder LLC, representing and embodying Baskin-Robbins' considerable goodwill and favorable reputation.

## THE FRANCHISE AGREEMENTS

23.    On May 14, 2001, Dunkin' Donuts Incorporated, predecessor in interest of Dunkin' Donuts Franchised Restaurants LLC, Baskin-Robbins USA, Co., predecessor in interest of Baskin-Robbins Franchised Restaurants LLC, and Defendant Ganpati Donuts, Inc. entered into a Franchise Agreement (collectively with any amendments the "Broadway Franchise Agreement").  The Broadway Franchise Agreement (Exhibit D) authorized Defendant to operate a restaurant utilizing the Dunkin' Donuts and Baskin-Robbins Systems at 674 Broadway, Newburgh, New York (the "Broadway Premises").

5

24.     On November 8, 2004, Dunkin' Donuts Incorporated, predecessor in interest of Dunkin' Donuts Franchised Restaurants LLC, and Defendant Shree Ram Donuts, Inc. entered into a Franchise Agreement (collectively with any amendments the "North Plank Road Franchise Agreement").  The North Plank Road Franchise Agreement (Exhibit E) authorized Defendant to operate a restaurant utilizing the Dunkin' Donuts System at 201 North Plank Road, Newburgh, New York (the "North Plank Road Premises").

25.     On November 8, 2004, Dunkin' Donuts Incorporated, predecessor in interest of Dunkin' Donuts Franchised Restaurants LLC, and Defendant Laxmi Donuts, Inc. entered into a Franchise Agreement (collectively with any amendments the "Vails Gate Franchise Agreement").  The Vails Gate Franchise Agreement (Exhibit F) authorized Defendant to operate a restaurant utilizing the Dunkin' Donuts System at 1002 Route 94, Vails Gate, New York (the "Vails Gate Premises").

26.     On November 8, 2004, Dunkin' Donuts Incorporated, predecessor in interest of Dunkin' Donuts Franchised Restaurants LLC, and Defendant Krishna Donuts, Inc. entered into a Franchise Agreement (collectively with any amendments the "Highland Falls Franchise Agreement").  The Highland Falls Franchise Agreement (Exhibit G) authorized Defendant to operate a restaurant utilizing the Dunkin' Donuts System at 184 Main Street, Highland Falls, New York (the "Highland Falls Premises").

27.     On September 14, 1998, Dunkin' Donuts Incorporated, predecessor in interest of Dunkin' Donuts Franchised Restaurants LLC, and Defendant Giatri Donuts Inc. entered into a Franchise Agreement (collectively with any amendments the "Cornwall Franchise Agreement"). The Cornwall Franchise Agreement (Exhibit H) authorized Defendant to operate a restaurant

6

utilizing the Dunkin' Donuts System at 45 Quaker Avenue, Cornwall, New York (the "Cornwall Premises").

28.     On May 17, 2007, Dunkin' Donuts Franchising LLC and Defendant Shreeji Donuts, Inc. entered into a Franchise Agreement (collectively with any amendments the "South Robinson Avenue Franchise Agreement").  The South Robinson Avenue Franchise Agreement (Exhibit I) authorized Defendant to operate a restaurant utilizing the Dunkin' Donuts System at 122-126 South Robinson Avenue, Newburgh, New York (the "Cornwall Premises").

## THE BROADWAY LEASE

29.     On May 14, 2001, Third Dunkin' Donuts Realty, Inc. (predecessor in interest of DB Real Estate Assets I LLC) and Ganpati Donuts, Inc. entered into a Lease (collectively with any amendments the "Broadway Lease").  The Broadway Lease (Exhibit J) authorized Defendant to occupy the Broadway Premises.

## MONETARY OBLIGATIONS UNDER FRANCHISE AGREEMENTS AND LEASE

30.     Pursuant to the Franchise Agreements, Defendants are required to pay franchise fees and advertising fees on a weekly basis.  (Exhibits D, E, F, G, H and I, Contract Data Schedules, ¶ E & F, ¶ 4.3, 4.4).  Defendants are also required to submit sales reports with their payments, because the amount of franchise fees and advertising fees is based upon gross sales. (*Id*. at ¶ 5.2.1).

31.     Pursuant to the Broadway Lease, Defendants are required to pay rent and taxes on the 15th day of the month immediately preceding the month for which the payments are due, and percentage rent equal to 9.25% of all Dunkin' Donuts and Baskin-Robbins sales not later than 15 days after the close of each Lease Month.  (Exhibit J, ¶ 1.8, 3 & 6, First Amendment, ¶ 2).

**THE DEFAULT NOTICES**

32.     On April 1, 2008, pursuant to the Broadway Franchise Agreement and the Broadway Lease, Dunkin' Donuts, Baskin-Robbins and DB Realty sent Defendant Ganpati Donuts, Inc. a Notice to Cure (the "Broadway Notice to Cure") by overnight carrier to the Broadway Premises and to Amish Patel and Ami Patel at 266 Main Street, Cornwall, New York 12518, and by first class mail to the Broadway Premises.  The Broadway Notice to Cure (Exhibit K) demanded that Defendant cure defaults in paying franchise fees, advertising fees, rent, percentage rent, taxes and other charges.  Upon information and belief, on April 2, 2008, Defendant received the Broadway Notice to Cure.  More than fifteen (15) days passed after Defendant received the Broadway Notice to Cure without the defaults having been cured.

33.     On April 1, 2008, pursuant to the North Plank Road Franchise Agreement, Dunkin' Donuts sent Defendant Shree Ram Donuts, Inc. a Notice to Cure (the "North Plank Road Notice to Cure") by overnight carrier to the North Plank Road Premises and to Amish Patel and Ami Patel at 266 Main Street, Cornwall, New York 12518.  The North Plank Road Notice to Cure (Exhibit L) demanded that Defendant cure defaults in paying franchise fees, advertising fees and other charges.  Upon information and belief, on April 2, 2008, Defendant received the North Plank Road Notice to Cure.  More than fifteen (15) days passed after Defendant received the North Plank Road Notice to Cure without the defaults having been cured.

34.     On April 1, 2008, pursuant to the Vails Gate Franchise Agreement, Dunkin' Donuts sent Defendant Laxmi Donuts, Inc. a Notice to Cure (the "Vails Gate Notice to Cure") by overnight carrier to the Vails Gate Premises and to Amish Patel and Ami Patel at 266 Main Street, Cornwall, New York 12518.  The Vails Gate Notice to Cure (Exhibit M) demanded that

Defendant cure defaults in paying franchise fees, advertising fees and other charges.  Upon information and belief, on April 2, 2008, Defendant received the Vails Gate Notice to Cure.  More than fifteen (15) days passed after Defendant received the Vails Gate Notice to Cure without the defaults having been cured.

35.    On April 1, 2008, pursuant to the Highland Falls Franchise Agreement, Dunkin' Donuts sent Defendant Krishna Donuts, Inc. a Notice to Cure (the "Highland Falls Notice to Cure") by overnight carrier to the Highland Falls Premises and to Amish Patel and Ami Patel at 266 Main Street, Cornwall, New York 12518.  The Highland Falls Notice to Cure (Exhibit N) demanded that Defendant cure defaults in paying franchise fees, advertising fees and other charges.  Upon information and belief, on April 2, 2008, Defendant received the Highland Falls Notice to Cure.  More than fifteen (15) days passed after Defendant received the Highland Falls Notice to Cure without the defaults having been cured.

36.    On April 1, 2008, pursuant to the Cornwall Franchise Agreement, Dunkin' Donuts sent Defendant Giatri Donuts Inc. a Notice to Cure (the "Cornwall Notice to Cure") by overnight carrier to the Cornwall Premises and to Amish Patel and Ami Patel at 266 Main Street, Cornwall, New York 12518.  The Cornwall Notice to Cure (Exhibit O) demanded that Defendant cure defaults in paying franchise fees, advertising fees and other charges.  Upon information and belief, on April 2, 2008, Defendant received the Cornwall Notice to Cure.  More than fifteen (15) days passed after Defendant received the Cornwall Notice to Cure without the defaults having been cured.

37.    On April 1, 2008, pursuant to the South Robinson Avenue Franchise Agreement, Dunkin' Donuts sent Defendant Shreeji Donuts, Inc. a Notice to Cure (the "South Robinson

Avenue Notice to Cure") by overnight carrier to the South Robinson Avenue Premises and to

Amish Patel and Ami Patel at 266 Main Street, Cornwall, New York 12518.  The South

Robinson Avenue Notice to Cure (Exhibit P) demanded that Defendant cure defaults in paying

franchise fees, advertising fees and other charges.  Upon information and belief, on April 2,

2008, Defendant received the South Robinson Avenue Notice to Cure.  More than fifteen (15)

days passed after Defendant received the South Robinson Avenue Notice to Cure without the

defaults having been cured.

## TERMINATION OF FRANCHISE AGREEMENTS AND BROADWAY LEASE

38.     On April 28, 2008, pursuant to the Broadway Franchise Agreement and the

Broadway Lease, Dunkin' Donuts, Baskin-Robbins and DB Realty sent Defendant Ganpati

Donuts, Inc. a Notice of Termination (the "Broadway Notice of Termination") by overnight

carrier to the Broadway Premises and to Amish Patel and Ami Patel at 266 Main Street,

Cornwall, New York 12518, and by first class mail to the Broadway Premises.  Upon

information and belief, on April 29, 2008, Defendant received the Broadway Notice of

Termination.  (Exhibit Q).  The Broadway Notice of Termination terminated the Broadway

Franchise Agreement and the Broadway Lease, effective immediately, based upon the failure to

cure the defaults listed in the Broadway Notice to Cure.

39.     On April 28, 2008, pursuant to the North Plank Road Franchise Agreement,

Dunkin' Donuts sent Defendant Shree Ram Donuts, Inc. a Notice of Termination (the "North

Plank Road Notice of Termination") by overnight carrier to the North Plank Road Premises and

to Amish Patel and Ami Patel at 266 Main Street, Cornwall, New York 12518.  Upon

information and belief, on April 29, 2008, Defendant received the North Plank Road Notice of

Termination.  (Exhibit R).  The North Plank Road Notice of Termination terminated the North Plank Road Franchise Agreement, effective immediately, based upon the failure to cure the defaults listed in the North Plank Road Notice to Cure.

40.    On April 28, 2008, pursuant to the Vails Gate Franchise Agreement, Dunkin' Donuts sent Defendant Laxmi Donuts, Inc. a Notice of Termination (the "Vails Gate Notice of Termination") by overnight carrier to the Vails Gate Premises and to Amish Patel and Ami Patel at 266 Main Street, Cornwall, New York 12518.  Upon information and belief, on April 29, 2008, Defendant received the Vails Gate Notice of Termination.  (Exhibit S).  The Vails Gate Notice of Termination terminated the Vails Gate Franchise Agreement, effective immediately, based upon the failure to cure the defaults listed in the Vails Gate Notice to Cure.

41.    On April 28, 2008, pursuant to the Highland Falls Franchise Agreement, Dunkin' Donuts sent Defendant Krishna Donuts, Inc. a Notice of Termination (the "Highland Falls Notice of Termination") by overnight carrier to the Highland Falls Premises and to Amish Patel and Ami Patel at 266 Main Street, Cornwall, New York 12518.  Upon information and belief, on April 29, 2008, Defendant received the Highland Falls Notice of Termination.  (Exhibit T).  The Highland Falls Notice of Termination terminated the Highland Falls Franchise Agreement, effective immediately, based upon the failure to cure the defaults listed in the Highland Falls Notice to Cure.

42.    On April 28, 2008, pursuant to the Cornwall Franchise Agreement, Dunkin' Donuts sent Defendant Giatri Donuts Inc. a Notice of Termination (the "Cornwall Notice of Termination") by overnight carrier to the Cornwall Premises and to Amish Patel and Ami Patel at 266 Main Street, Cornwall, New York 12518.  Upon information and belief, on April 29,

2008, Defendant received the Cornwall Notice of Termination. (Exhibit U). The Cornwall Notice of Termination terminated the Cornwall Franchise Agreement, effective immediately, based upon the failure to cure the defaults listed in the Cornwall Notice to Cure.

43.     On April 28, 2008, pursuant to the South Robinson Avenue Franchise Agreement, Dunkin' Donuts sent Defendant Shreeji Donuts, Inc. a Notice of Termination (the "South Robinson Avenue Notice of Termination") by overnight carrier to the South Robinson Avenue Premises and to Amish Patel and Ami Patel at 266 Main Street, Cornwall, New York 12518. Upon information and belief, on April 29, 2008, Defendant received the South Robinson Avenue Notice of Termination. (Exhibit V). The South Robinson Avenue Notice of Termination terminated the South Robinson Avenue Franchise Agreement, effective immediately, based upon the failure to cure the defaults listed in the South Robinson Avenue Notice to Cure.

## OBLIGATIONS FOLLOWING TERMINATION OF FRANCHISE AGREEMENTS

44.     In the Franchise Agreements Defendants agreed that they would not do or perform, directly or indirectly, any act injurious or prejudicial to the goodwill associated with the Dunkin' Donuts and Baskin-Robbins Proprietary Marks and the Dunkin' Donuts and Baskin-Robbins Systems. (Exhibit D, E, F, G, H and I, ¶ 8.0.1).

45.     The Franchise Agreements also contain acknowledgments and agreements concerning the use of the Dunkin' Donuts and Baskin-Robbins Proprietary Marks or any methods associated with the names "Dunkin' Donuts" and "Baskin-Robbins" (*Id*. at ¶ 9.4, 9.4.2). Defendants agreed that following the termination of their Franchise Agreements, they would not use the names or Proprietary Marks of Dunkin' Donuts and Baskin-Robbins. (*Id*. at ¶ 7.0, 7.1).

12

**RELATIONSHIP OF BROADWAY FRANCHISE AGREEMENT AND LEASE**

46.    Pursuant to the Broadway Franchise Agreement:

The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

(Exhibit D, ¶ 1.1).

47.    The Lease states that the Premises may be used and occupied only for the operation of a Dunkin' Donuts/Baskin-Robbins combo shop.  (Exhibit J, ¶ 1.7, 8).  It further provides that the Lease is subject to the Franchise Agreement remaining in full force and effect and that if the Franchise Agreement is terminated for any reason, then DB Realty shall have the right to terminate the Lease.  (*Id*. at ¶ 14 (a)).

**IRREPARABLE HARM TO PLAINTIFFS**

48.    Upon information and belief, Defendants continue to use the Dunkin' Donuts and Baskin-Robbins names, trademarks and service marks in the operation of their six retail food businesses in Orange County.

49.    Defendants' continued operation of their businesses using the Dunkin' Donuts and Baskin-Robbins trademarks has caused and continues to cause Franchisors to suffer irreparable harm and injury by reason of trademark dilution and damage to their reputation and goodwill. Franchisors no longer have the right to supervise, control or enforce their efforts to maintain high and uniform standards of quality, cleanliness, appearance and service.  Moreover, the public is being misled into believing that Defendants' businesses are or were authorized Dunkin' Donuts and Baskin-Robbins Shops.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on this

5th day of May 2008.

JACK LAUDERMILK

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

DUNKIN' DONUTS FRANCHISED                               :
  RESTAURANTS LLC,
DUNKIN' DONUTS FRANCHISING LLC,                         :
BASKIN-ROBBINS FRANCHISED
  SHOPS LLC                                           :
DD IP HOLDER LLC,
BR IP HOLDER LLC and                                    :
DB REAL ESTATE ASSETS I LLC,
                                           :

                Plaintiffs,

                               : Case No. 08-CV-4218 (WCC)

      v.                                               :

GANPATI DONUTS, INC.,
SHREE RAM DONUTS, INC.,                                 :
LAXMI DONUTS, INC.,
KRISHNA DONUTS, INC.,                                   :
GIATRI DONUTS INC.,
SHREEJI DONUTS, INC.,                                   :
AMISH PATEL and
AMI PATEL,                                              :

                Defendants.                     :

-------------------------------------------------------------X

## CERTIFICATION OF GARY ZULLIG

1.     I am employed by Dunkin' Brands Inc., which is the holding company of Dunkin'

Donuts Franchised Restaurants LLC (successor in interest to Dunkin' Donuts Incorporated),

Dunkin' Donuts Franchising LLC and Baskin-Robbins Franchised Shops LLC (successor in

interest to Baskin-Robbins USA, Co.), and since 1990 I have been employed by Dunkin' Brands

Inc. or its predecessors in interest.

2.     I am fully familiar with the facts herein and am submitting this Certification in

support of Plaintiffs' application for a preliminary injunction.

3.     My responsibilities as a Collections Specialist include credit and collection

matters concerning franchisees of Dunkin' Donuts Franchised Restaurants LLC and Dunkin'

Donuts Franchising LLC (collectively and individually "Dunkin' Donuts") and of Baskin-Robbins Franchised Shops LLC ("Baskin-Robbins") throughout some of the states in the northeastern United States, including the entire state of New York. I am also responsible for credit and collection matters involving subsidiary limited liability companies of Dunkin' Donuts, including DB Real Estate Assets I LLC ("DB Realty").

4.    This Certification is based upon my personal knowledge and Plaintiffs' books and records.

## PLAINTIFFS' FINANCIAL RECORDS OF DEFENDANTS

5.    As a Collections Specialist I work on a daily basis with the financial records and receivables of Dunkin' Donuts and Baskin-Robbins franchisees and am very familiar with them. The Accounts Receivable Status Reports submitted with this Certification are kept in the regular course of business by Dunkin' Donuts and Baskin-Robbins (collectively "Franchisors") and by DB Realty and they have been required to keep these documents.

## OBLIGATIONS UNDER THE FRANCHISE AGREEMENTS AND LEASE

6.    Pursuant to their Franchise Agreements, Defendants are required to pay Franchisors weekly royalty and advertising fees each Thursday for the seven-day period that ended the previous Saturday. Defendants are also required to submit sales reports with their payments, because the amount of royalties and advertising fees is based upon sales. In the ordinary course of business, franchisees report sales information to Franchisors through an electronic payment and reporting system known as FAST. In addition to franchise fees and advertising fees, Defendants are required to pay late charges, bad check charges and collection costs.

2

7.    Pursuant to its Lease (Exhibit J) with DB Realty, Defendant Ganpati Donuts, Inc. is required to pay rent, taxes and percentage rent.  Lease payments are also made electronically through the FAST System.

## MONIES OWED

8.    On April 1, 2008, Defendants owed Franchisors and DB Realty (collectively "Dunkin' Brands") $133,962.  For that reason, I directed our local counsel in New York to send them notices to cure under their Franchise Agreements and the Lease of the Premises occupied by Ganpati Donuts, Inc.  The notices and accounts receivable status reports showing the balance then due and kept in the regular course of business by Dunkin' Brands were sent to Defendants and are annexed hereto as Exhibits K through P.

9.    On April 28, 2008, the amount of money that Defendants had owed Dunkin' Brands four weeks earlier had increased by more than $46,000 to $180,186.  Accounts receivable status reports showing a breakdown of that amount are annexed hereto as Exhibit W.  That day I directed local counsel to send Defendants notices of termination of their Franchise Agreements and the Lease of the Premises occupied by Ganpati Donuts, Inc.  (Exhibits Q-V).

10.    The monies owed Dunkin' Brands on the dates that the notices to cure and the notices of termination were sent to Defendants are as follows:

| Franchisee | 04/01/08 | 04/28/08 |
|---|---|---|
| Ganpati Donuts, Inc. | $ 68,817 | $ 71,322 |
| Shree Ram Donuts, Inc. | 16,192 | 28,169 |
| Laxmi Donuts, Inc. | 24,032 | 36,506 |
| Krishna Donuts, Inc. | 7,165 | 10,952 |
| Giatri Donuts Inc. | 14,265 | 21,618 |
| Shreeji Donuts, Inc. | 3,491 | 11,619 |
| **TOTAL** | **$133,962** | **$180,186** |

11.    On April 29, 2008, Dunkin' Brands received a payment of $7,400 and sales

3

reports for a two-week period from one of Defendants' six franchises.  Meanwhile, over the past week the other five franchises have reported no sales and made no payments and their receivables have increased by more than that amount.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on this __5__ day of May 2008.

_____
**GARY ZULLIG**



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Sat Sep 2 04:19:11 EDT 2006*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST
NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [          ] OR Jump | to record: [          ]  **Record 18 out of 68**

TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | DUNKIN' DONUTS |
| **Goods and Services** | IC 029. US 046. G & S: Fruit-based fillings for doughnuts, cookies, cakes and pies; edible oils and fats; fruit topping; nut topping; shortenings. FIRST USE: 20020228. FIRST USE IN COMMERCE: 20020228 |
| | IC 030. US 046. G & S: Doughnuts and bakery products; coffee; tea; cocoa; sugar; cookies; cakes; pies; muffins; plain, glazed, coated and filled fried cakes; bagels; chocolate-based fillings for cakes and pies; custard-based fillings for cakes and pies; chocolate-based topping; flour; flavoring extracts; confectionery chips for baking; honey; yeast; baking-powder; hot chocolate; hot cocoa. FIRST USE: 20010508. FIRST USE IN COMMERCE: 20010508 |
| | IC 032. US 045 046 048. G & S: fruit drinks and fruit juices; coffee-flavored soft drinks; syrups and other preparations, concentrates and powder, for making soft drinks and fruit drinks. FIRST USE: 20010508. FIRST USE IN COMMERCE: 20010508 |
| | IC 043. US 100 101. G & S: Restaurant and carryout food services. FIRST USE: 20010508. FIRST USE IN COMMERCE: 20010508 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 01.15.05 - Smoke; Steam; Vapor<br>11.03.01 - Champagne glasses; Glasses, champagne; Glasses, wine; Goblets; Stemware (glasses); Wine glasses<br>11.03.03 - Coffee cups and mugs; Cups, coffee mugs; Mugs, coffee; Saucers<br>26.09.21 - Squares that are completely or partially shaded |
| **Serial Number** | 76266480 |

| | |
|---|---|
| **Filing Date** | June 5, 2001 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | August 20, 2002 |
| **Registration Number** | 2748147 |
| **Registration Date** | August 5, 2003 |
| **Owner** | (REGISTRANT) Dunkin' Donuts USA, Inc. CORPORATION MICHIGAN P.O.Box 33006 Detroit MICHIGAN 48232 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Jane E. Bullbrook |
| **Prior Registrations** | 0748901;1148165;1159354;AND OTHERS |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "DONUTS" APART FROM THE MARK AS SHOWN |
| **Description of Mark** | The mark consists of the design of a cup containing a hot beverage. The word "DUNKIN' DONUTS" in design appear on the face of the cup. |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST
NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Sat Sep 2 04:19:11 EDT 2006*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

**Logout** Please logout when you are done to release system resources allocated for you.

**Start** List At: [          ] OR **Jump** to record: [          ] **Record 46 out of 68**

---

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | DUNKIN' DONUTS |
| **Goods and Services** | IC 042. US 100 101. G & S: Restaurant and Carry-Out Food Services. FIRST USE: 19760620. FIRST USE IN COMMERCE: 19760815 |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Design Search Code** | |
| **Serial Number** | 73215289 |
| **Filing Date** | May 11, 1979 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | December 2, 1980 |
| **Registration Number** | 1148165 |
| **Registration Date** | March 3, 1981 |
| **Owner** | (REGISTRANT) Dunkin' Donuts of America, Inc. CORPORATION MASSACHUSETTS Pacella Park Dr. Randolph MASSACHUSETTS 02368 |
| | (LAST LISTED OWNER) DUNKIN' DONUTS USA, INC. CORPORATION BY ASSIGNMENT MICHIGAN 14855 GALLEON DRIVE PLYMOUTH MICHIGAN 48170 |

| | |
|---|---|
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | JANE E. BULLBROOK |
| **Prior Registrations** | 0692491;0988009;AND OTHERS |
| **Disclaimer** | The word "Donuts" is disclaimed apart from the mark as shown. |
| **Description of Mark** | The drawing is lined for the colors orange and pink. |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20010930. |
| **Renewal** | 1ST RENEWAL 20010930 |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Sat Sep 2 04:19:11 EDT 2006*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [ ]  OR  Jump  to record: [ ]  **Record 47 out of 68**

TARR Status  ASSIGN Status  TDR  TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | DUNKIN' DONUTS |
| **Goods and Services** | IC 030. US 046. G & S: Plain, Glazed, Coated and Filled Fried Cakes, Muffins and Coffee for Consumption On or Off the Premises. FIRST USE: 19760620. FIRST USE IN COMMERCE: 19760815 |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Design Search Code** | |
| **Serial Number** | 73214414 |
| **Filing Date** | May 7, 1979 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | April 7, 1981 |
| **Registration Number** | 1159354 |
| **Registration Date** | June 30, 1981 |
| **Owner** | |
| | (REGISTRANT) Dunkin' Donuts of America, Inc. a.k.a. Dunkin' Donuts CORPORATION MASSACHUSETTS Pacella Park Dr. Randolph MASSACHUSETTS 02368 |
| | (LAST LISTED OWNER) DUNKIN DONUTS USA, INC CORPORATION BY ASSIGNMENT |

|  | MICHIGAN 300O TOWN CENTER, SUITE 3000 SOUTHFIELD MICHIGAN 48075 |
|---|---|
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Prior Registrations** | 0715860;0988077;AND OTHERS |
| **Disclaimer** | Applicant claims no exclusive rights in "Donuts" as the name of the goods identified herein. |
| **Description of Mark** | The drawing is lined for the colors orange and pink. |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20010616. |
| **Renewal** | 1ST RENEWAL 20010616 |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | | CURR LIST
NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

## DUNKIN' DONUTS ADVERTISING EXPENDITURES

Source: Audits of Franchise Owners' Advertising and Sales Promotion Fund
(since 1971)

| Year | Direct Fund (Franchisees) | National Ad Fund |
|------|---------------------------|------------------|
| 1971-1989 FY Nov. 1-Oct. 31 | | |
| 1971 | $    913,605. | - |
| 1972 | $ 1,239,600. | - |
| 1973 | $ 1,537,500. | - |
| 1974 | $ 1,555,500. | - |
| 1975 | $ 1,913,900. | - |
| 1976 | $ 2,318,000. | - |
| 1977 | $ 3,148,200. | - |
| 1978 | $ 2,979,500. | $ 1,283,800. |
| 1979 | $ 3,852,300. | $ 2,930,900. |
| 1980 | $ 4,100,300. | $ 2,731,500. |
| 1981 | $ 5,246,200. | $ 3,680,300. |
| 1982 | $ 6,671,800. | $ 8,112,800. |
| 1983 | $ 9,985,400. | $ 9,190,400. |
| 1984 | $ 11,313,800. | $ 7,806,000. |
| 1985 | $ 13,924,500. | $ 7,010,600. |
| 1986 | $ 19,137,200. | $ 5,392,300. |
| 1987 | $ 23,457,900. | $ 3,375,400. |
| 1988 | $ 26,694,400. | $ 3,656,700. |
| 1989 | $ 24,731,200. | $ 6,005,700. |
| 1990 - 16 mos. (Oct. 28, 1989 - Feb. 23, 1991) | $ 34,671,100. | $ 8,990,900. |

| | | |
|---|---|---|
| 1997 | $ 60,623,402 | $ 13,600,318 |
| 1998 | $ 67,519,361 | $ 14,764,528 |
| 1999 | $ 72,019,035 | $ 13,981,813 |
| 2000 | $ 78,315,903 | $ 15,221,716 |
| TOTAL: | $ 698,447,871 | $ 175,221,716 |

5222_1.WPD

Trademark Electronic Search System (TESS)                                    Page 1 of 2

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Sat Sep 2 04:19:11 EDT 2006*



Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [        ]  OR  Jump  to record: [        ]  **Record 1 out of 21**

TARR Status    ASSIGN Status    TDR    TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | BASKIN 31 ROBBINS |
| **Goods and Services** | IC 030. US 046. G & S: Puddings. FIRST USE: 20050500. FIRST USE IN COMMERCE: 20050500 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 26.01.02 - Circles, plain single line; Plain single line circles<br>26.01.03 - Circles, incomplete (more than semi-circles); Incomplete circles (more than semi-circles) |
| **Serial Number** | 78977099 |
| **Filing Date** | October 28, 2004 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | October 4, 2005 |
| **Registration Number** | 3124983 |
| **Registration Date** | August 1, 2006 |
| **Owner** | (REGISTRANT) BR IP HOLDER LLC LTD LIAB CO DELAWARE 130 Royall Street Canton MASSACHUSETTS 02021 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |

| Attorney of Record | Byron R. Jacobson |
|---|---|
| Prior Registrations | 1185045;1783116;2786526 |
| Description of Mark | The color(s) Blue and Pink is/are claimed as a feature of the mark. The wording BASKIN ROBBINS appears in blue, while the number 31 and the circle design surrounding it are in pink. |
| Type of Mark | TRADEMARK |
| Register | PRINCIPAL |
| Live/Dead Indicator | LIVE |

TESS HOME   NEW USER   STRUCTURED   FREE FORM   Browse Dict   SEARCH OG   TOP   HELP   CURR LIST

PREV LIST   FIRST DOC   PREV DOC   NEXT DOC   LAST DOC

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Trademark Electronic Search System (TESS)                                    Page 1 of 2

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Sat Sep 2 04:19:11 EDT 2006*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
|---|---|---|---|---|---|---|---|---|---|
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC | | | | | |

Logout   Please logout when you are done to release system resources allocated for you.

Start   List At: [        ]   OR   Jump   to record: [        ]   **Record 2 out of 21**

---

TARR Status   ASSIGN Status   TDR   TTAB Status   *( Use the "Back" button of the Internet Browser to return to TESS)*

# Baskin(31)Robbins

| | |
|---|---|
| **Word Mark** | BASKIN 31 ROBBINS |
| **Goods and Services** | IC 030. US 046. G & S: Puddings. FIRST USE: 20050500. FIRST USE IN COMMERCE: 20050500 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 26.01.02 - Circles, plain single line; Plain single line circles<br>26.01.03 - Circles, incomplete (more than semi-circles); Incomplete circles (more than semi-circles) |
| **Serial Number** | 78977098 |
| **Filing Date** | October 28, 2004 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | October 4, 2005 |
| **Registration Number** | 3124982 |
| **Registration Date** | August 1, 2006 |
| **Owner** | (REGISTRANT) BR IP HOLDER LLC LTD LIAB CO DELAWARE 130 Royall Street Canton MASSACHUSETTS 02021 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Byron R. Jacobson |
| **Prior Registrations** | 1185045;1783116;2786526;AND OTHERS |
| **Type of Mark** | TRADEMARK |

| Register | PRINCIPAL |
|---|---|
| **Live/Dead Indicator** | LIVE |



|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Trademark Electronic Search System (TESS)                                    Page 1 of 2

 **United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Sat Sep 2 04:19:11 EDT 2006*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: [      ]  OR  Jump  to record: [      ]   **Record 3 out of 21**

TARR Status   ASSIGN Status   TDR   TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*

# Baskin (31) Robbins

| | |
|---|---|
| **Word Mark** | BASKIN 31 ROBBINS |
| **Goods and Services** | IC 025. US 022 039. G & S: Shirts, jackets and aprons. FIRST USE: 19910101. FIRST USE IN COMMERCE: 19910101 |
| | IC 029. US 046. G & S: Fruit toppings for use on ice cream for consumption on or off the premises. FIRST USE: 19910101. FIRST USE IN COMMERCE: 19910101 |
| | IC 030. US 046. G & S: Ice cream, low fat frozen dairy desserts, frozen yogurt, flavored topping syrups for use on ice cream, cakes, pies, candy, sherbets, for consumption on or off the premises, and food flavorings for use in making ice cream. FIRST USE: 19910101. FIRST USE IN COMMERCE: 19910101 |
| | IC 035. US 100 101 102. G & S: Offering technical assistance in the establishment and/or operation of ice cream stores or other food establishments and/or restaurants, and promoting the goods and services of others by conducting a recipe contest. FIRST USE: 20021202. FIRST USE IN COMMERCE: 20021202 |
| | IC 043. US 100 101. G & S: Restaurants featuring ice cream. FIRST USE: 19910101. FIRST USE IN COMMERCE: 19910101 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 26.01.03 - Circles, incomplete (more than semi-circles); Incomplete circles (more than semi-circles) 26.01.06 - Circles, semi; Semi-circles; Semi-circles |
| **Serial Number** | 78564330 |

| | |
|---|---|
| **Filing Date** | February 10, 2005 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | October 4, 2005 |
| **Registration Number** | 3035845 |
| **Registration Date** | December 27, 2005 |
| **Owner** | (REGISTRANT) Baskin-Robbins Incorporated CORPORATION DELAWARE 130 Royall Street Canton MASSACHUSETTS 020211010 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Byron R. Jacobson |
| **Prior Registrations** | 1371672;1783116;2282002;2786526;AND OTHERS |
| **Description of Mark** | The color(s) Blue and Pink is/are claimed as a feature of the mark. The wording BASKIN ROBBINS appears in blue, while the number 31 and the circle design surrounding it are in pink. |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST
NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

# FRANCHISE AGREEMENT
## ALLIED DOMECQ QUICK SERVICE RESTAURANTS

This Franchise Agreement is dated **MAY 14**_____, 2001, and made by and between **BASKIN-ROBBINS USA, CO.** (hereinafter "BASKIN-ROBBINS"), a California corporation, and **DUNKIN' DONUTS INCORPORATED** (hereinafter "DUNKIN' DONUTS"), a Delaware corporation, both with principal offices in Randolph, Massachusetts (such corporations are hereinafter individually or collectively referred to as "FRANCHISOR") and the following individual(s) and/or entity:

**GANPATI DONUTS, INC.**, a New York corporation
(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("ADQSR112099") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

## CONTRACT DATA SCHEDULE

A.    Location of the Franchised Unit (the "Premises"):

| 674 | Broadway | Newburgh | New York | 12550 |
|---|---|---|---|---|
| (number) | (street) | (city or town) | (state) | (zip code) |

B.    Term:......................................................In the case of the existing unit, until **December 31, 2020**.

C.    Baskin-Robbins Initial Franchise Fee: Ten Thousand _____ dollars ($ 10,000.00 )
       EBO Renewal Fees: Twenty-Two Thousand Five Hundred ___ dollars ($ 22,500.00 )

D.    Grand Opening Fee**: Four Thousand _____ dollars ($ 4,000.00 )
       **Pursuant to the Offer Letter dated October 31, 2000

E.    Continuing Franchise Fee Rate:    Five _____percent (5.0%) of Gross Sales

F.    Minimum Continuing Advertising Fee Rate: Five _____ _____percent (5.0%) of Gross Sales

G.    Refurbishment Date:........................In the case of an existing unit **five (5) years and fifteen (15) years** after the date the Unit re-opens to serve the general public.

       Remodel Date:...............................................In the case of an existing unit, the date **ten (10) years** after the first date the Unit re-opens to serve the general public.

H.    Transfer Fee:  As provided in subsection 10.4 of the General Terms and Conditions, unless another amount is inserted here: _____ No Change _____

I.    Address for notice to FRANCHISEE shall be at the Unit Premises, unless another address is inserted here: _____

J.    Special Terms and Conditions:

       [X] Special Terms and Conditions Applicable to a Baskin-Robbins Franchise

       [X] Special Terms and Conditions Applicable to a Dunkin' Donuts Franchise

       [X] Additional Provisions for a Dunkin' Donuts Manufacturing Retail Unit (A Full Producing Unit)

       [X] Addendum to the ADQSR Franchise and Store Development Agreement Required by the New York General Business Law

       [X] Special Terms and Conditions Applicable to a Promissory Note

K.    The Designated Representative for this Unit is  *AMISH PATEL*
                                                                    [print full name above]

L.    Arbitration under this Agreement shall be initiated in the city and state of New York, New York

M.    If applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit located at _____ N/A _____
       (insert address if this Unit is a Dunkin' Donuts non-producing unit; otherwise insert "not applicable").

Form last revised 10/02/99
Allied Domecq QSR corporations are EOE and AA Employers
(Franchisees are not employees)

ADQSR-112099

# ALLIED-DOMECQ QUICK SERVICE RESTAURANTS
## FRANCHISE AGREEMENT
© November 1999

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

**Baskin-Robbins USA Co.,** a California corporation ("BASKIN-ROBBINS"), **Dunkin' Donuts Incorporated,** a Delaware corporation ("DUNKIN' DONUTS") and **Togo's Eateries Inc.,** a California corporation ("TOGO'S") are indirect wholly-owned subsidiaries of Allied Domecq PLC, a publicly-traded United Kingdom company. To take advantage of synergies between them, the three subsidiaries share certain common field and support personnel and form an unincorporated division called "Allied Domecq Quick Service Restaurants". As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins*® ice cream, yogurt and novelties, *Dunkin' Donuts*® donuts, coffee and freshly baked goods, *Togo's*® fresh sandwiches, salads and deli platters, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.      The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, *Dunkin' Donuts*® owned or controlled by DUNKIN' DONUTS, *Baskin 31 Robbins*® owned or controlled by Baskin-Robbins Incorporated ("BRI"), and *TOGO'S*® and *TOGO'S EATERIES*® owned or controlled by TOGO'S, all of which are registered trademarks on the Principal Register of the United States Patent Office.

B.      "FRANCHISOR" refers to Dunkin' Donuts Incorporated with respect to the Dunkin' Donuts System, Baskin-Robbins USA, Co., with respect to the Baskin-Robbins System and Togo's Eateries, Inc. with respect to the Togo's System.

C.      "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.      The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.      The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.      The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.      "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.      The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

I.      The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System. Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit; specifications for the facility, equipment and products; business processes and techniques for the operation of the Unit; and guidelines and standards for quality, cleanliness, appearance and service.
*General Terms and Conditions*

## Section 1. Grant of the Franchise and Term

1.0    This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise"). The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule; provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1    **Training.** FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR. This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2    **Financing.** Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3    **Documents.** FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4    **Payment.** FRANCHISEE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5    **Possession.** FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6    **For a New Unit.** If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1    The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2    FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2. Services Furnished by FRANCHISOR

2.0    FRANCHISOR agrees:

2.1    **Prior to and For the Initial Opening of the Unit.**

2.1.1    FRANCHISOR shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2    FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3    FRANCHISOR shall provide its current operating procedures to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

2.1.4    FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

2.2    **After the Initial Opening of the Unit.**

2.2.1    FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

2.2.2    FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

*General Terms and Conditions*

2.2.3   FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

2.2.4   FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

## Section 3. Advertising and Promotion

3.0    FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System. FRANCHISEE's payments to the Fund(s) shall be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing. The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR. FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any. Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISEE contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

3.1    FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval. If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISOR, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

3.2    FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services for order through the mail or by any electronic or other medium. FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services. Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use. FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

3.3    Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

## Section 4. Payments

4.0    FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

4.1.   **Initial Franchise Fee.** - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

4.2    **Grand Opening Fee.** - FRANCHISEE shall pay a Grand Opening Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a grand opening promotional advertising program or such other advertising program as FRANCHISOR may specify. Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

4.3    **Continuing Franchise Fees** - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

4.4.   **Continuing Advertising Fee.** FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1   In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are

*General Terms and Conditions*

supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2    If FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5    If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6    FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank. Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR. If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1    FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability. FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account; (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE's bank rejects FRANCHISOR's EFT request because of insufficient funds; and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2    For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported. This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR. To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required. In FRANCHISOR's discretion or due to system failure, FRANNCHISOR may elect to withdraw the electronic form. In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

4.7    **Late Fees, Interest and Costs.**  If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have. Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR. FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks. At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.

## Section 5. Covenants of FRANCHISEE

5.0    FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons. FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1    If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

5.0.2    FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time. Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe. Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person. FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date. In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3    FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit

5.1    **Unit Operations.** - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day

*General Terms and Conditions*

permitted by law, on all days except Christmas and Thanksgiving, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing. In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1    FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR. All such items must conform to FRANCHISOR's Standards. FRANCHISOR reserves the right to specify any item by brand. FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2    FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards. Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products. For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3    FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit. FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR. FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit; and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit. FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit. FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4    FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5    FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR. Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier. FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use. FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year. This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6    FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7    FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

5.1.7.1    FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below, and to furnish to FRANCHISOR within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications. If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8    FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program. Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers. If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1    In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2    FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures. FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment. FRANCHISEE shall ensure that all employees whose duties include customer service have

*General Terms and Conditions*

sufficient literacy and fluency in the English language to adequately serve the public in the Unit. FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require. The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE. FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9    FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft. FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2    **Books, Records and Reports.**  FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR. Commencing upon the opening of the Unit:

5.2.1    FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and  (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years. FRANCHISOR shall have the right, in its sole discretion, to require that such annual financial statements be certified by an independent certified public accountant or such other independent public accountant acceptable to FRANCHISOR.

5.2.4    FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5    FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:
  a.  daily cash reports;
  b.  cash receipts journal and general ledger;
  c.  cash disbursements journal and weekly payroll register;
  d.  monthly bank statements, and daily deposit slips and canceled checks;
  e.  all business tax returns;
  f.  suppliers invoices (paid and unpaid);
  g.  dated cash register tapes (detailed and summary);
  h.  semi-annual balance sheets and monthly profit and loss statements;
  i.  weekly inventories;
  j.  records of promotion & coupon redemptions;
  k.  such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6    **Retail Information System**  FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

*General Terms and Conditions*

5.2.6.1 FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2 FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3 FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7    FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3    **Insurance.** FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, and their directors and employees, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1    Such policy or policies shall include:

5.3.1.1    commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with an aggregate single limit of two million dollars ($2,000,000.00) or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2    "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

5.3.1.3    plate glass insurance and, if applicable, boiler insurance; and

5.3.1.4    employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.2    All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR; (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named; (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3    During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid. If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums therefor. Maintenance of insurance and FRANCHISEE's performance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.    Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage. FRANCHISEE shall, upon obtaining the polices of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4    **Indemnification.** FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, and each of them, and the subsidiaries or each of them, and their respective officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any

*General Terms and Conditions*

provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation of or defense against any and all such claims.

5.5    **Refurbishment & Remodel of the Premises.** FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5. Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards. FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1    No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards. It is intended that the cost of the initial refurbishment shall not exceed $10,000.00 and that subsequent refurbishments shall not exceed $10,000.00 increased by the same percentage as the increase in the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the period from the Refurbishment Date to the date of subsequent refurbishment. The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition. The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2    No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment). The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3    FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6    **Cross-Guarantee.** In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s). Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party. FRANCHISEE's liability under this paragraph shall be limited to the extent that the total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7    **FRANCHISEE Entity.** FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC"). FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1    **Corporation.** If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is authorized to operate the Unit as provided under this Agreement; (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2    **LLC.** If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that its activities are limited to operating the Unit as provided under this Agreement; (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

## Section 6. Certain Rights of FRANCHISOR

6.0    In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or

*General Terms and Conditions*

without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s). During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1     If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1     FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2     FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3     FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation. If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

6.2     In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit. If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRANCHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales. If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate. FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees. Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3     In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit. Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that exclusion (c) therein does not apply. Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4     FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5     If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises. Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

### Section 7. Proprietary Marks

*General Terms and Conditions*

7.0     FRANCHISOR has, in connection with its business and the business of its franchisees, developed and used and continues to use and control the usage of Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts®**, owned by Dunkin' Donuts Incorporated, **Baskin 31 Robbins®**, owned by Baskin-Robbins Incorporated, and **TOGO'S®** and **TOGO'S EATERIES®**, owned by Togo's Eateries, Inc., all of which are registered as trademarks on the Principal Register of the United States Patent Office. FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1     FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE shall not sublicense the Proprietary Marks. FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1     FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement. FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE. FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

7.2     FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks. FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.3     FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts. Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4     FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISEE, be necessary to carry out such defense or prosecution.

## Section 8. Restrictions on FRANCHISEE's Activities

8.0     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1     Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2     Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3     Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute.

8.1     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business. Any and all information, knowledge, and know-how including, without limitation,

*General Terms and Conditions*

drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement. FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchisees licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2     The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3     FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

## Section 9.  Default

9.0     FRANCHISEE shall be in default under this Agreement:

9.0.1   If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2   If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3   If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4   If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5   If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

9.1     **Thirty Day Cure Period.** Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof. Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1   **Seven Day Cure Period.** A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2   **24 Hour Cure Period.** A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety;  or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3   **Cure on Demand.** FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4   **No Cure Period.** No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder. In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2     **Statutory Cure Period.** If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3     **Late Fees, Interest and Costs.** If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees,

*General Terms and Conditions*

collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination. All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4    **Termination.**  If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement.  Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR.  Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination.  Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

9.4.1    FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE; and

9.4.2    FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and

9.4.3    FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

9.4.4    FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law; and

9.4.5    FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) and return to FRANCHISOR, all of the Proprietary Marks or other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks.  Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks.  FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph; and

9.4.6.    FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings). If FRANCHISEE owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE.  All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE.  Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts; and

9.4.7    FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISEE within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises.  If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that change.  In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand; and

9.4.8    FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9; and

9.4.9    FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein.  If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress; and shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with FRANCHISOR whether or not constituting unfair competition.

*General Terms and Conditions*

9.5     Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, injunctive relief; No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder. FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

9.6     Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof. In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISOR shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

## Section 10.   Transfer Provisions

10.0     **Transfer By FRANCHISOR.**  This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively.  FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect.  Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1     If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand. FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof.  If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1     **Transfer By FRANCHISEE.**  FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE.  Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same.  Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder.  Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2     **Consent By FRANCHISOR.**  FRANCHISOR shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided that:

10.2.1     FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2     The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors. This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3     The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR.  Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable.  FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee; and

10.2.4     The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3     **Transfer Requirements.**  Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1     Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

*General Terms and Conditions*

10.3.2  Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3  FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity. Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4  Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5  If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6  The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable.  The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority.  The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s).  Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement.  The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7  FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each; and

10.3.8  In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4    **Transfer Fee.**  The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1  **Prior to FRANCHISEE's Fourth Year of Operations.**  The transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of:  (i) five thousand dollars ($5,000.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR;  or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1  The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR.  No adjustment shall be made for amounts paid in connection with the development of a new unit. The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description:  furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE.  It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2  For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business.  If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.2    **From and After FRANCHISEE's Fourth Year of Operations.**  If the transfer takes place after the commencement of FRANCHISEE's fourth year of operations, the transferor shall pay to FRANCHISOR the Transfer Fee indicated below based on the Unit's Gross Sales for the most recently completed twelve (12) calendar month period preceding the date of the contract of sale.  FRANCHISOR reserves the right to select another period or to make appropriate adjustments to such Gross Sales in the event extraordinary occurrences (e.g., road construction, fire or other casualty, etc.) materially affected Unit sales during the indicated twelve (12) month period.

| Sales for Most Recent 12 Month Period | Transfer Fee |
| --- | --- |
| Less than $400,000.00 | $5,000.00 |
| $400,000.00 or more, but less than $600,000.00 | $6,000.00 |
| $600,000.00 or more, but less than $1,000,000.00 | $8,000.00 |
| $1,000,000.00 or more, but less than $1,400,000.00 | $12,000.00 |
| $1,400,000.00 or more | $20,000.00 |

10.4.3  If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

*General Terms and Conditions*

10.4.4   <u>Transfer of Less Than Control.</u>  For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period.  FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.5   <u>Transfer to Spouse or Children.</u>  Notwithstanding anything else contained in this subsection 10.4, but provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above.  The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5   <u>Release of Transferor.</u>  Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6   <u>Transfer on Death, Disability or Incapacity.</u>  In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify.  Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement.  A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1   If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest shall have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR.  FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld.  FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2   If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time.   Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice-to cure.

10.6.3   FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6.  If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such interest.  FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7   <u>Right of First Refusal.</u>  If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer.  FRANCHISOR shall have the right and option, exercisable within forty-five (45) days after its receipt of said copy, to purchase FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party.  FRANCHISOR's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR.  Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have forty-five (45) days to exercise its right to purchase on the altered terms.  Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

<h2 style="text-align:center">Section 11.  Arbitration.</h2>

11.0   Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein modified.  This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any

*General Terms and Conditions*

state or federal statute. As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto. The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1    **Eligibility and Procedures.** Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted. Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances. Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement. If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply. The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue. Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims. The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2    **Enforceability and Effect.** Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3    **Governing Law.** The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought. Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4    **Exceptions to Arbitration.** Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time. In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5    **FRANCHISOR's Exceptions.** FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint in any court of competent jurisdiction:

11.5.1   the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2   any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

11.5.3   any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

11.5.4   any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1); or

11.5.5   any action in ejectment or for possession of any interest in real or personal property.

11.6    **FRANCHISEE's Exceptions.** FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

11.6.1   In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7    **Waiver of Rights.** THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1 The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2.   The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law; and

11.7.3   The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4   The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5   ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8   **No Class Actions.** No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9   **Post-Term Applicability.** The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

## Miscellaneous Provisions.

12.0   **Relationship of the Parties.** This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its affiliated corporation for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR or its affiliated corporation or to create any obligation, express or implied, on behalf of FRANCHISOR or its affiliated corporation. The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated corporation and FRANCHISEE.

12.1   Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party. Each party shall indemnify, protect, defend and save the other party harmless against any such claim. The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

13.0   **Non-Waiver.** Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement. Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE. Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0   **Notices.** All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to Allied Domecq Retailing USA, at Post Office Box 317, 14 Pacella Park Drive, Randolph, Massachusetts 02368, Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE.

15.0   **Entire Agreement.** This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement. The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto. In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0   **Severability.** Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any

*General Terms and Conditions*

existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.**  This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.**    THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS.   FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY. FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".

*General Terms and Conditions*

ALLIED DOMECQ-QSR
RIDER TO FRANCHISE AGREEMENT

PC 300392
**SCHEDULE "BR"**
110100

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
### BASKIN-ROBBINS FRANCHISE

In connection with its business and the business of its Baskin-Robbins franchisees, BASKIN-ROBBINS has developed, used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including, without limitation, *Baskin 31 Robbins®*, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of the Baskin-Robbins System and Proprietary Marks, desires to make use of the trademark *Baskin 31 Robbins®*, and to enjoy the benefits of that mark, the other Proprietary Marks and the Baskin-Robbins System. FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Baskin-Robbins System and the necessity of opening and operating FRANCHISEE's Baskin-Robbins Unit in conformity with the Baskin-Robbins System and in accordance with FRANCHISOR's Standards and specifications.

### DEFINITIONS

As used in these Special Terms and Conditions applicable to a Baskin-Robbins Franchise, the following defined terms shall have the following meanings:

A.  The "Baskin-Robbins Unit" is all or a portion of the Premises dedicated to the operation of the Baskin-Robbins System, as approved by FRANCHISOR.

B.  "Baskin-Robbins Products" mean and refer to ice cream, ice milk, sherbets, water ices, yogurts, frozen desserts, syrups, toppings, confections, novelties, food, beverages and fountain ingredients, all of a variety of kinds or flavors, made in accordance with the formulas or specifications designated by BASKIN-ROBBINS and identified by the Baskin-Robbins Proprietary Marks.

C.  "Associated BR Products" mean and refer to such other products and supplies as may be specified from time to time in writing by FRANCHISOR for sale in the Baskin-Robbins Unit.

### Section BR-1.  Grant Of The Franchise

1.0   BASKIN-ROBBINS grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate an ice cream and yogurt store utilizing the Baskin-Robbins System in accordance with the terms, covenants and conditions of this Agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this Agreement (hereinafter called the "Baskin-Robbins Unit").  In connection therewith, this Franchise includes the right to use at the Baskin-Robbins Unit only, the trademark *Baskin 31 Robbins®*, along with other Proprietary Marks owned by BRI and utilized by BASKIN-ROBBINS in connection with other Baskin-Robbins units, and the right to use at the Unit only, the Baskin-Robbins System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Baskin-Robbins franchisees.

### Section BR-2.  Scope Of The Franchise

2.0   This Baskin-Robbins Franchise is specific to one location only, for the term of this Agreement.  It grants no rights outside the Premises, nor includes any territorial protection against competition. FRANCHISOR reserves and retains the right to operate or permit others to operate Baskin-Robbins units or to sell or distribute Baskin-Robbins Products and/or services or to otherwise use the Baskin-Robbins Proprietary Marks and/or the Baskin-Robbins System, in each case at any other location. FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Baskin-Robbins Unit using the same or different brand(s).

2.2.4  Baskin-Robbins Products will be supplied to FRANCHISEE by BASKIN-ROBBINS, or one or more suppliers approved by BASKIN-ROBBINS.

### Section BR-3.  Advertising and Promotion

3.0   FRANCHISOR shall prepare and coordinate a "Grand Opening" promotional advertising program (or such other advertising program as FRANCHISOR may specify) for the initial opening of the Baskin-Robbins Unit.

3.1   FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Baskin-Robbins Unit; and

3.3.1    FRANCHISOR shall administer The Baskin-Robbins Advertising and Sales Promotion Fund (the "Baskin-Robbins Fund") and shall oversee all Baskin-Robbins System and product marketing, advertising and promotion, with sole discretion to approve or disapprove the creative concepts, materials and media used in the same, and the placement and allocation thereof.  That portion of FRANCHISEE's payments under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Baskin-Robbins Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Baskin-Robbins Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of BASKIN-ROBBINS and the Baskin-Robbins System.  The balance, including any interest earned by the Baskin-Robbins Fund, will be used for advertising and related expenses.  Contributions to the Baskin-Robbins Fund in excess of the percentage of Gross Sales of the Baskin-Robbins Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

3.3.2    In addition to its other obligations under this Section BR-3, FRANCHISEE shall participate in all sales promotion programs as required from time to time by FRANCHISOR.  Without limiting the foregoing, FRANCHISEE must redeem, for products, gift certificates distributed by FRANCHISOR, including, without limitation, unexpired gift certificates issued by any previous franchisee operating a Baskin-Robbins Unit at the Premises.  FRANCHISEE will be reimbursed or credited for the cost of products by FRANCHISOR upon its receipt of redeemed gift certificates.  However, FRANCHISEE may, at its discretion, redeem other coupons issued by FRANCHISOR for which FRANCHISEE is not reimbursed or credited.  All coupons or other promotions in which FRANCHISEE participates shall bear the expiration date thereof.

3.3.3    FRANCHISOR may, from time to time in its sole discretion, initiate one or more mandatory Maximum Price Promotional Campaigns for products or services designated by FRANCHISOR.   A material aspect of these campaigns will be FRANCHISOR's right to establish the maximum price that FRANCHISEE can charge customers for the designated product(s) or service(s) during the promotional period.   FRANCHISEE agrees to participate in each such campaign and, for the duration of the promotional period, FRANCHISEE will charge customers no more than the maximum price established by FRANCHISOR for the designated product(s) and/or service(s).  FRANCHISEE retains the right to charge customers less than any maximum retail price FRANCHISOR may establish.

## Section BR-4.  Payments

4.4    FRANCHISEE shall make payments to the Baskin-Robbins Fund as set forth in paragraph 4.4 of the General Terms and Conditions.  FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Baskin Robbins units included in the base for purposes of determining "two-thirds" support.

## Section BR-5.  Covenants of FRANCHISEE

5.0    FRANCHISEE understands and acknowledges that every detail of the Baskin-Robbins System is important to BASKIN-ROBBINS, to FRANCHISEE and to other Baskin-Robbins franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Baskin-Robbins Products and protect and enhance the reputation and goodwill of BASKIN-ROBBINS.

5.1.4    FRANCHISOR or its designee shall not be liable to FRANCHISEE, or be deemed in breach or default of any obligation contained in this Agreement, for any delay or failure of delivery for any cause beyond its reasonable control, including, without limitation, difficulties of supply occasioned by war, law, weather conditions, acts of God, regulations or order of public authority, labor troubles or shortages of materials.  If BASKIN-ROBBINS or its designee shall not be able to supply the full requirements of all Baskin-Robbins Units, FRANCHISOR or its designee shall endeavor to apportion available Baskin-Robbins Products and Associated BR Products equitably among them.

5.1.5.1    FRANCHISEE agrees to purchase from BASKIN-ROBBINS or its designee, and BASKIN-ROBBINS or its designee agrees to supply to FRANCHISEE, all of the Baskin-Robbins Unit's requirements for the Baskin-Robbins Products specified by FRANCHISOR from time to time in the Standards, at BASKIN-ROBBINS' or its designee's prices at the time of delivery.  Such Baskin-Robbins Products will be of the variety of kinds and flavors which from time to time are selected by FRANCHISOR for supply to Baskin-Robbins franchisees.  FRANCHISOR or its designee may change, at any time and from time to time without prior notice, its prices for the sale and delivery of any Baskin-Robbins Products.

5.1.5.2    FRANCHISEE agrees to place its orders with FRANCHISOR or its designee for Baskin-Robbins Products to be supplied by BASKIN-ROBBINS or its designee at such times and in such manner as from time to time prescribed by FRANCHISOR.  FRANCHISOR or its designee agrees to deliver such orders to FRANCHISEE in accordance with regular route schedules and times of delivery established by FRANCHISOR or its designee from time to time, including during non-business hours of FRANCHISEE, in its sole discretion.  FRANCHISEE agrees upon receipt of notice of the scheduled delivery time, to provide FRANCHISOR or its designee with a means of access to the Unit's frozen storage facility for the purpose of such delivery, by providing FRANCHISOR or its designee with a key to the Unit, or by having an agent present to open the Unit, or by other appropriate arrangements made with FRANCHISOR or its designee.  FRANCHISEE will also provide adequate freezer and other storage space to permit delivery of Associated BR Products required by FRANCHISOR in connection with the Baskin-Robbins Franchise.  FRANCHISEE acknowledges that late orders by FRANCHISEE cause additional administrative expenses to FRANCHISOR or its designee.  FRANCHISEE agrees that FRANCHISOR or its designee may, in its discretion, refuse to process a late order or impose a reasonable late charge or additional delivery expense charge, and add such charge to the next invoice payable by FRANCHISEE.

5.1.5.3    FRANCHISEE agrees to pay for all Baskin-Robbins Products which it purchases from BASKIN-ROBBINS or its designee on such terms and conditions as BASKIN-ROBBINS or its designee may from time to time specify. Should FRANCHISEE fail to make timely payment, FRANCHISOR shall have the right, upon notice to FRANCHISEE, to require cash or cash equivalent on or in advance of delivery.

5.1.5.4    In the event of a default by FRANCHISEE in its payment obligations under this Agreement, or in payment of rent under the Lease, if applicable, FRANCHISOR or its designee shall have the right, in addition to any other remedies, without notice, to discontinue the sale or delivery of any Baskin-Robbins Products to the Unit and to any other Baskin-Robbins unit in which FRANCHISEE or any of its shareholders, members or partners has an interest, until the next regularly scheduled delivery date following the date on which FRANCHISOR or its designee has received payment in full of all of FRANCHISEE's outstanding invoices for Baskin-Robbins Products, rent and any other payment(s) due under this Agreement or the Lease, if applicable.

5.1.5.5    FRANCHISEE acknowledges and agrees that BASKIN-ROBBINS or its designee has the exclusive right to supply FRANCHISEE Baskin-Robbins Products.

5.1.5.6    FRANCHISEE shall purchase all Associated BR Products used or offered for sale by the Baskin-Robbins Unit solely from suppliers, manufacturers, distributors, and other sources who are currently approved by FRANCHISOR.

## Section BR-7.  Proprietary Marks

7.0    BASKIN-ROBBINS is a wholly-owned subsidiary of Baskin-Robbins Incorporated, a Delaware corporation ("BRI").  BASKIN-ROBBINS has been licensed by BRI to use the Proprietary Marks in conjunction with the granting of franchises for the operation of Baskin-Robbins units on terms and conditions which have been approved by BRI.  If FRANCHISOR's license from BRI shall expire or for any reason be terminated, BRI or its nominee shall succeed to all of the rights and assume all of the duties of FRANCHISOR under this Agreement.

7.0.1    FRANCHISEE acknowledges and agrees that *Baskin 31 Robbins*® is a registered trademark owned by BRI, that said mark has been and is being used by BASKIN-ROBBINS under license from BRI, and by other franchisees and licensees of BASKIN-ROBBINS; that said mark, together with the other Proprietary Marks presently owned by BRI and/or BASKIN-ROBBINS or which may be acquired in the future by either of them, constitute part of the Baskin-Robbins System; that valuable goodwill is associated with and attached to said mark and the other Baskin-Robbins Proprietary Marks; and that any and all goodwill associated with the Baskin-Robbins Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of BRI.

7.5    FRANCHISEE shall operate, advertise, and promote the Baskin-Robbins Unit under the name "Baskin-Robbins," with no accompanying words or symbols of any nature except as may be otherwise required by law or designated by FRANCHISOR.  FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Baskin-Robbins", "Baskin" or "Robbins", or any form or variations thereof, including, but not limited to, "B.R.," which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of BASKIN-ROBBINS and FRANCHISEE.

7.6    BASKIN-ROBBINS represents that Baskin-Robbins Incorporated ("BRI") is the sole owner of all right, title and interest in and to the Baskin-Robbins Proprietary Marks and that BASKIN-ROBBINS is licensed by BRI to grant a Franchise to FRANCHISEE and to license the use of the Baskin-Robbins Proprietary Marks upon the terms and conditions of this Agreement.

## Section BR-9.  Default

9.4    <u>Termination</u> - Upon any termination or expiration of this Agreement:

9.4.6.1    FRANCHISEE shall further and immediately sell to FRANCHISOR (who hereby agrees to purchase) all of FRANCHISEE's unopened and unexpired Baskin-Robbins Products and such unopened and unexpired Associated BR Products as bear any of the Proprietary Marks, at FRANCHISEE's purchase cost.

INITIALS:

AP    AP

PC# 300392

ALLIED DOMECQ QSR
RIDER TO FRANCHISE AGREEMENT

**SCHEDULE "DD"**
110199

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
## DUNKIN' DONUTS FRANCHISE

In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has developed and used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including ***Dunkin' Donuts*®**, which is registered as a trademark on the Principal Register of the United States Patent Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark ***Dunkin' Donuts*®**, and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System. FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Unit in conformity with the Dunkin' Donuts System and in accordance with FRANCHISOR's Standards and specifications.

### DEFINITIONS

As used in these Special Terms and Conditions applicable to a Dunkin' Donuts Franchise, the following defined terms shall have the following meanings:

A.    The "Dunkin' Donuts Unit" means all or a portion of the Premises dedicated to the operation of the Dunkin' Donuts System, as approved by FRANCHISOR.

B.    "Dunkin' Donuts Products" shall mean and refer to donuts, bagels, muffins, cookies and other baked goods, sandwiches, coffee, soda, frozen drinks and other beverages, all of a variety of kinds or flavors, made in accordance with specifications designated by FRANCHISOR and identified by the Dunkin' Donuts Proprietary Marks, and such other products as may be specified from time to time in writing by FRANCHISOR for sale in the Dunkin' Donuts Unit.

C.    Where applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit designated in Item "M" of the Contract Data Schedule of this Agreement.

### Section DD-1. Grant Of The Franchise

1.0    FRANCHISOR grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this agreement (hereinafter called the "Dunkin' Donuts Unit"). In connection therewith, this Franchise includes the right to use at the Dunkin' Donuts Unit only, the trademark Dunkin' Donuts®, along with other Proprietary Marks owned and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts units, and the right to use at the Unit only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

### Section DD-2. Scope Of The Franchise

2.0    This Dunkin' Donuts Franchise is specific to one location only, for the term of this Agreement. It grants no rights outside the Premises, nor includes any territorial protection against competition. FRANCHISOR reserves and retains the right to operate or permit others to operate Dunkin' Donuts units or to sell or distribute Dunkin' Donuts products and/or services or to otherwise use the Dunkin' Donuts Proprietary Marks and/or the Dunkin' Donuts System, in each case at any other location. FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Unit using the same or different brand(s).

### Section DD-3. Advertising and Promotion

3.0    FRANCHISOR shall prepare and coordinate a "Grand Opening" promotional advertising program (or such other advertising program as FRANCHISOR may specify) for the initial opening of the Dunkin' Donuts Unit.

3.1    FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Unit; and

3.3.1    FRANCHISOR shall administer The Dunkin' Donuts Advertising and Sales Promotion Fund (the "Dunkin' Donuts Fund") and shall direct the development of all advertising, marketing and promotional programs for the Dunkin' Donuts System. That portion of FRANCHISEE's payments under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Dunkin' Donuts Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Dunkin' Donuts Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System. The balance, including any interest earned by the Dunkin' Donuts Fund, will be used for advertising and related expenses. Contributions to the Dunkin' Donuts Fund in excess of the percentage of Gross Sales of the Dunkin' Donuts Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

### Section DD-4. Payments

4.4    FRANCHISEE shall make payments to the Dunkin' Donuts Fund as described in paragraph 4.4 of the General Terms and Conditions, except that sales to wholesale accounts approved by FRANCHISOR are excluded for purposes of calculating fees due under paragraph 4.4 (only). For wholesale accounts to be approved by FRANCHISOR, FRANCHISEE must provide FRANCHISOR prior written notice of each such account. Upon FRANCHISOR's receipt of such notice, the account shall be deemed approved, unless FRANCHISOR at any time notifies FRANCHISEE in writing that such account is not approved. FRANCHISEE shall, within ten (10) days of receipt of a disapproval notice, discontinue sales to the disapproved wholesale account.

4.4.1    FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Dunkin' Donuts Units included in the base for purposes of determining "two-thirds" support.

### Section DD-5. Covenants of FRANCHISEE

5.0    FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Dunkin' Donuts Products and protect and enhance the reputation and goodwill of DUNKIN' DONUTS.

5.1    Unless this Unit is expressly authorized to manufacture donut products on the Premises, and except as DUNKIN' DONUTS may otherwise authorize and direct in writing, donut products sold at this Unit shall be produced in the Dunkin' Donuts manufacturing unit located at the address set forth in Item "M" of the Contract Data Schedule of this Agreement (the "Producing Unit").

5.1.5.1    Franchisees' cooperatively-owned distribution centers under the Distributor Commitment Program ("DCP") are currently approved by DUNKIN' DONUTS to supply franchisees with a variety of ingredients, supplies and equipment. DUNKIN' DONUTS or an affiliated company may from time to time be among the approved suppliers of products, supplies, services, equipment and/or materials required for the operation of the Dunkin' Donuts Unit. If any such party is designated an approved supplier, it will be subject to the same competitive bidding procedure as other suppliers of the same Dunkin' Donuts Products.

5.1.5.2    DUNKIN' DONUTS may, from time to time, enter into national or regional exclusive supply arrangements with one or more independent suppliers for designated Dunkin' Donuts Products. In evaluating the need for an exclusive supplier, DUNKIN' DONUTS may take into account (without limitation) the uniqueness of the designated Dunkin' Donuts Products, the projected price and required volume of such Dunkin' Donuts Products, the investment required of a supplier in order to meet the needs for such Dunkin' Donuts Products, the supplier's ability to provide such Dunkin' Donuts Products, the lack of availability of qualified alternative suppliers, the duration of exclusivity, the desirability of competitive bidding and such other business considerations as may be relevant.

5.2.1    Sales to approved wholesale accounts must be separately designated as "wholesale" on Gross Sales reports required under paragraph 5.2.1 of the General Terms and Conditions of this Agreement.

5.2.5    FRANCHISEE's Records shall also include, without limitation, daily production, throwaway and finishing records, and records of all wholesale accounts.

**Section DD-7. Proprietary Marks**

7.0    FRANCHISEE acknowledges and agrees that Dunkin' Donuts® is a registered trademark owned or controlled by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned or controlled by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7.5    FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Unit under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law.  FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

Initials

PC 300392

ALLIED DOMECQ QSR
RIDER TO FRANCHISE AGREEMENT

SCHEDULE "DD"
ADDENDUM ONE
110100

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO
## A DUNKIN' DONUTS FRANCHISE

### ADDITIONAL PROVISIONS FOR A DUNKIN' DONUTS MANUFACTURING RETAIL UNIT
### (A FULL-PRODUCING UNIT)

### Section DD-5.1 - Covenants of FRANCHISEE

5.1.1    **Percentage Rent** - Except as hereinafter set forth, if FRANCHISEE, or, if applicable, the partners or shareholders of FRANCHISEE, leases this manufacturing Retail Unit from FRANCHISOR or its designated landlord entity, products manufactured at this Unit for retail sale at other Dunkin' Donuts units shall not be included in determining percentage rent, if any, as defined in this Unit's lease. Wholesale sales made from any Dunkin' Donuts unit supplied by this Unit shall be deemed to be sales from this Unit and subject to percentage rent and other charges under the terms of such lease for this Unit.    In addition and notwithstanding the foregoing, FRANCHISEE shall pay to FRANCHISOR's designated landlord entity any percentage rent and other charges which said designated landlord entity may be required to pay under any underlying lease applicable to this Unit, because of any sales of products manufactured at this Unit and sold from other Dunkin' Donuts unit(s).  FRANCHISEE shall execute an amendment to the lease for this Unit in a form satisfactory to FRANCHISOR or its designated landlord entity, incorporating the foregoing provisions.

5.1.2    **Manufacture and Transportation of Products** - FRANCHISEE shall not, without the prior written consent of FRANCHISOR, deliver any products manufactured or finished at this  Unit to any other location(s), except as authorized or directed by FRANCHISOR.  FRANCHISOR reserves the right, in its sole and absolute discretion, to require FRANCHISEE to manufacture, in whole or in part, and/or to finish at this Unit and to deliver to all authorized non-manufacturing satellite retail units, such products as are now or hereafter designated as approved for sale at such Dunkin' Donuts units.  Products not finished at this Unit must be finished at the satellite retail units and at no other place unless prior written approval is granted by FRANCHISOR.  FRANCHISEE shall transport products and supplies from this Unit to the authorized satellite retail units on a schedule and in a manner acceptable to FRANCHISOR that ensures compliance with federal, state and local regulation as well as FRANCHISOR's sanitation, quality, freshness and other standards and that an adequate supply of product is available for sale at all times that such satellite retail units are open for business.

5.1.3    **Product and Vehicle Liability Insurance** - FRANCHISEE shall also maintain a policy or policies of product liability, vehicle liability, and non-owned vehicle liability insurance coverages, in the amounts set forth in paragraph 5.3 of the Franchise Agreement.

## Section DD-10.  Transfer Provisions

10.3.1    **Transfer of this Manufacturing Retail Unit** - If FRANCHISEE shall propose a transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more of the Franchise for this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of this Agreement, be subject to the requirement that a controlling interest in all satellite retail units supplied by this Unit must be transferred to (a) the same qualified transferee, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of this Agreement, and who also must control one or more manufacturing Dunkin' Donuts Unit(s) at the time of transfer  which FRANCHISOR, in its sole and absolute discretion, authorizes as the producing unit(s) for the satellite retail Dunkin' Donuts unit(s).

10.3.2    **Transfer of other Dunkin' Donuts Units supplied by this Manufacturing Retail Unit** - If FRANCHISOR receives notice of a proposed transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in any Dunkin' Donuts Franchise for a retail unit supplied by this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, be subject to the requirement that the proposed transferee must (a) also be a qualified transferee of this Unit, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, and who also must control another manufacturing retail Unit at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the manufacturing unit to supply products for such satellite retail unit.

Initials:

_AP_

_Dsc_   _AP_

Dunkin' Donuts Rider - Addendum One

PC# 300392
SCHEDULE "NY"

120199

### ADDENDUM TO THE ADQSR FRANCHISE AGREEMENT AND
### STORE DEVELOPMENT AGREEMENT
### REQUIRED BY THE NEW YORK GENERAL BUSINESS LAW

Notwithstanding anything to the contrary set forth in the ADQSR Franchise Agreement (the "Franchise Agreement") and/or the Store Development Agreement ("SDA") the following provisions shall supersede and apply to all Baskin-Robbins, Dunkin' Donuts and Togo's franchises offered and sold in the State of New York.

1.      Subsection 5.4 of the Franchise Agreement and Section 14 of the SDA shall each be supplemented by the addition of the following language as the last sentence of these sections:

However, FRANCHISEE shall not be required to indemnify FRANCHISOR for any claims arising out of a breach of this Agreement by FRANCHISOR or other civil wrongs of FRANCHISOR.

2.      Paragraph 7.4 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must notify FRANCHISOR immediately in writing of any apparent infringement of or challenge to FRANCHISEE's use of any Mark, or claim by any person of any rights in any Mark or any similar trade name, trademark or service mark of which FRANCHISEE becomes aware. FRANCHISEE may not communicate with any person other than FRANCHISOR and its counsel in connection with any such infringement, challenge or claim. FRANCHISOR shall have sole discretion to take such action as it deems appropriate and the right to exclusively control any litigation, U.S. Patent and Trademark Office proceedings or other administrative proceeding or to otherwise protect and maintain its interest in the Marks. FRANCHISOR shall not be obligated to defend the FRANCHISEE against the claim of a third party that the operation of Retail Unit or the FRANCHISEE's use of the Marks infringes any right of the third party and FRANCHISOR shall not be obligated to protect, indemnify or hold harmless the FRANCHISEE from the consequences of any such claim or litigation. In the event FRANCHISOR does not take action, FRANCHISEE will have to protect itself at its own expense.

3.      Paragraph 10.3.7 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must execute a general release in a form satisfactory to FRANCHISOR, releasing FRANCHISOR, its shareholders, directors, officers, employees, in their corporate and individual capacities, of any claims FRANCHISEE may have against them; provided, however, that all rights enjoyed by FRANCHISEE and any causes of action arising in its favor from the provision of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York State General Business Law Sections 687.4 and 687.5 be satisfied.

4.      Paragraph 10.1 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

This Agreement is fully assignable by FRANCHISOR and shall inure to the benefit of any assignee or other legal successor to the interest of FRANCHISOR herein. However, no assignment shall be made except to an assignee who, in the good faith judgment of FRANCHISOR, is willing and able to assume FRANCHISOR's obligations under this Agreement.

Initials

*AP*

*Dol*   *AP*

ALLIED DOMECQ QSR                                              PC#300392
RIDER TO FRANCHISE AGREEMENT

**SPECIAL CONDITIONS OF THE ADQSR FRANCHISE AGREEMENT**

**PROMISSORY NOTE**

In the event FRANCHISEE fails to perform pursuant to the Promissory Note for
$410,500.00, then FRANCHISOR and THIRD DUNKIN' DONUTS REALTY, INC.
shall have the right, in their sole and absolute discretion, to immediately terminate
FRANCHISEE'S Franchise Agreement and Lease of Dunkin' Donuts/Baskin-Robbins
Shop, which documents shall be held by FRANCHISOR in escrow pending performance
by FRANCHISEE.

**Initials:**

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in triplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof. FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

FRANCHISOR

ATTEST:                                    BASKIN-ROBBINS USA, CO.
                                          DUNKIN' DONUTS INCORPORATED


_____                  By: _____
Arthur J. Anastos, Assistant Secretary          Donald Law, Director of Retail Operations

This agreement is not binding upon the above corporation(s) until executed and attested by an authorized officer.

FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.

INITIAL

FRANCHISEE

ATTEST:                                    GANPATI DONUTS, INC.


_____  BY _____ By: _____
Ami Patel, Secretary    ATTY. IN FACT.      Amish Patel, President


## PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION
## OR MEMBERS OF A LIMITED LIABILITY COMPANY

We, the undersigned, represent and warrant that we constitute

[X]  the shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of the above FRANCHISEE, a corporation

[  ] one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of New York. Waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally. The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned. This Guarantee is intended to take effect as a sealed instrument.


_____              _____
             witness                    Amish Patel, individually


_____              _____
             witness                    Ami Patel, individually

## CERTIFICATION OF FRANCHISEE

As a material inducement for FRANCHISOR to grant FRANCHISEE this Franchise, the undersigned, including all individuals who influenced the FRANCHISEE's decision to enter into this agreement, hereby disclose to FRANCHISOR any and all promises, representations, agreements and/or understandings that are not expressly contained in the Franchise Agreement or the Offering Circulars, but which induced FRANCHISEE to sign this agreement or influenced FRANCHISEE's decision to sign this agreement:

DESCRIBE BELOW ALL PROMISES, UNDERSTANDINGS AND/OR AGREEMENTS THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT, BUT WHICH INFLUENCED YOUR DECISION TO BECOME FRANCHISEE.

*If there are none, you must write "NONE."*   *NONE*

DESCRIBE BELOW ALL REPRESENTATIONS OR STATEMENTS THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR THE OFFERING CIRCULARS BUT WHICH INFLUENCED YOUR DECISION TO BECOME FRANCHISEE.

*If there are none, you must write "NONE."*   *NONE*

*If you need more space to answer either query, attach and sign additional pages.*

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, and this certification was executed only after obtaining the advice of an attorney.

Dated this __14__ day of __MAY__, 2001.

                                                                    FRANCHISEE

ATTEST/WITNESS:                          **GANPATI DONUTS, INC.**

_Ami Patel BY _____                  By: _____
Ami Patel, Secretary *ATTY. IN FACT.*        Amish Patel, President & Individually

_Elizabeth A. Stout_                     _Ami Patel BY _____
                        witness          Ami Patel, individually
                                                 *ATTY. IN FACT.*

## AMENDMENT TO FRANCHISE AGREEMENT(S)
## FOR CML CO-OP MEMBER SHOP(S)

For and in consideration of the premises, and other good and valuable consideration, the mutual receipt and sufficiency of which is hereby acknowledged, DUNKIN' DONUTS FRANCHISING LLC ("Dunkin' Donuts") and the following FRANCHISEE(s) ("Franchisee(s)") hereby amend, as set forth below, the following Dunkin' Donuts Franchise Agreement(s):

---

Shop Address: **674 Broadway, Newburgh, New York 12250**

Date of
Franchise Agreement: **June 14, 2001**    FRANCHISEE: **GANPATI DONUTS, INC.**

---

PC#301926    Shop Address: **201 North Plank Road, Newburgh, New York 12550**
73

Date of
Franchise Agreement: **November 8, 2004**   FRANCHISEE: **SHREE RAM DONUTS, INC.**

---

PC#304729    Shop Address: **1002 Route 94, Vails Gate, New York 12584**

Date of
Franchise Agreement: **November 8, 2004**   FRANCHISEE: **LAXMI DONUTS, INC.**

---

PC#330252    Shop Address: **184 Main Street, Highland Falls, New York 10928**
310

Date of
Franchise Agreement: **November 8, 2004**   FRANCHISEE: **KRISHNA DONUTS, INC.**

---

### RECITALS

Franchisee(s) desire(s) to become member(s) in Dunkin' Donuts Co-operative Production Location or Central Manufacturing Location Co-Op (for convenience, the "CML Co-Op") PC#**342686**, located at **228-230 Macarthur Avenue, New Windsor, New York 12553**, for the manufacture and delivery of Franchisee(s)' needs for products designated from time to time by Dunkin' Donuts. Where applicable, this will require the modification of the Franchisee(s)' current production and other obligations with respect to the above shops. This Amendment sets forth the terms and conditions under which Dunkin' Donuts will consent to the aforesaid.

TERMS AND CONDITIONS:  DUNKIN' DONUTS AND FRANCHISEE(S) AGREE THAT THE TERMS AND
CONDITIONS ATTACHED ARE A PART OF THIS AGREEMENT.

Date: 10/24/06 ,2006

FOR THE ABOVE ~~FRANCHISEE(S)~~

By _____
Amish Patel, President

DUNKIN' DONUTS FRANCHISING LLC

By _____
~~Wendy Betts~~, Assistant Secretary

MARY ANN ORMOND
ASSISTANT SECRETARY

WITNESS:

Lynette Romero

Print Name: Lynette Romero

THIS AGREEMENT IS NOT BINDING UPON DUNKIN' DONUTS UNTIL EXECUTED BY ITS AUTHORIZED REPRESENTATIVE

AMENDMENT TO FRANCHISE AGREEMENT(S)
TERMS AND CONDITIONS

1.      Franchisee(s) acknowledge that Dunkin' Donuts has limited experience with production facilities of this type.

2.      Franchisee(s) shall cause the CML Co-Op entity to be formed, or if previously formed, to be amended, and shall ensure that the entity conforms to Dunkin' Donuts' requirements.

3.      Franchisee(s) represent and warrant that Franchisee(s) have entered into a purchase commitment agreement with the CML Co-Op, in a form approved in writing by Dunkin' Donuts, binding themselves and their successors to purchase exclusively from the CML Co-Op for the above shops their requirements for products designated by Dunkin' Donuts from time to time.   Franchisee(s) shall promptly pay all required membership and other fees to the CML Co-Op, as well as each invoice for product deliveries.

4.      Dunkin' Donuts makes no representations or warranties as to the sales, profits, or other benefits, if any, that may result from the operation of the CML Co-Op.  Dunkin' Donuts will use reasonable efforts to have the CML Co-Op conform to Dunkin' Donuts' quality standards.  But Dunkin' Donuts assumes no obligation or liability for the CML Co-Op's failure to comply with these standards or its failure to provide bakery products sufficient to meet the Franchisee(s)'needs.

5.      It is not intended that the CML Co-Op will produce all product to be sold in the Franchisee(s)' Dunkin' Donuts shops.  Dunkin' Donuts reserves the right to require the Franchisee(s) to produce in their shops (or elsewhere as Dunkin' Donuts may direct) products determined from time to time by Dunkin' Donuts.

6.      It is not intended that the Franchisee(s) transfer their membership(s) in the CML Co-Op except on the transfer of the applicable shop(s). Each transfer shall comply with the CML Co-Op's Franchise Agreement and Dunkin' Donuts' requirements.  Franchisee(s) shall also comply with the provision of the CML Co-Op's by-laws and their Franchise Agreement(s) with respect to the transfer of its shop(s).

7.      For purposes of determining the correct Transfer Fee on the transfer of an interest in the CML Co-Op, the Franchise Agreements for the Member Shops provide Dunkin' Donuts the right to reallocate values agreed upon by Franchisee(s) and the transferee(s) for the transaction.   Franchisee(s) acknowledge that for the purposes of calculating the Transfer Fee on the sale of any CML Co-Op Member Shop, no value shall be attributable to the Member Shop's ownership of or membership in the CML Co-Op.

8.      Franchisee(s) shall remove production equipment for the above stores, wherever such production is presently occurring, only in accordance with a schedule mutually agreed upon by Dunkin' Donuts and Franchisee(s).   If the CML Co-Op is newly created, Franchisee(s) shall coordinate its production activities with the CML Co-Op during its start-up and initial phases of membership.  If one or more of the above shops has excess space resulting from the removal of production equipment, the applicable Franchisee(s)' reconfiguration and subsequent use of such space shall conform to the terms of the Franchise Agreement(s), including without limitation, Dunkin' Donuts' prior approval thereof.

9.      The Franchise Agreement(s) for Franchisee(s)' shops are hereby amended as follows:  The producing unit designated in Item M of the Contract Data Schedule, if any, is hereby deleted and the profit center number and address of the CML Co-Op is inserted in its place. For any of Franchisee(s)' shops that are currently operating as full-producer(s), Schedule DD, Addendum One, "Special Terms

and Conditions Applicable to a Dunkin' Donuts Franchise - Additional Provisions for a Dunkin' Donuts Manufacturing Retail Unit (A Full-Producing Unit)" are hereby deleted from the Franchise Agreement(s).

10.    Franchisee(s) agree to vote their shares in the CML Co-Op (and, if an officer or director of the CML Co-Op, to act at all times) in a manner consistent with the CML Co-Op's obligations to Dunkin' Donuts under the CML Co-Op Franchise Agreement and consistent with the Franchisee(s)' obligations to Dunkin' Donuts under their Franchise Agreement(s) with Dunkin' Donuts.

## 11.    GUARANTEE OF THE CML Co-Op BY FRANCHISEE(S)

Franchisee(s) hereby waive demand and notice, and jointly and severally, guarantee the performance of all of the CML Co-Op's obligations under the CML Co-Op's Franchise Agreement (other than its money obligations, which are provided for below), including, without limitation, paragraph 6.3 and Section 8, in their entirety, relative to the restrictions on the activities of Franchisee(s).    However, the post-term restrictions under the CML Co-Op Franchise Agreement applicable to a Franchisee by virtue of this guarantee shall not extend beyond 2 years from the last of the Franchisee's member shops' franchise agreements to be transferred, terminated or expire.

Franchisee(s) each agree to guarantee a portion of the CML Co-Op's money obligations under Section 4 of the CML Co-Op's Franchise Agreement.    The portion guaranteed by each of the Franchisee(s) shall be proportionate to the percentage of the CML Co-Op's member shops in which the respective Franchisee(s) has an interest.    By way of example, if the CML Co-Op's member shops number 50, and the respective Franchisee(s) has an interest in 17 of those shops, the respective Franchisee(s)' guarantee shall be 34% (17/50) of the CML Co-Op's money obligations.

The Franchisee(s) agree that Dunkin' Donuts may, without notice to or consent of the Franchisee(s), (a) extend, in whole or in part, the time for payment of the CML Co-Op's money obligations under Section 4 of the CML Co-Op's Franchise Agreement; (b) modify, with the consent of the CML Co-Op, its money or other obligations under the CML Co-Op's Franchise Agreement; and/or (c) settle, waive or compromise any claim of Dunkin' Donuts against the CML Co-Op or any of the Franchisee(s), all without in any way affecting the guarantee of the Franchisee(s).    This Guarantee is intended to take effect as a sealed instrument.

## FRANCHISE AGREEMENT
## ALLIED DOMECQ QUICK SERVICE RESTAURANTS

This Franchise Agreement is dated _November 8_, 2004, and made by and between **DUNKIN' DONUTS INCORPORATED**, a Delaware corporation with principal offices in Randolph, Massachusetts (hereinafter referred to as "DUNKIN' DONUTS" or "FRANCHISOR"), and the following individual(s) and/or entity:

**SHREE RAM DONUTS, INC.**, a New York corporation
_____
(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("ADQSR-120103") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

### CONTRACT DATA SCHEDULE

A.　Location of the Franchised Unit (the "Premises"):

　　201　　North Plank Road　　　Newburgh　　　New York　　　12550
　　(number)　(street)　　　　　(city or town)　　(state)　　(zip code)

B.　Term:　　　　　　　　　　　　　in the case of an existing Unit, **September 2, 2018***

C.　Initial Franchise Fee:　_____N/A_____ dollars ($　　)

D.　Marketing Start-Up Fee: _____N/A_____ dollars ($　　)

E.　Continuing Franchise Fee Rate:　Five and Nine Tenths　 percent (5.9%) of Gross Sales

F.　Minimum Continuing Advertising Fee Rate: ------------------FIVE-- percent (5.0%) of Gross Sales

G.　Refurbishment Date:　　　　　in the case of an existing unit, see special schedule*

　　Remodel Date:　　　　　　　in the case of an existing unit, see special schedule*

H.　Transfer Fee:　As provided in subsection 10.4 of the General Terms and Conditions, unless another
　　　　　　　　　amount is inserted here: _No Change_____

I.　Address for notice to FRANCHISEE shall be at the Unit Premises, unless another address is inserted
　　here: _____

J.　Special Terms and　　[✓]　Special Terms and Conditions Applicable to a Dunkin' Donuts Franchise
　　Conditions:

　　　　　　　　　　　[✓]　Addendum to the ADQSR Franchise Agreement and Store Development
　　　　　　　　　　　　　Agreement Required by the New York General Business Law

　　　　　　　　　　　[✓]　Additional Provisions Applicable to Franchise Term and
　　　　　　　　　　　　　Remodel/Refurbishment dates

K.　The Designated Representative for this Unit is　_Amish Patel_____
　　　　　　　　　　　(List only one person. See definitions in General Terms and Conditions. Print full name above.)

L.　Arbitration under this Agreement shall be initiated in the city and state of _New York, New York_____.

M.　If applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit
　　located　at　_PC# 300392, 674 Broadway, Newburgh, New York_____
　　　　　　　(insert address if this Unit is a Dunkin' Donuts non-producing unit; otherwise insert "not applicable").

Form last revised 12/01/02

Allied Domecq QSR corporations are EOE and AA Employers
(Franchisees are not employees)

ADQSR-120103

# ALLIED-DOMECQ QUICK SERVICE RESTAURANTS FRANCHISE AGREEMENT

© December, 2003

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

**Baskin-Robbins USA Co.**, a California corporation ("BASKIN-ROBBINS"), **Dunkin' Donuts Incorporated**, a Delaware corporation ("DUNKIN' DONUTS") and **Togo's Eateries Inc.**, a California corporation ("TOGO'S") are indirect wholly-owned subsidiaries of Allied Domecq PLC, a publicly-traded United Kingdom company. To take advantage of synergies between them, the three subsidiaries share certain common field and support personnel and form an unincorporated division called "Allied Domecq Quick Service Restaurants". As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins®* ice cream, yogurt and novelties, *Dunkin' Donuts®* donuts, coffee and freshly baked goods, *Togo's®* fresh sandwiches, salads and deli platters, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.      The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, *Dunkin' Donuts®* owned or controlled by DUNKIN' DONUTS, *Baskin 31 Robbins®* owned or controlled by Baskin-Robbins Incorporated ("BRI"), and *TOGO'S®* owned or controlled by TOGO'S, all of which are registered trademarks on the Principal Register of the United States Patent and Trademark Office.

B.      "FRANCHISOR" refers to Dunkin' Donuts Incorporated with respect to the Dunkin' Donuts System, Baskin-Robbins USA, Co., with respect to the Baskin-Robbins System and Togo's Eateries, Inc. with respect to the Togo's System.

C.      "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.      The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.      The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.      The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.      "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.      The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

-2-

I.      The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System. Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit; specifications for the facility, equipment and products; business processes and techniques for the operation of the Unit; and guidelines and standards for quality, cleanliness, appearance and service.

## Section 1. Grant of the Franchise and Term

1.0      This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise"). The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule; provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1      **Training.** FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR. This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2      **Financing.** Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3      **Documents.** FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4      **Payment.** FRANCHISEE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5      **Possession.** FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6      **For a New Unit.** If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1      The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2      FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2. Services Furnished by FRANCHISOR

2.0      FRANCHISOR agrees:

2.1      **Prior to and For the Initial Opening of the Unit.**

2.1.1      FRANCHISEE shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2      FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3      FRANCHISOR shall provide its current **operating procedures** to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

*General Terms and Conditions*





2.1.4   FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

2.2   **After the Initial Opening of the Unit.**

2.2.1   FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

2.2.2   FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

2.2.3   FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

2.2.4   FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

### Section 3. Advertising and Promotion

3.0   FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System. FRANCHISEE's payments to the Fund(s) shall be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing. The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR. FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any. Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISEE contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

3.1   FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval. If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISOR, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

3.2   FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services for order through the mail or by any electronic or other medium. FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services. Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use. FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

3.3   Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

### Section 4. Payments

4.0   FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

4.1.   **Initial Franchise Fee.** - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

4.2   **Marketing Start-Up Fee.** - FRANCHISEE shall pay a Marketing Start-Up Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a start-up promotional program or such other promotion or advertising program as FRANCHISOR may specify. Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

-4-

4.3    **Continuing Franchise Fees** - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

4.4.    **Continuing Advertising Fee.** FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1    In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2    If FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5    If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6    FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank. Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR. If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1    FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability. FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account; (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE'S bank rejects FRANCHISOR's EFT request because of insufficient funds; and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2    For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported. This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR. To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required. In FRANCHISOR's discretion or due to system failure, FRANCHISOR may elect to withdraw the electronic form. In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

4.7    **Late Fee, Interest and Costs.** If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have. Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR. FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks. At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.

## Section 5. Covenants of FRANCHISEE

5.0    FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons. FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1    If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

*General Terms and Conditions*        



5.0.2    FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time. Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe. Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person. FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date. In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3    FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit.

5.1    **Unit Operations.** - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day permitted by law, on all days, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing. In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1    FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR. All such items must conform to FRANCHISOR's Standards. FRANCHISOR reserves the right to specify any item by brand. FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2    FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards. Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products. For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3    FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit. FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR. FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit; and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit. FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit. FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4    FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5    FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR. Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier. FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use. FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year. This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6    FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. FRANCHISEE shall make no material alteration, addition, replacement or improve-ment in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7    FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

-6-

5.1.7.1  FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below. and to furnish to FRANCHISOR therefor, within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications. If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8    FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program. Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers. If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1  In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2  FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures. FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment. FRANCHISEE shall ensure that all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Unit. FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require. The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE. FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9    FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft. FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2      **Books, Records and Reports.** FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR. Commencing upon the opening of the Unit:

5.2.1    FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years. FRANCHISOR shall have the right, in its sole discretion, to require that such annual financial statements be certified by an independent certified public accountant or such other independent public accountant acceptable to FRANCHISOR.

5.2.4    FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5    FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:
    a. daily cash reports;
    b. cash receipts journal and general ledger;
    c. cash disbursements journal and weekly payroll register;
    d. monthly bank statements, and daily deposit slips and canceled checks;
    e. all business tax returns;
    f. suppliers invoices (paid and unpaid);

g. dated cash register tapes (detailed and summary);
h. semi-annual balance sheets and monthly profit and loss statements;
i. weekly inventories;
j. records of promotion & coupon redemptions;
k. such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6    Retail Information System FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

5.2.6.1   FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2   FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3   FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7    FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3    **Insurance.** FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, and their directors and employees, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1    Such policy or policies shall include:

5.3.1.1   commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with an aggregate single limit of two million dollars ($2,000,000.00) or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2   "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

-8-

5.3.1.3  plate glass insurance and, if applicable, boiler insurance; and

5.3.1.4  employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.2    All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR; (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named; (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3    During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid. If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums therefor. Maintenance of insurance and FRANCHISEE's perfor- mance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.   Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage. FRANCHISEE shall, upon obtaining the polices of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4    **Indemnification.** FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, and each of them, and the subsidiaries or each of them, and their respective officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation of or defense against any and all such claims.

5.5    **Refurbishment & Remodel of the Premises.** FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5. Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards. FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1    No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards. It is intended that the cost of the initial refurbishment shall not exceed $10,000.00 and that subsequent refurbishments shall not exceed $10,000.00 increased by the same percentage as the increase to the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the period from the Refurbishment Date to the date of subsequent refurbishment. The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition. The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2    No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment). The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3    FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6    **Cross-Guarantee.** In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s). Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party. FRANCHISEE's liability under this paragraph shall be limited to the extent that the

total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7    **FRANCHISEE Entity.** FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC"). FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1    **Corporation.** If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is authorized to operate the Unit as provided under this Agreement; (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2    **LLC.** If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that its activities are limited to operating the Unit as provided under this Agreement; (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

## Section 6. Certain Rights of FRANCHISOR

6.0    In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s). During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1    If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1    FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2    FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3    FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation. If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

-10-

6.2     In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit. If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRAN-CHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales. If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate. FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees. Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3     In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit. Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that exclusion (c) therein does not apply. Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4     FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5     If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises. Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

## Section 7. Proprietary Marks

7.0     FRANCHISOR has, in connection with its business and the business of its franchisees, developed and used and continues to use and control the usage of Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts®**, owned by Dunkin' Donuts Incorporated, **Baskin 31 Robbins®**, owned by Baskin-Robbins Incorporated, and **TOGO'S®**, owned by Togo's Eateries, Inc., all of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office. FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1     FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE shall not sublicense the Proprietary Marks. FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1   FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement. FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE. FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

7.2     FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks. FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.3     FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts. Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4     FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISOR, be necessary to carry out such defense or prosecution.

## Section 8. Restrictions on FRANCHISEE's Activities

8.0     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1     Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2     Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3     Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute.

8.1     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business. Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement. FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchisees licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2     The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3     FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

-12-

## Section 9. Default

9.0    FRANCHISEE shall be in default under this Agreement:

9.0.1    If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law shall be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2    If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3    If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4    If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5    If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

9.1    **Thirty Day Cure Period.** Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof. Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1    **Seven Day Cure Period.** A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2    **24 Hour Cure Period.** A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety; or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3    **Cure on Demand.** FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4    **No Cure Period.** No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder. In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2    **Statutory Cure Period.** If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3    **Late Fee, Interest and Costs.** If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees, collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination. All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4    **Termination.** If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement. Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR. Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination. Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

*General Terms and Conditions*

9.4.1    FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE; and

9.4.2    FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and

9.4.3    FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

9.4.4    FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law; and

9.4.5    FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) and return to FRANCHISOR, all of the Proprietary Marks or other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks. Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks. FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph; and

9.4.6.    FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings). If FRANCHISEE owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE. All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE. Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts; and

9.4.7    FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISEE within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises. If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that purpose. In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand; and

9.4.8    FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9; and

9.4.9    FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein. If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress; and FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with FRANCHISOR whether or not constituting unfair competition.

9.5    Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, injunctive relief; No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder. FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

-14-

9.6     Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof. In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISOR shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

## Section 10. Transfer Provisions

10.0     **Transfer By FRANCHISOR.** This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively. FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect. Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1     If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand. FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof. If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1     **Transfer By FRANCHISEE.** FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE. Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2     **Consent By FRANCHISOR.** FRANCHISOR shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided, that:

10.2.1     FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2     The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors. This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3     The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable. FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee; and

10.2.4     The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3     **Transfer Requirements.** Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1     Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

*General Terms and Conditions*

10.3.2   Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3   FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity. Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4   Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5   If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6   The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable. The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority. The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s). Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement. The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7   FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each; and

10.3.8   In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4   **Transfer Fee.** The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1   **Prior to FRANCHISEE's Fourth Year of Operations.** The transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of: (i) five thousand dollars ($5,000.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR; or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1 The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR. No adjustment shall be made for amounts paid in connection with the development of a new unit. The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description: furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE. It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2 For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business. If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.2   **From and After FRANCHISEE's Fourth Year of Operations.** If the transfer takes place after the commencement of FRANCHISEE's fourth year of operations, the transferor shall pay to FRANCHISOR the Transfer Fee indicated below based on the Unit's Gross Sales for the most recently completed twelve (12) calendar month period preceding the date of the contract of sale. FRANCHISOR reserves the right to select another period or to make appropriate adjustments to such Gross Sales in the event extraordinary occurrences (e.g., road construction, fire or other casualty, etc.) materially affected Unit sales during the indicated twelve (12) month period.

| Sales for Most Recent 12 Month Period | Transfer Fee |
| --- | --- |
| Less than $400,000.00 | $5,000.00 |
| $400,000.00 or more, but less than $600,000.00 | $6,000.00 |
| $600,000.00 or more, but less than $1,000,000.00 | $8,000.00 |
| $1,000,000.00 or more, but less than $1,400,000.00 | $12,000.00 |
| $1,400,000.00 or more | $20,000.00 |

-16-

10.4.3    If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.4    **Transfer of Less Than Control.** For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period. FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.5    **Transfer to Spouse or Children.** Notwithstanding anything else contained in this subsection 10.4, but provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above. The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5    **Release of Transferor.** Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6    **Transfer on Death, Disability or Incapacity.** In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify. Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement. A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1    If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest shall have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR. FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld. FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2    If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time. Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice-to cure.

10.6.3    FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6. If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such interest. FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7    **Right of First Refusal.** If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer. FRANCHISOR shall have the right and option, exercisable within sixty (60) days after its receipt of said copy, to purchase FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party. FRANCHISOR's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR. Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have sixty (60) days to exercise its right to purchase on the altered terms. Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

*General Terms and Conditions*

## Section 11. Arbitration.

11.0    Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein modified. This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any state or federal statute. As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto. The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1    **Eligibility and Procedures.** Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted. Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances. Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement. If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply. The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue. Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims. The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2    **Enforceability and Effect.** Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3    **Governing Law.** The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought. Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4    **Exceptions to Arbitration.** Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time. In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5    **FRANCHISOR's Exceptions.** FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint in any court of competent jurisdiction:

11.5.1    the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2    any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

11.5.3    any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

11.5.4    any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1); or

11.5.5    any action in ejectment or for possession of any interest in real or personal property.

11.6    **FRANCHISEE's Exceptions.** FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

-18-

11.6.1   In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7   **Waiver of Rights.** THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1   The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2   The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law; and

11.7.3   The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4   The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5   ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8   **No Class Actions.** No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9   **Post-Term Applicability.** The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

## Miscellaneous Provisions.

12.0   **Relationship of the Parties.** This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its affiliated corporation for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR or its affiliated corporation or to create any obligation, express or implied, on behalf of FRANCHISOR or its affiliated corporation. The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated corporation and FRANCHISEE.

12.1   Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party. Each party shall indemnify, protect, defend and save the other party harmless against any such claim. The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

13.0   **Non-Waiver.** Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement. Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE. Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0   **Notices.** All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from

time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to Allied Domecq Retailing USA, at Post Office Box 317, 14 Pacella Park Drive, Randolph, Massachusetts 02368, Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE.

15.0    **Entire Agreement.** This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement. The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto. In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0    **Severability.** Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.** This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.** THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS. FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY. FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    **FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".**

Initials

ALLIED DOMECQ QSR
RIDER TO FRANCHISE AGREEMENT

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
### DUNKIN' DONUTS FRANCHISE

In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has developed and used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including *Dunkin' Donuts*®, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark *Dunkin' Donuts*®, and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System.    FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Unit in conformity with the Dunkin' Donuts System and in accordance with FRANCHISOR's Standards and specifications.

### DEFINITIONS

As used in these Special Terms and Conditions applicable to a Dunkin' Donuts Franchise, the following defined terms shall have the following meanings:

A.    The "Dunkin' Donuts Unit" means all or a portion of the Premises dedicated to the operation of the Dunkin' Donuts System, as approved by FRANCHISOR.

B.    "Dunkin' Donuts Products" shall mean and refer to donuts, bagels, muffins, cookies and other baked goods, sandwiches, coffee, soda, frozen drinks and other beverages, all of a variety of kinds or flavors, made in accordance with specifications designated by FRANCHISOR and identified by the Dunkin' Donuts Proprietary Marks, and such other products as may be specified from time to time in writing by FRANCHISOR for sale in the Dunkin' Donuts Unit.

C.    Where applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit designated in Item "M" of the Contract Data Schedule of this Agreement.

### Section DD-1.  Grant Of The Franchise

1.0    FRANCHISOR grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this agreement (hereinafter called the "Dunkin' Donuts Unit").  In connection therewith, this Franchise includes the right to use at the Dunkin' Donuts Unit only, the trademark *Dunkin' Donuts*®, along with other Proprietary Marks owned and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts units, and the right to use at the Unit only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

### Section DD-2.  Scope Of The Franchise

2.0   This Dunkin' Donuts Franchise is specific to one location only, for the term of this Agreement.  It grants no rights outside the Premises, nor includes any territorial protection against competition.  FRANCHISOR reserves and retains the right to operate or permit others to operate Dunkin' Donuts units or to sell or distribute Dunkin' Donuts products and/or services or to otherwise use the Dunkin' Donuts Proprietary Marks and/or the Dunkin' Donuts System, in each case at any other location.  FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Unit using the same or different brand(s).

### Section DD-3.  Advertising and Promotion

3.0   FRANCHISOR shall prepare and coordinate a "Start-Up" promotional program (or such other promotional or advertising program as FRANCHISOR may specify) for the initial opening of the Dunkin' Donuts Unit.

3.1    FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Unit; and

3.3.1   FRANCHISOR shall administer The Dunkin' Donuts Advertising and Sales Promotion Fund (the "Dunkin' Donuts Fund") and shall direct the development of all advertising, marketing and promotional programs for the Dunkin' Donuts System.  That portion of FRANCHISEE's payments under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Dunkin' Donuts Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Dunkin' Donuts Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System.  The balance, including any interest earned by the Dunkin' Donuts Fund, will be used for advertising and related expenses.  Contributions to the Dunkin' Donuts Fund in excess of the percentage of Gross Sales of the Dunkin' Donuts Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

*Dunkin' Donuts Rider – pg.* 1

## Section DD-4.  Payments

4.4  FRANCHISEE shall make payments to the Dunkin' Donuts Fund as described in paragraph 4.4 of the General Terms and Conditions, except that sales to wholesale accounts approved by FRANCHISOR are excluded for purposes of calculating fees due under paragraph 4.4 (only).  For wholesale accounts to be approved by FRANCHISOR, FRANCHISEE must provide FRANCHISOR prior written notice of each such account.  Upon FRANCHISOR's receipt of such notice, the account shall be deemed approved, unless FRANCHISOR at any time notifies FRANCHISEE in writing that such account is not approved.  FRANCHISEE shall, within ten (10) days of receipt of a disapproval notice, discontinue sales to the disapproved wholesale account.

4.4.1  FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Dunkin' Donuts Units included in the base for purposes of determining "two-thirds" support.

## Section DD-5.  Covenants of FRANCHISEE

5.0  FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Dunkin' Donuts Products and protect and enhance the reputation and goodwill of DUNKIN' DONUTS.

5.1    Unless this Unit is expressly authorized to manufacture donut products on the Premises, and except as DUNKIN' DONUTS may otherwise authorize and direct in writing, donut products sold at this Unit shall be produced in the Dunkin' Donuts manufacturing unit located at the address set forth in Item "M" of the Contract Data Schedule of this Agreement (the "Producing Unit").

5.1.5.1    Franchisees' cooperatively-owned distribution centers under the Distributor Commitment Program ("DCP") are currently approved by DUNKIN' DONUTS to supply franchisees with a variety of ingredients, supplies and equipment.  DUNKIN' DONUTS or an affiliated company may from time to time be among the approved suppliers of products, supplies, services, equipment and/or materials required for the operation of the Dunkin' Donuts Unit.  If any such party is designated an approved supplier, it will be subject to the same competitive bidding procedure as other suppliers of the same Dunkin' Donuts Products.

5.1.5.2  DUNKIN' DONUTS may, from time to time, enter into national or regional exclusive supply arrangements with one or more independent suppliers for designated Dunkin' Donuts Products.  In evaluating the need for an exclusive supplier, DUNKIN' DONUTS may take into account (without limitation) the uniqueness of the designated Dunkin' Donuts Products, the projected price and required volume of such Dunkin' Donuts Products, the investment required of a supplier in order to meet the needs for such Dunkin' Donuts Products, the supplier's ability to provide such Dunkin' Donuts Products, the lack of availability of qualified alternative suppliers, the duration of exclusivity, the desirability of competitive bidding and such other business considerations as may be relevant.

5.2.1    Sales to approved wholesale accounts must be separately designated as "wholesale" on Gross Sales reports required under paragraph 5.2.1 of the General Terms and Conditions of this Agreement.

5.2.5  FRANCHISEE's Records shall also include, without limitation, daily production, throwaway and finishing records, and records of all wholesale accounts.

## Section DD-7.  Proprietary Marks

7.0    FRANCHISEE acknowledges and agrees that *Dunkin' Donuts*® is a registered trademark owned or controlled by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned or controlled by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7.5    FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Unit under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law. FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

## Section 10.  Transfer Provisions

10.3.1    **Transfer of this Manufacturing Retail Unit** - If FRANCHISEE shall propose a transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more of the Franchise for this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of this Agreement, be subject to the requirement that a controlling interest in all satellite retail units supplied by this Unit must be transferred to (a) the same qualified transferee, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of this Agreement, and who also must control one or more manufacturing Dunkin' Donuts Unit(s) at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the producing unit(s) for the satellite retail Dunkin' Donuts unit(s).

*Dunkin' Donuts Rider - pg.* 2

10.3.2    **Transfer of other Dunkin' Donuts Units supplied by this Manufacturing Retail Unit** - If FRANCHISOR receives notice of a proposed transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in any Dunkin' Donuts Franchise for a retail unit supplied by this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, be subject to the requirement that the proposed transferee must (a) also be a qualified transferee of this Unit, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, and who also must control another manufacturing retail Unit at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the manufacturing unit to supply products for such satellite retail unit.

PC# 301926
SCHEDULE "NY"

120199

### ADDENDUM TO THE ADQSR FRANCHISE AGREEMENT AND
### STORE DEVELOPMENT AGREEMENT
### REQUIRED BY THE NEW YORK GENERAL BUSINESS LAW

Notwithstanding anything to the contrary set forth in the ADQSR Franchise Agreement (the "Franchise Agreement") and/or the Store Development Agreement ("SDA") the following provisions shall supersede and apply to all Baskin-Robbins, Dunkin' Donuts and Togo's franchises offered and sold in the State of New York.

1.      Subsection 5.4 of the Franchise Agreement and Section 14 of the SDA shall each be supplemented by the addition of the following language as the last sentence of these sections:

However, FRANCHISEE shall not be required to indemnify FRANCHISOR for any claims arising out of a breach of this Agreement by FRANCHISOR or other civil wrongs of FRANCHISOR.

2.      Paragraph 7.4 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must notify FRANCHISOR immediately in writing of any apparent infringement of or challenge to FRANCHISEE's use of any Mark, or claim by any person of any rights in any Mark or any similar trade name, trademark or service mark of which FRANCHISEE becomes aware. FRANCHISEE may not communicate with any person other than FRANCHISOR and its counsel in connection with any such infringement, challenge or claim. FRANCHISOR shall have sole discretion to take such action as it deems appropriate and the right to exclusively control any litigation, U.S. Patent and Trademark Office proceedings or other administrative proceeding or to otherwise protect and maintain its interest in the Marks. FRANCHISOR shall not be obligated to defend the FRANCHISEE against the claim of a third party that the operation of Retail Unit or the FRANCHISEE's use of the Marks infringes any right of the third party and FRANCHISOR shall not be obligated to protect, indemnify or hold harmless the FRANCHISEE from the consequences of any such claim or litigation. In the event FRANCHISOR does not take action, FRANCHISEE will have to protect itself at its own expense.

3.      Paragraph 10.3.7 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must execute a general release in a form satisfactory to FRANCHISOR, releasing FRANCHISOR, its shareholders, directors, officers, employees, in their corporate and individual capacities, of any claims FRANCHISEE may have against them; provided, however, that all rights enjoyed by FRANCHISEE and any causes of action arising in its favor from the provision of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York State General Business Law Sections 687.4 and 687.5 be satisfied.

4.      Paragraph 10.1 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

This Agreement is fully assignable by FRANCHISOR and shall inure to the benefit of any assignee or other legal successor to the interest of FRANCHISOR herein. However, no assignment shall be made except to an assignee who, in the good faith judgment of FRANCHISOR, is willing and able to assume FRANCHISOR's obligations under this Agreement.

Initials

_AP_

_X._

PC# 301926, Newburgh, NY

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO FRANCHISE TERM AND REMODEL/REFURBISHMENT DATES

As a condition of granting FRANCHISEE an additional fifteen (15) years of franchise term at no cost to FRANCHISEE, FRANCHISEE must remodel the premises to the then current Dunkin' Donuts image in accordance with DUNKIN' DONUTS approved plans and specifications at FRANCHISEE's sole cost and expense on or before December 31, 2004. FRANCHISEE at the time of closing shall execute a Termination of Franchise Agreement and General Release documents to be held in escrow to ensure that the above referenced remodel is completed. If FRANCHISEE fails to complete the above-referenced requirements the termination of Franchise Agreement will be released from escrow and countered signed by Dunkin' Donuts and the Franchise Agreement will be terminated immediately without any further rights and without need for further notice.

FRANCHISEE must, in remodeling, at its sole cost and expense, ensure that it meets the then-current standards for accessible design of the Americans' with Disability Act Accessibility Guidelines ("ADAAG"), as well as any more stringent accessibility standard that may be required under federal, state or local law.

FRANCHISEE further acknowledges that FRANCHISEE is obligated to perform future remodel and refurbishment of the DUNKIN' DONUTS SHOP at FRANCHISEE's sole cost and expense on the dates set forth below:

Remodel Due Dates:             December 31, 2014


Refurbishment Due Dates:       December 31, 2009


Initial

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in duplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof.   FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

**FRANCHISOR**

**DUNKIN' DONUTS INCORPORATED**

By: _____
Wendy Deas, Assistant Secretary

This agreement is not binding upon the above corporation(s) until executed by an authorized officer.

**FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.**

**FRANCHISEE**

ATTEST:                                     **SHREE RAM DONUTS, INC.**

_____              By: _____
Ami Patel, Secretary                          Amish Patel, President

### PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION
### OR MEMBERS OF A LIMITED LIABILITY COMPANY

We, the undersigned, represent and warrant that we constitute

[✓]  the shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of the above FRANCHISEE, a corporation

[  ]  one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of New York.  Waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally.   The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned.  This Guarantee is intended to take effect as a sealed instrument.

_____              _____
                Witness                                   Amish Patel, individually

Print Name: Elizabeth A. Strada

_____              _____
                Witness                                   Ami Patel, individually

Print Name: Elizabeth A. Strada

## CERTIFICATION OF FRANCHISEE

DESCRIBE BELOW ALL PROMISES AND REPRESENTATIONS MADE BY FRANCHISOR THAT ARE NOT
EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR UNIFORM FRANCHISE OFFERING
CIRCULAR BUT WHICH INFLUENCED FRANCHISEE'S DECISION TO SIGN THIS FRANCHISE AGREEMENT.

*If the answer is "none," please write "NONE" below.*

NONE

FRANCHISEE's completion of this page is a material inducement for FRANCHISOR to grant FRANCHISEE this
Franchise.    If FRANCHISEE fails to complete, sign and deliver this Certification of Franchisee page to
FRANCHISOR along with the Franchise Agreement, FRANCHISOR will not counter-execute the Franchise
Agreement or may void the Franchise Agreement if it already has been counter-executed.

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, that
FRANCHISEE had the opportunity to obtain the advice of an attorney, and that FRANCHISEE, and not
FRANCHISEE's attorney or other representative, has executed this Certification of Franchisee.

The date of the Certification shall be the date on the Franchise Agreement

FRANCHISEE:

Attest:                                              SHREE RAM DONUTS, INC.

_____              By: _____
Ami Patel, Secretary                              Amish Patel, President

_____                   _____
Witness                                                  Amish Patel, individually

Print Name: Elizabeth A. Strader

_____                   _____
Witness                                                  Ami Patel, individually

Print Name: Elizabeth A. Strader

05/06

## AMENDMENT TO FRANCHISE AGREEMENT(S)
## FOR CML CO-OP MEMBER SHOP(S)

For and in consideration of the premises, and other good and valuable consideration, the mutual receipt and sufficiency of which is hereby acknowledged, DUNKIN' DONUTS FRANCHISING LLC ("Dunkin' Donuts") and the following FRANCHISEE(s) ("Franchisee(s)") hereby amend, as set forth below, the following Dunkin' Donuts Franchise Agreement(s):

PC#300392          Shop Address: **674 Broadway, Newburgh, New York 12250**

Date of
Franchise Agreement: **June 14, 2001**        FRANCHISEE: **GANPATI DONUTS, INC.**

---

              Shop Address: ~~201~~ **North Plank Road, Newburgh, New York 12550**
                                     73
Date of
Franchise Agreement: **November 8, 2004**   FRANCHISEE: **SHREE RAM DONUTS, INC.**

---

PC#304729     Shop Address: **1002 Route 94, Vails Gate, New York 12584**

Date of
Franchise Agreement: **November 8, 2004**   FRANCHISEE: **LAXMI DONUTS, INC.**

---

PC#330252        Shop Address: ~~184~~ **Main Street, Highland Falls, New York 10928**
                                     310
Date of
Franchise Agreement: **November 8, 2004**   FRANCHISEE: **KRISHNA DONUTS, INC.**

### RECITALS

Franchisee(s) desire(s) to become member(s) in Dunkin' Donuts Co-operative Production Location or Central Manufacturing Location Co-Op (for convenience, the "CML Co-Op") PC#**342686**, located at **228-230 Macarthur Avenue, New Windsor, New York 12553**, for the manufacture and delivery of Franchisee(s)' needs for products designated from time to time by Dunkin' Donuts. Where applicable, this will require the modification of the Franchisee(s)' current production and other obligations with respect to the above shops. This Amendment sets forth the terms and conditions under which Dunkin' Donuts will consent to the aforesaid.

TERMS AND CONDITIONS: DUNKIN' DONUTS AND FRANCHISEE(S) AGREE THAT THE TERMS AND
CONDITIONS ATTACHED ARE A PART OF THIS AGREEMENT.

Date: __10/24/06__ ,2006

FOR THE ABOVE FRANCHISEE(S)

By _____

Amish Patel, President

DUNKIN' DONUTS FRANCHISING LLC

By _____

Wendy Bean, Assistant Secretary

MARY ANN ORMOND
ASSISTANT SECRETARY

WITNESS:

_Lynette Romero_

Print Name: __Lynette Romero__

THIS AGREEMENT IS NOT BINDING UPON DUNKIN' DONUTS UNTIL EXECUTED BY ITS AUTHORIZED REPRESENTATIVE

## AMENDMENT TO FRANCHISE AGREEMENT(S)
### TERMS AND CONDITIONS

1.      Franchisee(s) acknowledge that Dunkin' Donuts has limited experience with production facilities of this type.

2.      Franchisee(s) shall cause the CML Co-Op entity to be formed, or if previously formed, to be amended, and shall ensure that the entity conforms to Dunkin' Donuts' requirements.

3.      Franchisee(s) represent and warrant that Franchisee(s) have entered into a purchase commitment agreement with the CML Co-Op, in a form approved in writing by Dunkin' Donuts, binding themselves and their successors to purchase exclusively from the CML Co-Op for the above shops their requirements for products designated by Dunkin' Donuts from time to time.  Franchisee(s) shall promptly pay all required membership and other fees to the CML Co-Op, as well as each invoice for product deliveries.

4.      Dunkin' Donuts makes no representations or warranties as to the sales, profits, or other benefits, if any, that may result from the operation of the CML Co-Op.  Dunkin' Donuts will use reasonable efforts to have the CML Co-Op conform to Dunkin' Donuts' quality standards. But Dunkin' Donuts assumes no obligation or liability for the CML Co-Op's failure to comply with these standards or its failure to provide bakery products sufficient to meet the Franchisee(s)'needs.

5.      It is not intended that the CML Co-Op will produce all product to be sold in the Franchisee(s)' Dunkin' Donuts shops.  Dunkin' Donuts reserves the right to require the Franchisee(s) to produce in their shops (or elsewhere as Dunkin' Donuts may direct) products determined from time to time by Dunkin' Donuts.

6.      It is not intended that the Franchisee(s) transfer their membership(s) in the CML Co-Op except on the transfer of the applicable shop(s). Each transfer shall comply with the CML Co-Op's Franchise Agreement and Dunkin' Donuts' requirements.  Franchisee(s) shall also comply with the provision of the CML Co-Op's by-laws and their Franchise Agreement(s) with respect to the transfer of its shop(s).

7.      For purposes of determining the correct Transfer Fee on the transfer of an interest in the CML Co-Op, the Franchise Agreements for the Member Shops provide Dunkin' Donuts the right to reallocate values agreed upon by Franchisee(s) and the transferee(s) for the transaction.  Franchisee(s) acknowledge that for the purposes of calculating the Transfer Fee on the sale of any CML Co-Op Member Shop, no value shall be attributable to the Member Shop's ownership of or membership in the CML Co-Op.

8.      Franchisee(s) shall remove production equipment for the above stores, wherever such production is presently occurring, only in accordance with a schedule mutually agreed upon by Dunkin' Donuts and Franchisee(s).   If the CML Co-Op is newly created, Franchisee(s) shall coordinate its production activities with the CML Co-Op during its start-up and initial phases of membership.  If one or more of the above shops has excess space resulting from the removal of production equipment, the applicable Franchisee(s)' reconfiguration and subsequent use of such space shall conform to the terms of the Franchise Agreement(s), including without limitation, Dunkin' Donuts' prior approval thereof.

9.      The Franchise Agreement(s) for Franchisee(s)' shops are hereby amended as follows:  The producing unit designated in Item M of the Contract Data Schedule, if any, is hereby deleted and the profit center number and address of the CML Co-Op is inserted in its place.  For any of Franchisee(s)' shops that are currently operating as full-producer(s), Schedule DD, Addendum One, "Special Terms

and Conditions Applicable to a Dunkin' Donuts Franchise - Additional Provisions for a Dunkin' Donuts Manufacturing Retail Unit (A Full-Producing Unit)" are hereby deleted from the Franchise Agreement(s).

10.     Franchisee(s) agree to vote their shares in the CML Co-Op (and, if an officer or director of the CML Co-Op, to act at all times) in a manner consistent with the CML Co-Op's obligations to Dunkin' Donuts under the CML Co-Op Franchise Agreement and consistent with the Franchisee(s)' obligations to Dunkin' Donuts under their Franchise Agreement(s) with Dunkin' Donuts.

11.     **GUARANTEE OF THE CML Co-Op BY FRANCHISEE(S)**

Franchisee(s) hereby waive demand and notice, and jointly and severally, guarantee the performance of all of the CML Co-Op's obligations under the CML Co-Op's Franchise Agreement (other than its money obligations, which are provided for below), including, without limitation, paragraph 6.3 and Section 8, in their entirety, relative to the restrictions on the activities of Franchisee(s). However, the post-term restrictions under the CML Co-Op Franchise Agreement applicable to a Franchisee by virtue of this guarantee shall not extend beyond 2 years from the last of the Franchisee's member shops' franchise agreements to be transferred, terminated or expire.

Franchisee(s) each agree to guarantee a portion of the CML Co-Op's money obligations under Section 4 of the CML Co-Op's Franchise Agreement. The portion guaranteed by each of the Franchisee(s) shall be proportionate to the percentage of the CML Co-Op's member shops in which the respective Franchisee(s) has an interest. By way of example, if the CML Co-Op's member shops number 50, and the respective Franchisee(s) has an interest in 17 of those shops, the respective Franchisee(s)' guarantee shall be 34% (17/50) of the CML Co-Op's money obligations.

The Franchisee(s) agree that Dunkin' Donuts may, without notice to or consent of the Franchisee(s), (a) extend, in whole or in part, the time for payment of the CML Co-Op's money obligations under Section 4 of the CML Co-Op's Franchise Agreement; (b) modify, with the consent of the CML Co-Op, its money or other obligations under the CML Co-Op's Franchise Agreement; and/or (c) settle, waive or compromise any claim of Dunkin' Donuts against the CML Co-Op or any of the Franchisee(s), all without in any way affecting the guarantee of the Franchisee(s). This Guarantee is intended to take effect as a sealed instrument.

## FRANCHISE AGREEMENT
## ALLIED DOMECQ QUICK SERVICE RESTAURANTS

This Franchise Agreement is dated _November 8_____, 2004, and made by and between **DUNKIN' DONUTS INCORPORATED**, a Delaware corporation with principal offices in Randolph, Massachusetts (hereinafter referred to as "DUNKIN' DONUTS" or "FRANCHISOR"), and the following individual(s) and/or entity:

**LAXMI DONUTS, INC.**, a New York corporation _____
(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("ADQSR-120103") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

### CONTRACT DATA SCHEDULE

A. Location of the Franchised Unit (the "Premises"):

| 1002 | Route 94 | Vails Gate | New York | 12584 |
|------|----------|------------|----------|-------|
| (number) | (street) | (city or town) | (state) | (zip code) |

B. Term:      in the case of an existing Unit, until **October 27, 2018**

C. Total EBO/Gray Renewal Fee:  Twenty Two Thousand Five Hundred _____ dollars ($22,500.00)

D. Grand Re-Opening Fee: Three Thousand _____ dollars ($3,000.00)*
*Pursuant to the EBO/Gray Renewal Offer dated January 23, 1998.

E. Continuing Franchise Fee Rate:      Four and Nine Tenths _____ percent (4.9%) of Gross Sales

F. Minimum Continuing Advertising Fee Rate: _____FIVE— percent (5.0%) of Gross Sales

G. Refurbishment Date:      in the case of an existing unit, August 8, 2005, and again on August 8, 2015

    Remodel Date:      in the case of an existing unit, August 8, 2010
                                 **(EBO/Gray Remodel completed on August 8, 2000)**

H. Transfer Fee:  As provided in subsection 10.4 of the General Terms and Conditions, unless another amount is inserted here: No Change _____

I. Address for notice to FRANCHISEE shall be at the Unit Premises, unless another address is inserted here: _____

J. Special Terms and    [✓] Special Terms and Conditions Applicable to a Dunkin' Donuts Franchise
   Conditions:

               [✓] Additional Provisions for the EBO Renewal Offer

               [✓] Addendum to the ADQSR Franchise Agreement and Store Development Agreement Required by the New York General Business Law

K. The Designated Representative for this Unit is _Amish Patel_____
         (List only one person. See definitions in General Terms and Conditions. Print full name above.)

L. Arbitration under this Agreement shall be initiated in the city and state of New York, New York _____.

M. If applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit located at PC# 300392, 674 Broadway, Newburgh, New York _____
         (insert address if this Unit is a Dunkin' Donuts non-producing unit; otherwise insert "not applicable").

Form last revised 12/01/02

Allied Domecq QSR corporations are EOE and AA Employers
(Franchisees are not employees)

ADQSR-120103

# ALLIED-DOMECQ QUICK SERVICE RESTAURANTS FRANCHISE AGREEMENT
© December, 2003

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

**Baskin-Robbins USA Co.**, a California corporation ("BASKIN-ROBBINS"), **Dunkin' Donuts Incorporated**, a Delaware corporation ("DUNKIN' DONUTS") and **Togo's Eateries Inc.**, a California corporation ("TOGO'S") are indirect wholly-owned subsidiaries of Allied Domecq PLC, a publicly-traded United Kingdom company. To take advantage of synergies between them, the three subsidiaries share certain common field and support personnel and form an unincorporated division called "Allied Domecq Quick Service Restaurants". As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins®* ice cream, yogurt and novelties, *Dunkin' Donuts®* donuts, coffee and freshly baked goods, *Togo's®* fresh sandwiches, salads and deli platters, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.    The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, ***Dunkin' Donuts®*** owned or controlled by DUNKIN' DONUTS, ***Baskin 31 Robbins®*** owned or controlled by Baskin-Robbins Incorporated ("BRI"), and ***TOGO'S®*** owned or controlled by TOGO'S, all of which are registered trademarks on the Principal Register of the United States Patent and Trademark Office.

B.    "FRANCHISOR" refers to Dunkin' Donuts Incorporated with respect to the Dunkin' Donuts System, Baskin-Robbins USA, Co., with respect to the Baskin-Robbins System and Togo's Eateries, Inc. with respect to the Togo's System.

C.    "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.    The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.    The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.    The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.    "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.    The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

-2-

I.    The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System. Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit; specifications for the facility, equipment and products; business processes and techniques for the operation of the Unit; and guidelines and standards for quality, cleanliness, appearance and service.

## Section 1. Grant of the Franchise and Term

1.0    This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise"). The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule; provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1    **Training.** FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR. This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2    **Financing.** Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3    **Documents.** FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4    **Payment.** FRANCHISEE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5    **Possession.** FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6    **For a New Unit.** If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1    The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2    FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2. Services Furnished by FRANCHISOR

2.0    FRANCHISOR agrees:

2.1    **Prior to and For the Initial Opening of the Unit.**

2.1.1    FRANCHISOR shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2    FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3    FRANCHISOR shall provide its current **operating procedures** to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

*General Terms and Conditions*

2.1.4    FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

2.2    **After the Initial Opening of the Unit.**

2.2.1    FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

2.2.2    FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

2.2.3    FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

2.2.4    FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

## Section 3. Advertising and Promotion

3.0    FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System. FRANCHISOR's payments to the Fund(s) shall be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing. The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR. FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any. Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISEE contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

3.1    FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval. If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISOR, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

3.2    FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services for order through the mail or by any electronic or other medium. FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services. Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use. FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

3.3    Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

## Section 4. Payments

4.0    FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

4.1.    **Initial Franchise Fee.** - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

4.2    **Marketing Start-Up Fee.** - FRANCHISEE shall pay a Marketing Start-Up Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a start-up promotional program or such other promotion or advertising program as FRANCHISOR may specify. Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

-4-

4.3    **Continuing Franchise Fees** - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

4.4.    **Continuing Advertising Fee.** FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1    In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2    If FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5    If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6    FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank. Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR. If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1    FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability. FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account; (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE'S bank rejects FRANCHISOR's EFT request because of insufficient funds; and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2    For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported. This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR. To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required. In FRANCHISOR's discretion or due to system failure, FRANCHISOR may elect to withdraw the electronic form. In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

4.7    **Late Fee, Interest and Costs.** If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have. Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR. FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks. At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.

## Section 5. Covenants of FRANCHISEE

5.0    FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons. FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1    If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

*General Terms and Conditions*  

5.0.2    FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time. Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe. Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person. FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date. In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3    FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit.

5.1    **Unit Operations.** - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day permitted by law, on all days, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing. In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1    FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR. All such items must conform to FRANCHISOR's Standards. FRANCHISOR reserves the right to specify any item by brand. FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2    FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards. Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products. For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3    FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit. FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR. FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit; and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit. FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit. FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4    FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5    FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR. Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier. FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use. FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year. This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6    FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7    FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

-6-

5.1.7.1  FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below, and to furnish to FRANCHISOR within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications. If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8    FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program. Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers. If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1  In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2  FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures. FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment. FRANCHISEE shall ensure that all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Unit. FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require. The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE. FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9    FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft. FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2    **Books, Records and Reports.** FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR. Commencing upon the opening of the Unit:

5.2.1    FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years. FRANCHISOR shall have the right, in its sole discretion, to require that such annual financial statements be certified by an independent certified public accountant or such other independent public accountant acceptable to FRANCHISOR.

5.2.4    FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5    FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:

    a. daily cash reports;
    b. cash receipts journal and general ledger;
    c. cash disbursements journal and weekly payroll register;
    d. monthly bank statements, and daily deposit slips and canceled checks;
    e. all business tax returns;
    f. suppliers invoices (paid and unpaid);

*General Terms and Conditions*

g. dated cash register tapes (detailed and summary);

h. semi-annual balance sheets and monthly profit and loss statements;

i. weekly inventories;

j. records of promotion & coupon redemptions;

k. such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6    Retail Information System FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

5.2.6.1    FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2    FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3    FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7    FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3    **Insurance.** FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, and their directors and employees, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1    Such policy or policies shall include:

5.3.1.1    commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with an aggregate single limit of two million dollars ($2,000,000.00) or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2    "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

-8-

5.3.1.3  plate glass insurance and, if applicable, boiler insurance; and

5.3.1.4  employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.2   All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR; (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named; (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3   During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid. If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums therefor. Maintenance of insurance and FRANCHISEE's performance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.  Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage. FRANCHISEE shall, upon obtaining the polices of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4     **Indemnification.** FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, and each of them, and the subsidiaries or each of them, and their respective officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation of or defense against any and all such claims.

5.5     **Refurbishment & Remodel of the Premises.** FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5. Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards. FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1   No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards. It is intended that the cost of the initial refurbishment shall not exceed $10,000.00 and that subsequent refurbishments shall not exceed $10,000.00 increased by the same percentage as the increase to the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the period from the Refurbishment Date to the date of subsequent refurbishment. The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition. The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2   No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment). The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3   FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6     **Cross-Guarantee.** In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s). Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party. FRANCHISEE's liability under this paragraph shall be limited to the extent that the

total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7    **FRANCHISEE Entity.** FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC"). FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1    **Corporation.** If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is authorized to operate the Unit as provided under this Agreement; (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2    **LLC.** If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that its activities are limited to operating the Unit as provided under this Agreement; (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

### Section 6. Certain Rights of FRANCHISOR

6.0    In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and in general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s). During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1    If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1    FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2    FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3    FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation. If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

-10-

6.2     In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit. If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRANCHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales. If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate. FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees. Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3     In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit. Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that exclusion (c) therein does not apply. Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4     FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5     If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises. Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

## Section 7. Proprietary Marks

7.0     FRANCHISOR has, in connection with its business and the business of its franchisees, developed and used and continues to use and control the usage of Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts®**, owned by Dunkin' Donuts Incorporated, **Baskin 31 Robbins®**, owned by Baskin-Robbins Incorporated, and **TOGO'S®**, owned by Togo's Eateries, Inc., all of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office. FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1     FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE shall not sublicense the Proprietary Marks. FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1   FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement. FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE. FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

7.2    FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks. FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.3    FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts. Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4    FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISOR, be necessary to carry out such defense or prosecution.

## Section 8. Restrictions on FRANCHISEE's Activities

8.0    During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1    Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2    Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3    Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute.

8.1    During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business. Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement. FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchises licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2    The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3    FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

-12-

## Section 9. Default

9.0     FRANCHISEE shall be in default under this Agreement:

9.0.1     If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law shall be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2     If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3     If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4     If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5     If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

9.1     **Thirty Day Cure Period.** Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof. Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1     **Seven Day Cure Period.** A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2     **24 Hour Cure Period.** A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety; or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3     **Cure on Demand.** FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4     **No Cure Period.** No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder. In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2     **Statutory Cure Period.** If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3     **Late Fee, Interest and Costs.** If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees, collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination. All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4     **Termination.** If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement. Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR. Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination. Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

*General Terms and Conditions*

9.4.1     FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE; and

9.4.2     FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and

9.4.3     FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

9.4.4     FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law; and

9.4.5     FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) and return to FRANCHISOR, all of the Proprietary Marks or other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks. Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks. FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph; and

9.4.6.     FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings). If FRANCHISOR owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE. All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE. Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts; and

9.4.7     FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISEE within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises. If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that purpose. In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand; and

9.4.8     FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9; and

9.4.9     FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein. If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress; and FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with FRANCHISOR whether or not constituting unfair competition.

9.5     Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, injunctive relief; No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder. FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

-14-

9.6     Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof. In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISOR shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

## Section 10. Transfer Provisions

10.0     **Transfer By FRANCHISOR.** This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively. FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect. Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1     If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand. FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof. If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1     **Transfer By FRANCHISEE.** FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE. Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2     **Consent By FRANCHISOR.** FRANCHISOR shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided, that:

10.2.1     FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2     The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors. This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3     The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable. FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee; and

10.2.4     The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3     **Transfer Requirements.** Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1     Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

10.3.2   Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3   FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity. Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4   Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5   If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6   The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable. The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority. The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s). Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement. The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7   FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each; and

10.3.8   In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4     **Transfer Fee.** The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1   **Prior to FRANCHISEE's Fourth Year of Operations.** The transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of: (i) five thousand dollars ($5,000.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR; or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1 The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR. No adjustment shall be made for amounts paid in connection with the development of a new unit. The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description: furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE. It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2 For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business. If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.2   **From and After FRANCHISEE's Fourth Year of Operations.** If the transfer takes place after the commencement of FRANCHISEE's fourth year of operations, the transferor shall pay to FRANCHISOR the Transfer Fee indicated below based on the Unit's Gross Sales for the most recently completed twelve (12) calendar month period preceding the date of the contract of sale. FRANCHISOR reserves the right to select another period or to make appropriate adjustments to such Gross Sales in the event extraordinary occurrences (e.g., road construction, fire or other casualty, etc.) materially affected Unit sales during the indicated twelve (12) month period.

| Sales for Most Recent 12 Month Period | Transfer Fee |
|---|---|
| Less than $400,000.00 | $5,000.00 |
| $400,000.00 or more, but less than $600,000.00 | $6,000.00 |
| $600,000.00 or more, but less than $1,000,000.00 | $8,000.00 |
| $1,000,000.00 or more, but less than $1,400,000.00 | $12,000.00 |
| $1,400,000.00 or more | $20,000.00 |

-16-

10.4.3   If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.4   **Transfer of Less Than Control.** For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period. FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.5   **Transfer to Spouse or Children.** Notwithstanding anything else contained in this subsection 10.4, but provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above. The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5   **Release of Transferor.** Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6   **Transfer on Death, Disability or Incapacity.** In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify. Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement. A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1   If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest shall have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR. FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld. FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2   If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time. Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice-to-cure.

10.6.3   FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6. If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such interest. FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7   **Right of First Refusal.** If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer. FRANCHISOR shall have the right and option, exercisable within sixty (60) days after its receipt of said copy, to purchase FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party. FRANCHISOR's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR. Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have sixty (60) days to exercise its right to purchase on the altered terms. Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

## Section 11. Arbitration.

11.0     Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein modified. This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any state or federal statute. As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto. The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1     **Eligibility and Procedures.** Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted. Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances. Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement. If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply. The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue. Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims. The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2     **Enforceability and Effect.** Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3     **Governing Law.** The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought. Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4     **Exceptions to Arbitration.** Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time. In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5     **FRANCHISOR's Exceptions.** FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint in any court of competent jurisdiction:

11.5.1   the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2   any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

11.5.3   any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

11.5.4   any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1); or

11.5.5   any action in ejectment or for possession of any interest in real or personal property.

11.6     **FRANCHISEE's Exceptions.** FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

-18-

11.6.1    In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7    **Waiver of Rights.** THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1    The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2    The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law; and

11.7.3    The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4    The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5    ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8    **No Class Actions.** No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9    **Post-Term Applicability.** The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

## Miscellaneous Provisions.

12.0    **Relationship of the Parties.** This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its affiliated corporation for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR or its affiliated corporation or to create any obligation, express or implied, on behalf of FRANCHISOR or its affiliated corporation. The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated corporation and FRANCHISEE.

12.1    Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party. Each party shall indemnify, protect, defend and save the other party harmless against any such claim. The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

13.0    **Non-Waiver.** Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement. Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE. Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0    **Notices.** All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from

time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to Allied Domecq Retailing USA, at Post Office Box 317, 14 Pacella Park Drive, Randolph, Massachusetts 02368, Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE.

15.0    **Entire Agreement.** This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or warranties, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement. The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto. In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0    **Severability.** Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.** This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.** THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS. FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY. FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    **FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".**

Initials

PC# 304729

ALLIED DOMECQ QSR
RIDER TO FRANCHISE AGREEMENT

**SCHEDULE "DD"**
120103

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
## DUNKIN' DONUTS FRANCHISE

In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has developed and used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including *Dunkin' Donuts*®, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark *Dunkin' Donuts*®, and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System. FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Unit in conformity with the Dunkin' Donuts System and in accordance with FRANCHISOR's Standards and specifications.

### DEFINITIONS

As used in these Special Terms and Conditions applicable to a Dunkin' Donuts Franchise, the following defined terms shall have the following meanings:

A.   The "Dunkin' Donuts Unit" means all or a portion of the Premises dedicated to the operation of the Dunkin' Donuts System, as approved by FRANCHISOR.

B.   "Dunkin' Donuts Products" shall mean and refer to donuts, bagels, muffins, cookies and other baked goods, sandwiches, coffee, soda, frozen drinks and other beverages, all of a variety of kinds or flavors, made in accordance with specifications designated by FRANCHISOR and identified by the Dunkin' Donuts Proprietary Marks, and such other products as may be specified from time to time in writing by FRANCHISOR for sale in the Dunkin' Donuts Unit.

C.   Where applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit designated in Item "M" of the Contract Data Schedule of this Agreement.

## Section DD-1.  Grant Of The Franchise

1.0    FRANCHISOR grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this agreement (hereinafter called the "Dunkin' Donuts Unit"). In connection therewith, this Franchise includes the right to use at the Dunkin' Donuts Unit only, the trademark *Dunkin' Donuts*®, along with other Proprietary Marks owned and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts units, and the right to use at the Unit only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

## Section DD-2.  Scope Of The Franchise

2.0    This Dunkin' Donuts Franchise is specific to one location only, for the term of this Agreement. It grants no rights outside the Premises, nor includes any territorial protection against competition. FRANCHISOR reserves and retains the right to operate or permit others to operate Dunkin' Donuts units or to sell or distribute Dunkin' Donuts products and/or services or to otherwise use the Dunkin' Donuts Proprietary Marks and/or the Dunkin' Donuts System, in each case at any other location. FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Unit using the same or different brand(s).

## Section DD-3.  Advertising and Promotion

3.0    FRANCHISOR shall prepare and coordinate a "Start-Up" promotional program (or such other promotional or advertising program as FRANCHISOR may specify) for the initial opening of the Dunkin' Donuts Unit.

3.1    FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Unit; and

3.3.1    FRANCHISOR shall administer The Dunkin' Donuts Advertising and Sales Promotion Fund (the "Dunkin' Donuts Fund") and shall direct the development of all advertising, marketing and promotional programs for the Dunkin' Donuts System. That portion of FRANCHISEE's payments under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Dunkin' Donuts Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Dunkin' Donuts Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System. The balance, including any interest earned by the Dunkin' Donuts Fund, will be used for advertising and related expenses. Contributions to the Dunkin' Donuts Fund in excess of the percentage of Gross Sales of the Dunkin' Donuts Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

*Dunkin' Donuts Rider – pg.* 1

## Section DD-4.  Payments

4.4   FRANCHISEE shall make payments to the Dunkin' Donuts Fund as described in paragraph 4.4 of the General Terms and Conditions, except that sales to wholesale accounts approved by FRANCHISOR are excluded for purposes of calculating fees due under paragraph 4.4 (only).   For wholesale accounts to be approved by FRANCHISOR, FRANCHISEE must provide FRANCHISOR prior written notice of each such account.   Upon FRANCHISOR's receipt of such notice, the account shall be deemed approved, unless FRANCHISOR at any time notifies FRANCHISEE in writing that such account is not approved.   FRANCHISEE shall, within ten (10) days of receipt of a disapproval notice, discontinue sales to the disapproved wholesale account.

4.4.1   FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Dunkin' Donuts Units included in the base for purposes of determining "two-thirds" support.

## Section DD-5.  Covenants of FRANCHISEE

5.0   FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Dunkin' Donuts Products and protect and enhance the reputation and goodwill of DUNKIN' DONUTS.

5.1   Unless this Unit is expressly authorized to manufacture donut products on the Premises, and except as DUNKIN' DONUTS may otherwise authorize and direct in writing, donut products sold at this Unit shall be produced in the Dunkin' Donuts manufacturing unit located at the address set forth in Item "M" of the Contract Data Schedule of this Agreement (the "Producing Unit").

5.1.5.1   Franchisees' cooperatively-owned distribution centers under the Distributor Commitment Program ("DCP") are currently approved by DUNKIN' DONUTS to supply franchisees with a variety of ingredients, supplies and equipment.  DUNKIN' DONUTS or an affiliated company may from time to time be among the approved suppliers of products, supplies, services, equipment and/or materials required for the operation of the Dunkin' Donuts Unit.  If any such party is designated an approved supplier, it will be subject to the same competitive bidding procedure as other suppliers of the same Dunkin' Donuts Products.

5.1.5.2   DUNKIN' DONUTS may, from time to time, enter into national or regional exclusive supply arrangements with one or more independent suppliers for designated Dunkin' Donuts Products.  In evaluating the need for an exclusive supplier, DUNKIN' DONUTS may take into account (without limitation) the uniqueness of the designated Dunkin' Donuts Products, the projected price and required volume of such Dunkin' Donuts Products, the investment required of a supplier in order to meet the needs for such Dunkin' Donuts Products, the supplier's ability to provide such Dunkin' Donuts Products, the lack of availability of qualified alternative suppliers, the duration of exclusivity, the desirability of competitive bidding and such other business considerations as may be relevant.

5.2.1   Sales to approved wholesale accounts must be separately designated as "wholesale" on Gross Sales reports required under paragraph 5.2.1 of the General Terms and Conditions of this Agreement.

5.2.5   FRANCHISEE's Records shall also include, without limitation, daily production, throwaway and finishing records, and records of all wholesale accounts.

## Section DD-7.  Proprietary Marks

7.0   FRANCHISEE acknowledges and agrees that *Dunkin' Donuts*® is a registered trademark owned or controlled by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned or controlled by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7.5   FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Unit under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law. FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

## Section 10.  Transfer Provisions

10.3.1   **Transfer of this Manufacturing Retail Unit** - If FRANCHISEE shall propose a transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more of the Franchise for this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of this Agreement, be subject to the requirement that a controlling interest in all satellite retail units supplied by this Unit must be transferred to (a) the same qualified transferee, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of this Agreement, and who also must control one or more manufacturing Dunkin' Donuts Unit(s) at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the producing unit(s) for the satellite retail Dunkin' Donuts unit(s).

10.3.2    <u>**Transfer of other Dunkin' Donuts Units supplied by this Manufacturing Retail Unit**</u> - If FRANCHISOR receives notice of a proposed transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in any Dunkin' Donuts Franchise for a retail unit supplied by this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, be subject to the requirement that the proposed transferee must (a) also be a qualified transferee of this Unit, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, and who also must control another manufacturing retail Unit at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the manufacturing unit to supply products for such satellite retail unit.

ALLIED DOMECQ QSR
RIDER TO FRANCHISE AGREEMENT

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO
### A DUNKIN' DONUTS FRANCHISE

### ADDITIONAL PROVISIONS FOR THE EBO RENEWAL OFFER

> Note:   These additional provisions supplement and in some cases supersede the General Terms and Conditions ("GTC") and Schedule "DD" of the Franchise Agreement.  If any of the additional provisions contain in this Addendum Four conflict directly with any terms of the GTC or Schedule "DD", these additional provisions shall prevail.

1.0    **EBO Renewal Fee** - This Dunkin' Donuts Shop is an existing shop.  Accordingly, GTC Subsection 4.1 regarding Initial Franchise Fees are hereby deleted.  The following is inserted in place thereof:

4.1    **EBO Renewal Fee** - FRANCHISEE agrees to pay DUNKIN' DONUTS an EBO Renewal Fee, in the amount set forth in Item C. of the Contract Data Schedule, in accordance with the following payment schedule:  at least $7,500.00 which Franchise represents to have paid on execution of the EBO Renewal Offer, and the remaining balance in six equal annual installments due on or before June 1 of the years listed on the Renewal Data Schedule.  The EBO Renewal Fee is non-refundable.  The remaining unpaid balance of the EBO Renewal Fee shall become immediately due and payable if this Franchise Agreement terminates or expires before all payments are made.  The balance of the EBO Renewal Fee is set forth in Item E of the Renewal Data Schedule of the EBO Renewal Offer.  The annual installments described above shall also include the remaining balance of renewal fees for prior renewal offers as set forth in Items E. and G. of the Renewal Data Schedule.

2.0    **Initial Services** - This Dunkin' Donuts Shop is an existing shop.  Accordingly, GTC Subsections 2.1 and 4.2 are not applicable.  The following is hereby inserted in place of GTC Subsection 4.2:

4.2    **Grand Reopening Fee** - FRANCHISEE shall pay the Fund a Grand Reopening Fee in the amount set forth in Item "D" of the Contract Data Schedule for a Grand Reopening Promotional Advertising Program (or such other advertising program as DUNKIN' DONUTS may specify).  FRANCHISEE represents and warrants that FRANCHISEE has paid the Grand Reopening Fee.  The fee is nonrefundable.

3.0    **Additional Advertising Contributions** - The provisions of GTC Subsection 4.4.1 shall not affect the continuation of programs voted upon prior to the execution of this Agreement.

4.0    **Suppliers** - The following is DUNKIN' DONUTS' interpretation of Subsection 5.1.5.2 of Schedule "DD":

If designated an approved supplier, DUNKIN' DONUTS or an affiliate will be subject to the same competitive bidding procedure as other suppliers of such products.  With respect to designating an independent third party as an exclusive supplier, DUNKIN' DONUTS expects this to happen infrequently.  In evaluating the need for an exclusive supplier, DUNKIN' DONUTS intends to take into account the availability or lack of availability of alternative suppliers, the uniqueness of the product or supplier, the financial capabilities of the supplier, the supplier's ability to provide the requested product or service, the investment required of the supplier, the projected price and volume, the duration of exclusivity, the desirability of competitive bidding, and such other business considerations as may be relevant.  DUNKIN' DONUTS intends to make such designations after consultation with the NLC and National DCP.  By "consultation," the parties intend that DUNKIN' DONUTS will provide the above bodies with information and discuss a proposed designation with them.  Nothing herein shall imply that DUNKIN' DONUTS will obtain the consent of either such body in connection with making such a designation.  Examples of such exclusive suppliers include Pepsi for fountain soft drinks, Heinz for bagels and CPLs for the retail shops they service.  The foregoing is not an exclusive list.

5.0    **Retail Information Systems** - The following is hereby added to GTC Subsection 5.2.6:

1.    FRANCHISEE represents and warrants that FRANCHISEE has purchased or leased and installed a retail information technology system, as described in GTC Subsection 5.2.6, and as designated by DUNKIN' DONUTS for the Shop (hereinafter for convenience called "RIS").  Except as may be provided in the EBO Renewal Offer, FRANCHISEE shall bear all costs associated with RIS.

2.    The cost for the initial RIS training, exclusive of the following, shall be limited to $400 increased by the same percentage as the increase to the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the period from July, 1997 to the date of the training.  Such costs do not include

transportation, wages, benefits and other employment costs, living expenses, or training required as a result of changes in personnel.

3.      DUNKIN' DONUTS' request for FRANCHISEE to replace at its sole cost the RIS system shall occur no sooner than seven years after the shop reopens following the First Remodel described in the EBO Renewal Offer, and no sooner than each seven (7) years thereafter. The cost of the replacement system FRANCHISEE shall be required to install shall not exceed the original final cost of RIS at the shop, including all hardware, other equipment, software, installation, annual maintenance and support contracts, training and all other costs, increased by the same percentage as the increase to the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the period from July, 1997 to the date of the installation of the replacement system. The foregoing limitation assumes there is no material change in FRANCHISEE's business which would necessitate a different, more costly shop information system.

**6.0    Periodic Remodeling and Refurbishment** - GTC Subsection 5.5 is hereby amended to add the following provisions:

5.5.4    FRANCHISEE represents and warrants that the Shop was remodeled to DUNKIN' DONUTS standards on the date set forth in Item G. of the Contract Data Schedule. Refurbishments and remodels required by this Franchise Agreement are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Shop in accordance with Dunkin' Donuts standards. FRANCHISEE's obligations to maintain, repair and replace shall not be deferred pending or in anticipation of any refurbishment or remodel.

**7.0    Lease Option** - The following provisions are hereby added to GTC Subsection 6.5:

**Lease Option** - Pursuant to Section I.J. of the EBO Renewal Offer for this Shop, if the real estate is owned or controlled by FRANCHISEE, FRANCHISEE represents and warrants that FRANCHISEE has provided DUNKIN' DONUTS with DUNKIN' DONUTS' standard form Lease Option Agreement or Rider to Lease covering the full term of FRANCHISEE's lease and all renewal options.

**8.0    Arbitration** - The following provisions are hereby added to GTC Section 11:

11.5.2  If FRANCHISEE believes DUNKIN' DONUTS' filing of the action alleging intentional underreporting of Gross Sales is not brought in good faith, FRANCHISEE may request in writing that DUNKIN' DONUTS' good faith basis be reviewed by FRANCHISEE's Market Leadership Council within thirty (30) days of such filing. Such review shall be advisory only and the decision of the Market Leadership Council shall not be binding on DUNKIN' DONUTS;

11.7.2  **Limitation of Damages:**  Notwithstanding the waiver contained in GTC subsection 11.7.2, or any other limitation of damages set forth in this Franchise Agreement, if any party shall seek punitive, multiple, exemplary and/or consequential damages with respect to any claim or cause of action against another party, whether in arbitration or litigation, where punitive, multiple, exemplary and/or consequential damages are permitted by statute, recovery will be limited to two (2) times actual damages.

**9.0    Relocation of the Shop** - Subject to the following, at any time after the First Remodel described in the Shop's EBO Renewal Offer, FRANCHISEE may, with DUNKIN' DONUTS' prior written consent, close the Shop and substitute therefor another unit of the same type at a location approved by DUNKIN' DONUTS. FRANCHISEE must not be in default under this Agreement and must qualify for expansion under then current guidelines for multi-unit development. The substitution may not conflict with any contract between DUNKIN' DONUTS and any third party. The new unit must:  be developed by FRANCHISEE in accordance with DUNKIN' DONUTS' then current requirements; be approved within six (6) months following the closing of the Shop; and must open within one (1) year following the closing of the Shop. FRANCHISEE's existing Franchise Agreement shall apply to the new unit. Prior to the opening of the new unit, FRANCHISEE shall:  execute an amendment to the Franchise Agreement to reflect the address of the new unit; execute DUNKIN' DONUTS' standard related agreements (e.g., lease option agreement) for the new unit; and reimburse DUNKIN' DONUTS for DUNKIN' DONUTS' out-of-pocket expenses to third parties related to the development and approval of the new unit.

PC# 304729
SCHEDULE "NY"

120199

### ADDENDUM TO THE ADQSR FRANCHISE AGREEMENT AND
### STORE DEVELOPMENT AGREEMENT
### REQUIRED BY THE NEW YORK GENERAL BUSINESS LAW

Notwithstanding anything to the contrary set forth in the ADQSR Franchise Agreement (the "Franchise Agreement") and/or the Store Development Agreement ("SDA") the following provisions shall supersede and apply to all Baskin-Robbins, Dunkin' Donuts and Togo's franchises offered and sold in the State of New York.

1.       Subsection 5.4 of the Franchise Agreement and Section 14 of the SDA shall each be supplemented by the addition of the following language as the last sentence of these sections:

However, FRANCHISEE shall not be required to indemnify FRANCHISOR for any claims arising out of a breach of this Agreement by FRANCHISOR or other civil wrongs of FRANCHISOR.

2.       Paragraph 7.4 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must notify FRANCHISOR immediately in writing of any apparent infringement of or challenge to FRANCHISEE's use of any Mark, or claim by any person of any rights in any Mark or any similar trade name, trademark or service mark of which FRANCHISEE becomes aware. FRANCHISEE may not communicate with any person other than FRANCHISOR and its counsel in connection with any such infringement, challenge or claim. FRANCHISOR shall have sole discretion to take such action as it deems appropriate and the right to exclusively control any litigation, U.S. Patent and Trademark Office proceedings or other administrative proceeding or to otherwise protect and maintain its interest in the Marks. FRANCHISOR shall not be obligated to defend the FRANCHISEE against the claim of a third party that the operation of Retail Unit or the FRANCHISEE's use of the Marks infringes any right of the third party and FRANCHISOR shall not be obligated to protect, indemnify or hold harmless the FRANCHISEE from the consequences of any such claim or litigation. In the event FRANCHISOR does not take action, FRANCHISEE will have to protect itself at its own expense.

3.       Paragraph 10.3.7 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must execute a general release in a form satisfactory to FRANCHISOR, releasing FRANCHISOR, its shareholders, directors, officers, employees, in their corporate and individual capacities, of any claims FRANCHISEE may have against them; provided, however, that all rights enjoyed by FRANCHISEE and any causes of action arising in its favor from the provision of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York State General Business Law Sections 687.4 and 687.5 be satisfied.

4.       Paragraph 10.1 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

This Agreement is fully assignable by FRANCHISOR and shall inure to the benefit of any assignee or other legal successor to the interest of FRANCHISOR herein. However, no assignment shall be made except to an assignee who, in the good faith judgment of FRANCHISOR, is willing and able to assume FRANCHISOR's obligations under this Agreement.

Initials

*AP*

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in duplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof. FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

FRANCHISOR

DUNKIN' DONUTS INCORPORATED

By: _____
Wendy Deas, Assistant Secretary

This agreement is not binding upon the above corporation(s) until executed by an authorized officer.

**FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.**

FRANCHISEE

ATTEST:                                          LAXMI DONUTS, INC.

_____            By: _____
Ami Patel, Secretary                     Amish Patel, President

## PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION OR MEMBERS OF A LIMITED LIABILITY COMPANY

We, the undersigned, represent and warrant that we constitute

[√]  the shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of the above FRANCHISEE, a corporation

[  ]  one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of New York. Waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally. The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned. This Guarantee is intended to take effect as a sealed instrument.

_____                    _____
Witness                                                   Amish Patel, individually

Print Name: _Elizabeth A. Strader_

_____                    _____
Witness                                                   Ami Patel, individually

Print Name: _Elizabeth A. Strader_

PC # 304128
Vails Gate, NY

## CERTIFICATION OF FRANCHISEE

DESCRIBE BELOW ALL PROMISES AND REPRESENTATIONS MADE BY FRANCHISOR THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR UNIFORM FRANCHISE OFFERING CIRCULAR BUT WHICH INFLUENCED FRANCHISEE'S DECISION TO SIGN THIS FRANCHISE AGREEMENT.

*If the answer is "none," please write "NONE" below.*

NONE

FRANCHISEE's completion of this page is a material inducement for FRANCHISOR to grant FRANCHISEE this Franchise. If FRANCHISEE fails to complete, sign and deliver this Certification of Franchisee page to FRANCHISOR along with the Franchise Agreement, FRANCHISOR will not counter-execute the Franchise Agreement or may void the Franchise Agreement if it already has been counter-executed.

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, that FRANCHISEE had the opportunity to obtain the advice of an attorney, and that FRANCHISEE, and not FRANCHISEE's attorney or other representative, has executed this Certification of Franchisee.

The date of the Certification shall be the date on the Franchise Agreement

FRANCHISEE:

Attest:                                                    LAXMI DONUTS, INC.

_____                By: _____
Ami Patel, Secretary                                   Amish Patel, President

_____                _____
            Witness                                    Amish Patel, individually
Print Name: Elizabeth A Strader

_____                _____
            Witness                                    Ami Patel, individually
Print Name: Elizabeth A. Strader

05/06

## AMENDMENT TO FRANCHISE AGREEMENT(S)
## FOR CML CO-OP MEMBER SHOP(S)

For and in consideration of the premises, and other good and valuable consideration, the mutual receipt and sufficiency of which is hereby acknowledged, DUNKIN' DONUTS FRANCHISING LLC ("Dunkin' Donuts") and the following FRANCHISEE(s) ("Franchisee(s)") hereby amend, as set forth below, the following Dunkin' Donuts Franchise Agreement(s):

PC#300392        Shop Address: **674 Broadway, Newburgh, New York 12250**

Date of
Franchise Agreement: **June 14, 2001**        FRANCHISEE: **GANPATI DONUTS, INC.**

PC#301926        Shop Address: **201 North Plank Road, Newburgh, New York 12550**
                          73
Date of
Franchise Agreement: **November 8, 2004**    FRANCHISEE: **SHREE RAM DONUTS, INC.**

Shop Address: **1002 Route 94, Vails Gate, New York 12584**

Date of
Franchise Agreement: **November 8, 2004**    FRANCHISEE: **LAXMI DONUTS, INC.**

PC#330252        Shop Address: **184 Main Street, Highland Falls, New York 10928**
                          310
Date of
Franchise Agreement: **November 8, 2004**    FRANCHISEE: **KRISHNA DONUTS, INC.**

## RECITALS

Franchisee(s) desire(s) to become member(s) in Dunkin' Donuts Co-operative Production Location or Central Manufacturing Location Co-Op (for convenience, the "CML Co-Op") PC#**342686**, located at **228-230 Macarthur Avenue, New Windsor, New York 12553**, for the manufacture and delivery of Franchisee(s)' needs for products designated from time to time by Dunkin' Donuts. Where applicable, this will require the modification of the Franchisee(s)' current production and other obligations with respect to the above shops. This Amendment sets forth the terms and conditions under which Dunkin' Donuts will consent to the aforesaid.

TERMS AND CONDITIONS: DUNKIN' DONUTS AND FRANCHISEE(S) AGREE THAT THE TERMS AND
CONDITIONS ATTACHED ARE A PART OF THIS AGREEMENT.

Date: 10/24/06 ,2006

FOR THE ABOVE FRANCHISEE(S)

By _____

Amish Patel, President

DUNKIN' DONUTS FRANCHISING LLC

By _____

Wendy Bean, Assistant Secretary

MARY ANN OHMISHD
ASSISTANT SECRETARY

WITNESS:

_Lynette Romero_

Print Name: Lynette Romero

THIS AGREEMENT IS NOT BINDING UPON DUNKIN' DONUTS UNTIL EXECUTED BY ITS AUTHORIZED REPRESENTATIVE

AMᴜNDMENT TO FRANCHISE AGREEMᴜNT(S)
TERMS AND CONDITIONS

1.    Franchisee(s) acknowledge that Dunkin' Donuts has limited experience with production facilities of this type.

2.    Franchisee(s) shall cause the CML Co-Op entity to be formed, or if previously formed, to be amended, and shall ensure that the entity conforms to Dunkin' Donuts' requirements.

3.    Franchisee(s) represent and warrant that Franchisee(s) have entered into a purchase commitment agreement with the CML Co-Op, in a form approved in writing by Dunkin' Donuts, binding themselves and their successors to purchase exclusively from the CML Co-Op for the above shops their requirements for products designated by Dunkin' Donuts from time to time.  Franchisee(s) shall promptly pay all required membership and other fees to the CML Co-Op, as well as each invoice for product deliveries.

4.    Dunkin' Donuts makes no representations or warranties as to the sales, profits, or other benefits, if any, that may result from the operation of the CML Co-Op.  Dunkin' Donuts will use reasonable efforts to have the CML Co-Op conform to Dunkin' Donuts' quality standards.  But Dunkin' Donuts assumes no obligation or liability for the CML Co-Op's failure to comply with these standards or its failure to provide bakery products sufficient to meet the Franchisee(s)'needs.

5.    It is not intended that the CML Co-Op will produce all product to be sold in the Franchisee(s)' Dunkin' Donuts shops.  Dunkin' Donuts reserves the right to require the Franchisee(s) to produce in their shops (or elsewhere as Dunkin' Donuts may direct) products determined from time to time by Dunkin' Donuts.

6.    It is not intended that the Franchisee(s) transfer their membership(s) in the CML Co-Op except on the transfer of the applicable shop(s). Each transfer shall comply with the CML Co-Op's Franchise Agreement and Dunkin' Donuts' requirements.  Franchisee(s) shall also comply with the provision of the CML Co-Op's by-laws and their Franchise Agreement(s) with respect to the transfer of its shop(s).

7.    For purposes of determining the correct Transfer Fee on the transfer of an interest in the CML Co-Op, the Franchise Agreements for the Member Shops provide Dunkin' Donuts the right to reallocate values agreed upon by Franchisee(s) and the transferee(s) for the transaction.    Franchisee(s) acknowledge that for the purposes of calculating the Transfer Fee on the sale of any CML Co-Op Member Shop, no value shall be attributable to the Member Shop's ownership of or membership in the CML Co-Op.

8.    Franchisee(s) shall remove production equipment for the above stores, wherever such production is presently occurring, only in accordance with a schedule mutually agreed upon by Dunkin' Donuts and Franchisee(s).  If the CML Co-Op is newly created, Franchisee(s) shall coordinate its production activities with the CML Co-Op during its start-up and initial phases of membership.  If one or more of the above shops has excess space resulting from the removal of production equipment, the applicable Franchisee(s)' reconfiguration and subsequent use of such space shall conform to the terms of the Franchise Agreement(s), including without limitation, Dunkin' Donuts' prior approval thereof.

9.    The Franchise Agreement(s) for Franchisee(s)' shops are hereby amended as follows:  The producing unit designated in Item M of the Contract Data Schedule, if any, is hereby deleted and the profit center number and address of the CML Co-Op is inserted in its place. For any of Franchisee(s)' shops that are currently operating as full-producer(s), Schedule DD, Addendum One, "Special Terms

and Conditions Applicable to a Dunkin' Donuts Franchise - Additional Provisions for a Dunkin' Donuts Manufacturing Retail Unit (A Full-Producing Unit)" are hereby deleted from the Franchise Agreement(s).

10.    Franchisee(s) agree to vote their shares in the CML Co-Op (and, if an officer or director of the CML Co-Op, to act at all times) in a manner consistent with the CML Co-Op's obligations to Dunkin' Donuts under the CML Co-Op Franchise Agreement and consistent with the Franchisee(s)' obligations to Dunkin' Donuts under their Franchise Agreement(s) with Dunkin' Donuts.


11.    **GUARANTEE OF THE CML Co-Op BY FRANCHISEE(S)**

Franchisee(s) hereby waive demand and notice, and jointly and severally, guarantee the performance of all of the CML Co-Op's obligations under the CML Co-Op's Franchise Agreement (other than its money obligations, which are provided for below), including, without limitation, paragraph 6.3 and Section 8, in their entirety, relative to the restrictions on the activities of Franchisee(s). However, the post-term restrictions under the CML Co-Op Franchise Agreement applicable to a Franchisee by virtue of this guarantee shall not extend beyond 2 years from the last of the Franchisee's member shops' franchise agreements to be transferred, terminated or expire.

Franchisee(s) each agree to guarantee a portion of the CML Co-Op's money obligations under Section 4 of the CML Co-Op's Franchise Agreement. The portion guaranteed by each of the Franchisee(s) shall be proportionate to the percentage of the CML Co-Op's member shops in which the respective Franchisee(s) has an interest. By way of example, if the CML Co-Op's member shops number 50, and the respective Franchisee(s) has an interest in 17 of those shops, the respective Franchisee(s)' guarantee shall be 34% (17/50) of the CML Co-Op's money obligations.

The Franchisee(s) agree that Dunkin' Donuts may, without notice to or consent of the Franchisee(s), (a) extend, in whole or in part, the time for payment of the CML Co-Op's money obligations under Section 4 of the CML Co-Op's Franchise Agreement; (b) modify, with the consent of the CML Co-Op, its money or other obligations under the CML Co-Op's Franchise Agreement; and/or (c) settle, waive or compromise any claim of Dunkin' Donuts against the CML Co-Op or any of the Franchisee(s), all without in any way affecting the guarantee of the Franchisee(s). This Guarantee is intended to take effect as a sealed instrument.

**FRANCHISE AGREEMENT**
**ALLIED DOMECQ QUICK SERVICE RESTAURANTS**

This Franchise Agreement is dated _November 8_ , 2004, and made by and between **DUNKIN' DONUTS INCORPORATED**, a Delaware corporation with principal offices in Randolph, Massachusetts (hereinafter referred to as "DUNKIN' DONUTS" or "FRANCHISOR"), and the following individual(s) and/or entity:

**KRISHNA DONUTS, INC.**, a New York corporation

(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("ADQSR-120103") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

## CONTRACT DATA SCHEDULE

A.  Location of the Franchised Unit (the "Premises"):

| 184 | Main Street | Highland Falls | New York | 10928 |
|---|---|---|---|---|
| (number) | (street) | (city or town) | (state) | (zip code) |

B.  Term:                                                          in the case of an existing Unit, **June 13, 2006**\*

C.  Initial Franchise Fee: _____ N/A _____ dollars ($        )

D.  Marketing Start-Up Fee: _____ N/A _____ dollars ($        )

E.  Continuing Franchise Fee Rate:    Five and Nine Tenths        percent (5.9%) of Gross Sales

F.  Minimum Continuing Advertising Fee Rate: ―――――――――FIVE― percent (5.0%) of Gross Sales

G.  Refurbishment Date:                         in the case of an existing unit, not applicable

    Remodel Date:                    in the case of an existing unit, on September 30, 2005

H.  Transfer Fee:  As provided in subsection 10.4 of the General Terms and Conditions, unless another amount is inserted here: No Change _____

I.  Address for notice to FRANCHISEE shall be at the Unit Premises, unless another address is inserted here: _____

J.  Special Terms and        [✓] Special Terms and Conditions Applicable to a Dunkin' Donuts Franchise
    Conditions:
                              [✓] Addendum to the ADQSR Franchise Agreement and Store Development
                                  Agreement Required by the New York General Business Law

                              [✓] Special Terms and Conditions Applicable To Renewal of The Franchise
                                  Agreement

K.  The Designated Representative for this Unit is    _Amish Patel_
                              (List only one person. See definitions in General Terms and Conditions. Print full name above.)

L.  Arbitration under this Agreement shall be initiated in the city and state of New York, New York        .

M.  If applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit located   at   PC#   300392,   674   Broadway,   Newburgh,   New   York _____
                   (insert address if this Unit is a Dunkin' Donuts non-producing unit;  otherwise insert "not applicable").

Form last revised 12/01/02

Allied Domecq QSR corporations are EOE and AA Employers
(Franchisees are not employees)

ADQSR-120103

# ALLIED-DOMECQ QUICK SERVICE RESTAURANTS
## FRANCHISE AGREEMENT
© December, 2003

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

**Baskin-Robbins USA Co.**, a California corporation ("BASKIN-ROBBINS"), **Dunkin' Donuts Incorporated**, a Delaware corporation ("DUNKIN' DONUTS") and **Togo's Eateries Inc.**, a California corporation ("TOGO'S") are indirect wholly-owned subsidiaries of Allied Domecq PLC, a publicly-traded United Kingdom company. To take advantage of synergies between them, the three subsidiaries share certain common field and support personnel and form an unincorporated division called "Allied Domecq Quick Service Restaurants". As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins®* ice cream, yogurt and novelties, *Dunkin' Donuts®* donuts, coffee and freshly baked goods, *Togo's®* fresh sandwiches, salads and deli platters, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.    The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, *Dunkin' Donuts®* owned or controlled by DUNKIN' DONUTS, *Baskin 31 Robbins®* owned or controlled by Baskin-Robbins Incorporated ("BRI"), and *TOGO'S®* owned or controlled by TOGO'S, all of which are registered trademarks on the Principal Register of the United States Patent and Trademark Office.

B.    "FRANCHISOR" refers to Dunkin' Donuts Incorporated with respect to the Dunkin' Donuts System, Baskin-Robbins USA, Co., with respect to the Baskin-Robbins System and Togo's Eateries, Inc. with respect to the Togo's System.

C.    "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.    The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.    The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.    The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.    "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.    The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

-2-

I.    The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System. Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit; specifications for the facility, equipment and products; business processes and techniques for the operation of the Unit; and guidelines and standards for quality, cleanliness, appearance and service.

## Section 1. Grant of the Franchise and Term

1.0    This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise"). The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule; provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1    **Training.** FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR. This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2    **Financing.** Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3    **Documents.** FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4    **Payment.** FRANCHISEE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5    **Possession.** FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6    **For a New Unit.** If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1    The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2    FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2. Services Furnished by FRANCHISOR

2.0    FRANCHISOR agrees:

2.1    **Prior to and For the Initial Opening of the Unit.**

2.1.1    FRANCHISEE shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2    FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3    FRANCHISOR shall provide its current operating procedures to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

2.1.4    FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

2.2    **After the Initial Opening of the Unit.**

2.2.1    FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

2.2.2    FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

2.2.3    FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

2.2.4    FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

### Section 3. Advertising and Promotion

3.0    FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System. FRANCHISEE's payments to the Fund(s) shall be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing. The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR. FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any. Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISEE contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

3.1    FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval. If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISOR, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

3.2    FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services for order through the mail or by any electronic or other medium. FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services. Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use. FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

3.3    Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

### Section 4. Payments

4.0    FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

4.1.    **Initial Franchise Fee.** - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

4.2    **Marketing Start-Up Fee.** - FRANCHISEE shall pay a Marketing Start-Up Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a start-up promotional program or such other promotion or advertising program as FRANCHISOR may specify. Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

-4-

4.3   **Continuing Franchise Fees** - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

4.4.   **Continuing Advertising Fee.** FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1   In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2   If FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5   If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6   FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank. Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR. If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1   FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability. FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account; (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE'S bank rejects FRANCHISOR's EFT request because of insufficient funds; and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2   For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported. This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR. To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required. In FRANCHISOR's discretion or due to system failure, FRANCHISOR may elect to withdraw the electronic form. In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

4.7   **Late Fee, Interest and Costs.** If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have. Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR. FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks. At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.

## Section 5. Covenants of FRANCHISEE

5.0   FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons. FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1   If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

  


5.0.2    FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time. Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe. Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person. FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date. In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3    FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit.

5.1      **Unit Operations.** - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day permitted by law, on all days, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing. In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1    FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR. All such items must conform to FRANCHISOR's Standards. FRANCHISOR reserves the right to specify any item by brand. FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2    FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards. Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products. For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3    FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit. FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR. FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit; and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit. FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit. FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4    FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5    FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR. Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier. FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use. FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year. This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6    FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7    FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

-6-

5.1.7.1 FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below. and to furnish to FRANCHISOR therefor, within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications. If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8    FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program. Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers. If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1  In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2  FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures. FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment. FRANCHISEE shall ensure that all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Unit. FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require. The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE. FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9    FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft. FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2    **Books, Records and Reports.** FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR. Commencing upon the opening of the Unit:

5.2.1    FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years. FRANCHISOR shall have the right, in its sole discretion, to require that such annual financial statements be certified by an independent certified public accountant or such other independent public accountant acceptable to FRANCHISOR.

5.2.4    FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5    FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:

    a. daily cash reports;
    b. cash receipts journal and general ledger;
    c. cash disbursements journal and weekly payroll register;
    d. monthly bank statements, and daily deposit slips and canceled checks;
    e. all business tax returns;
    f. suppliers invoices (paid and unpaid);

*General Terms and Conditions*

g. dated cash register tapes (detailed and summary);

h. semi-annual balance sheets and monthly profit and loss statements;

i. weekly inventories;

j. records of promotion & coupon redemptions;

k. such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6    Retail Information System FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

5.2.6.1    FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2    FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3    FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7    FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3    **Insurance.** FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, and their directors and employees, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1    Such policy or policies shall include:

5.3.1.1    commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with an aggregate single limit of two million dollars ($2,000,000.00) or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2    "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

-8-

5.3.1.3  plate glass insurance and, if applicable, boiler insurance; and

5.3.1.4  employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.2    All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR; (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named; (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3    During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid. If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums therefor. Maintenance of insurance and FRANCHISEE's performance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.   Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage. FRANCHISEE shall, upon obtaining the polices of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4    **Indemnification.** FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, and each of them, and the subsidiaries or each of them, and their respective officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation of or defense against any and all such claims.

5.5    **Refurbishment & Remodel of the Premises.** FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5. Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards. FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1    No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards. It is intended that the cost of the initial refurbishment shall not exceed $10,000.00 and that subsequent refurbishments shall not exceed $10,000.00 increased by the same percentage as the increase to the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the period from the Refurbishment Date to the date of subsequent refurbishment. The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition. The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2    No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment). The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3    FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6    **Cross-Guarantee.** In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s). Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party. FRANCHISEE's liability under this paragraph shall be limited to the extent that the

total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7     **FRANCHISEE Entity.** FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC"). FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1     **Corporation.** If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is authorized to operate the Unit as provided under this Agreement; (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2     **LLC.** If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that its activities are limited to operating the Unit as provided under this Agreement; (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

### Section 6. Certain Rights of FRANCHISOR

6.0     In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and in, general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s). During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1     If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1     FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2     FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3     FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation. If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

-10-

6.2    In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit. If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRAN-CHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales. If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate. FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees. Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3    In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit. Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that exclusion (c) therein does not apply. Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4    FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5    If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises. Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

## Section 7. Proprietary Marks

7.0    FRANCHISOR has, in connection with its business and the business of its franchisees, developed and used and continues to use and control the usage of Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts®**, owned by Dunkin' Donuts Incorporated, **Baskin 31 Robbins®**, owned by Baskin-Robbins Incorporated, and **TOGO'S®**, owned by Togo's Eateries, Inc., all of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office. FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1    FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE shall not sublicense the Proprietary Marks. FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1    FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement. FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE. FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

7.2     FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks. FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.3     FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts. Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4     FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISOR, be necessary to carry out such defense or prosecution.

## Section 8. Restrictions on FRANCHISEE's Activities

8.0     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1     Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2     Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3     Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute.

8.1     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business. Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement. FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchises licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2     The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3     FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

-12-

## Section 9. Default

9.0    FRANCHISEE shall be in default under this Agreement:

9.0.1    If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law shall be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2    If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3    If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4    If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5    If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

9.1    **Thirty Day Cure Period.** Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof. Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1    **Seven Day Cure Period.** A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2    **24 Hour Cure Period.** A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety; or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3    **Cure on Demand.** FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4    **No Cure Period.** No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder. In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2    **Statutory Cure Period.** If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3    **Late Fee, Interest and Costs.** If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees, collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination. All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4    **Termination.** If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement. Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR. Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination. Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

*General Terms and Conditions*

9.4.1    FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE; and

9.4.2    FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and

9.4.3    FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

9.4.4    FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law; and

9.4.5    FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) and return to FRANCHISOR, all of the Proprietary Marks or other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks. Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks. FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph; and

9.4.6.    FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings). If FRANCHISEE owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE. All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE. Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts; and

9.4.7    FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISEE within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises. If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that purpose. In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand; and

9.4.8    FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9; and

9.4.9    FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein. If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress; and FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with FRANCHISOR whether or not constituting unfair competition.

9.5    Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, injunctive relief; No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder. FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

-14-

9.6    Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof. In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISOR shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

## Section 10. Transfer Provisions

10.0    **Transfer By FRANCHISOR.** This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively. FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect. Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1    If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand. FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof. If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1    **Transfer By FRANCHISEE.** FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE. Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2    **Consent By FRANCHISOR.** FRANCHISOR shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided, that:

10.2.1    FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2    The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors. This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3    The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable. FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee; and

10.2.4    The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3    **Transfer Requirements.** Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1    Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

*General Terms and Conditions*

10.3.2    Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3    FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity. Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4    Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5    If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6    The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable. The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority. The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s). Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement. The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7    FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each; and

10.3.8    In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4    **Transfer Fee.** The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1    **Prior to FRANCHISEE's Fourth Year of Operations.** The transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of: (i) five thousand dollars ($5,000.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR; or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1 The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR. No adjustment shall be made for amounts paid in connection with the development of a new unit. The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description: furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE. It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2 For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business. If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.2    **From and After FRANCHISEE's Fourth Year of Operations.** If the transfer takes place after the commencement of FRANCHISEE's fourth year of operations, the transferor shall pay to FRANCHISOR the Transfer Fee indicated below based on the Unit's Gross Sales for the most recently completed twelve (12) calendar month period preceding the date of the contract of sale. FRANCHISOR reserves the right to select another period or to make appropriate adjustments to such Gross Sales in the event extraordinary occurrences (e.g., road construction, fire or other casualty, etc.) materially affected Unit sales during the indicated twelve (12) month period.

| Sales for Most Recent 12 Month Period | Transfer Fee |
|---|---|
| Less than $400,000.00 | $5,000.00 |
| $400,000.00 or more, but less than $600,000.00 | $6,000.00 |
| $600,000.00 or more, but less than $1,000,000.00 | $8,000.00 |
| $1,000,000.00 or more, but less than $1,400,000.00 | $12,000.00 |
| $1,400,000.00 or more | $20,000.00 |

-16-

10.4.3    If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.4    **Transfer of Less Than Control.** For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period. FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.5    **Transfer to Spouse or Children.** Notwithstanding anything else contained in this subsection 10.4, but provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above. The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5    **Release of Transferor.** Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6    **Transfer on Death, Disability or Incapacity.** In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify. Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement. A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1    If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest shall have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR. FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld. FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2    If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time. Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice-to cure.

10.6.3    FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6. If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such interest. FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7    **Right of First Refusal.** If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer. FRANCHISOR shall have the right and option, exercisable within sixty (60) days after its receipt of said copy, to purchase FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party. FRANCHISOR's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR. Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have sixty (60) days to exercise its right to purchase on the altered terms. Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

## Section 11. Arbitration.

11.0    Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein modified. This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any state or federal statute. As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto. The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1    **Eligibility and Procedures.** Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted. Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances. Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement. If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply. The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue. Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims. The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2    **Enforceability and Effect.** Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3    **Governing Law.** The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought. Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4    **Exceptions to Arbitration.** Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time. In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5    **FRANCHISOR's Exceptions.** FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint in any court of competent jurisdiction:

11.5.1    the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2    any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

11.5.3    any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

11.5.4    any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1); or

11.5.5    any action in ejectment or for possession of any interest in real or personal property.

11.6    **FRANCHISEE's Exceptions.** FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

-18-

11.6.1    In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7    **Waiver of Rights.** THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1    The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2    The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law; and

11.7.3    The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4    The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5    ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8    **No Class Actions.** No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9    **Post-Term Applicability.** The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

## Miscellaneous Provisions.

12.0    **Relationship of the Parties.** This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its affiliated corporation for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR or its affiliated corporation or to create any obligation, express or implied, on behalf of FRANCHISOR or its affiliated corporation. The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated corporation and FRANCHISEE.

12.1    Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party. Each party shall indemnify, protect, defend and save the other party harmless against any such claim. The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

13.0    **Non-Waiver.** Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement. Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE. Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0    **Notices.** All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from

time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to Allied Domecq Retailing USA, at Post Office Box 317, 14 Pacella Park Drive, Randolph, Massachusetts 02368, Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE.

15.0    **Entire Agreement.** This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement. The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto. In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0    **Severability.** Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation of or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.** This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.** THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS. FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY. FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    **FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".**

Initials

ALLIED DOMECQ QSR
RIDER TO FRANCHISE AGREEMENT

PC# 330252
**SCHEDULE "DD"**
120103

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
### DUNKIN' DONUTS FRANCHISE

In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has developed and used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including *Dunkin' Donuts*®, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark *Dunkin' Donuts*®, and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System.    FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Unit in conformity with the Dunkin' Donuts System and in accordance with FRANCHISOR's Standards and specifications.

## DEFINITIONS

As used in these Special Terms and Conditions applicable to a Dunkin' Donuts Franchise, the following defined terms shall have the following meanings:

A.    The "Dunkin' Donuts Unit" means all or a portion of the Premises dedicated to the operation of the Dunkin' Donuts System, as approved by FRANCHISOR.

B.    "Dunkin' Donuts Products" shall mean and refer to donuts, bagels, muffins, cookies and other baked goods, sandwiches, coffee, soda, frozen drinks and other beverages, all of a variety of kinds or flavors, made in accordance with specifications designated by FRANCHISOR and identified by the Dunkin' Donuts Proprietary Marks, and such other products as may be specified from time to time in writing by FRANCHISOR for sale in the Dunkin' Donuts Unit.

C.    Where applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit designated in Item "M" of the Contract Data Schedule of this Agreement.

## Section DD-1.  Grant Of The Franchise

1.0    FRANCHISOR grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this agreement (hereinafter called the "Dunkin' Donuts Unit").  In connection therewith, this Franchise includes the right to use at the Dunkin' Donuts Unit only, the trademark *Dunkin' Donuts*®, along with other Proprietary Marks owned and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts units, and the right to use at the Unit only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

## Section DD-2.  Scope Of The Franchise

2.0    This Dunkin' Donuts Franchise is specific to one location only, for the term of this Agreement.  It grants no rights outside the Premises, nor includes any territorial protection against competition.  FRANCHISOR reserves and retains the right to operate or permit others to operate Dunkin' Donuts units or to sell or distribute Dunkin' Donuts products and/or services or to otherwise use the Dunkin' Donuts Proprietary Marks and/or the Dunkin' Donuts System, in each case at any other location. FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Unit using the same or different brand(s).

## Section DD-3.  Advertising and Promotion

3.0    FRANCHISOR shall prepare and coordinate a "Start-Up" promotional program (or such other promotional or advertising program as FRANCHISOR may specify) for the initial opening of the Dunkin' Donuts Unit.

3.1    FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Unit; and

3.3.1    FRANCHISOR shall administer The Dunkin' Donuts Advertising and Sales Promotion Fund (the "Dunkin' Donuts Fund") and shall direct the development of all advertising, marketing and promotional programs for the Dunkin' Donuts System.  That portion of FRANCHISEE's payments under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Dunkin' Donuts Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Dunkin' Donuts Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System.  The balance, including any interest earned by the Dunkin' Donuts Fund, will be used for advertising and related expenses.  Contributions to the Dunkin' Donuts Fund in excess of the percentage of Gross Sales of the Dunkin' Donuts Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

## Section DD-4.  Payments

4.4   FRANCHISEE shall make payments to the Dunkin' Donuts Fund as described in paragraph 4.4 of the General Terms and Conditions, except that sales to wholesale accounts approved by FRANCHISOR are excluded for purposes of calculating fees due under paragraph 4.4 (only).   For wholesale accounts to be approved by FRANCHISOR, FRANCHISEE must provide FRANCHISOR prior written notice of each such account.   Upon FRANCHISOR's receipt of such notice, the account shall be deemed approved, unless FRANCHISOR at any time notifies FRANCHISEE in writing that such account is not approved.   FRANCHISEE shall, within ten (10) days of receipt of a disapproval notice, discontinue sales to the disapproved wholesale account.

4.4.1   FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Dunkin' Donuts Units included in the base for purposes of determining "two-thirds" support.

## Section DD-5.  Covenants of FRANCHISEE

5.0   FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Dunkin' Donuts Products and protect and enhance the reputation and goodwill of DUNKIN' DONUTS.

5.1   Unless this Unit is expressly authorized to manufacture donut products on the Premises, and except as DUNKIN' DONUTS may otherwise authorize and direct in writing, donut products sold at this Unit shall be produced in the Dunkin' Donuts manufacturing unit located at the address set forth in Item "M" of the Contract Data Schedule of this Agreement (the "Producing Unit").

5.1.5.1   Franchisees' cooperatively-owned distribution centers under the Distributor Commitment Program ("DCP") are currently approved by DUNKIN' DONUTS to supply franchisees with a variety of ingredients, supplies and equipment.   DUNKIN' DONUTS or an affiliated company may from time to time be among the approved suppliers of products, supplies, services, equipment and/or materials required for the operation of the Dunkin' Donuts Unit.   If any such party is designated an approved supplier, it will be subject to the same competitive bidding procedure as other suppliers of the same Dunkin' Donuts Products.

5.1.5.2   DUNKIN' DONUTS may, from time to time, enter into national or regional exclusive supply arrangements with one or more independent suppliers for designated Dunkin' Donuts Products.   In evaluating the need for an exclusive supplier, DUNKIN' DONUTS may take into account (without limitation) the uniqueness of the designated Dunkin' Donuts Products, the projected price and required volume of such Dunkin' Donuts Products, the investment required of a supplier in order to meet the needs for such Dunkin' Donuts Products, the supplier's ability to provide such Dunkin' Donuts Products, the lack of availability of qualified alternative suppliers, the duration of exclusivity, the desirability of competitive bidding and such other business considerations as may be relevant.

5.2.1   Sales to approved wholesale accounts must be separately designated as "wholesale" on Gross Sales reports required under paragraph 5.2.1 of the General Terms and Conditions of this Agreement.

5.2.5   FRANCHISEE's Records shall also include, without limitation, daily production, throwaway and finishing records, and records of all wholesale accounts.

## Section DD-7.  Proprietary Marks

7.0   FRANCHISEE acknowledges and agrees that *Dunkin' Donuts*® is a registered trademark owned or controlled by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned or controlled by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7.5   FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Unit under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law.   FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

## Section 10.  Transfer Provisions

10.3.1   **Transfer of this Manufacturing Retail Unit** - If FRANCHISEE shall propose a transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more of the Franchise for this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of this Agreement, be subject to the requirement that a controlling interest in all satellite retail units supplied by this Unit must be transferred to (a) the same qualified transferee, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of this Agreement, and who also must control one or more manufacturing Dunkin' Donuts Unit(s) at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the producing unit(s) for the satellite retail Dunkin' Donuts unit(s).

*Dunkin' Donuts Rider – pg.* 2

**10.3.2    Transfer of other Dunkin' Donuts Units supplied by this Manufacturing Retail Unit** - If FRANCHISOR receives notice of a proposed transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in any Dunkin' Donuts Franchise for a retail unit supplied by this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, be subject to the requirement that the proposed transferee must (a) also be a qualified transferee of this Unit, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, and who also must control another manufacturing retail Unit at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the manufacturing unit to supply products for such satellite retail unit.

PC# 330252
SCHEDULE "NY"

120199

### ADDENDUM TO THE ADQSR FRANCHISE AGREEMENT AND
### STORE DEVELOPMENT AGREEMENT
### REQUIRED BY THE NEW YORK GENERAL BUSINESS LAW

Notwithstanding anything to the contrary set forth in the ADQSR Franchise Agreement (the "Franchise Agreement") and/or the Store Development Agreement ("SDA") the following provisions shall supersede and apply to all Baskin-Robbins, Dunkin' Donuts and Togo's franchises offered and sold in the State of New York.

1.      Subsection 5.4 of the Franchise Agreement and Section 14 of the SDA shall each be supplemented by the addition of the following language as the last sentence of these sections:

However, FRANCHISEE shall not be required to indemnify FRANCHISOR for any claims arising out of a breach of this Agreement by FRANCHISOR or other civil wrongs of FRANCHISOR.

2.      Paragraph 7.4 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must notify FRANCHISOR immediately in writing of any apparent infringement of or challenge to FRANCHISEE's use of any Mark, or claim by any person of any rights in any Mark or any similar trade name, trademark or service mark of which FRANCHISEE becomes aware. FRANCHISEE may not communicate with any person other than FRANCHISOR and its counsel in connection with any such infringement, challenge or claim. FRANCHISOR shall have sole discretion to take such action as it deems appropriate and the right to exclusively control any litigation, U.S. Patent and Trademark Office proceedings or other administrative proceeding or to otherwise protect and maintain its interest in the Marks. FRANCHISOR shall not be obligated to defend the FRANCHISEE against the claim of a third party that the operation of Retail Unit or the FRANCHISEE's use of the Marks infringes any right of the third party and FRANCHISOR shall not be obligated to protect, indemnify or hold harmless the FRANCHISEE from the consequences of any such claim or litigation. In the event FRANCHISOR does not take action, FRANCHISEE will have to protect itself at its own expense.

3.      Paragraph 10.3.7 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must execute a general release in a form satisfactory to FRANCHISOR, releasing FRANCHISOR, its shareholders, directors, officers, employees, in their corporate and individual capacities, of any claims FRANCHISEE may have against them; provided, however, that all rights enjoyed by FRANCHISEE and any causes of action arising in its favor from the provision of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York State General Business Law Sections 687.4 and 687.5 be satisfied.

4.      Paragraph 10.1 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

This Agreement is fully assignable by FRANCHISOR and shall inure to the benefit of any assignee or other legal successor to the interest of FRANCHISOR herein. However, no assignment shall be made except to an assignee who, in the good faith judgment of FRANCHISOR, is willing and able to assume FRANCHISOR's obligations under this Agreement.

Initials

*Ar*

*N*

ALLIED DOMECQ QSR                          PC#330252, Highland Falls, NY
RIDER TO FRANCHISE AGREEMENT

## SPECIAL TERMS AND CONDITIONS
### APPLICABLE TO RENEWAL OF THE FRANCHISE

DUNKIN' DONUTS hereby grants FRANCHISEE the right to renew this Franchise Agreement for **fifteen (15) years** beyond its expiration date, contingent upon compliance by FRANCHISEE with the following terms and conditions:

1.  Remodeling

    FRANCHISEE shall remodel the DUNKIN' DONUTS Shop to the then current Dunkin' Donuts image in accordance with FRANCHISOR's approved plans and specifications at FRANCHISEE's sole cost and expense on or before September 30, 2005. FRANCHISEE must, in remodeling, at its sole cost and expense, ensure that it meets the then-current standards for accessible design of the Americans' with Disability Act Accessibility Guidelines ("ADAAG"), as well as any more stringent accessibility standard that may be required under federal, state or local law.

2.  New Franchise Agreement a Time of Renewal

    FRANCHISEE must executed, for the renewal term, FRANCHISOR's then-current form of franchise agreement, which shall supersede this Agreement in all respects, and the terms of which may differ from the terms of this Agreement, including, without limitation, a higher continuing franchise fee and/or a higher minimum continuing advertising fee.

3.  General Release

    FRANCHISEE must executed a general release of FRANCHISOR, its subsidiaries and affiliates, and their respective officers, directors and employees, in their corporate and individual capacities, in form satisfactory to FRANCHISOR.

4.  Failure to Remodel

    If the remodel of the Dunkin' Donuts Shop is not completed on or before September 30, 2005, then the term of the Franchise Agreement will not be extended beyond the current expiration date as set forth in Item B of the contract data schedule of the franchise agreement.

Initial

_AP_

_AN_ -

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in duplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof.   FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

FRANCHISOR

DUNKIN' DONUTS INCORPORATED

By: _____

Wendy Deas, Assistant Secretary

This agreement is not binding upon the above corporation(s) until executed by an authorized officer.

**FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.**

FRANCHISEE

ATTEST:

_____
Ami Patel, Secretary

**KRISHNA DONUTS, INC.**

By: _____

Amish Patel, President

## PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION
## OR MEMBERS OF A LIMITED LIABILITY COMPANY

We, the undersigned, represent and warrant that we constitute

[✓]  the shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of the above FRANCHISEE, a corporation

[  ]  one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of New York.  Waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally.   The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned.  This Guarantee is intended to take effect as a sealed instrument.

_____
Witness

Print Name: Elizabeth A. Strudur

_____
Witness

Print Name: Elizabeth A. Strudur

_____
Amish Patel, individually

_____
Ami Patel, individually

## CERTIFICATION OF FRANCHISEE

DESCRIBE BELOW ALL PROMISES AND REPRESENTATIONS MADE BY FRANCHISOR THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR UNIFORM FRANCHISE OFFERING CIRCULAR BUT WHICH INFLUENCED FRANCHISEE'S DECISION TO SIGN THIS FRANCHISE AGREEMENT.

*If the answer is "none," please write "NONE" below.*

*NONE*

FRANCHISEE's completion of this page is a material inducement for FRANCHISOR to grant FRANCHISEE this Franchise. If FRANCHISEE fails to complete, sign and deliver this Certification of Franchisee page to FRANCHISOR along with the Franchise Agreement, FRANCHISOR will not counter-execute the Franchise Agreement or may void the Franchise Agreement if it already has been counter-executed.

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, that FRANCHISEE had the opportunity to obtain the advice of an attorney, and that FRANCHISEE, and not FRANCHISEE's attorney or other representative, has executed this Certification of Franchisee.

The date of the Certification shall be the date on the Franchise Agreement

FRANCHISEE:

Attest:

_____
Ami Patel, Secretary

_____
Witness
Print Name: Elizabeth A. Stradar

_____
Witness
Print Name: Elizabeth A. Stradar

**KRISHNA DONUTS, INC.**

By: _____
Amish Patel, President

_____
Amish Patel, individually

_____
Ami Patel, individually

05/06

## AMENDMENT TO FRANCHISE AGREEMENT(S)
## FOR CML CO-OP MEMBER SHOP(S)

For and in consideration of the premises, and other good and valuable consideration, the mutual receipt and sufficiency of which is hereby acknowledged, DUNKIN' DONUTS FRANCHISING LLC ("Dunkin' Donuts") and the following FRANCHISEE(s) ("Franchisee(s)") hereby amend, as set forth below, the following Dunkin' Donuts Franchise Agreement(s):

| | |
|---|---|
| PC#300392 | Shop Address: **674 Broadway, Newburg̱, New York 12250** |
| Date of<br>Franchise Agreement: **June 14, 2001** | FRANCHISEE: **GANPATI DONUTS, INC.** |

| | |
|---|---|
| PC#301926 | Shop Address: ~~201~~ North Plank Road, Newburgh, New York 12550<br>73 |
| Date of<br>Franchise Agreement: **November 8, 2004** | FRANCHISEE: **SHREE RAM DONUTS, INC.** |

| | |
|---|---|
| PC#304729 | Shop Address: **1002 Route 94, Vails Gate, New York 12584** |
| Date of<br>Franchise Agreement: **November 8, 2004** | FRANCHISEE: **LAXMI DONUTS, INC.** |

| | |
|---|---|
| ▆▆▆▆▆▆ | Shop Address: ~~184~~ Main Street, Highland Falls, New York 10928<br>310 |
| Date of<br>Franchise Agreement: **November 8, 2004** | FRANCHISEE: **KRISHNA DONUTS, INC.** |

### RECITALS

Franchisee(s) desire(s) to become member(s) in Dunkin' Donuts Co-operative Production Location or Central Manufacturing Location Co-Op (for convenience, the "CML Co-Op") PC#342686, located at **228-230 Macarthur Avenue, New Windsor, New York 12553,** for the manufacture and delivery of Franchisee(s)' needs for products designated from time to time by Dunkin' Donuts. Where applicable, this will require the modification of the Franchisee(s)' current production and other obligations with respect to the above shops. This Amendment sets forth the terms and conditions under which Dunkin' Donuts will consent to the aforesaid.

TERMS AND CONDITIONS: DUNKIN' DONUTS AND FRANCHISEE(S) AGREE THAT THE TERMS AND CONDITIONS ATTACHED ARE A PART OF THIS AGREEMENT.

Date: 10/24/06 ,2006

FOR THE ABOVE FRANCHISEE(S)

By _____

    Amish Patel, President

DUNKIN' DONUTS FRANCHISING LLC

By _____

  ~~Wendy Beas~~, Assistant Secretary

    MARY ANN OFMOND
    ASSISTANT SECRETARY

WITNESS:

_____

Print Name: Lynette Romero

THIS AGREEMENT IS NOT BINDING UPON DUNKIN' DONUTS UNTIL EXECUTED BY ITS AUTHORIZED REPRESENTATIVE

AMENDMENT TO FRANCHISE AGREEMENT(S)
TERMS AND CONDITIONS

1.     Franchisee(s) acknowledge that Dunkin' Donuts has limited experience with production facilities of this type.

2.     Franchisee(s) shall cause the CML Co-Op entity to be formed, or if previously formed, to be amended, and shall ensure that the entity conforms to Dunkin' Donuts' requirements.

3.     Franchisee(s) represent and warrant that Franchisee(s) have entered into a purchase commitment agreement with the CML Co-Op, in a form approved in writing by Dunkin' Donuts, binding themselves and their successors to purchase exclusively from the CML Co-Op for the above shops their requirements for products designated by Dunkin' Donuts from time to time.  Franchisee(s) shall promptly pay all required membership and other fees to the CML Co-Op, as well as each invoice for product deliveries.

4.     Dunkin' Donuts makes no representations or warranties as to the sales, profits, or other benefits, if any, that may result from the operation of the CML Co-Op.  Dunkin' Donuts will use reasonable efforts to have the CML Co-Op conform to Dunkin' Donuts' quality standards. But Dunkin' Donuts assumes no obligation or liability for the CML Co-Op's failure to comply with these standards or its failure to provide bakery products sufficient to meet the Franchisee(s)' needs.

5.     It is not intended that the CML Co-Op will produce all product to be sold in the Franchisee(s)' Dunkin' Donuts shops.  Dunkin' Donuts reserves the right to require the Franchisee(s) to produce in their shops (or elsewhere as Dunkin' Donuts may direct) products determined from time to time by Dunkin' Donuts.

6.     It is not intended that the Franchisee(s) transfer their membership(s) in the CML Co-Op except on the transfer of the applicable shop(s). Each transfer shall comply with the CML Co-Op's Franchise Agreement and Dunkin' Donuts' requirements.  Franchisee(s) shall also comply with the provision of the CML Co-Op's by-laws and their Franchise Agreement(s) with respect to the transfer of its shop(s).

7.     For purposes of determining the correct Transfer Fee on the transfer of an interest in the CML Co-Op, the Franchise Agreements for the Member Shops provide Dunkin' Donuts the right to reallocate values agreed upon by Franchisee(s) and the transferee(s) for the transaction.   Franchisee(s) acknowledge that for the purposes of calculating the Transfer Fee on the sale of any CML Co-Op Member Shop, no value shall be attributable to the Member Shop's ownership of or membership in the CML Co-Op.

8.     Franchisee(s) shall remove production equipment for the above stores, wherever such production is presently occurring, only in accordance with a schedule mutually agreed upon by Dunkin' Donuts and Franchisee(s).  If the CML Co-Op is newly created, Franchisee(s) shall coordinate its production activities with the CML Co-Op during its start-up and initial phases of membership.  If one or more of the above shops has excess space resulting from the removal of production equipment, the applicable Franchisee(s)' reconfiguration and subsequent use of such space shall conform to the terms of the Franchise Agreement(s), including without limitation, Dunkin' Donuts' prior approval thereof.

9.     The Franchise Agreement(s) for Franchisee(s)' shops are hereby amended as follows:  The producing unit designated in Item M of the Contract Data Schedule, if any, is hereby deleted and the profit center number and address of the CML Co-Op is inserted in its place. For any of Franchisee(s)' shops that are currently operating as full-producer(s), Schedule DD, Addendum One, "Special Terms

and Conditions Applicable to a Dunkin' Donuts Franchise - Additional Provisions for a Dunkin' Donuts Manufacturing Retail Unit (A Full-Producing Unit)" are hereby deleted from the Franchise Agreement(s).

10.    Franchisee(s) agree to vote their shares in the CML Co-Op (and, if an officer or director of the CML Co-Op, to act at all times) in a manner consistent with the CML Co-Op's obligations to Dunkin' Donuts under the CML Co-Op Franchise Agreement and consistent with the Franchisee(s)' obligations to Dunkin' Donuts under their Franchise Agreement(s) with Dunkin' Donuts.

11.    **GUARANTEE OF THE CML Co-Op BY FRANCHISEE(S)**

Franchisee(s) hereby waive demand and notice, and jointly and severally, guarantee the performance of all of the CML Co-Op's obligations under the CML Co-Op's Franchise Agreement (other than its money obligations, which are provided for below), including, without limitation, paragraph 6.3 and Section 8, in their entirety, relative to the restrictions on the activities of Franchisee(s). However, the post-term restrictions under the CML Co-Op Franchise Agreement applicable to a Franchisee by virtue of this guarantee shall not extend beyond 2 years from the last of the Franchisee's member shops' franchise agreements to be transferred, terminated or expire.

Franchisee(s) each agree to guarantee a portion of the CML Co-Op's money obligations under Section 4 of the CML Co-Op's Franchise Agreement. The portion guaranteed by each of the Franchisee(s) shall be proportionate to the percentage of the CML Co-Op's member shops in which the respective Franchisee(s) has an interest. By way of example, if the CML Co-Op's member shops number 50, and the respective Franchisee(s) has an interest in 17 of those shops, the respective Franchisee(s)' guarantee shall be 34% (17/50) of the CML Co-Op's money obligations.

The Franchisee(s) agree that Dunkin' Donuts may, without notice to or consent of the Franchisee(s), (a) extend, in whole or in part, the time for payment of the CML Co-Op's money obligations under Section 4 of the CML Co-Op's Franchise Agreement; (b) modify, with the consent of the CML Co-Op, its money or other obligations under the CML Co-Op's Franchise Agreement; and/or (c) settle, waive or compromise any claim of Dunkin' Donuts against the CML Co-Op or any of the Franchisee(s), all without in any way affecting the guarantee of the Franchisee(s). This Guarantee is intended to take effect as a sealed instrument.

TDA __N/A__                                                                PC __332132__

# DUNKIN' DONUTS FRANCHISE AGREEMENT

This Agreement, dated _SEPTEMBER 14_, 19 _98_ is made by and between DUNKIN' DONUTS INCORPORATED, a Delaware corporation with a principal place of business in Randolph, Massachusetts (hereinafter "DUNKIN' DONUTS"), and the following individual(s) and/or entity (hereinafter collectively "FRANCHISEE"):

GIATRI DONUTS, INC., a New York corporation

This Agreement includes the Contract Data Schedule, General Terms and Conditions ("__DDFA0895__") and Special Terms and Conditions designated in Item "J" of the Contract Data Schedule below, which are attached hereto as Schedule(s) "A".

## CONTRACT DATA SCHEDULE

A.   Location of the Dunkin' Donuts Shop:

| 45 Quaker Avenue | Cornwall | New York | 12518 |
|---|---|---|---|
| (No.)  (Street) | (City or Town) | (State) | (Zip Code) |

B.   Term: __Ten__-------------------( 10 ) years from the first date the Shop opens to serve the general public, or, in the case of an existing Shop, until _____, ____.

C.   Initial Franchise Fee: __Ten Thousand__----------------------- Dollars ($ 10,000 00

D.   Grand Opening Fee: __Three Thousand__---------------------- Dollars ($ 3,000 00

E.   Continuing Franchise Fee Rate:                    Four & Nine Tenths Percent (4.9%) of Gross Sales

F.   Minimum Continuing Advertising Fee Rate:            Five Percent (5.0%) of Gross Sales

G.   Remodeling Date:     On the date ten (10) years from the first date the Dunkin' Donuts Shop opens to serve the general public; or, in the case of an existing Shop, on _____, ____.

H.   Transfer Fee: Except as described in Section 10, the greater of:

   (i)  Four Thousand Dollars ($4,000.00), increased by five percent (5%) compounded annually during the term of this Agreement, including any renewal period;  or

   (ii) Five percent (5%) of the Adjusted Sales Price of the Dunkin' Donuts Shop if the transfer takes place within three (3) years after the date of this Agreement (except, if a new Shop, the first date on which the Shop opens to serve the public); or three percent (3%) of the Adjusted Sales Price of the Dunkin' Donuts Shop if the transfer takes place more than three (3) years thereafter.

I.   Address for notice to FRANCHISEE shall be to the Dunkin' Donuts Shop, unless an address is inserted below:

J.   Schedule "A":          [x] Schedule A.1 - New Shop developed by FRANCHISEE
     (check all that apply)
                            [ ] Schedule A.2 - New Shop developed by DUNKIN' DONUTS

     [ ] - None              [x] Schedule A.3 - Non-Producing, Satellite Shop

                            [x] Schedule A.1997 - Provisions to General Conditions

                            [ ] Schedule A. - _____

FRANCHISEE acknowledges having carefully read this Agreement in its entirety, including all Schedules checked off above and the Personal Guaranty, if applicable. This Agreement is not binding upon DUNKIN' DONUTS until executed and attested to by its authorized representatives and delivered to FRANCHISEE.

Dunkin' Donuts Incorporated is an EOE and AA Employer.
Franchisees are not employees of Dunkin' Donuts Incorporated.

DDFA0895

DDFA0895

# GENERAL TERMS AND CONDITIONS OF THE
# DUNKIN' DONUTS FRANCHISE AGREEMENT

*332-132*

### Introduction

DUNKIN' DONUTS, as the result of the expenditure of time, effort and money, has acquired experience and skill in the development, opening and operating of shops and distribution outlets involving the production, merchandising and sale of donuts and other products utilizing a specially designed building or facility with specially developed equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, distribution and delivery methods, specifications and propriety marks and information, all of which are referred to in this Agreement as the "Dunkin' Donuts System". In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has developed and used and continues to use and control the usage of certain proprietary interests, trademarks, service marks and trade names, including "Dunkin' Donuts", which is registered as a trademark on the Principal Register of the United States Patent Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark "Dunkin' Donuts", and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System. FRANCHISEE understands the importance of DUNKIN' DONUTS' high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Shop in conformity with the Dunkin' Donuts System and in accordance with DUNKIN' DONUTS' standards and specifications.

## Section 1.  Grant Of The Franchise

1.0    DUNKIN' DONUTS grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this Agreement, at one location only, described in Item "A" of the Contract Data Schedule of this Agreement (hereinafter called the "Site", "Dunkin' Donuts Shop" or "Shop", as the context permits). In connection therewith, this franchise includes the right to use at the Shop only, the trademark "Dunkin' Donuts", along with other Proprietary Marks owned and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts shops, and the right to use at the Shop only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in DUNKIN' DONUTS' manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

1.1    This franchise is specific to one location only. It grants no rights outside the Site, nor includes any territorial protection against competition. DUNKIN' DONUTS reserves the right to operate or permit others to operate Dunkin' Donuts shops or to otherwise use the Proprietary Marks and/or the Dunkin' Donuts System, in each case at locations which may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Shop.

1.2    The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule of this Agreement; provided however, the term shall expire without notice upon any earlier expiration or termination of a lease or the foreclosure of a mortgage, affecting FRANCHISEE's possession and occupancy of the Shop.

1.3    FRANCHISEE and all partners and shareholders of FRANCHISEE represent and warrant that each individual is a United States citizen or a lawful resident alien of the United States; that each corporation is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to DUNKIN' DONUTS in connection with FRANCHISEE's application for this Dunkin' Donuts franchise is true and accurate.

## Section 2.  Initial Services Furnished by DUNKIN' DONUTS

2.0    DUNKIN' DONUTS agrees:

2.1    To make available to FRANCHISEE the specifications and/or requirements for the equipment to be utilized in the Dunkin' Donuts Shop;

2.2    To make available to FRANCHISEE and FRANCHISEE's designated representative, prior to the initial opening of the Dunkin' Donuts Shop, a training program with respect to the operation of the Dunkin' Donuts System, at the Dunkin' Donuts University Corporate Training Center ("DDU") located in Braintree, Massachusetts, USA, or at such other training facility as DUNKIN' DONUTS may, from time to time, designate;

2.3    To provide operating procedures to assist FRANCHISEE in complying with DUNKIN' DONUTS' standard methods of record keeping, controls, staffing and training requirements, and production methods, and in developing approved sources of supply;

2.4    To make available to FRANCHISEE assistance, based on the experience and judgment of DUNKIN' DONUTS, in the pre-opening, opening and initial operation of the Dunkin' Donuts Shop and in conforming to the requirements of the Dunkin' Donuts System; and

1

2

2.5    To prepare and coordinate a "Grand Opening" promotional advertising program (or such other advertising program as DUNKIN' DONUTS may specify) for the initial opening of the Dunkin' Donuts Shop.

## Section 3. Continuing Services Furnished by DUNKIN' DONUTS

3.0    DUNKIN' DONUTS agrees:

3.1    To maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations;

3.2    To provide to FRANCHISEE standards, specifications, procedures and techniques of the Dunkin' Donuts System, as the same may be modified by DUNKIN' DONUTS from time to time, in its sole and absolute discretion;

3.3    To continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all Dunkin' Donuts shops, thus protecting and enhancing the reputation of DUNKIN' DONUTS and the demand for the products of the Dunkin' Donuts System and, to that end, to make reasonable efforts to disseminate its standards and specifications to potential suppliers of FRANCHISEE upon the written request of FRANCHISEE;

3.4    To review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Shop; and

3.5    To administer The Dunkin' Donuts Franchise Owners Advertising and Sales Promotion Fund (the "Fund") and to direct the development of all advertising and promotional programs. That portion of FRANCHISEE's advertising contribution equal to one percent (1%) of the Gross Sales of the Shop will be utilized, at the discretion of DUNKIN' DONUTS, to provide for the administrative expenses of the Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System. The balance, including any interest earned by the Fund, will be used for advertising and related expenses. Contributions to the Fund in excess of the percentage of Gross Sales set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate. The content of all advertising, as well as the media in which the advertising is to be placed and the advertising area, shall be at the discretion of DUNKIN' DONUTS. DUNKIN' DONUTS undertakes no obligation to insure that any individual franchisee benefits directly or on a prorata basis from the placement, if any, of advertising in local markets. Upon request, DUNKIN' DONUTS will provide FRANCHISEE a statement of receipts and disbursements of the Fund, prepared by an independent certified public accountant, for each fiscal year of the Fund.

## Section 4. Payments

4.0    FRANCHISEE agrees to make the following payments:

4.1    **Initial Franchise Fee** - FRANCHISEE shall pay DUNKIN' DONUTS an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Territory Development Agreement, Five Thousand Dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance upon written approval by DUNKIN' DONUTS of FRANCHISEE's location for the Dunkin' Donuts Shop, provided however, if the location is developed by DUNKIN' DONUTS, the balance shall be due in full upon FRANCHISEE's execution of the Lease of Dunkin' Donuts Shop, or on the date FRANCHISEE or FRANCHISEE's designated representative enters DDU, whichever date is earlier.

4.1.1    If the Dunkin' Donuts Shop is not open to serve the general public within fifteen (15) months from the date of this Agreement, the Initial Franchise Fee shall be increased to the then-current Initial Franchise Fee, which shall be payable to DUNKIN' DONUTS upon demand, unless DUNKIN' DONUTS elects to terminate this Agreement.

4.1.2    At any time prior to the date the second payment required under the terms of paragraph 4.1 of this Agreement becomes due, FRANCHISEE may terminate this Agreement, by written notice to DUNKIN' DONUTS. In that event, DUNKIN' DONUTS will return the initial installment paid upon execution of this Agreement, less a charge of Three Thousand Dollars ($3,000.00) to compensate DUNKIN' DONUTS for assistance rendered to FRANCHISEE to the date of termination. Franchise fees are not otherwise refundable.

4.2    **Grand Opening Fee** - FRANCHISEE shall pay the Fund a Grand Opening Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, which shall be nonrefundable after the Dunkin' Donuts Shop commences operating, for a Grand Opening Promotional Advertising Program (or such other advertising program as DUNKIN' DONUTS may specify). Payment shall be made in full prior to attendance by FRANCHISEE or FRANCHISEE's designated representative at DDU or thirty (30) days prior to the scheduled opening of the Dunkin' Donuts Shop, whichever date is earlier.

4.3    **Continuing Franchise Fees** - FRANCHISEE shall pay to DUNKIN' DONUTS at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or such other address as DUNKIN' DONUTS shall from time to time give to FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Dunkin' Donuts Shop for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement. The term "Gross Sales" used in this Agreement includes all sales made by FRANCHISEE pursuant to this Agreement, but shall not include sale of cigarettes, sales taxes or similar taxes.

4.4  **Continuing Advertising Fees** - FRANCHISEE shall pay to the Fund at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 of this Agreement, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Dunkin' Donuts Shop (excluding wholesale sales to accounts approved in writing, in advance, by DUNKIN' DONUTS). In addition, FRANCHISEE shall participate in and make additional payments to the Fund with respect to all advertising, marketing and other Dunkin' Donuts programs which from time to time are supported by a majority of producing Dunkin' Donuts Shops in the market in which the Dunkin' Donuts Shop is located with respect to local programs, and in the continental United States, with respect to national programs. DUNKIN' DONUTS reserves the right in its sole and absolute discretion to designate or change the composition of shops included in the base for purposes of determining a majority. FRANCHISEE shall have complete discretion as to the prices FRANCHISEE charges for product sold in the Dunkin' Donuts Shop. Nothing herein shall be construed to require FRANCHISEE to establish prices in accordance with programs supported by the majority of shops.

4.5  DUNKIN' DONUTS shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank. Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of DUNKIN' DONUTS.

## Section 5.  Covenants of FRANCHISEE

5.0  FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to develop and maintain high and uniform standards of quality, cleanliness, appearance, service, facilities, products and techniques to increase the demand for Dunkin' Donuts products and to protect and enhance the reputation and goodwill of DUNKIN' DONUTS. Accordingly, FRANCHISEE agrees to devote full time, energy and effort to the management and operation of the Dunkin' Donuts Shop and to use continuous best efforts to maximize sales of the Dunkin' Donuts Shop.

5.1  Continuous Shop Operation - FRANCHISEE shall keep the Dunkin' Donuts Shop open and in normal operation twenty-four (24) hours per day on all days except Christmas and Thanksgiving, unless prior written approval is obtained from DUNKIN' DONUTS or unless DUNKIN' DONUTS otherwise directs in writing. FRANCHISEE shall operate the Dunkin' Donuts Shop so as to maximize Gross Sales and maintain all standards of the Dunkin' Donuts System. In connection therewith, but without limitation, FRANCHISEE further agrees:

5.1.1  To use all materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product preparation and delivery prescribed by or which conform to DUNKIN' DONUTS' standards and specifications; and to carry out the business covered by this Agreement in accordance with the operational standards and specifications established by DUNKIN' DONUTS and set forth in DUNKIN' DONUTS' operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to DUNKIN' DONUTS' franchisees from time to time.

5.1.2  To refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product preparation, merchandising, and delivery which do not meet DUNKIN' DONUTS' standards and specifications.

5.1.3  To offer for sale at the Dunkin' Donuts Shop all products that are, from time to time, designated in writing as approved for sale at Dunkin' Donuts Shops by DUNKIN' DONUTS; and to refrain from offering for sale any product(s) that have not been so designated in writing as approved by DUNKIN' DONUTS.

5.1.4  To maintain at all times a sufficient supply of approved products.

5.1.5  To purchase all food products, supplies, equipment and materials required for the operation of the Dunkin' Donuts Shop from suppliers who demonstrate, to the reasonable satisfaction of DUNKIN' DONUTS, the ability to meet all of DUNKIN' DONUTS' standards and specifications for such items; who possess adequate capacity and facilities to supply FRANCHISEE's needs in the quantities, at the times and with the reliability requisite to an efficient operation and who have been approved, in writing, by DUNKIN' DONUTS. Prior to purchasing any items from any supplier not previously approved by DUNKIN' DONUTS, FRANCHISEE shall submit to DUNKIN' DONUTS a written request for approval of the supplier. DUNKIN' DONUTS may require that samples from the supplier be delivered to DUNKIN' DONUTS or to a designated independent testing laboratory for testing prior to approval and use. A charge not to exceed the actual cost of the test shall be made by DUNKIN' DONUTS and shall be paid by FRANCHISEE; provided, however, the cost of the first test requested by FRANCHISEE in any calendar year shall be borne by DUNKIN' DONUTS.

5.1.6  To maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Dunkin' Donuts Shop and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by DUNKIN' DONUTS. FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Dunkin' Donuts Shop (including the parking lot and landscaped areas) without the prior written consent of DUNKIN' DONUTS.

5.1.7  To comply promptly with all applicable laws, rules, regulations, ordinances and orders of public authorities including, but not limited to, the Board of Fire Underwriters and other similar organizations and all governmental agencies, however designated, which address health, safety, sanitation, environmental or other issues affecting operations of the Dunkin' Donuts Shop. FRANCHISEE agrees to submit to DUNKIN' DONUTS promptly upon receipt thereof,

4

copies of all customer complaints and notices and communications from public authorities and hereby authorizes any such public authority to provide copies of all such notices and communications directly to DUNKIN' DONUTS.

5.1.8    To manage the Dunkin' Donuts Shop at all times with at least two (2) individuals, one of whom must be FRANCHISEE or a partner or shareholder of FRANCHISEE, and both of whom must have successfully completed the Dunkin' Donuts training program at DDU.  Both individuals must have literacy and fluency in the English language sufficient, in the good faith opinion of DUNKIN' DONUTS, to satisfactorily complete training at DDU and to communicate with employees, customers, and suppliers.  In the event FRANCHISEE applies for and receives approval to develop or purchase an additional Dunkin' Donuts shop, DUNKIN' DONUTS requires that the additional shop be managed by at least one (1) DDU trained individual approved by DUNKIN' DONUTS.  FRANCHISEE shall ensure that all employees are trained in accordance with DUNKIN' DONUTS' training procedures and that the manager and all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Dunkin' Donuts Shop.  FRANCHISEE shall attend, and shall require those employed in the Dunkin' Donuts Shop to attend, such further training as DUNKIN' DONUTS shall from time to time reasonably require.  The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Dunkin' Donuts Shop will be borne entirely by FRANCHISEE.  FRANCHISEE will also bear the cost of all other training programs.  DUNKIN' DONUTS will bear the cost of presenting the initial Dunkin' Donuts training program at DDU.

5.1.9    To ensure accurate reporting of Gross Sales to DUNKIN' DONUTS and to implement all procedures recommended by DUNKIN' DONUTS to minimize employee theft.  FRANCHISEE further agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to DUNKIN' DONUTS based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales includes ringing all sales in the cash register at the time the product is delivered to the purchaser including, without limitation, retail, wholesale and bulk discount sales and sales for which payment may be deferred.  FRANCHISEE must obtain DUNKIN' DONUTS' prior written approval of all wholesale accounts.

5.2    **Books, Records and Reports** - FRANCHISEE shall keep full, complete and accurate books and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed below or as from time to time further prescribed by DUNKIN' DONUTS.  FRANCHISEE agrees:

5.2.1    To submit to DUNKIN' DONUTS, on or before Thursday of each week, on an approved form, a signed statement of Gross Sales for the seven (7) day period ending at the close of business on the preceding Saturday along with all monies required to be paid under paragraphs 4.3 and 4.4 of this Agreement.

5.2.2    To submit to DUNKIN' DONUTS, on or before the twentieth (20th) day of each month, on an approved form, a profit and loss statement of the Dunkin' Donuts Shop for the preceding calendar or fiscal month prepared in accordance with generally accepted accounting principles.

5.2.3    To submit to DUNKIN' DONUTS, within thirty (30) days after the close of each six (6) month period, commencing with the opening of the Dunkin' Donuts Shop, on an approved form, a profit and loss statement for the six (6) month period and a balance sheet (including a statement of retained earnings or partnership account) as of the end of the period.  Annual financial statements must be certified by an independent certified public accountant or such other independent public accountant as may be acceptable to DUNKIN' DONUTS.

5.2.4    To submit to DUNKIN' DONUTS, at the times required, such other periodic forms, reports and information as may from time to time be prescribed by DUNKIN' DONUTS.

5.2.5    To preserve, in the English language and for the time periods set forth below, all accounting records and supporting documents relating to the FRANCHISEE's operation of the Dunkin' Donuts Shop under this Agreement, and any lease with DUNKIN' DONUTS or its subsidiary (hereinafter called the "Records"), including but not limited to:

        a.   daily cash reports;
        b.   cash receipts journal and general ledger;
        c.   cash disbursements journal and weekly payroll register;
        d.   monthly bank statements, and daily deposit slips and canceled checks;
        e.   all tax returns;
        f.   suppliers invoices (paid and unpaid);
        g.   dated cash register tapes (detailed and summary);
        h.   semi-annual balance sheets and monthly profit and loss statements;
        i.   daily production, throwaway and finishing records and weekly inventories;
        j.   records of promotion and coupon redemptions;
        k.   records of all wholesale accounts (DUNKIN' DONUTS' prior written approval of wholesale accounts is required); and
        l.   such other records as DUNKIN' DONUTS may from time to time request.

During the term of this Agreement, FRANCHISEE shall preserve the Records for at least its current fiscal year and for the three (3) immediate past fiscal years.  For three (3) years after the date of any transfer of an interest in this Agreement, the transferor of such interest shall preserve the Records for its last three (3) fiscal years of operation under this Agreement.  For three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve the Records for its last three (3) fiscal years of operation under this Agreement.

5.2.6    To record all sales on cash registers, the make, model and serial numbers of which have been individually approved in writing by DUNKIN' DONUTS. Such cash registers shall contain a device that will record accumulated sales and cannot be turned back or reset, and a back-up power system for memory storage in the event of power loss.

5.3    **Insurance** - FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and DUNKIN' DONUTS, and their directors and employees, against any loss, liability or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with the Dunkin' Donuts Shop or by reason of FRANCHISEE's operation or occupancy of the Dunkin' Donuts Shop. Such policy or policies shall include comprehensive general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with a single limit of One Million Dollars ($1,000,000.00) (or such higher limit as DUNKIN' DONUTS, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any lease for the Dunkin' Donuts Shop) for bodily injury and property damage combined, "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Dunkin' Donuts Shop and the contents thereof, plate glass insurance and boiler insurance, if applicable, and such statutory insurance as may be required in the state in which the Dunkin' Donuts Shop is located. All insurance afforded by the policies required under the terms of this Agreement shall:

5.3.1    Be written in the names of FRANCHISEE, DUNKIN' DONUTS, and any other parties designated by DUNKIN' DONUTS, as their respective interest may appear, by insurance companies acceptable to DUNKIN' DONUTS;

5.3.2    Contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named;

5.3.3    Provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and

5.3.4    Not be limited in any way by reason of any insurance which may be maintained by DUNKIN' DONUTS or any party named.

During the term of this Agreement, FRANCHISEE shall promptly (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish DUNKIN' DONUTS with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that the premiums therefore have been paid. If at any time FRANCHISEE fails to comply with the provisions of this paragraph 5.3, DUNKIN' DONUTS, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Dunkin' Donuts Shop, at FRANCHISEE's sole expense. FRANCHISEE shall pay DUNKIN' DONUTS when and as billed for the cost of premiums therefor. Maintenance of insurance and FRANCHISEE's performance of the obligations contained in this paragraph 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in this Agreement.

5.4    **Advertising Approval** - FRANCHISEE shall submit all advertising and promotional materials prepared for use in local areas to DUNKIN' DONUTS prior to use. In the event written disapproval of the advertising and promotional material is not received by FRANCHISEE from DUNKIN' DONUTS within fifteen (15) days from the date such material is received by DUNKIN' DONUTS, said materials shall be deemed approved unless and until subsequently disapproved.

5.5    **Remodel of the Dunkin' Donuts Shop** - No later than the Remodeling Date set forth in Item "G" of the Contract Data Schedule of this Agreement, FRANCHISEE shall renovate and remodel the interior and exterior of the Dunkin' Donuts Shop to the then-current design for shops of comparable age and condition (including but not limited to fixtures, furnishings, signs and equipment). The nature and scope of renovation and remodeling shall be as then generally required by DUNKIN' DONUTS for shops of comparable age and condition.

5.6    **Cross-Guarantee** - In the event FRANCHISEE, or any partner or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other Dunkin' Donuts shop, FRANCHISEE agrees to be jointly and severally liable to DUNKIN' DONUTS as guarantor of the obligations of the franchisee under each franchise agreement for such other shop(s). Included in such guaranty is, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental payments and tax payments to subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to DUNKIN' DONUTS or guaranteed by DUNKIN' DONUTS to any third party. FRANCHISEE's liability under this paragraph shall be limited to the extent that the total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any lease obligations by any shareholder(s) or partner(s), after such guaranty shall have expired or terminated by its terms.

5.7    **FRANCHISEE Entity** - FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein. If FRANCHISEE is a corporation, said corporation and its shareholders shall comply with the following requirements:

5.7.1    Such corporation's charter shall provide that its activities are limited exclusively to operating Dunkin' Donuts Shops as provided under this Agreement, unless otherwise permitted in writing by DUNKIN' DONUTS;

5.7.2    All shareholders of the corporation shall enter into a written agreement, in a form satisfactory to DUNKIN' DONUTS, to jointly and severally guaranty the full payment and performance of the corporation's obligations to DUNKIN' DONUTS and to assume all personal obligations required of partners and/or shareholders contained in this Agreement;

5.7.3    Each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon transfers by this Agreement; and

5.7.4    No new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association or corporation without obtaining DUNKIN' DONUTS' prior written consent, pursuant to Section 10 of this Agreement.

## Section 6.  Certain Rights of DUNKIN' DONUTS

6.0    In order to preserve the validity and integrity of the Proprietary Marks and to assure that the standards and specifications of the Dunkin' Donuts System are properly employed in the operation of the Dunkin' Donuts Shop and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, DUNKIN' DONUTS, or its agents, shall have the right, at all times, to enter and inspect the Dunkin' Donuts Shop and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the standards and specifications of the Dunkin' Donuts System.  DUNKIN' DONUTS may require FRANCHISEE to remove any item which does not conform to applicable standards and specifications.  DUNKIN' DONUTS may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable standards and specifications.

6.1    If, within twenty-four (24) hours following written notice by DUNKIN' DONUTS requesting the correction of an unhealthy, unsanitary or unclean condition, or within thirty (30) days following written notice by DUNKIN' DONUTS requesting maintenance, repairs or alterations to the Dunkin' Donuts Shop, FRANCHISEE has not corrected the condition or completed the maintenance, repairs or alterations, as the case may be, DUNKIN' DONUTS may enter the Dunkin' Donuts Shop, without being guilty of, or liable for, trespass or tort, and may cause the repairs, alterations or painting to be completed, or the condition to be corrected, at the expense of FRANCHISEE and without prejudice to any other rights or remedies of DUNKIN' DONUTS.

6.2    DUNKIN' DONUTS' representatives shall have the right to examine FRANCHISEE's original books, records and supporting documents at reasonable times and to perform such inspections, tests and analyses as it deems appropriate to verify Gross Sales.  If an examination reveals that the Gross Sales reported by FRANCHISEE to DUNKIN' DONUTS are less than the Gross Sales ascertained by the examination, then FRANCHISEE shall immediately pay to DUNKIN' DONUTS any amounts owing to DUNKIN' DONUTS and the Fund and DUNKIN' DONUTS' rental subsidiary based upon the corrected Gross Sales.  If an examination results from FRANCHISEE's failure to prepare, deliver or preserve statements or records required by paragraph 5.2 of this Agreement, or if an examination of FRANCHISEE'S records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay or reimburse DUNKIN' DONUTS for any and all expenses connected with the examination, including, but not limited to, reasonable accounting and legal fees, the unpaid amounts owed to DUNKIN' DONUTS, its rental subsidiary and the Fund, and interest thereon from the date payment was due at 18% per annum or the highest permissible rate.  Such payments will be without prejudice to any other remedies DUNKIN' DONUTS may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3    Upon the request of DUNKIN' DONUTS in connection with the examination of FRANCHISEE's books and records under this Agreement, FRANCHISEE and all partners and shareholders of FRANCHISEE shall provide DUNKIN' DONUTS' representatives with personal federal and state tax returns, bank statements (including deposit slips and cancelled checks) and such other documents and information as DUNKIN' DONUTS may in its sole discretion request in connection with DUNKIN' DONUTS' efforts to verify Gross Sales reported to DUNKIN' DONUTS under this Agreement or any Lease of Dunkin' Donuts Shop.  Personal tax returns and financial data unrelated to the franchise business need not be provided by any partner or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the franchised business, alone or in conjunction with any other family member or related entity.

6.4    FRANCHISEE hereby grants DUNKIN' DONUTS the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release to DUNKIN' DONUTS records of FRANCHISEE's purchases and deliveries, by electronic transfer or otherwise, at such times and places as DUNKIN' DONUTS shall request.

## Section 7.  Proprietary Marks

7.0    FRANCHISEE acknowledges and agrees that "DUNKIN' DONUTS" is a registered trademark; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned by DUNKIN' DONUTS or which may be acquired in the future,

constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Proprietary Marks; and that any and all goodwill associated with the Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7.1　　　FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE further agrees that any unauthorized use or continued use of the Proprietary Marks after the termination of this Agreement shall constitute irreparable harm subject to injunctive relief.

7.1.1　　FRANCHISEE understands that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement. FRANCHISEE further acknowledges that DUNKIN' DONUTS, in its sole discretion, has the right to operate or franchise other Dunkin' Donuts Shops and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, in each case at such locations and on such terms and conditions as DUNKIN' DONUTS deems acceptable.

7.2.1　　FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use "DUNKIN' DONUTS" or any other of the PROPRIETARY MARKS or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.2　　　FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks.

7.3　　　FRANCHISEE agrees to notify DUNKIN' DONUTS promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event DUNKIN' DONUTS undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for DUNKIN' DONUTS, be necessary to carry out such defense or prosecution.

7.4　　　FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Shop under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law. FRANCHISEE shall not use, as part of its corporate or other business name, any proprietary marks used by DUNKIN' DONUTS, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of DUNKIN' DONUTS, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

## Section 8.　Restrictions on FRANCHISEE's Activities

8.0　　　During the term of this Agreement or any extension thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any shareholder, if FRANCHISEE is a corporation, shall:

8.0.1　　Divert or attempt to divert any business or customer of the Dunkin' Donuts Shop to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with DUNKIN' DONUTS' Proprietary Marks and the Dunkin' Donuts System;

8.0.2　　Employ or seek to employ any person who is at that time employed by DUNKIN' DONUTS or by any other Dunkin' Donuts franchisee, or otherwise directly or indirectly induce such person to leave such employment;

8.0.3　　Except with respect to the ownership or operation of additional licensed Dunkin' Donuts shops, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type offered by Dunkin' Donuts shops; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other Dunkin' Donuts shop. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with the rules of the American Arbitration Association then applicable for commercial disputes. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute;

8.0.4　　Communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating a Dunkin' Donuts shop and all other information or knowledge which DUNKIN' DONUTS deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the licensed business. Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which DUNKIN' DONUTS designates confidential shall be deemed confidential for purposes of this Agreement. DUNKIN' DONUTS shall have the non-exclusive right to use and incorporate into the Dunkin' Donuts System, for the benefit of itself and other Dunkin' Donuts franchisees, any modifications, changes, and improvements developed or discovered by

FRANCHISEE or FRANCHISEE's employees or agents in connection with the licensed business, without any liability or obligation to the developer thereof; or

8.0.5    Directly or indirectly contest or aid in contesting the right of DUNKIN' DONUTS or any prospective Dunkin' Donuts franchisee to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a Dunkin' Donuts Shop.

8.1    The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in a decision to which DUNKIN' DONUTS is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.2    FRANCHISEE understands and acknowledges that DUNKIN' DONUTS shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

8.3    FRANCHISEE agrees that the existence of any claims against DUNKIN' DONUTS, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by DUNKIN' DONUTS of any of the covenants contained in this Section 8.

8.4    FRANCHISEE acknowledges that FRANCHISEE's violation of the terms of this Section 8 would result in irreparable injury to DUNKIN' DONUTS for which no adequate remedy at law may be available, and FRANCHISEE accordingly consents to the issuance of an injunction prohibiting any conduct by FRANCHISEE in violation of the terms of this Section 8.

## Section 9.  Default

9.0    FRANCHISEE shall be in default under this Agreement:

9.0.1    If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable;  or

9.0.2    If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any lease, mortgage, equipment agreement, promissory note, conditional sales contract or other contract materially affecting the Dunkin' Donuts Shop, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not DUNKIN' DONUTS is a party thereto.

9.1    **Thirty Day Cure Period** - Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from DUNKIN' DONUTS is received or refused, as the case may be. Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1    **Seven Day Cure Period** - A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to DUNKIN' DONUTS any monies owing to DUNKIN' DONUTS or to the Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in paragraph 5.3 of this Agreement.

9.1.2    **24 Hour Cure Period** - A twenty-four (24) hour cure period shall apply to the violation of any law, regulation, order or DUNKIN' DONUTS standard relating to health, sanitation or safety; or if the FRANCHISEE ceases to operate the Dunkin' Donuts Shop for a period of forty-eight (48) hours without the prior written consent of DUNKIN' DONUTS, provided, however, that if the Shop is abandoned, no cure period shall apply.

9.1.3    **No Cure Period** - No cure period shall be available if FRANCHISEE is in default under paragraph 9.0.1 above; or if FRANCHISEE abandons the Dunkin' Donuts Shop; or if FRANCHISEE intentionally under-reports Gross Sales, falsifies financial data or otherwise commits an act of fraud with respect to its rights or obligations under this Agreement; or if FRANCHISEE's lease for the Dunkin' Donuts Shop with DUNKIN' DONUTS or a subsidiary of DUNKIN' DONUTS is terminated for reason of default by FRANCHISEE.

9.2    **Statutory Cure Period** - If a statute in the state in which the Dunkin' Donuts Shop is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3    **Interest and Costs** - If FRANCHISEE fails to remit when due any payments required under this Agreement, FRANCHISEE agrees to pay, in addition to the unpaid amounts, all collection costs, reasonable attorney's fees and

interest on the unpaid amounts at eighteen percent (18%) per annum or the highest permissible rate. If FRANCHISEE fails to cure a default, following notice, within the applicable time period set forth in paragraph 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to DUNKIN' DONUTS all damages, costs and expenses, including, without limitation, interest at eighteen percent (18%) per annum, or the highest permissible rate, and reasonable attorneys' fees, incurred by DUNKIN' DONUTS as a result of any such default or termination; and said interest and all damages, costs and expenses, including reasonable attorneys' fees, may be included in and form part of the judgment awarded to DUNKIN' DONUTS in any proceedings brought by DUNKIN' DONUTS against FRANCHISEE.

9.4    **Termination** - If FRANCHISEE fails to cure any default to DUNKIN' DONUTS' satisfaction, within the applicable period following notice from DUNKIN' DONUTS, DUNKIN' DONUTS may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement. Such termination shall be effective immediately upon receipt of a written notice of termination from DUNKIN' DONUTS. Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraph 9.0.1 or 9.1.3, without notice or opportunity to cure or notice of termination. Upon any termination or expiration of this Agreement:

9.4.1    FRANCHISEE shall promptly pay DUNKIN' DONUTS all sums owing or accrued from FRANCHISEE to DUNKIN' DONUTS, the Fund, and DUNKIN' DONUTS' rental subsidiary prior to such termination or expiration, including interest  and any damages, costs and expenses, including reasonable attorneys' fees, incurred by DUNKIN' DONUTS by reason of default on the part of FRANCHISEE, as set forth in paragraph 9.3 above;

9.4.2    FRANCHISEE shall immediately cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the Dunkin' Donuts System, any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices forming part of the Dunkin' Donuts System or otherwise used in connection with the operation of the Dunkin' Donuts Shop. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of DUNKIN' DONUTS' trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE. Nothing in this Agreement shall preclude DUNKIN' DONUTS from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, treble damages and injunctive relief;

9.4.3    FRANCHISEE shall immediately return to DUNKIN' DONUTS all operating manuals, plans, specifications, and other materials containing information prepared by DUNKIN' DONUTS and relative to the operation of a Dunkin'' Donuts Shop; and

9.4.4    FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the period specified therein.

9.5    No right or remedy herein conferred upon or reserved to DUNKIN' DONUTS is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder.

## Section 10.  Transfer Provisions

10.0    **Transfer By DUNKIN' DONUTS** - This Agreement shall inure to the benefit of the successors and assigns of DUNKIN' DONUTS. DUNKIN' DONUTS shall have the right to assign its rights under this agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by DUNKIN' DONUTS herein and FRANCHISEE receives a statement from both Dunkin' Donuts and its transferee to that effect. Upon such assignment and assumption, DUNKIN' DONUTS shall be under no further obligation hereunder except for accrued liabilities, if any.

10.1    **Transfer By FRANCHISEE** - Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any shareholder, if FRANCHISEE is a corporation, without DUNKIN' DONUTS' prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of DUNKIN' DONUTS shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of DUNKIN' DONUTS including, but not limited to, those set forth in this Section 10.

10.2    **Consent By DUNKIN' DONUTS** - DUNKIN' DONUTS shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided, that:

10.2.1    FRANCHISEE must have operated the Dunkin' Donuts Shop for a period of not less than six (6) months prior to the proposed transfer;

10.2.2    The sales price of the interest to be conveyed must not be so high, in the good faith judgment of DUNKIN' DONUTS, as to jeopardize the ability of the transferee to maintain, operate and promote the Dunkin' Donuts Shop properly and meet the transferee's financial obligations to DUNKIN' DONUTS, third party suppliers and creditors. This provision shall not create any liability on the part of DUNKIN' DONUTS to the transferee in the event that DUNKIN' DONUTS approves the transfer and the transferee experiences financial difficulties;

10

10.2.3    The transferee and each partner and shareholder of transferee must be a United States citizen or lawful resident alien of the United States and shall be of good moral character and reputation and shall have a good credit rating and business qualifications reasonably acceptable to DUNKIN' DONUTS. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in the good faith opinion of DUNKIN' DONUTS, to communicate with employees, customers, and suppliers of DUNKIN' DONUTS and to satisfactorily complete training at DDU. FRANCHISEE shall provide DUNKIN' DONUTS with such information as DUNKIN' DONUTS may require to make such determination concerning each proposed transferee; and/or

10.2.4    The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3    **Transfer Requirements** - Each transfer of any interest in FRANCHISEE, the Dunkin' Donuts Shop, this Agreement and/or the Dunkin' Donut franchise herein granted, must receive the prior written consent of DUNKIN' DONUTS set forth in paragraph 10.2 above and must conform to the following requirements:

10.3.1    Prior to the transfer, FRANCHISEE must satisfy all accrued money obligations to DUNKIN' DONUTS, its subsidiaries and the Fund, obligations of FRANCHISEE which DUNKIN' DONUTS has guaranteed, liens, deferred rent and other obligations under the Lease of Dunkin' Donuts Shop or other contracts pertaining to the Shop;

10.3.2    Prior to the transfer, the Dunkin' Donuts Shop, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with DUNKIN' DONUTS' then-current standards, including, without limitation, standards for replacements and additions;

10.3.3    FRANCHISEE and any transferee may not assert any security interest, lien, claim or right now or hereafter in this franchise, the franchise granted to the transferee, or, if applicable, the lease with DUNKIN' DONUTS' subsidiary for the Dunkin' Donuts Shop.  Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by DUNKIN' DONUTS, its successors or assigns;

10.3.4    Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of DUNKIN' DONUTS;

10.3.5    If the transferee is a corporation, it must comply with the terms of paragraph 5.7 of this Agreement;

10.3.6    The transferee, including, where appropriate, all shareholders and partners of the transferee, shall jointly and severally execute, on DUNKIN' DONUTS' then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable, with DUNKIN' DONUTS. The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Shop and to DUNKIN' DONUTS, its subsidiaries and the Fund, payments to DUNKIN' DONUTS, its subsidiaries and the Fund will have priority. The transferee's franchise agreement shall require no greater percentages of Gross Sales than those required by paragraphs 4.3 and 4.4 of this Agreement. Unless a longer period is agreed upon between DUNKIN' DONUTS and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement and the transferee shall pay no initial franchise fee as provided in paragraph 4.1 of this Agreement (unless a longer term is agreed upon by DUNKIN' DONUTS);

10.3.7    The transferor, including all individuals proposing to transfer an interest in the franchise or the FRANCHISEE, must execute a general release of all claims against DUNKIN' DONUTS and its affiliated corporations and the directors, officers and employees of each;  and

10.3.8    Prior to the transfer, FRANCHISEE must have fully paid and satisfied all of FRANCHISEE's obligations to DUNKIN' DONUTS, the Fund, and DUNKIN' DONUTS' rental subsidiary, if any, and FRANCHISEE must have paid DUNKIN' DONUTS the transfer fee provided below, if appropriate.

10.3.9    In addition, DUNKIN' DONUTS shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4    **Transfer Fee** - The transferor shall pay to DUNKIN' DONUTS the Transfer Fee set forth in Item "H" of the Contract Data Schedule of this Agreement. The "Adjusted Sales Price" shall include, without limitation, cash, assumption of debt, equipment lease obligations, and deferred financing and amounts allocated to property of every kind, nature and description:  furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building if owned by FRANCHISEE.  It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the Contract of Sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1    The Adjusted Sales Price shall be the sales price to be received by FRANCHISEE upon transfer of the Dunkin' Donuts Shop less the amount paid by FRANCHISEE for the Dunkin' Donuts Shop, when purchased as a previously operated shop from another franchisee or from DUNKIN' DONUTS.  No adjustment shall be made for amounts paid in connection with the development of a new Dunkin' Donuts shop.

10.4.2    For purposes of determining the correct Transfer Fee, DUNKIN' DONUTS reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in the good faith opinion of DUNKIN' DONUTS,

the allocation of the parties is unreasonable in relation to the value of the business. If DUNKIN' DONUTS purchases the Dunkin' Donuts Shop from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to DUNKIN' DONUTS as if FRANCHISEE had sold the franchised business to a third party.

10.4.3   For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, DUNKIN' DONUTS will reduce the Transfer Fee set forth in Item "H" of the Contract Data Schedule of this Agreement to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor, provided, however, DUNKIN' DONUTS will waive the Transfer Fee entirely if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.4   DUNKIN' DONUTS will waive the percent of Adjusted Sales Price, but not the fixed Transfer Fee of $4,000.00, subject to increase, in connection with a transfer of the Dunkin' Donuts Shop to FRANCHISEE's spouse or one or more of FRANCHISEE's children provided that, in DUNKIN' DONUTS' good faith opinion, FRANCHISEE has been in full compliance with the terms of all agreements with DUNKIN' DONUTS and its rental subsidiary.   The Franchise Agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5   **Release of Transferor** - Upon DUNKIN' DONUTS' approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4, through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6   **Transfer on Death** - In the event of the death of FRANCHISEE, or any partner or shareholder thereof, at any time during the term of this Agreement, the legal representative of FRANCHISEE, or the partner or shareholder, together with all surviving partners or shareholders, if any, shall, within three (3) months of such event, jointly apply, in writing to transfer the franchise or the interest of the deceased partner or shareholder in such franchise, to such person or persons as the legal representative may specify.   Such transfer shall be approved by DUNKIN' DONUTS upon fulfillment of all of the conditions set forth in paragraph 10.3 of this Agreement.   A Transfer Fee shall be due pursuant to paragraph 10.4 above, except that paragraph 10.4.3 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1   If the legal representative and all surviving partners or shareholders, if any, do not comply with the provisions of paragraph 10 or do not propose a transferee acceptable to DUNKIN' DONUTS under the standards set forth in this Agreement, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to DUNKIN' DONUTS.   DUNKIN' DONUTS shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld.   DUNKIN' DONUTS shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.7   **Right of First Refusal** - If FRANCHISEE, or any shareholder or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's or partner's interest in the franchised business, FRANCHISEE or such shareholder or partner shall notify DUNKIN' DONUTS and provide it with a complete copy of such offer.   DUNKIN' DONUTS shall have the right and option, exercisable within forty-five (45) days after its receipt of said copy, to purchase FRANCHISEE's franchise, or such shareholder's or partner's interest in the franchised business, on the same terms and conditions as offered by said party.   DUNKIN' DONUTS' exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to DUNKIN' DONUTS under paragraph 10.4. Should DUNKIN' DONUTS not exercise this option and the terms of the unaccepted offer be altered, DUNKIN' DONUTS shall, in each such instance, be notified of the changed offer and shall again have forty-five (45) days to exercise its right to purchase on the altered terms.   Should DUNKIN' DONUTS not exercise this option, all of the terms of Section 10 shall apply to the transfer.

## Miscellaneous Provisions.

11.0   **Relationship of the Parties** - This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of DUNKIN' DONUTS or its subsidiary for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of DUNKIN' DONUTS or its subsidiary or to create any obligation, express or implied, on behalf of DUNKIN' DONUTS or its subsidiary.   The parties agree that this Agreement does not create a fiduciary relationship between DUNKIN' DONUTS or its subsidiary and FRANCHISEE.

11.1   Under no circumstances shall DUNKIN' DONUTS or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party.  Each party shall indemnify, protect, defend and save the other party harmless against any such claim.   The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Dunkin' Donuts Shop shall be borne by FRANCHISEE.

11

12

12.0   **Non-Waiver** - Any failure of DUNKIN' DONUTS to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by DUNKIN' DONUTS of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement. Subsequent acceptance by DUNKIN' DONUTS of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by DUNKIN' DONUTS of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. Acceptance by DUNKIN' DONUTS of payments due to it hereunder from any person or entity other than FRANCHISEE shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

13.0   **Notices** - All notices hereunder by DUNKIN' DONUTS to FRANCHISEE shall, at DUNKIN' DONUTS' option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from time to time give notice of to DUNKIN' DONUTS. All notices hereunder by FRANCHISEE to DUNKIN' DONUTS shall be sent by certified mail to Dunkin' Donuts Incorporated, Post Office Box 317, Randolph, Massachusetts 02368, Attn: Senior Vice President and General Counsel or to such other address as DUNKIN' DONUTS may from time to time give notice to FRANCHISEE.

14.0   **Entire Agreement** - This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between DUNKIN' DONUTS and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing.

14.1   The prospect for success of the business venture undertaken by FRANCHISEE by virtue of this Agreement is speculative and depends to a material extent upon FRANCHISEE's capability as an independent franchisee, as well as other factors. DUNKIN' DONUTS makes no representations or warranties as to the potential success of the business venture undertaken by FRANCHISEE hereby. FRANCHISEE represents and warrants that it has entered into this Agreement after making independent investigations of DUNKIN' DONUTS' business, and not in reliance upon any representation by DUNKIN' DONUTS as to sales or profits which FRANCHISEE in particular might be expected to realize. FRANCHISEE further represents and warrants that DUNKIN' DONUTS and its representatives, employees or agents have made no representations to induce FRANCHISEE to acquire this franchise and execute this Agreement which are not expressly set forth herein or in the Disclosure Materials provided to FRANCHISEE prior to entering into this Agreement.

14.2   Captions, paragraph and subparagraph designations and section headings are included in this Agreement for convenience only, and in no way they define, limit, construe or describe the scope or intent of the respective parts of this Agreement.

15.0   **Severability** - Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

16.0   **Applicable Law** - This Agreement shall be interpreted, construed and governed by the laws of the Commonwealth of Massachusetts.

16.1   Nothing herein contained shall bar the right of either party to obtain injunctive relief against threatened conduct that will cause loss of damages, under the usual equity rules, including the applicable rules for obtaining preliminary injunctions.



INITIALS

080295

## SPECIAL TERMS AND CONDITIONS OF THE DUNKIN' DONUTS FRANCHISE AGREEMENT

## SCHEDULE "A-1"

### DEVELOPMENT OF A NEW DUNKIN' DONUTS SHOP BY FRANCHISEE

FRANCHISEE wishes to develop a new Dunkin' Donuts Shop at the Site. In order to facilitate FRANCHISEE's obtaining financing and other needed resources, DUNKIN' DONUTS may enter into this Agreement prior to having an opportunity to review the Site to determine if it is suitable for development as a Dunkin' Donuts Shop. FRANCHISEE's right to develop and operate a Dunkin' Donuts Shop on the Site is, therefore, subject to the conditions that (i) DUNKIN' DONUTS shall approve the Site as a suitable location for a Dunkin' Donuts Shop and (ii) DUNKIN' DONUTS shall confirm that FRANCHISEE meets all of DUNKIN' DONUTS' qualifications and requirements for new (or if appropriate multi-unit) franchise owners. This Schedule A-1 enumerates the respective responsibilities of the parties pertaining to FRANCHISEE undertaking to develop a Dunkin' Donuts Shop on the Site. In consideration of the conditional grant to FRANCHISEE of a franchise to operate a Dunkin' Donuts shop to be developed by FRANCHISEE on the Site, FRANCHISEE hereby agrees as follows:

### A-1.1.0 Approval of the Site

Development of the proposed Site as a Dunkin' Donuts Shop must be approved by DUNKIN' DONUTS, as evidenced solely by written notice sent to FRANCHISEE by the General Manager or other duly authorized representative of DUNKIN' DONUTS (the "Site Approval Notice"), within thirty (30) days after the Responsibility Meeting hereinafter described. Any real estate commitments that FRANCHISEE may make must be subject to: (a) FRANCHISEE obtaining DUNKIN' DONUTS' written approval of development of a Dunkin' Donuts Shop on the Site; (b) FRANCHISEE obtaining all necessary permits, licenses and local governmental approvals; and (c) such other contingencies as FRANCHISEE's attorney may recommend. FRANCHISEE will provide DUNKIN' DONUTS with a copy of any lease of the Site within ten (10) days after execution and delivery thereof to FRANCHISEE.

A-1.1.1 FRANCHISEE shall retain an attorney and other appropriate, independent advisors in connection with negotiating the acquisition and development of the Site real estate, in addition to reviewing all agreements with DUNKIN' DONUTS. DUNKIN' DONUTS assumes no liability or obligation to FRANCHISEE or to any third party for any assistance in negotiation DUNKIN' DONUTS may elect to provide. Although DUNKIN' DONUTS may comment on FRANCHISEE's real estate negotiations, any assistance it provides to FRANCHISEE is no substitute for the advice of independent counsel. DUNKIN' DONUTS will not act as agent, employee or fiduciary of FRANCHISEE for the purpose of assisting FRANCHISEE in negotiations.

A-1.1.2 In the event the Site is disapproved, this Franchise Agreement and all of the parties' rights and obligations hereunder shall cease and be of no further force and effect.

A-1.1.3 DUNKIN' DONUTS' approval of the Site is not a representation or a warranty that the Dunkin' Donuts Shop will be profitable or that Shop sales will achieve certain levels. It merely means that the minimum criteria which DUNKIN' DONUTS has established for identifying suitable sites for proposed Dunkin' Donuts shops have been met. Because shop development is not a precise science, FRANCHISEE agrees that DUNKIN' DONUTS' approval or disapproval of a development shall not impose any liability or obligation on DUNKIN' DONUTS. The decision to accept or reject a particular shop development is FRANCHISEE's, subject to DUNKIN' DONUTS' final approval. Preliminary approval of the Site by any local or regional representative of DUNKIN' DONUTS is not conclusive or binding, because their recommendations may be rejected by DUNKIN' DONUTS.

### A-1.2.0 Approval of FRANCHISEE

In addition to the Approval of the Site set forth above, FRANCHISEE's qualifications to obtain a Dunkin' Donuts franchise or, if FRANCHISEE is already a Dunkin' Donuts Franchise Owner, for expansion as a multi-unit owner, must be approved in writing by DUNKIN' DONUTS. In the event DUNKIN' DONUTS disapproves the qualifications of FRANCHISEE within sixty (60) days of the date of this Agreement, this Agreement and all of the parties' rights and obligations hereunder shall cease and expire.

### A-1.3.0 Execution of Documents

FRANCHISEE shall execute such other documents and agreements as are customarily required by DUNKIN' DONUTS in such circumstances, including, if appropriate, but not limited to, a standard form of Lease Option Agreement or Rider, which ensures the continued availability of the Site as a Dunkin' Donuts shop, in the event of a default under this Agreement or, if applicable, FRANCHISEE's lease of the Site, during the term of this Agreement. If FRANCHISEE owns the Site, DUNKIN' DONUTS will have the right to lease the Site on negotiated terms comparable to those under which DUNKIN' DONUTS leases comparable property from others. A Lease Option Agreement or Rider confirming these rights in a form acceptable to DUNKIN' DONUTS, must be signed before construction commences on the Site.

-2-

## A-1.4.0 Development of the Dunkin' Donuts Shop

The Dunkin' Donuts shop must be developed and constructed in strict accordance with DUNKIN' DONUTS' current standards, requirements, procedures, plans, specifications and documentation (hereinafter collectively the "Requirements").  In order that development of the Site proceed as expeditiously as possible, FRANCHISEE shall strictly comply with the following procedures:

A-1.4.1 FRANCHISEE shall promptly hire a licensed architect whose responsibility shall be to adapt DUNKIN' DONUTS' generic plans and/or specifications to the specific requirements of the Site, the geographical region in which the Site is located and the building codes and ordinances pertinent to the Site, and to oversee the contractor's completion of construction of the Dunkin' Donuts Shop on the Site.  FRANCHISEE's architect must promptly order such topographical and boundary surveys of the Site, soil borings and structural engineering tests as DUNKIN' DONUTS' Construction Department and/or FRANCHISEE's architect may require (the "Reports"). FRANCHISEE's architect must attend a Responsibility Meeting (as defined below) between FRANCHISEE and DUNKIN' DONUTS' representatives, no later than thirty (30) days after the date of the Site Approval Notice.

A-1.4.2 Within approximately thirty (30) days after written request by FRANCHISEE, DUNKIN' DONUTS' representatives will meet at the Site with FRANCHISEE and FRANCHISEE's architect to establish a work schedule and coordinate the respective responsibilities of each of the parties with respect to development of a Dunkin' Donuts Shop on the Site (the "Responsibility Meeting").  The Reports and copies of zoning ordinances and by-laws applicable to the Site shall be made available to DUNKIN' DONUTS at the Responsibility Meeting by FRANCHISEE's architect.  If any such Reports or FRANCHISEE's architect are not available when required, the Responsibility Meeting shall be postponed and, if necessary, FRANCHISEE shall reimburse DUNKIN' DONUTS' out-of-pocket travel costs.  If the Responsibility Meeting is postponed because any Report(s) or FRANCHISEE's architect are not available when required, DUNKIN' DONUTS shall have the right, at its sole discretion:

A-1.4.2.1 - to order, on behalf of FRANCHISEE, such Reports as DUNKIN' DONUTS shall deem necessary and appropriate.  The cost of such Reports shall be reimbursed by FRANCHISEE within ten (10) days after demand. DUNKIN' DONUTS makes no representation or warranty about the completeness or accuracy of any Report ordered by DUNKIN' DONUTS on behalf of FRANCHISEE; and/or

A-1.4.2.2 - to reschedule the Responsibility Meeting, based upon a firm commitment from FRANCHISEE's architect that the architect and/or Reports will be available within no more than thirty (30) additional days; and/or

A-1.4.2.3 - to terminate this Agreement, if, in the good faith judgement of DUNKIN' DONUTS, FRANCHISEE has failed to exercise reasonable diligence to comply with the terms of this Agreement.

A-1.4.3 DUNKIN' DONUTS assumes no responsibility for (a) evaluation of the Site's soil for hazardous substances, (b) inspection of any structure on the Site for asbestos or other toxic or hazardous materials, or (c) compliance with the Americans With Disabilities Act ("ADA").  It is FRANCHISEE's sole responsibility to obtain satisfactory evidence and/or assurances that the Site (and any structures thereon) are free from environmental contamination and in compliance with the requirements of ADA.

A-1.4.4 Prior to commencement of construction of the Dunkin' Donuts Shop on the Site, the plans and specifications prepared by FRANCHISEE's architect must be reviewed by DUNKIN' DONUTS and approved for compliance with DUNKIN' DONUTS' design Requirements.

A-1.4.5 DUNKIN' DONUTS shall have the right of entry upon the Site at all times, to inspect the construction in progress to ensure that all Requirements are being met.  DUNKIN' DONUTS' and its employees shall not act as an architect or agent of FRANCHISEE.  DUNKIN' DONUTS' construction representative's duties are limited solely to ensuring that DUNKIN' DONUTS' Requirements are met on the Site.  FRANCHISEE shall not rely upon any opinions expressed by DUNKIN' DONUTS or any of its employees or agents regarding structural integrity, safety or construction procedures, building codes or ordinances or other matters properly within the responsibility of FRANCHISEE's architect.  DUNKIN' DONUTS assumes no liability or responsibility for architectural or engineering judgements outside the scope of the duties stated above.

A-1.4.6 Before the Dunkin' Donuts Shop opens to the public, FRANCHISEE must obtain DUNKIN' DONUTS' final approval of the construction of the building, site improvements and landscaping, as appropriate, and the installation of all signs and equipment.  DUNKIN' DONUTS' approval of construction of the Dunkin' Donuts Shop is not a representation or warranty that the Dunkin' Donuts Shop has been constructed in accordance with any architectural, engineering or legal standards for design or workmanship.  It merely means that DUNKIN' DONUTS is satisfied that the minimum requirements which DUNKIN' DONUTS has established for consistency of design and layout have been met.  FRANCHISEE agrees that DUNKIN' DONUTS' approval of construction of the Dunkin' Donuts Shop shall not impose any liability or obligation on DUNKIN' DONUTS.  FRANCHISEE also agrees that all franchise and real estate documentation must be complete and all initial payments must be received by DUNKIN' DONUTS before the shop is opened.

A-1.4.7 If all conditions required for opening the Shop have been met, FRANCHISEE shall promptly open the Dunkin' Donuts Shop to the general public as soon as DUNKIN' DONUTS approves that construction and equipping the Shop are substantially complete.  FRANCHISEE agrees that the Dunkin' Donuts Shop must open to the public no later than fifteen (15) months from the date of this Agreement.

-3-

### A-1.5.0 Financing

Prior to commencing construction of the Dunkin' Donuts Shop on the Site, FRANCHISEE shall provide evidence satisfactory to DUNKIN' DONUTS that cash and/or financing is in place, sufficient to fund completion of construction and purchase of necessary equipment and signs.  Dunkin' Donuts assumes no obligation to guarantee the funding or financing of FRANCHISEE's construction project.  DUNKIN' DONUTS will not guarantee FRANCHISEE's mortgage, lease or other real estate related obligations.  If DUNKIN' DONUTS, at its election, finances or guarantees the financing of FRANCHISEE's purchase of or leasing of equipment and/or signs, the owner of the Site real estate must agree that the equipment and signs are not a part of the realty and must waive any and all interest in the equipment and/or signs, in order to permit the financing of the equipment and/or signs. In this connection, the owner of the Site real estate must sign such other reasonable documents as are customarily required by DUNKIN' DONUTS, including, but not limited to, the Lease Option Agreement or Rider.

### A-1.6.0 Control of the Site

FRANCHISEE hereby represents to DUNKIN' DONUTS that FRANCHISEE will have the following relationship with the owner or lessor of the Site (place an "x" in the appropriate box):

[X]    the Site will be owned by an independent third party landlord with which FRANCHISEE will not share or maintain any common partner, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

[ ]    the Site will be owned by a third party landlord with which FRANCHISEE will share or maintain a common partner, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

[ ]    the Site will be owned by a corporation, trust, partnership or other entity controlled by FRANCHISEE; or

[ ]    the Site will be owned by the same entity that will execute the Dunkin' Donuts Franchise Agreement.

FRANCHISEE agrees to promptly advise DUNKIN' DONUTS of any change, whatsoever, in the relationship represented above.

### A-1.7.0 Remodel of the Dunkin' Donuts Shop

If the Remodeling Date set forth in Item G. of the Contract Data Schedule is within one (1) year of the expiration date of the Term set forth in Item B. of the Contract Data Schedule, it is agreed that such remodel obligation shall not apply if this Agreement is not renewed by DUNKIN' DONUTS.

Initials:

AP
AP

080195

**SPECIAL CONDITIONS OF THE DUNKIN' DONUTS FRANCHISE AGREEMENT**

**SCHEDULE "A-3"**

ADDITIONAL PROVISIONS FOR A SATELLITE UNIT

A-3.1.0 <u>Source of Products</u> - Products sold at this Dunkin' Donuts Shop shall be produced in the Dunkin' Donuts shop owned by FRANCHISEE or, if applicable, the partners or shareholders of FRANCHISEE, located at <u>676-682 Broadway, Newburgh, NY  12550</u>                    P/C <u>300392</u>  (hereinafter called the "Producing Unit"), except as DUNKIN' DONUTS may otherwise authorize and direct in writing. FRANCHISEE may not service wholesale accounts or other retail outlets from this Dunkin' Donuts Shop.

A-3.2.0 <u>Participation in Dunkin' Donuts Programs</u> - This Dunkin' Donuts Shop shall not be included in the base of Dunkin' Donuts shops for the purpose of determining the number of shops required to trigger participation in marketing, advertising or other programs, unless DUNKIN' DONUTS, in its sole and absolute discretion, elects to include this Dunkin' Donuts Shop in such base.  FRANCHISEE shall participate in and make additional payments to the Fund with respect to all advertising, marketing and other Dunkin' Donuts programs as from time to time are supported or required to be supported by the Producing Unit.

A-3.3.0 <u>Percentage Rent for the Producing Unit</u> - Except as hereinafter set forth, if FRANCHISEE, or, if applicable, the partners or shareholders of FRANCHISEE, leases the Producing Unit from DUNKIN' DONUTS or its subsidiary, retail sales made from this Dunkin' Donuts Shop shall not be included in determining percentage rent, if any, as defined in the Producing Unit's lease.  Wholesale sales made from the Dunkin' Donuts Shop will be deemed to be sales of the Producing Unit and subject to percentage rent and other charges under the terms of the lease for the Producing Unit.  In addition and notwithstanding the foregoing, FRANCHISEE shall pay to DUNKIN' DONUTS or its subsidiary any percentage rent and other charges which DUNKIN' DONUTS or its subsidiary may be required to pay under any underlying lease applicable to the Producing Unit, because of any sales from this Dunkin' Donuts Shop.  FRANCHISEE, or, if applicable, the partners or shareholders of FRANCHISEE, shall execute an amendment to the lease for the Producing Unit in a form satisfactory to DUNKIN' DONUTS or its subsidiary incorporating the foregoing provisions.

A-3.4.0 <u>Production and Transport of Product</u> - This Dunkin' Donuts Shop is a non-producing Dunkin' Donuts sales outlet.  Accordingly, FRANCHISEE shall not, without the prior written consent of DUNKIN' DONUTS, manufacture or finish any product at the Dunkin' Donuts Shop, except as authorized or directed by DUNKIN' DONUTS.  DUNKIN' DONUTS reserves the right, in its sole and absolute discretion, to require FRANCHISEE to manufacture, in whole or in part, and/or to finish at the Dunkin' Donuts Shop products now or hereafter designated as approved for sale at Dunkin' Donuts shops.  Products not manufactured at this Dunkin' Donuts Shop shall be manufactured at the Producing Unit and at no other place unless prior written approval is granted by DUNKIN' DONUTS.  FRANCHISEE shall transport products and supplies from the Producing Unit to this Dunkin' Donuts Shop on a schedule and in a manner acceptable to DUNKIN' DONUTS that ensures compliance with federal, state and local regulation as well as DUNKIN' DONUTS' quality, freshness and other standards and that an adequate supply of product is available for sale at all times the Shop is open for business.

A-3.5.0 <u>Product and Vehicle Liability Insurance</u> - FRANCHISEE shall also maintain a policy or policies of product liability, vehicle liability, and non-owned vehicle liability insurance coverages, in the amounts set forth in paragraph 5.3 of the Franchise Agreement.

A-3.6.0 <u>Certain Rights of DUNKIN' DONUTS on Termination</u> - In the event the Dunkin' Donuts Shop's location is leased or licensed from a third party, FRANCHISEE shall use its best efforts to secure its landlord's execution of a standard form Dunkin' Donuts Lease Option Agreement.  If FRANCHISEE is unable to obtain its landlord's execution thereof, FRANCHISEE shall execute and use its best efforts to secure its landlord's consent (where required) to a collateral assignment of lease to DUNKIN' DONUTS.  Such collateral assignment shall grant DUNKIN' DONUTS the option to assume the lease or license agreement in the event of FRANCHISEE'S default under this Franchise Agreement or under the lease or license.

A-3.6.1 If FRANCHISEE is unable to obtain execution of a Lease Option Agreement or collateral assignment of the lease, or if DUNKIN' DONUTS, in its sole and absolute discretion, waives the requirement for these agreements, the following provision shall apply.  At the expiration or termination of this Franchise Agreement, FRANCHISEE shall assign to DUNKIN' DONUTS at its request any lease or license agreement for the location. FRANCHISEE shall comply with all requirements for notice or consent under such lease or license agreement and shall execute documents acceptable to DUNKIN' DONUTS, assigning such lease or license agreement to DUNKIN' DONUTS.  DUNKIN' DONUTS' rental payments shall be limited to those set forth in the assigned lease, license agreement or other document.

A-3.6.2 If the real estate for this Dunkin' Donuts Shop is owned or controlled in whole or in part by FRANCHISEE or the partners or shareholders of FRANCHISEE, DUNKIN' DONUTS shall have the option, upon any early termination of this Franchise Agreement, to lease the location for the duration of the original term of the Franchise Agreement.  DUNKIN' DONUTS' rental payments thereunder will be equivalent to then current market value and shall be determined by agreement between the owner of the real estate and DUNKIN' DONUTS or, if they fail to agree, by arbitration under the rules of the American Arbitration Association.  The intent of the above is to preserve the site as a Dunkin' Donuts sales outlet, at DUNKIN' DONUTS' option, should the FRANCHISEE default under the Franchise Agreement or any contract affecting the operation of the Dunkin' Donuts Shop.

-2-

A-3.7.0 **Default** - FRANCHISEE shall be in default under this Franchise Agreement if FRANCHISEE, or, if applicable, the partners or shareholders of FRANCHISEE, fails to comply with all the requirements imposed by the Franchise Agreement for the Producing Unit. FRANCHISEE shall be in default under this Franchise Agreement if the Franchise Agreement for the Producing Unit is terminated.

A-3.7.1 **Cure Period** - A thirty day cure period shall apply if FRANCHISEE, or, if applicable, the partners or shareholders of FRANCHISEE, fails to comply with any of the requirements imposed by the Franchise Agreement for the Producing Unit. No cure period shall be available if the Franchise Agreement for the Producing Unit is terminated.

A-3.8.0 **Transfer of the Satellite Unit** - If a transfer of an interest, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in this Dunkin' Donuts franchise or the entity holding such franchise, the following provisions shall apply. The proposed transferee must satisfy DUNKIN' DONUTS' then current multi-unit owner guidelines, have ownership interest in a full producing Dunkin' Donuts shop at the time of transfer (and continuously thereafter during the term of the transferee's Franchise Agreement for this Dunkin' Donuts Shop) which DUNKIN' DONUTS, in its sole and absolute discretion, authorizes as the Producing Unit for the Dunkin' Donuts Shop.

A-3.8.1 **Transfer of the Producing Unit** - If a transfer of an interest, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more of the franchise licensed by the Franchise Agreement for the Producing Unit, or the entity holding such franchise, the transferee must also qualify as a transferee of this Dunkin' Donuts Shop and must purchase an equivalent interest in the franchise for this Dunkin' Donuts Shop. FRANCHISEE and the partners or shareholders thereof shall execute an amendment to the Franchise Agreement for the Producing Unit in a form satisfactory to DUNKIN' DONUTS which incorporates the foregoing provisions.

A-3.9.0    **DUNKIN' DONUTS' Option to Purchase Modular Component System** - The second sentence of paragraph 10.6.1 of the Franchise Agreement is hereby amended to add the following:

> DUNKIN' DONUTS shall have the right and option, exercisable upon such termination, to purchase any Modular Component System from the FRANCHISEE under the terms and conditions set forth in paragraph A-3.9.1 below. A "Modular Component System" is one or more modular components designed by or under the authority of DUNKIN' DONUTS and incorporated into the approved layout of the DUNKIN' DONUTS SHOP.

A-3.9.1 At the expiration or sooner termination of this Franchise Agreement, DUNKIN' DONUTS shall have the option to purchase the Modular Component System from FRANCHISEE for an amount equal to the original cost thereof (including freight and sales tax) less 1.67% thereof for each month the Modular Component System has been in operation. DUNKIN' DONUTS may deduct from this payment any amount due DUNKIN' DONUTS from FRANCHISEE. If DUNKIN' DONUTS exercises the foregoing option, FRANCHISEE shall promptly deliver and convey to DUNKIN' DONUTS marketable title to the Modular Component System free and clear of all liens and encumbrances, on payment of the amount determined in the manner described above.

A-3.9.2 Before FRANCHISEE accepts a bona fide written offer to purchase any Modular Component System in the DUNKIN' DONUTS SHOP, independent of a sale of the franchise, DUNKIN' DONUTS shall have the first right and option to purchase the Modular Component System from FRANCHISEE under the same terms and conditions as are contained in the bona fide offer. FRANCHISEE shall promptly notify DUNKIN' DONUTS and provide DUNKIN' DONUTS with a copy of the offer to purchase the Modular Component System which FRANCHISEE desires to accept. DUNKIN' DONUTS shall have forty-five (45) days within which to exercise DUNKIN' DONUTS' purchase option hereunder. Should DUNKIN' DONUTS not exercise this option and the terms of the unaccepted offer be altered, DUNKIN' DONUTS shall, in each instance, be notified of the changed offer and shall again, have forty-five (45) days to purchase on the altered terms. Should DUNKIN' DONUTS not exercise this option, the terms of Section 10 of the Franchise Agreement, including any Special Conditions thereto, as applicable, shall apply to any transfer which may be contemplated.

A-3.9.3 At the expiration or sooner termination of this Franchise Agreement, if DUNKIN' DONUTS elects not to purchase the Modular Component System, FRANCHISEE shall promptly deidentify the Modular Component System in the following manner: remove the canopy and canopy structures, remove and destroy all Dunkin' Donuts trademarks, service marks, trade names, advertising, commercial symbols, product labelling systems, sign faces, display trays and other items which DUNKIN' DONUTS reasonably requires be removed as being distinctive and indicative of the Dunkin' Donuts System, and change the color scheme so that it does not conform to the then-current Dunkin' Donuts color scheme. DUNKIN' DONUTS may enter upon the premises where the Modular Component System is located without being guilty of trespass or tort to effect such de-identification if FRANCHISEE fails to do so within ten (10) days after termination of the Franchise Agreement. FRANCHISEE shall pay DUNKIN' DONUTS the reasonable costs and expenses in effecting de-identification within ten (10) days of FRANCHISEE'S receipt of DUNKIN' DONUTS' written request.

Initials:

_AP_
_AP_

ddfasc97\120197

**SPECIAL CONDITIONS OF THE DUNKIN' DONUTS FRANCHISE AGREEMENT**

**SCHEDULE "A-1997"**

<u>ADDITIONAL PROVISIONS TO THE GENERAL TERMS AND CONDITIONS
REGARDING CHECKS, SHOPTALK, LEASE OPTION, LATE FEES, ARBITRATION AND OTHER MATTERS</u>

1.0     <u>**Dishonored Checks**</u> - The following is hereby added to the end of GTC Subsection 4.5: "Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by DUNKIN' DONUTS. At DUNKIN' DONUTS request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, as set forth in this Agreement."

2.0     <u>**ShopTALK**</u> - The following is hereby added to GTC Subsection 5.2.6:

    1.     FRANCHISEE shall purchase or lease and install a shop information technology system, including computers, printers, cash registers, touch heads, cash drawers, software and other equipment designated by DUNKIN' DONUTS for the Shop (hereinafter "ShopTALK"). FRANCHISEE shall bear all costs associated with ShopTALK. DUNKIN' DONUTS makes no representation or warranty as to the costs, sales, or profits, if any which may result from the installation and use of ShopTALK.

    2.     The term "ShopTALK" includes, without limitation, all designated hardware and software and the data stored thereon by FRANCHISEE. FRANCHISEE agrees that ShopTALK is proprietary to DUNKIN' DONUTS and shall be used by FRANCHISEE solely in connection with the operation of the Shop in the manner specified by FRANCHISOR from time to time. FRANCHISEE agrees to comply with such requirements determined by DUNKIN' DONUTS from time to time regarding maintenance, storage and safeguarding of data, records, reports and other matters relative to ShopTALK.

    3.     FRANCHISEE agrees, at its sole cost, to: a) to attend, and cause the employees in the Dunkin' Donuts Shop to attend, such initial and other training specified by DUNKIN' DONUTS; b) maintain ShopTALK in continuous operation at the Shop; c) purchase an ongoing maintenance and support contract and to replace the ShopTALK components as necessary, d) upgrade or replace ShopTALK from time to time as may be required by DUNKIN' DONUTS; e) permit DUNKIN' DONUTS immediate access to ShopTALK, electronically or otherwise, at all times without prior notice to FRANCHISEE, and DUNKIN' DONUTS agrees that such access shall not unreasonably interfere with FRANCHISEE's normal shop operations; and f) install and maintain telephone or other service required by DUNKIN' DONUTS to permit such access.

3.0     <u>**Lease Option**</u> - The following is hereby added to the GTC as Subsection 6.5:

    6.5     <u>**Lease Option**</u> - If the real estate is owned or controlled by FRANCHISEE, FRANCHISEE represents and warrants that FRANCHISEE has provided DUNKIN' DONUTS with DUNKIN' DONUTS' standard form Lease Option Agreement or Rider to Lease covering the full term of FRANCHISEE's lease and all renewal options. If, during the term of this Agreement or any extension thereof, FRANCHISEE directly or indirectly acquires ownership or control of the property, FRANCHISEE also agrees to grant DUNKIN' DONUTS, under DUNKIN' DONUTS' standard Lease Option Agreement, the option to acquire the location in the event of default by FRANCHISEE under this Agreement or in the event of FRANCHISEE's default under any lease or mortgage relating to the premises.

4.0 <u>Interest, Late Fees and Collection Costs</u> - GTC Subsection 9.3. is hereby deleted from and the following is inserted in its place:

    9.3     If FRANCHISEE fails to remit when due any payments required under this Agreement, FRANCHISEE agrees to pay, in addition to the unpaid amounts, the then current late fee for each unpaid invoice. If FRANCHISEE fails to cure a default, following notice, within the applicable time period set forth in GTC Subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to DUNKIN' DONUTS all damages, costs and expenses, including, without limitation, the then current late fees, the then current collections fees, costs of collection, interest at one and one-half percent (1.5%) per month or the highest permissible rate, and reasonable attorneys' fees, incurred by DUNKIN' DONUTS as a result of any such default or termination. All such interest and all damages, fees, costs and expenses may be included in and form part of the judgment awarded to DUNKIN' DONUTS in any proceedings brought by DUNKIN' DONUTS against FRANCHISEE.

5.0    <u>Arbitration</u> - The following is hereby added to the GTC as Section 17:

17.0    <u>Agreement to Arbitrate Disputes</u> - All disputes except those described below in Subsection 17.4, arising from or relating to the Shop, this Agreement or any other agreements relating to the Shop or the negotiation thereof, between FRANCHISEE and DUNKIN' DONUTS (including their past and current employees, agents, representatives, officers, directors, shareholders, members, guarantors, parent corporation, subsidiaries, and affiliated corporations) shall be submitted to arbitration. This applies to all causes of action, whether nominally a "claim," "counterclaim," or "cross-claim," arising under common law or any state or federal statute. Actions brought to enforce the judgment upon the award of the arbitrator may be entered in any court having jurisdiction thereof.

17.1    <u>Place of Arbitration</u>:  The parties agree that the arbitration shall take place at the American Arbitration Association office in Boston, Massachusetts or in another city agreed to by the parties.

17.2    <u>Arbitration Procedure</u>: Except as follows, arbitration shall be conducted under the Commercial Arbitration Rules of the American Arbitration Association using a panel of three arbitrators unless the parties agree on a lesser number. Where a panel of three arbitrators is to be used, DUNKIN' DONUTS and FRANCHISEE shall each select one arbitrator from a list provided by the American Arbitration Association and the two shall select a third from such list. Actions to enforce an obligation to pay moneys under an express term of any agreement to which there are no counterclaims may be brought under the Expedited Procedures of the Commercial Arbitration Rules of the American Arbitration Association.

17.3    <u>Limitation of Damages</u>:  No party shall seek punitive, exemplary, or multiple damages with respect to any claim or cause of action against another party, whether in arbitration or litigation.

17.4    <u>Exceptions</u>:  At the option of DUNKIN' DONUTS, the following actions may be litigated in a court of competent jurisdiction. In such event, the provisions of Subsection 17.3 shall nonetheless apply:

    17.4.1  The enforcement of an obligation to pay moneys under an express term of any agreement. If DUNKIN' DONUTS opts not to arbitrate such obligations, then (unless the action is based on alleged intentional underreporting of Gross Sales by FRANCHISEE as described in Subsection 17.4.2) the FRANCHISEE may raise any counterclaims in that action as permitted by the rules of the forum;

    17.4.2  An action brought in good faith based on alleged intentional underreporting of Gross Sales by FRANCHISEE. If DUNKIN' DONUTS opts not to arbitrate such an action, FRANCHISEE shall be precluded (to the extent permitted by law) from raising any counterclaims in that action, but shall instead submit any counterclaims to arbitration as provided in Section 17;

    17.4.3  An action by DUNKIN' DONUTS for declaratory relief or temporary, preliminary or permanent injunctive relief under another provision of any agreement or an action for injunctive relief to prevent the possibility of irreparable harm to the goodwill associated with the DUNKIN' DONUTS trademarks and trade name;

    17.4.4  An action in ejectment or for possession of any interest in real or personal property.

17.5    <u>Continuation of Agreement to Arbitrate</u>:  The provisions of this Section 17 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

17.6    <u>Limited Effect of Arbitration Decision</u>:  The parties agree that the binding or preclusive effect of any arbitration decision shall be limited to the actual dispute or claim arbitrated between them. Further, the parties agree that no mediation settlement or arbitration decision between DUNKIN' DONUTS  and any other franchisee shall have any collateral effect on any dispute or claim between DUNKIN' DONUTS and FRANCHISEE.

17.7    <u>No Class Action Claims</u>:  Neither party may bring or participate in any class action claims or class action-type claims against the other.

Initials

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this Agreement in triplicate on the date and year first written above. FRANCHISEE acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof.

ATTEST: _____

Susan J. Berry
Assistant Secretary

ATTEST/WITNESS: _____

Secretary       Amish Patel

_____

_____

_____

_____

DUNKIN' DONUTS INCORPORATED

By: _____
Mark Maddy, Director of Retail Development

GIATRI DONUTS, INC. _____ FRANCHISEE

By: _____
Ami Patel,                              President

_____ FRANCHISEE

_____ FRANCHISEE

_____ FRANCHISEE

_____ FRANCHISEE

## PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION

We, the undersigned shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock

of _____GIATRI DONUTS, INC._____, a corporation organized under the laws of the state of
New York_____, waiving demand and notice, hereby, jointly and severally, personally guarantee the full payment of the corporation's money obligations under Section 4 and the performance of all of the corporation's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety, relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally. The undersigned, jointly and severally, agree that DUNKIN' DONUTS may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of the corporation's money obligations under paragraph 4; (b) modify, with the consent of the corporation, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of DUNKIN' DONUTS against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned. This Guarantee is intended to take effect as a sealed instrument.

Signed in the presence of:

_____B. K. Patel_____
      to All

_____ Witness

_____
Ami Patel,                              Individually

_____
Amish Patel,                            Individually

_____ Witness

_____ Individually

_____ Witness

_____ Individually

_____ Witness

_____ Individually

_____ Witness

_____ Individually

**PC# 342639**
**Newburgh, New York**

# FRANCHISE AGREEMENT

This Franchise Agreement is dated _MAY 17TH_, 2007, and made by and between **DUNKIN' DONUTS FRANCHISING LLC** (hereinafter "DUNKIN' DONUTS"), a Delaware limited liability company, with principal offices in Canton, Massachusetts (such corporations are hereinafter individually or collectively referred to as "FRANCHISOR") and the following individual(s) and/or entity:

**Shreeji Donuts, Inc. a New York corporation**
(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("GTC 04-07") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

## CONTRACT DATA SCHEDULE

A.  Location of the Franchised Unit (the "Premises"):

| 122-126 | South Robinson Avenue | Newburgh | New York | 12550 |
|---|---|---|---|---|
| (number) | (street) | (city or town) | (state) | (zip code) |

B.  Term: ————TWENTY—— ( 20 ) years from the first date the Unit opens to serve the general public.

C.  Initial Franchise Fee: ————————FIFTY THOUSAND————————————dollars ($50,000.00)*
*IFF payment acknowledged – SDA 338210

D.  Marketing Start-Up Fee: ————————Five Thousand————————dollars ($ 5,000.00)**

E.  Continuing Franchise Fee Rate: ————Five and Nine Tenths————percent (5.9%) of Gross Sales

E.2.  Continuing Training Fee: ————————Three Hundred and Sixty————————dollars ($360.00)

F.  Minimum Continuing Advertising Fee Rate: ————Five———— percent (5.0%) of Gross Sales

G.  Refurbishment Date: In the case of a new unit, the date **five (5) years** and **fifteen (15) years** after the first date the Unit opens to serve the general public
Remodel Date:    In the case of a new unit, the date **ten (10) years** after the first date the Unit opens to serve the general public

H.  Transfer Fee:  As provided in subsection 10.4 of the General Terms and Conditions, unless another amount is inserted here: _____No Change_____

I.  Address for notice to FRANCHISEE shall be at the Unit Premises, unless another address is inserted here: _266 MAIN ST. SUITE 2 CORNWALL NY 12518_

J.  Special Terms and Conditions:    [ x ]    Special Terms and Conditions Applicable to a Dunkin' Donuts Franchise

[ x ]    **Special Terms and Conditions Applicable to a Dunkin' Donuts Franchise – The Marketing Start Up Fee

[ x ]    Special Terms and Conditions Applicable to the Development of a New Unit By Franchisee

[ x ]    Addendum to the Franchise Agreement and Store Development Agreement required by the New York State General Business Law

K.  The Designated Representative for this Unit is __Amish Patel__
*(print full name above)*
*(List only one person. See definitions in General Terms and Conditions.)*

L.  Arbitration under this Agreement shall be initiated in the city and state of **New York, New York.**

M.  If applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit located at  PC# 300392 – 674 Broadway, Newburgh, New York 12550
*(insert address if this Unit is a Dunkin' Donuts non-producing unit; otherwise insert "not applicable").*

Form last revised 04/07

Franchisor's entities are EOE and AA Employers
(Franchisees are not employees)

BR-DD GTC-04-07

# FRANCHISE AGREEMENT
© April 2007

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

**Baskin-Robbins Franchising LLC**, a Delaware limited liability company ("BASKIN-ROBBINS") and **Dunkin' Donuts Franchising LLC**, a Delaware limited liability company ("DUNKIN' DONUTS") are indirect, wholly-owned subsidiaries of Dunkin' Brands, Inc. As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins* ice cream, yogurt and novelties and *Dunkin' Donuts* donuts, coffee and freshly baked goods, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.    The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, *Dunkin' Donuts* licensed by DUNKIN' DONUTS and *Baskin 31 Robbins* licensed by BASKIN-ROBBINS, both of which are registered trademarks on the Principal Register of the United States Patent and Trademark Office.

B.    "FRANCHISOR" refers to Dunkin' Donuts Franchising LLC with respect to the Dunkin' Donuts System and/or Baskin-Robbins Franchising LLC, with respect to the Baskin-Robbins System.

C.    "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.    The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.    The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.    The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.    "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.    The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

-2-

I.     The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System. Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit; specifications for the facility, equipment and products; business processes and techniques for the operation of the Unit; and guidelines and standards for quality, cleanliness, appearance and service.

## Section 1.  Grant of the Franchise and Term

1.0     This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise"). The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule; provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1     Training.  FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR.  This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2     Financing.  Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3     Documents.  FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4     Payment.  FRANCHISEE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5     Possession.  FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6     For a New Unit.  If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1     The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2     FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2.  Services Furnished by FRANCHISOR

2.0     FRANCHISOR, or its designee, agrees:

2.1     Prior to and For the Initial Opening of the Unit.

2.1.1     FRANCHISOR shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2     FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3     FRANCHISOR shall provide its current operating procedures to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

2.1.4     FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

*General Terms and Conditions*

**2.2**     <u>After the Initial Opening of the Unit.</u>

**2.2.1**     FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

**2.2.2**     FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

**2.2.3**     FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

**2.2.4**     FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

## Section 3. Advertising and Promotion

**3.0**     FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System. FRANCHISEE's payments to the Fund(s) shall be used for advertising,, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing. The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR. FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any. Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISEE contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

**3.1**     FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval. If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISOR, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

**3.2**     FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services for order through the mail or by any electronic or other medium. FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services. Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use. FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

**3.3**     Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

## Section 4. Payments

**4.0**     FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

**4.1**     <u>Initial Franchise Fee.</u> - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

**4.2**     <u>Marketing Start-Up Fee.</u> - FRANCHISEE shall pay a Marketing Start-Up Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a start-up promotional program or such other promotion or advertising program as FRANCHISOR may specify. Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

**4.3**     <u>Continuing Franchise Fees</u> - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

-4-

**4.4    Continuing Advertising Fee.** FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1    In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2    If FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5    If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6    FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank. Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR. If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1    FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability. FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account; (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE's bank rejects FRANCHISOR's EFT request because of insufficient funds; and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2    For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported. This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR. To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required. In FRANCHISOR's discretion or due to system failure, FRANCHISOR may elect to withdraw the electronic form. In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

**4.7    Late Fee, Interest and Costs.** If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have. Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR. FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks. At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.

## Section 5.  Covenants of FRANCHISEE

5.0    FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons. FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1    If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

5.0.2    FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time. Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe. Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person. FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date. In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3    FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit.

5.1    Unit Operations. - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day permitted by law, on all days, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing. In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1    FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR. All such items must conform to FRANCHISOR's Standards. FRANCHISOR reserves the right to specify any item by brand. FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2    FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards. Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products. For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3    FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit. FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR. FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit; and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit. FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit. FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4    FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5    FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR. Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier. FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use. FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year. This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6    FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7    FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

*General Terms and Conditions*

-6-

5.1.7.1    FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below, and to furnish to FRANCHISOR within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications.    If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8    FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program.  Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers.    If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1   In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2   FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures.  FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment.  FRANCHISEE shall ensure that all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Unit.  FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require.  The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE.  FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9    FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft.  FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2    **Books, Records and Reports.**  FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR.  Commencing upon the opening of the Unit:

5.2.1    FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and  (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years. FRANCHISOR shall have the right, in its sole discretion, to require FRANCHISEE to have such annual statements audited by an Independent certified public accountant and submitted to FRANCHISOR within ninety (90) days after the close of each of FRANCHISEE's fiscal year.

5.2.4    FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5    FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:

    a.  daily cash reports;
    b.  cash receipts journal and general ledger;
    c.  cash disbursements journal and weekly payroll register;
    d.  monthly bank statements, and daily deposit slips and canceled checks;
    e.  all business tax returns;
    f.  suppliers invoices (paid and unpaid);

*General Terms and Conditions*

g. dated cash register tapes (detailed and summary);
h. semi-annual balance sheets and monthly profit and loss statements;
i. weekly inventories;
j. records of promotion & coupon redemptions;
k. such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6    Retail Information System. FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

5.2.6.1 FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2 FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3 FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7    FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3    Insurance. FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, its parent, subsidiaries and affiliates and their respective members, officers, directors, employees, agents, successors and assigns, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1    Such policy or policies shall include:

5.3.1.1 commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with a limit of two million dollars ($2,000,000.00) per occurrence and two million dollars ($2,000,000.00) in the aggregate or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2 "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

-7-

*General Terms and Conditions*

-8-

5.3.1.3  plate glass insurance and, if applicable, boiler insurance; and

5.3.1.4  employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.1.5  employment practices liability insurance with a limit of one million dollars ($1,000,000.00) per occurrence and one million dollars ($1,000,000.00) in the aggregate.

5.3.2   All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR;  (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named;  (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3   During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid.  If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums therefor.  Maintenance of insurance and FRANCHISEE's performance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.  Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage.  FRANCHISEE shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4   **Indemnification.**  FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, its parent, subsidiaries and affiliates, or each of them, and their respective members, officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation of or defense against any and all such claims.

5.5   **Refurbishment & Remodel of the Premises.**  FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5.  Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards.  FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1   No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards.   The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition.  The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2   No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment).  The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3   FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6   **Cross-Guarantee.**  In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s).  Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its parent, subsidiaries and affiliates, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party.  FRANCHISEE's liability under this paragraph shall be limited to the extent                                                        that                                                                  the

*General Terms and Conditions*

total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7    **FRANCHISEE Entity.** FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC"). FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1    **Corporation.** If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is limited to operating the Unit as provided under this Agreement; (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2    **LLC.** If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that its activities are limited to operating the Unit as provided under this Agreement; (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

## Section 6. Certain Rights of FRANCHISOR

6.0    In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s). During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1    If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1    FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2    FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3    FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation. If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

-9-

-10-

6.2     In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit.  If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRANCHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales.  If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate.  FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees.  Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3     In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit.  Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that exclusion (c) therein does not apply.  Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4     FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5     If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises.  Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

## Section 7.  Proprietary Marks

7.0     FRANCHISOR has, in connection with its business and the business of its franchisees, the right to use the Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts®**, licensed by Dunkin' Donuts Franchising LLC and **Baskin 31 Robbins®** licensed by Baskin-Robbins Franchising LLC, both of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office.  FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1     FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement.  FRANCHISEE shall not sublicense the Proprietary Marks.  FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1   FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement.  FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE.  FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

7.2    FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks. FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.3    FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts. Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4    FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISOR, be necessary to carry out such defense or prosecution.

## Section 8.  Restrictions on FRANCHISEE's Activities

8.0    During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1    Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2    Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3    Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the matter.

8.1    During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business. Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement. FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchisees licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2    The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3    FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

*General Terms and Conditions*

-12-

## Section 9. Default

9.0    FRANCHISEE shall be in default under this Agreement:

9.0.1    If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2    If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3    If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4    If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5    If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

9.1    **Thirty Day Cure Period.** Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof. Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1    **Seven Day Cure Period.** A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2    **24 Hour Cure Period.** A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety;  or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3    **Cure on Demand.** FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4    **No Cure Period.** No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder.  In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2    **Statutory Cure Period.** If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3    **Late Fees, Interest and Costs.** If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees, collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination.  All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4    **Termination.** If FRANCHISEE fails to cure default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement.  Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR.  Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraph 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination.  Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

*General Terms and Conditions*

9.4.1    FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE; and

9.4.2    FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and

9.4.3    FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

9.4.4    FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law; and

9.4.5    FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) any indicia of FRANCHISOR, and if other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks. Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks. FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph; and

9.4.6.   FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings). If FRANCHISEE owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE. All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE. Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts; and

9.4.7    FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISEE within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises.    If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that purpose. In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand; and

9.4.8    FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9; and

9.4.9    FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein. If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress; and FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with FRANCHISOR whether or not constituting unfair competition.

9.5    Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, injunctive relief.  No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder.  FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

-13-

*General Terms and Conditions*

-14-

9.6     Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof. In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISOR shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

### Section 10.  Transfer Provisions

10.0     **Transfer By FRANCHISOR.**  This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively.  FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect.  Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1     If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand.  FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof.  If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1     **Transfer By FRANCHISEE.**  FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE.  Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same.  Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder.  Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2     **Consent By FRANCHISOR.**  FRANCHISOR shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided, that:

10.2.1     FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2     The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors.  This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3     The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR.  Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable.  FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee; and

10.2.4     The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3     **Transfer Requirements.**  Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1     Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

*General Terms and Conditions*

10.3.2 Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3 FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity. Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4 Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5 If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6 The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable. The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority. The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s). Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement. The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7 FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each; and

10.3.8 In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4   **Transfer Fee.** The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee as forth in Schedule BR or DD, as applicable.

10.5   **Release of Transferor.** Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6   **Transfer on Death, Disability or Incapacity.** In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify. Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement. A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 of Schedule BR or DD, as applicable, shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1 If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest shall have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR. FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld. FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2 If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time. Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice to cure.

*General Terms and Conditions*

-15-

*General Terms and Conditions*

-16-

10.6.3   FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6. If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such interest. FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7   **Right of First Refusal.** If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer. FRANCHISOR shall have the right and option, exercisable within sixty (60) days after its receipt of said copy, to purchase or assume and assign without recourse to a third party FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party. FRANCHISOR's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR. Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have sixty (60) days to exercise its right to purchase on the altered terms. Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

## Section 11. Arbitration.

11.0   Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein modified. This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any state or federal statute. As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto. The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1   **Eligibility and Procedures.** Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted. Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances. Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement. If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply. The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue. Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims. The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2   **Enforceability and Effect.** Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3   **Governing Law.** The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought. Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4   **Exceptions to Arbitration.** Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time. In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5   **FRANCHISOR's Exceptions.** FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint in any court of competent jurisdiction:

11.5.1   the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2   any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

*General Terms and Conditions*

11.5.3  any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

11.5.4  any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1); or

11.5.5  any action in ejectment or for possession of any interest in real or personal property.

11.6  **FRANCHISEE's Exceptions.**  FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

11.6.1  In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7  **Waiver of Rights.**  THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1  The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2.  The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law; and

11.7.3  The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4  The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5  ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8  **No Class Actions.**  No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9  **Post-Term Applicability.**  The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

## Miscellaneous Provisions.

12.0  **Relationship of the Parties.**  This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its parent, subsidiaries and affiliated entity(ies) for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR parent, subsidiaries or its affiliated entity(ies) or to create any obligation, express or implied, on behalf of FRANCHISOR parent, subsidiaries or its affiliated entity(ies). The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated entity(ies) and FRANCHISEE.

12.1  Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party. Each party shall indemnify, protect, defend and save the other party harmless against any such claim. The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

-18-

13.0    **Non-Waiver.** Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement. Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE. Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0    **Notices.** All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from

time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to FRANCHISOR at 130 Royall Street, Canton, MA 02021, Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE by email, regular mail or any other means set forth above.

15.0    **Entire Agreement.** This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement. The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto. In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0    **Severability.** Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.** This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.** THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS. FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY. FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".

RIDER TO FRANCHISE AGREEMENT

SCHEDULE "DD"<br>04/07

SPECIAL TERMS AND CONDITIONS APPLICABLE TO A<br>DUNKIN' DONUTS FRANCHISE

In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has the right to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including *Dunkin' Donuts*®, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark *Dunkin' Donuts*®, and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System. FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Unit in conformity with the Dunkin' Donuts System and in accordance with FRANCHISOR's Standards and specifications.

DEFINITIONS

As used in these Special Terms and Conditions applicable to a Dunkin' Donuts Franchise, the following defined terms shall have the following meanings:

A.  The "Dunkin' Donuts Unit" means all or a portion of the Premises dedicated to the operation of the Dunkin' Donuts System, as approved by FRANCHISOR.

B.  "Dunkin' Donuts Products" shall mean and refer to donuts, bagels, muffins, cookies and other baked goods, sandwiches, coffee, soda, frozen drinks and other beverages, all of a variety of kinds or flavors, made in accordance with specifications designated by FRANCHISOR and identified by the Dunkin' Donuts Proprietary Marks, and such other products as may be specified from time to time in writing by FRANCHISOR for sale in the Dunkin' Donuts Unit.

C.  Where applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit designated in Item "M" of the Contract Data Schedule of this Agreement.

Section DD-1. Grant Of The Franchise

1.0  FRANCHISOR grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this agreement (hereinafter called the "Dunkin' Donuts Unit"). In connection therewith, this Franchise includes the right to use at the Dunkin' Donuts Unit only, the trademark *Dunkin' Donuts*®, along with other Proprietary Marks licensed and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts units, and the right to use at the Unit only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

Section DD-2. Scope Of The Franchise

2.0  This Dunkin' Donuts Franchise is specific to one location only, for the term of this Agreement. It grants no rights outside the Premises, nor includes any territorial protection against competition. FRANCHISOR reserves and retains the right to operate or permit others to operate Dunkin' Donuts units or to sell or distribute Dunkin' Donuts products and/or services or to otherwise use the Dunkin' Donuts Proprietary Marks and/or the Dunkin' Donuts System, in each case at any other location. FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Unit using the same or different brand(s).

Section DD-3. Advertising and Promotion

3.0  FRANCHISOR shall prepare and coordinate a "Start-Up" promotional program (or such other promotional or advertising program as FRANCHISOR may specify) for the initial opening of the Dunkin' Donuts Unit.

3.1  FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Unit; and

3.3.1  FRANCHISOR shall administer The Dunkin' Donuts Advertising and Sales Promotion Fund (the "Dunkin' Donuts Fund") and shall direct the development of all advertising, marketing and promotional programs for the Dunkin' Donuts System. That portion of FRANCHISEE's payments under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Dunkin' Donuts Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Dunkin' Donuts Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System. The balance, including any interest earned by the Dunkin' Donuts Fund, will be used for advertising and related expenses. Contributions to the Dunkin' Donuts Fund in excess of the percentage of Gross Sales of the Dunkin' Donuts Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

Section DD-4. Payments

4.4  FRANCHISEE shall make payments to the Dunkin' Donuts Fund as described in paragraph 4.4 of the General Terms and Conditions, except that sales to wholesale accounts approved by FRANCHISOR are excluded for purposes of calculating fees due under paragraph 4.4 (only). For wholesale accounts to be approved by FRANCHISOR, FRANCHISEE must provide FRANCHISOR prior written notice of each such account. Upon FRANCHISOR's receipt of such notice, the account shall be

deemed approved, unless FRANCHISOR at any time notifies FRANCHISEE in writing that such account is not approved. FRANCHISEE shall, within ten (10) days of receipt of a disapproval notice, discontinue sales to the disapproved wholesale account.

4.4.1   FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Dunkin' Donuts Units included in the base for purposes of determining "two-thirds" support.

### Section DD-5.  Covenants of FRANCHISEE

5.0   FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Dunkin' Donuts Products and protect and enhance the reputation and goodwill of DUNKIN' DONUTS.

5.1   Unless this Unit is expressly authorized to manufacture donut products on the Premises, and except as DUNKIN' DONUTS may otherwise authorize and direct in writing, donut products sold at this Unit shall be produced in the Dunkin' Donuts manufacturing unit located at the address set forth in Item "M" of the Contract Data Schedule of this Agreement (the "Producing Unit").  The individual(s) or entity(ies) that controls at least a fifty percent (50%) interest in FRANCHISEE shall maintain at least a fifty percent (50%) interest in the Producing Unit, or have a documented interest in an approved cooperative manufacturing location ("CML Co-Op").

5.1.5.1   Franchisees' cooperatively-owned distribution centers under the Distributor Commitment Program ("DCP") are currently approved by DUNKIN' DONUTS to supply franchisees with a variety of ingredients, supplies and equipment. DUNKIN' DONUTS or an affiliated company may from time to time be among the approved suppliers of products, supplies, services, equipment and/or materials required for the operation of the Dunkin' Donuts Unit. If any such party is designated an approved supplier, it will be subject to the same competitive bidding procedure as other suppliers of the same Dunkin' Donuts Products.

5.1.5.2   DUNKIN' DONUTS may, from time to time, enter into national or regional exclusive supply arrangements with one or more independent suppliers for designated Dunkin' Donuts Products.  In evaluating the need for an exclusive supplier, DUNKIN' DONUTS may take into account (without limitation) the uniqueness of the designated Dunkin' Donuts Products, the projected price and required volume of such Dunkin' Donuts Products, the investment required of a supplier in order to meet the needs for such Dunkin' Donuts Products, the supplier's ability to provide such Dunkin' Donuts Products, the lack of availability of qualified alternative suppliers, the duration of exclusivity, the desirability of competitive bidding and such other business considerations as may be relevant.

5.2.1   Sales to approved wholesale accounts must be separately designated as "wholesale" on Gross Sales reports required under paragraph 5.2.1 of the General Terms and Conditions of this Agreement.

5.2.5   FRANCHISEE's Records shall also include, without limitation, daily production, throwaway and finishing records, and records of all wholesale accounts.

### Section DD-7.  Proprietary Marks

7.0   FRANCHISEE acknowledges and agrees that Dunkin' Donuts® is a registered trademark licensed by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently licensed by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS and/or the licensor of the marks.

7.5   FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Unit under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law or designated by FRANCHISOR. FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

### Section 10.  Transfer Provisions

10.3.1   **Transfer of this Manufacturing Retail Unit** - If FRANCHISEE shall propose a transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more of FRANCHISEE, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of this Agreement, be subject to the requirement that an ownership interest of fifty percent (50%) or more of all satellite retail units supplied by this Unit must be transferred to (a) the same qualified transferee, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of this Agreement, and who also must an ownership interest of fifty percent (50%) or more of one or more manufacturing Dunkin' Donuts Unit(s) at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the producing unit(s) for the satellite retail unit(s) or have a documented interest in an approved CPL.

10.3.2   **Transfer of other Dunkin' Donuts Units supplied by this Manufacturing Retail Unit** - If FRANCHISOR receives notice of a proposed transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in any Dunkin' Donuts Franchise for a retail unit supplied by this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, be subject to the requirement that the proposed transferee must (a) also be a qualified transferee of this Unit, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, and who also must an ownership interest of fifty percent (50%) or more of another manufacturing Unit at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the manufacturing unit to supply products for such satellite retail unit or have a documented interest in an approved CPL.

10.4    **Transfer Fee.** The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1    Prior to FRANCHISEE's Fourth Year of Operations. The transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of: (i) five thousand dollars ($5,000.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR; or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1    The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR. No adjustment shall be made for amounts paid in connection with the development of a new unit. The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description: furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE. It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2    For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, or if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business. If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. of the Agreement, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.2    From and After FRANCHISEE's Fourth Year of Operations. If the transfer takes place after the commencement of FRANCHISEE's fourth year of operations, the transferor shall pay to FRANCHISOR the Transfer Fee indicated below based on the Unit's Gross Sales for the most recently completed twelve (12) calendar month period preceding the date of the contract of sale. FRANCHISOR reserves the right to select another period or to make appropriate adjustments to such Gross Sales in the event extraordinary occurrences (e.g., road construction, fire or other casualty, etc.) materially affected Unit sales during the indicated twelve (12) month period.

| Sales for Most Recent 12 Month Period | Transfer Fee |
| --- | --- |
| Less than $400,000.00 | $5,000.00 |
| $400,000.00 or more, but less than $600,000.00 | $6,000.00 |
| $600,000.00 or more, but less than $1,000,000.00 | $8,000.00 |
| $1,000,000.00 or more, but less than $1,400,000.00 | $12,000.00 |
| $1,400,000.00 or more | $20,000.00 |

10.4.3    If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. of the Agreement, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.4    Transfer of Less Than Control. For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of one thousand dollars ($1,000), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period. FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.5    Transfer to Spouse or Children. Notwithstanding anything else contained in this subsection 10.4, but provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above. The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

RIDER TO FRANCHISE AGREEMENT

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO
### A DUNKIN' DONUTS FRANCHISE

### THE MARKETING STARTUP FEE

### TEST AGREEMENT FOR DUNKIN' DONUTS SOLO STORES

1. Pursuant to Section D. of the Contract Data Schedule and Section 4.2 of the General Terms and Conditions of the Franchise Agreement, Franchisee was to have paid Franchisor a Marketing Startup Fee (the "Fee") in connection with the opening of the Retail Unit to the public.

2. Franchisor has agreed to forebear in collecting the fee at this time in reliance upon Franchisee's representations as set forth in this Agreement.

3. Franchisee hereby represents and warrants to Franchisor that Franchisee shall develop and execute a start up promotional program or such other promotion or advertising program as Franchisor may specify for the Retail Unit. In connection therewith, Franchisee shall utilize such website(s), program materials and methods as Franchisor shall specify from time to time. It is anticipated that such program would be undertaken in the period starting four weeks before the opening of the Retail Unit and be complete within 2 months of the opening of the retail unit.

4. In reliance on the foregoing, Franchisor agrees to forebear in collecting the Fee as set forth in the Franchise Agreement. Franchisor may collect the entire Fee, without offset, if Franchisee fails to complete the required program within 2 months of the opening of the Retail Unit.

5. All of Franchisor's remedies under the Franchise Agreement, including without limitation the right to attorneys fees, are hereby incorporated by reference.

6. Franchisor reserves the right to rescind this Test Agreement in the event that the web site intended for Franchisee's use in furtherance of this Test Agreement is not operational on the day on which the Retail Unit opens to the public. In such event, Franchisee agrees to promptly pay the Fee applicable to the market in which the Retail Unit is located and to comply with the provisions of the Franchise Agreement relating to startup promotional program or other Franchisor-required program as if this Test Agreement had not been entered into.

RIDER TO FRANCHISE AGREEMENT

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO
## DEVELOPMENT OF A NEW UNIT BY FRANCHISEE

FRANCHISEE wishes to develop a new Unit that will utilize one or more of FRANCHISOR's Proprietary Marks at the Premises. In order to facilitate FRANCHISEE's obtaining financing and other needed resources, FRANCHISOR may elect to enter into this agreement prior to having had the opportunity to review the Premises to determine if it is suitable for development as such a Unit. FRANCHISEE's right to develop and operate a Unit under the terms of this agreement at the Premises is, therefore, subject to the conditions that (i) FRANCHISOR shall approve the Premises as a suitable location for development of a Unit and (ii) FRANCHISOR shall determine that FRANCHISEE meets all of FRANCHISOR's qualifications and requirements for new, or if appropriate multiple-unit, franchisees. This Schedule enumerates the respective responsibilities of the parties pertaining to FRANCHISEE undertaking to develop a Unit on the Premises. In consideration of a conditional grant to FRANCHISEE of one or more franchise(s) for the Premises, FRANCHISEE hereby agrees as follows:

1.0   Approval of the Premises - Development of the Premises as a Unit must be approved by FRANCHISOR, as evidenced solely by written notice sent to FRANCHISEE by the General Manager or other duly authorized representative of FRANCHISOR (the "Site Approval Notice") pursuant to the process hereinafter described. Any real estate commitments that FRANCHISEE may make pursuant to this agreement MUST be subject to: (a) FRANCHISEE having obtained FRANCHISOR's prior written approval of development of a Unit on the Premises; (b) FRANCHISEE obtaining all necessary permits, licenses and local governmental approvals needed to develop and operate a Unit on the Premises. In addition, FRANCHISEE should include such other contingencies as FRANCHISEE's attorney may recommend. FRANCHISEE must provide FRANCHISOR a copy of any lease of the Premises within ten (10) days after its execution and receipt by FRANCHISEE.

1.1   It shall be FRANCHISEE's responsibility to retain an attorney and other appropriate, independent advisors in connection with negotiating FRANCHISEE's acquisition of the right to develop and operate a Unit on the Premises, including reviewing all agreements with FRANCHISOR.  FRANCHISOR assumes no liability or obligation to FRANCHISEE or to any third party for any assistance in negotiation FRANCHISOR may elect to provide to FRANCHISEE. Although FRANCHISOR may comment on FRANCHISEE's negotiations with third parties, any assistance FRANCHISOR provides to FRANCHISEE is no substitute for the advice of independent counsel.  FRANCHISOR will not act as agent, employee or fiduciary of FRANCHISEE for the purpose of assisting FRANCHISEE in negotiations.

1.2   In the event that development of a Unit on the Premises is disapproved by FRANCHISOR or by any governmental authority, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and be of no further force and effect.

1.3   FRANCHISOR's approval of the Premises is not a representation or a warranty that the Unit will be profitable or that FRANCHISEE will achieve any particular level of sales at the Unit.  It merely means that the Premises has met certain minimum criteria which FRANCHISOR has established for identifying suitable sites for proposed Units in the region in which the Premises are located. Because unit development is not a precise science, FRANCHISEE agrees that FRANCHISOR's approval or disapproval of a development shall not impose any liability or obligation on FRANCHISOR. The decision to develop any particular Premises is FRANCHISEE's, subject to FRANCHISOR's final approval. A preliminary favorable opinion of the Premises by local or regional representatives of FRANCHISOR is not conclusive or binding approval, because their recommendations may be rejected by FRANCHISOR.

2.0   Approval of FRANCHISEE - In addition to approval of the Premises set forth above, FRANCHISEE's qualifications to obtain this Franchise must be approved in writing by FRANCHISOR.  In the event FRANCHISOR disapproves FRANCHISEE's qualifications within sixty (60) days of the date of this agreement, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and expire.

3.0   Execution of Documents - FRANCHISEE shall execute such other documents and agreements as are customarily required by FRANCHISOR in such circumstances, including, if appropriate, but not limited to, a standard form of Lease Option Agreement or Rider to Lease, which ensures the continued availability of the Premises as a franchised unit, in the event of a default under this agreement or, if applicable, under FRANCHISEE's lease of the Premises, during the term of this agreement.  If FRANCHISEE owns the Premises real estate, FRANCHISEE shall grant FRANCHISOR the right to lease the Premises on negotiated terms comparable to those under which FRANCHISOR leases comparable property from others.  A Lease Option Agreement or a Rider to Lease confirming these rights in a form acceptable to FRANCHISOR, must be signed before construction commences on the Premises.

4.0   Development of the Unit - The Unit must be developed and constructed in strict accordance with FRANCHISOR's current standards, requirements, procedures, plans, specifications and documentation for the type, configuration and brand(s) approved for the Premises (hereinafter collectively the "Requirements").  In order that development of the Premises proceed as expeditiously as possible, FRANCHISEE shall strictly comply with the following procedures set forth in Sections 4 and 5:

4.1   FRANCHISEE shall request FRANCHISOR's review of a proposed site, submitted in writing on the proscribed form, signed by FRANCHISEE and, if applicable, FRANCHISEE's landlord (the "Request for Site Approval").   Within approximately thirty (30) days, FRANCHISOR will advise FRANCHISEE if the proposed Premises fails to meet FRANCHISOR's minimum preliminary criteria.   Otherwise, FRANCHISOR will schedule a Responsibility Meeting (described below), to be held within approximately sixty (60) days after FRANCHISOR received the Request for Site Approval.  This preliminary review procedure is intended to allow FRANCHISEE the opportunity to limit the amount of money FRANCHISEE spends on a site that does not meet FRANCHISOR's minimum criteria.

4.2   Once FRANCHISOR has scheduled a Responsibility Meeting, FRANCHISEE shall promptly hire a licensed architect for the Unit project, whose responsibility shall be to adapt FRANCHISOR's generic plans and/or specifications to the specific requirements of the Premises, the geographical region in which the Premises are located and the building codes and

ordinances pertinent to the Premises, and to oversee the contractor's completion of construction of the Unit on the Premises. FRANCHISEE's architect must promptly order such topographical and boundary surveys of the Premises, soil borings and structural engineering tests as FRANCHISOR and/or FRANCHISEE's architect may require (the "Reports"). FRANCHISEE's architect must attend the Responsibility Meeting.

4.3    On the scheduled day, FRANCHISOR's representatives will meet at the Premises with FRANCHISEE and FRANCHISEE's architect, to establish a work schedule and coordinate the respective responsibilities of each of the parties with respect to development of a Unit on the Premises (the "Responsibility Meeting"). The Reports, including copies of zoning ordinances and by-laws applicable to the Premises, shall be made available to FRANCHISOR at the Responsibility Meeting by FRANCHISEE's architect. If any such Report or FRANCHISEE's architect is not available when required, FRANCHISOR may, at its option, postpone the Responsibility Meeting, in which case FRANCHISEE shall reimburse FRANCHISOR's out-of-pocket travel costs, if any. Should the Responsibility Meeting be so postponed, FRANCHISOR shall reschedule the Responsibility Meeting on a date FRANCHISEE makes a firm commitment that the architect and/or Reports will be available, no later than within thirty (30) additional days. If FRANCHISEE is unable to comply, FRANCHISOR shall have the right to terminate this Franchise agreement, provided that, in FRANCHISOR's good faith judgement, FRANCHISEE has failed to exercise reasonable diligence to comply with the terms of this Schedule.

4.4    Subject to delays caused by FRANCHISEE or its landlord or otherwise beyond FRANCHISOR's reasonable control, FRANCHISOR shall use its best efforts to notify FRANCHISEE of its approval or disapproval of the Premises, within approximately ninety (90) days after the date FRANCHISOR received FRANCHISEE's Request for Site Approval.

4.5    FRANCHISOR assumes no responsibility for (a) evaluation of the soil or subsoil on the Premises for hazardous substances or unstable conditions, (b) inspection of any structure on the Premises for asbestos or other toxic or hazardous materials, or (c) compliance with the Americans With Disabilities Act ("ADA"). It is FRANCHISEE's sole responsibility to obtain satisfactory evidence and/or assurances that the Premises (and any structures thereon) are free from environmental contamination and in compliance with the requirements of ADA.

5.0    **Construction of the Unit** -Prior to commencement of construction of the Unit on the Premises, the plans and specifications prepared by FRANCHISEE's architect must be reviewed by FRANCHISOR and approved for compliance with FRANCHISOR's design Requirements. FRANCHISEE is solely responsible for obtaining all necessary permits from all applicable governmental agencies for completing construction of the Unit. If FRANCHISEE fails to commence construction of the Unit within twelve (12) months from the date of this Franchise Agreement, FRANCHISOR shall have the right, in its sole discretion, to terminate this agreement by written notice to FRANCHISEE.

5.1    FRANCHISEE and its contractor(s) shall obtain a comprehensive general liability insurance policy written by an insurer having at least a rating of A-XII in Best's Insurance Reports and in which FRANCHISOR is named as an additional insured party, Such policy shall comply with Subsection 5.3 of the General Terms and Conditions of this Franchise Agreement. Coverage under such insurance shall include operations, premises liability, independent contractor's coverage, contractual liability and automobile liability (owned and non-owned). Prior to commencement of construction, FRANCHISEE shall furnish FRANCHISOR an insurance certificate evidencing the foregoing policy and that FRANCHISEE or its contractor(s) have procured worker's compensation insurance covering all persons employed in construction of the Unit.

5.2    FRANCHISOR shall have the right of entry upon the Premises at all times, to inspect construction in progress, to ensure that all of FRANCHISOR's Requirements are being met. FRANCHISOR and its employees shall not act as an architect or agent of FRANCHISEE. The duties of FRANCHISOR's construction representative are limited solely to ensuring that FRANCHISOR's Requirements are met on the Premises. FRANCHISEE shall not rely upon any opinions expressed by FRANCHISOR or any of its employees or agents regarding structural integrity, safety or construction procedures, building codes or ordinances or other matters properly within the responsibility of FRANCHISEE's architect. FRANCHISOR assumes no liability or responsibility for architectural or engineering judgments outside the scope of the duties stated above.

5.3    If the Unit does not initially open to serve the general public, or does not commence operations (as the case may be), within fifteen (15) months from the date of this agreement, FRANCHISOR shall have the right, in its sole discretion, (a) to increase the Initial Franchise Fee(s) to the then-current initial franchise fee(s), which increase, if any, shall be payable to FRANCHISOR upon demand; or (b) to terminate this agreement by written notice to FRANCHISEE. In the event of any delay caused by FRANCHISOR, or if FRANCHISEE has been unavoidably delayed by act of God, government restrictions, labor difficulties, inability to obtain building materials or similar contingencies (other than making any payment) not within FRANCHISEE's control, FRANCHISOR shall extend the deadline for a period of time equal to the period of such unavoidable delay.

5.4    Before the Unit opens to serve the general public, or commences operations (as the case may be), FRANCHISEE must obtain FRANCHISOR's final approval of the construction of the building, site improvements and landscaping, as appropriate, and the installation of all signs and equipment. FRANCHISOR's approval of construction of the unit is not a representation or warranty that the Unit has been constructed in accordance with any architectural, engineering or legal standards for design or workmanship. It merely means that FRANCHISOR is satisfied that the Requirements which FRANCHISOR has established for consistency of design and layout have been met (or waived, where appropriate). FRANCHISEE agrees that FRANCHISOR's approval of construction of the Unit shall not impose any liability or obligation on FRANCHISOR. FRANCHISEE also agrees that all franchise and real estate documentation must be complete and all required payments must be received by FRANCHISOR before the Unit is opened.

5.5    As soon as FRANCHISOR approves that construction and equipping the Unit are substantially complete and all conditions required for opening the Unit, or commencing operations (as the case may be), have been met, FRANCHISEE shall promptly open the Unit to serve the general public. FRANCHISEE agrees that the Unit must open to serve the general public no later than fifteen (15) months from the date of this Agreement.

6.0    **Financing** - Prior to commencing construction of the Unit on the Premises, FRANCHISEE shall provide evidence satisfactory to FRANCHISOR that cash and/or financing is in place, sufficient to fund completion of construction and purchase of necessary improvements, equipment and signs. FRANCHISOR assumes no obligation to guarantee the funding or financing of FRANCHISEE's construction project. FRANCHISOR will not guarantee FRANCHISEE's mortgage, lease or

other real estate related obligations. If FRANCHISOR, at its election, finances or guarantees the financing of FRANCHISEE's purchase or leasing of equipment and/or signs, the owner of the Premises real estate must agree that the equipment and signs are not a part of the realty and must waive any and all interest in the equipment and/or signs, in order to permit the financing of the equipment and/or signs. In this connection, the owner of the Premises real estate must sign such reasonable documents as are reasonably required by FRANCHISOR.

7.0    **Control of the Premises** - FRANCHISEE hereby represents to FRANCHISOR that FRANCHISEE will have the following relationship with the owner or lessor of the Premises (place an "x" in the appropriate box):

☐    the Premises will be owned by an independent third party landlord with which FRANCHISEE will <u>not</u> share or maintain any common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

☐    the Premises will be owned by a third party landlord with which FRANCHISEE <u>will</u> share or maintain a common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

☒    the Premises will be owned by a corporation, LLC, trust, partnership or other entity controlled by FRANCHISEE; or

☐    the Premises will be owned by the same entity that will execute the Franchise Agreement.

FRANCHISEE agrees to promptly advise FRANCHISOR of any change, whatsoever, in the relationship represented above.

03/29/07                                                                SCHEDULE "NY"

### ADDENDUM TO THE FRANCHISE AGREEMENT AND
### STORE DEVELOPMENT AGREEMENT
### REQUIRED BY THE NEW YORK GENERAL BUSINESS LAW

Notwithstanding anything to the contrary set forth in the Franchise Agreement (the "Franchise Agreement") and/or the Store Development Agreement ("SDA") the following provisions shall supersede and apply to all Dunkin' Donuts franchises offered and sold in the State of New York.  There are circumstances in which an offering made by FRANCHISOR would not fall within the scope of the New York General Business Law, Article 33, such as when the offer and acceptance occurred outside the state of New York.  However, *an offer or sale is deemed made in New York* if FRANCHISEE is domiciled in or the franchise will be opening in New York.  FRANCHISOR is required to furnish a New York prospectus to every prospective franchisee who is protected under the New York General Business Law, Article 33.

1.    Subsection 5.4 of the Franchise Agreement and Section 11.A of the SDA shall each be supplemented by the addition of the following language as the last sentence of these sections:    ...

   However, FRANCHISEE shall not be required to indemnify FRANCHISOR for any claims arising out of a breach of this Agreement by FRANCHISOR or other civil wrongs of FRANCHISOR.

2.  Paragraph 10.3.7 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

   FRANCHISEE must execute a general release in a form satisfactory to FRANCHISOR, releasing FRANCHISOR, its shareholders, directors, officers, employees, in their corporate and individual capacities, of any claims FRANCHISEE may have against them; provided, however, that all rights enjoyed by FRANCHISEE and any causes of action arising in its favor from the provision of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York State General Business Law Sections 687.4 and 687.5 be satisfied.

3.  Paragraph 10.1 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

   This Agreement is fully assignable by FRANCHISOR and shall inure to the benefit of any assignee or other legal successor to the interest of FRANCHISOR herein. However, no assignment shall be made except to an assignee who, in the good faith judgment of FRANCHISOR, is willing and able to assume FRANCHISOR's obligations under this Agreement.

Initials

_AJ_

_AP_

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in duplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof. FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

FRANCHISOR:
Dunkin' Donuts Franchising LLC

By: _____

**Assistant Secretary**

This agreement is not binding upon the above entity(ies) until executed by an authorized representative.

**FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.**

ATTEST:

_____
Ami Patel, Secretary

FRANCHISEE:
**Shreeji Donuts, Inc.**

By: _____
Amish Patel, President

## PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION OR MEMBERS OF A LIMITED LIABILITY COMPANY

We, the undersigned, represent and warrant that we constitute

[x]   the shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of the above FRANCHISEE, a corporation

[ ]   one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of **New York**. Waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally. The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned. This Guarantee is intended to take effect as a sealed instrument.

WITNESS:

_____
Print name  G . K . PATEL

_____
Amish Patel, individually

WITNESS:

_____
Print name  Bhanu Patel

_____
Ami Patel, individually

PC # 342639
Newburgh, New York

## CERTIFICATION OF FRANCHISEE

DESCRIBE BELOW ALL PROMISES AND REPRESENTATIONS MADE BY FRANCHISOR THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR UNIFORM FRANCHISE OFFERING CIRCULAR BUT WHICH INFLUENCED FRANCHISEE'S DECISION TO SIGN THIS FRANCHISE AGREEMENT.

*If the answer is "none," please write "NONE" below.*

*NONE*

FRANCHISEE's completion of this page is a material inducement for FRANCHISOR to grant FRANCHISEE this Franchise. If FRANCHISEE fails to complete, sign and deliver this Certification of Franchisee page to FRANCHISOR along with the Franchise Agreement, FRANCHISOR will not counter-execute the Franchise Agreement or may void the Franchise Agreement if it already has been counter-executed.

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, that FRANCHISEE had the opportunity to obtain the advice of an attorney, and that FRANCHISEE, and not FRANCHISEE's attorney or other representative, has executed this Certification of Franchisee.

The date of the Certification shall be the date on the Franchise Agreement.

ATTEST:

_____
Ami Patel, Secretary

WITNESS:

_____

Print name    G . K . PATEL

FRANCHISEE:
**Shreeji Donuts, Inc.**

By:_____
    Amish Patel, President & Individually

By:_____
    Ami Patel, Secretary & Individually

**AD QSR**
**LEASE OF DUNKIN' DONUTS/BASKIN' ROBBINS SHOP**

This Lease (the "Lease") is dated _MAY 14_, 2001 and made by and between **THIRD DUNKIN' DONUTS REALTY, INC.** (hereinafter "Landlord"), a Massachusetts corporation with principal offices in Randolph, Massachusetts and the following individual(s) and/or entity **GANPATI DONUTS, INC.** (hereinafter "Tenant").

1.    Lease Date Schedule:

As used in this Lease, the following terms shall have the meanings set forth below, subject to the terms and conditions set forth elsewhere in the Lease. If any of the following definitions conflicts or is inconsistent with any subsequent provision of this Lease, the provision in this Section 1 shall prevail over the subsequent provision in this Lease.

| | | |
|---|---|---|
| 1.1 | Landlord: | Third Dunkin' Donuts Realty, Inc., a Massachusetts corporation |
| 1.2 | Landlord's Notice Address: | Post Office Box 317, Randolph, Massachusetts 02368, Attention: Vice President Finance |
| 1.3 | Landlord's Rent Payment Address: | Dunkin' Donuts:   Post Office Box 1097 Charlotte, NC 28201-1097 |
| 1.4 | Tenant: | Ganpati Donuts, Inc., a New York corporation |
| 1.5 | Tenant's Notice Address: | 674 Broadway, Newburgh, New York 12550 |
| 1.6 | Premises: | The property known as 674 Broadway, Newburgh, New York 12550 with the improvements located on such property as more particularly described on Schedule A attached hereto. |
| 1.7 | Permitted Use: | For the operation of a Dunkin' Donuts/Baskin-Robbins combo shop. |

1.8    Base Rent:

| Rental Period | Annual | Monthly |
|---|---|---|
| Date the remodeled shop Re-opens To December 31, 2010 | $ 60,000.00 | $ 5,000.00 |
| January 1, 2010 To December 31, 2020 | $ 65,000.00 | $5,416.00 |

| | | |
|---|---|---|
| 1.9 | Percentage Rent Rate: | Nine and a Quarter Percent ( 9.25 % ) |
| 1.10 | Term: From the date the remodeled shop re-opens to December 31, 2020. | |
| 1.11 | Initial Monthly Tax Payment Deposit:    Estimated at $660.00 per month. | |
| 1.12 | Initial Monthly Common Area and Additional Rent Deposit:    None | |
| 1.13 | Security Deposit:    None | |
| 1.14 | Prime Lease:    The lease dated May 19, 1981 by and between Valmar Textile Processing, Inc. predecessor in interest to Stephen W. Craig (the "Prime Landlord") and Third Dunkin' Donuts Realty, Inc. survivor of a merger with Dunkin' Donuts of New York, Inc. | |
| 1.15 | Franchise Agreement: The Franchise Agreement dated _MAY 14_, 2001 by and between Franchisor and Tenant | |
| 1.16 | Franchisor:    Dunkin' Donuts Incorporated and Baskin-Robbins USA, Co. | |
| 1.17 | Shop:    The Dunkin' Donuts existing and the Baskin Robbins to be constructed on the premises. | |
| 1.18 | Addendum:  Addendum attached hereto and incorporated herein containing Sections: 25 and 26 | |

Initials:



**Premises**

2.      The Landlord hereby Leases to Tenant and Tenant hereby Leases from Landlord the Premises, subject to the terms and conditions contained herein.

**Base Rent**

3.      (a)      Commencing upon the Rent Commencement Date as defined in Paragraph 5(c) below and continuing through the Term, Tenant agrees to pay the Annual Base Rent which shall be payable in equal monthly installments in advance on the fifteenth (15) day of the month immediately preceding the month for which such Base Rent is due. For fractions of a calendar month at the beginning and the end of the term, Base Rent shall be prorated based on a 30 day month.

      (b)      On execution of this Lease, Tenant shall pay to Landlord the first month's Base Rent.

      (c)      On execution of this Lease, Tenant shall pay Landlord an amount equal to Base Rent for the last month of the Term and, if this Lease is a sublease, all amounts payable as a security deposit under the Prime Lease. If Tenant fails to pay any sums due under this Lease or any other agreement between Landlord and Tenant, Landlord may apply such deposit, or any portion thereof, to the amount due Landlord and Tenant shall promptly replace the funds so applied. If Tenant shall default with respect to any covenant duty, or obligation of Tenant under this Lease, then the security deposit or any part thereof may be applied by Landlord (but Landlord shall not be obligated to do so) to the damages sustained by Landlord by reason of any such default. No such application shall be construed as an agreement to limit the amount of Landlord's claim or as a waiver of any damage or release of any indebtedness, and any claim of Landlord under this Lease not recovered in full from the security deposit shall remain in full force and effect. Any time the security deposit has been depleted, for any reason, Tenant shall promptly replace the funds so applied. Tenant shall make each such requested remittance within ten (10) days following such request from Landlord and each such remittance received by Landlord shall thereupon constitute a part of the security deposit subject to the terms and provisions hereof. Failure to make any such requested remittance within such ten (10) day period may be treated by Landlord as a failure by Tenant to make timely payment of rent and as an event of default. Said deposit shall be held by Landlord and may be commingled with Landlord's other funds, without liability for interest, as security for the faithful performance by Tenant of all of the terms, covenants and conditions of this Lease by Tenant to be kept and performed during the Term. Providing all of the terms of this Lease have been complied with, this sum, less any amounts due Landlord, shall be returned to Tenant within such time, after expiration of Tenant's occupancy hereunder, as may be necessary for Landlord to determine the amount of any liabilities which have not been ascertained at the date of expiration. The liabilities to which this security deposit may be applied shall include any liabilities or obligations from Tenant to Landlord arising under this Lease or any other agreement between Tenant and Landlord. If Tenant has paid the last month's rent under this paragraph, such funds may also be held, commingled and applied as stated herein.

**Percentage Rent**

4.      (a)      The Tenant further agrees to pay to Landlord, for each Lease Year, an amount equal to the amount by which Gross Sales multiplied by the Percentage Rent Rate exceeds the amount of Base Rent paid or payable during such Lease Year. In anticipation of Percentage Rent payable by Tenant under the terms of this Paragraph 4., Tenant shall pay to Landlord not later than fifteen (15) days after the close of each Lease Month, the amount by which the Gross Sales in the preceding Lease Month multiplied by the Percentage Rent Rate exceeds the Base Rent payable for that Lease Month.

      (b)      In the event this Lease is terminated or assigned with the consent of Landlord prior to the end of any Lease Year, yearly rentals shall be apportioned at the date of termination or assignment.

      (c)      The term "Gross Sales", as used herein, shall include all sales made by Tenant in, on, or from the Premises, but shall not include, sales taxes or similar taxes.

      (d)      The term "Lease Year", as used herein, shall refer to successive periods of 52 consecutive weeks commencing on the first Sunday the Shop is open to serve the general public, or on the next succeeding business day if the Shop is not open on Sunday.

      (e)      The term "Lease Month", as used herein, shall mean the period beginning on the Sunday immediately following the last Saturday of any calendar month and ending on the last Saturday of the next calendar month.

      (f)      The Tenant agrees to furnish Landlord, within fifty (50) days following each Lease Year, a statement of the Gross Sales for such year certified by an independent public accountant acceptable to Landlord. Any Percentage Rent due based upon such Gross Sales in excess of any amounts previously deposited with Landlord, as provided above, is to be paid simultaneously with the furnishing of such

statement. The Landlord agrees to refund to Tenant any amounts deposited with Landlord, as provided herein, in excess of the total Percentage Rent due based on actual Gross Sales for any Lease Year upon receipt of the certified statement of Gross Sales. Landlord reserves the right to apply any refund against outstanding obligations of Tenant, if any.

(g)     Tenant shall keep such books and records of sales as are required under the Franchise Agreement and as otherwise required by Landlord from time to time including, but not limited to, complete, true and accurate records and books of account showing the total Gross Sales for each Lease Year, original invoices, sales records, sales slips, sales checks, sales reports, cash register tapes, records of bank deposits, inventories prepared as of the close of the Tenant's accounting period, sales and occupation tax returns, and all other original records pertaining to the business conducted in or from the Premises and other pertinent papers and/or documents which enable Landlord to determine the Gross Sales.  Such books and records shall be kept for the term of this Lease and for three (3) years following the termination or expiration of this Lease or Tenant's assignment thereof.  Upon assignment, expiration or sooner termination of this Lease, Tenant, agrees to notify Landlord in writing of the place where its books will be kept, which place is subject to Landlord's approval and this obligation shall survive expiration of this Lease.

(h)     If this Lease is a sublease, Tenant shall also keep such books and records as are required to be kept by Tenant under the Prime Lease and in the manner prescribed by the Prime Lease.  If the Prime Lease requires books and records to be kept for a period of time beyond the expiration or assignment of this Lease, Tenant shall so maintain such books and records.

(i)     If this Lease is a sublease, for each period of this Lease wherein Tenant's Percentage Rent payment is less than Landlord's annual percentage rent payment under the Prime Lease, Tenant agrees to pay to Landlord as Percentage Rent an amount equal to Landlord's percentage rent payment under the Prime Lease less Tenant's Percentage Rent paid for the corresponding period pursuant to Section 4(a) above.

(j)     Landlord's representatives shall have the right to inspect Tenant's original books and records at reasonable times. If an inspection reveals that the Gross Sales reported by Tenant to Landlord are less than the Gross Sales ascertained by the inspection, then Tenant shall immediately pay to Landlord any amounts owing to Landlord based upon the correct Gross Sales. All inspections shall be at the expense of Landlord; however, if an inspection results from Tenant's failure to prepare, deliver or preserve statements or records required by this Lease, or results in the discovery of a discrepancy in the Gross Sales reported by Tenant of two percent (2%) or more, Tenant shall pay or reimburse Landlord for any and all expenses connected with the inspection, including, but not limited to, accounting and legal fees, as well as interest on any unpaid amounts at the rate set forth in Paragraph 18(c). Such payments will be without prejudice to any other remedies Landlord may have under this Lease or the Franchise Agreement, including the right to terminate this Lease, without opportunity to cure, in the case of intentional underreporting of Gross Sales.

**Term and Rent Commencement**

5.     (a)     This Lease is for the term commencing on the date the remodeled shop re-opens (the "Term Commencement Date"), and ending on December 31, 2020 (the "Term"). Notwithstanding the foregoing, if this Lease is a sublease, the term of this Lease shall expire fifteen (15) days prior to the expiration or any earlier termination of the Prime Lease. If an equipment package is to be installed in the Premises by Franchisor, substantial completion shall mean that the Premises are sufficiently complete to allow normal operation of the Shop as contemplated herein. If equipment is to be installed by Tenant, substantial completion shall mean that the Premises are sufficiently complete to allow such installation of equipment by Tenant.

(b)     Prior to the commencement of the term, Tenant may proceed to erect temporary or permanent signs and to outfit the Shop with fixtures and to install equipment, provided that there shall be no unreasonable interference with Landlord and that Tenant will employ only such labor as will not cause any conflict or controversy with any labor organization representing the trade performing work for Landlord or any contractors or subcontractors. The Tenant's entrance on the Premises for such purpose shall not impose any liability upon Landlord for any fixtures or equipment installed or work done by Tenant, and Tenant will, prior to commencing such work, cause Landlord to be insured from the date of Tenant's entry upon the Premises with liability coverage elsewhere herein provided to be carried by Tenant during the term hereof, and will adequately satisfy Landlord that all workmen of Tenant and of any of Tenant's contractors and subcontractors are properly covered by Workmen's Compensation Insurance. All of the terms and conditions of this Lease shall apply during such period prior to the commencement of the term excepting only provisions relating to payment of rent and operation of the Shop on the Premises.

(c)     Tenant's obligation to pay rental hereunder shall commence upon the earlier to occur of:  (i) the date that is five (5) days after the Term Commencement Date; or (ii) the first date that the Shop on the Premises is open for business (the "Rent Commencement Date").  Upon request by Landlord, Tenant shall execute and deliver on agreement confirming the Term and Rent Commencement Dates and the date of expiration of the Term.

3

(d)     Notwithstanding anything contained herein to the contrary, if this Lease is a sublease, the term of this Lease shall expire upon the expiration or earlier termination of the Prime Lease.

**Taxes**

6.     (a)     In addition to the rentals provided above, Tenant agrees to pay, before interest and penalties accrue, all real estate taxes and other taxes, including special assessments for betterments, which may be imposed on or become due and payable with respect to the Premises during the Term. During the first and last years of the Term Tenant shall pay a prorata share of all such taxes; said share shall be apportioned over the period for which the taxes are assessed to include only those taxes applicable to the Term. The Tenant may, at its own expense, and in the name of either or both Landlord or Tenant, initiate and prosecute proceedings for an abatement or review of such taxes and Landlord agrees to cooperate with Tenant in any such proceedings. If this Lease is a sublease, Tenant's right to initiate and prosecute such proceedings shall be conditioned upon Landlord having a like right under the Prime Lease.

(b)     Tenant agrees to deposit with Landlord each month one-twelfth (1/12) of the estimated yearly real estate taxes due and payable with respect to the Premises. For the purposes of this Lease, the estimated yearly real estate tax with respect to the Premises shall be assumed to be the amount of tax levied in the most current tax year of the taxing authorities concerned unless Landlord determines that an alternative estimated yearly real estate tax is more reasonable. Such deposits shall initially be in the amount of the Initial Monthly Tax Payment Deposit. All such monthly tax payments shall be due and payable at the same time as the rental payments required under Paragraph 3(a) above. Upon the payment of any real estate or other tax bill, if Landlord determines that there is a deficiency in the balance of deposits held on account of future tax liabilities, Tenant shall pay to Landlord, within twenty (20) days after billing, the amount of such deficiency, as determined by Landlord.

**Additional Rent**

7.     (a)     If this Lease is a sublease, in addition to the payments herein before specified, Tenant shall pay to Landlord, without offset or deduction, all other charges and amounts payable under the Prime Lease, including, without limitation, any common area maintenance charges, merchants association dues, promotion fund fees and advertising fees. Tenant agrees to deposit with Landlord each month one-twelfth (1/12) of the estimated yearly total for such charges. Such deposits shall initially be in the amount of the Initial Monthly Common Area and Additional Rent Deposit. Computations of Tenant's *pro rata* share and any adjustments required by the Prime Lease shall be made between Prime Landlord and Landlord. Landlord agrees to pay as soon as reasonably practicable thereafter any refunds which may be due Tenant and Tenant hereby agrees to pay any amounts due Landlord on written demand.

(b)     Tenant also agrees to pay or reimburse Landlord for any local, state and federal taxes, including sales tax, use tax, leasing or rental tax, excise tax or other taxes, however described, which may be assessed, levied or payable upon the leasing or use or occupancy of, or the rent or other receipts derived from, the Premises, leasehold improvements and/or personal property supplied together with the Premises or upon the business conducted on the Premises, including any such taxes which may be payable with respect to said Premises or property by or on behalf of the Prime Landlord or any other prior lessor of said Premises and for which Landlord herein is under obligation or liability of payment or reimbursement.

(c)     All monetary obligations of Tenant which are not already designated hereunder as rent shall be considered additional rent and, in the event of default in the payment thereof, any remedies for default in the payment of rent shall be available to Landlord.

**Purpose and Use**

8.     It is agreed that Tenant may use the Premises only for the Permitted Use. Tenant shall use the Premises for no other purpose.

**Landlord's Warranties**

9.     Landlord warrants that Landlord controls the Premises, either by ownership or Lease, or both, and that Landlord has full legal right to enter into this Lease.

**Landlord's Covenants**

10.     The Landlord agrees:

(a)     To complete, or to cause completion of, any work required to substantially complete the Premises in accordance with Franchisor's plans and specifications with reasonable dispatch after commencement of the term of this Lease;

(b)    To assign to Tenant all warranties and guarantees obtained from contractors, suppliers or others with respect to the performance, work and materials and equipment used in the construction and development of the Premises and to use reasonable diligence in assisting Tenant in the enforcement of such warranties and guarantees; and

(c)    Not to disturb Tenant's possession and quiet enjoyment of the Premises so long as Tenant is not in default under this Lease.

**Tenant's Covenants**

11.    The Tenant agrees:

(a)    To pay, when due, rent, additional rent and all charges for water, gas, electricity and other utilities furnished to the Premises;

(b)    To pay any and all taxes pertaining to and levied upon the Premises and Tenant's property located on the Premises;

(c)    Prior to entry upon the Premises, to procure and maintain in full force and effect for the Premises during the entire term of this Lease, at Tenant's sole expense, an insurance policy or policies protecting Tenant and Landlord and their directors and employees against any loss, liability or expense whatsoever from (without limitation) fire, personal injury, theft, death, property damage or otherwise arising or occurring upon or in connection with the Premises or by reason of Tenant's operation or occupancy of the Premises. Such policy or policies shall include comprehensive general liability insurance, including, but not limited to, product and contractual liability coverage, with a single limit of two million dollars ($2,000,000) or such higher limit as Landlord, in its sole and absolute discretion, may from time to time require, for bodily injury and property damage combined, all risk property damage insurance, including flood and earthquake protection, for the full replacement cost value of the Premises, plate glass insurance and boiler insurance, if applicable, and such statutory insurance as may be required in the state in which the Shop is located. All insurance afforded by the policies required under the terms of this Paragraph shall:

(1) Be written in the names of Tenant, the Landlord and any other party directed by Landlord, as their respective interests may appear;

(2) Be written by insurance companies acceptable to Landlord;

(3) Contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named;

(4) Contain the provision that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and

(5) Not be limited in any way by reason of any insurance which may be maintained by Landlord;

(6) Contain a standard mortgage clause naming the holder of any mortgage, deed of trust or any other security agreement as a named insured.

During the Term, Tenant shall furnish Landlord with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that the premiums therefor have been paid. If at any time during the Term Tenant fails to comply with the provisions of this Paragraph 11(c), Landlord, in addition to all other remedies available, may elect to obtain such insurance and keep the same in effect and Tenant shall pay Landlord, as additional rent upon demand, the cost of premiums therefor.    If this Lease is a sublease, Tenant shall also comply with any additional insurance requirements set forth in the Prime Lease including, without limitation, carrying such additional coverage as may be required under the Prime Lease and naming the Prime Landlord and any other third party designated by the Prime Landlord as a named or additional insured under all required insurance policies.

(d)    To comply promptly with all applicable laws, rules, regulations, ordinances, requirements and orders of public authorities, the Board of Fire Underwriters and similar organizations;

(e)    To save Landlord and any other party claiming an interest in the Premises harmless and indemnified from and against any and all injury, loss, claim or damage or liability to any person or property while on the Premises;

(f)    Tenant shall at all times during the Term or any extension thereof, at Tenant's sole cost and expense and in full compliance with the Franchise Agreement and with all applicable laws, ordinances, governmental rules and regulations and the requirements of any insurer of the Premises, put, keep, replace and maintain in good repair and first-class order and condition, the Premises, including but not limited to the land, building, signs, poles, parking lot, walkways, landscaping, foundations, walls, roofs, roof covering, gutters, downspouts, glass, pipes, wires, septic or sewer systems, grease traps, plumbing, utility systems, equipment and appurtenances (including heating, ventilation and air conditioning), both interior and exterior, structural and non-structural, ordinary and extraordinary. Tenant shall maintain, repair, and replace the same and at all times keep the same in good repair and condition, howsoever the necessity for such maintenance, repairs or replacements shall occur. Tenant shall further be responsible

for making repairs, replacements, alterations or capital improvements to the Premises of every type and description, required by any law, rule, regulation or order of any federal, state or municipal government having jurisdiction over the Premises, subject to paragraph 11(g) below. If, by the terms of the Prime Lease the Prime Landlord has assumed any of Tenant's obligations hereunder, such assumption shall only operate to limit Tenant's obligations as, when and to the extent that any such obligations are assumed and paid by the Prime Landlord. Tenant acknowledges and agrees that Landlord shall have no responsibility or liability for repairs, maintenance or replacements to the Premises during the term of the Lease.

(g)      To make no material alteration, addition, replacement or improvement in, or to, the Premises or the interior or exterior of the Shop without prior written consent of Landlord;

(h)      To continuously operate the Shop on the Premises, fully stocked and staffed, so as to maximize the amount of Gross Sales;

(i)      To give written notice of any default of Landlord's covenants or obligations under the terms of this Lease to any mortgagee or assignee (conditional or otherwise) of any interest, or holder of any security interest, in any portion of the Lease or the Premises (whether derived from Landlord or from any parent, affiliate or assignee of Landlord) of which Tenant has notice, and if such default would allow Tenant to cancel or terminate this Lease, give written notice of any intended cancellation or termination to any such mortgagee, assignee or holder and allow such mortgagee, assignee, or holder thirty (30) days to cure the default or undertake in writing to perform all of the covenants of Landlord under the terms of this Lease, in either of which events the Lease is to continue in full force and effect; and

(j)      To remove, at the expiration of the Term, Tenant's goods and effects and to peaceably yield up the Premises in as good repair and condition as the same may be in at the commencement of the Term or may be put in thereafter except for reasonable wear and use, and if this Lease is a sublease, to comply with any provisions of the Prime Lease regarding the condition in which the Premises must be surrendered at the expiration of the term of the Prime Lease.

**Subordination**

12.      This Lease shall be subject and subordinate to any mortgage, deed of trust, sale, sale and leaseback, or any other security arrangement or interest made with or given to any bank, insurance company, finance company, other lender or purchaser covering the Premises; provided, however, that such subordination will not disturb Tenant's possession and quiet enjoyment of the Premises so long as Tenant is not in default under this Lease. Tenant does hereby designate Landlord as its agent to execute any document necessary to complete such subordination. In the event the interest of Landlord in the Premises shall be transferred to and owned by any other person (i) by reason of a foreclosure or other proceedings brought in respect to any mortgage, deed of trust or security instrument affecting the Premises, (ii) by a deed in lieu of foreclosure, or (iii) by any other manner, Tenant shall agree to recognize such other person under all of the terms, covenants and conditions of this Lease, and Tenant hereby agrees that any person which Tenant agrees to recognize as its landlord hereunder shall not be liable for any action or omission of any prior landlord, including Landlord. Landlord and Tenant hereby agree for the benefit of any mortgagee that may hereafter have an interest in the Premises that the rent payable hereunder by Tenant shall not be paid for more than sixty (60) days in advance and no amendment of the Lease or waiver or modification of the terms of the Lease shall become effective without prior written consent of the mortgagee, provided that such consent is required under the indenture of mortgage.

**Mutual Covenants**

13.      (a)      Tenant hereby agrees that Landlord is not to be held responsible or liable in any manner whatsoever for any latent construction or other defects in the Premises and that the rent payable hereunder shall not be diminished or abated by reason thereof. In the event Tenant shall hereafter contend that the Premises require repair or replacement of any nature or kind whatsoever, then Tenant shall exert any claim therefor directly against the contractor or contractors of Landlord or Prime Landlord, without in any manner asserting any claim against Landlord. In the event of any claim or claims against the said contractor or contractors, Landlord agrees to cooperate with Tenant in advancing and furthering Tenant's claim against said contractor or contractors, at Tenant's cost and expense. Tenant agrees to reimburse Landlord for any expenses or cost to which Landlord shall have been put in so cooperating with Tenant. Tenant also agrees that Landlord is not liable or responsible in any manner whatsoever for delays in the completion of the construction of the Premises.

(b)      Each party doing any construction, maintenance or repair work shall promptly discharge or bond any obligations or liens arising therefrom; and

(c)      Upon the request of Landlord, Tenant shall execute, acknowledge and deliver appropriate recordable instruments giving notice of this Lease and the commencement date of the term of the Lease and any other documents which may be required to facilitate any financing of the Premises.

6

**Landlord's Rights**

14.    (a)    Tenant warrants that the Franchise Agreement is in full force and effect and that this Lease is subject to the Franchise Agreement remaining in full force and effect. If the Franchise Agreement is terminated for any reason, then Landlord shall have the right to terminate this Lease.

(b)    Landlord's representatives shall have the right to inspect the Premises at all times without prior notice to Tenant.

**Assignment or Subletting**

15.    (a)    Landlord may assign any interest in this Lease at any time, provided that no such assignment will reduce the obligations of Landlord or disturb Tenant's possession and quiet enjoyment of the Premises so long as Tenant is not in default under this Lease or under the provisions of any notification received by Tenant from the assignee of this Lease. Landlord, at its option, shall have the right to assign Landlord's interest in the Prime Lease to Tenant, provided that the rent and additional rent payable under the Prime Lease is not greater than the rent and additional rent under this Lease. In the event that Landlord elects to assign its interest in the Prime Lease to Tenant, Tenant agrees to execute and deliver to Landlord an assignment and assumption agreement pursuant to which Tenant assumes all of Landlord's remaining obligations under the Prime Lease.

(b)    Tenant shall not assign, transfer, mortgage or otherwise encumber or dispose of this Lease, or any interest in this Lease, nor sublet or permit the Premises or any part thereof to be used by others, without obtaining Landlord's prior written consent in each instance. Any act or instrument purporting to do any of the foregoing, but which does not have Landlord's prior written consent, shall be null and void. Upon any permitted assignment of this Lease, Tenant shall remain liable throughout the balance of the Term for the payment of rent and other charges and for the performance of all terms, covenants and conditions herein undertaken by Tenant.

(c)    If Tenant is a corporation, the transfer of a majority of the issued and outstanding capital stock of such corporation, or if Tenant is a partnership, the transfer of a majority of the total interest in such partnership, however accomplished, and whether in a single transaction or in a series of related or unrelated transactions, shall be deemed an assignment of this Lease.

**Fire and Casualty**

16.    Landlord agrees with Tenant that if the Premises or any part hereof shall be damaged by fire or casualty, Landlord will proceed with reasonable dispatch, after receipt of the insurance proceeds resulting from the fire or casualty, to restore the Premises to substantially the same condition as prior to the damage, it being understood and agreed that if the cost of the restoration exceeds the amount of the insurance recovery, Tenant will pay Landlord for such additional cost prior to restoration. Tenant agrees that there shall be no abatement in rent pending restoration of the Premises and that Tenant during the term of this Lease shall keep in full force and effect adequate "Business Interruption Insurance" insuring the operation of the Shop against loss or damage by fire or casualty. If the Premises are damaged by fire or casualty during the last three (3) years of the term of this Lease and such damage exceeds fifty percent (50%) of the full insurable value of the Premises, Landlord may elect, by notice to Tenant within sixty (60) days of occurrence of the damage, not to restore the Premises and may terminate the Lease.

If this Lease is a sublease, and if the Prime Landlord under the Prime Lease elects to terminate this Lease due to the fact that the Premises or any building or shopping center of which the Premises are a part is damaged by fire or casualty, then this Lease shall terminate as of the date of such termination of the Prime Lease.

**Eminent Domain**

17.    In the case the Premises or any part thereof shall be taken by the exercise of the right of eminent domain, then Tenant shall have the option to terminate this Lease, provided the taking is of such character as to substantially prevent Tenant from conducting Tenant's business as theretofore and provided said election shall be made within sixty (60) days of said taking. It is further agreed that each party shall be entitled to receive out of any award payment for the amount of damages sustained by it, to its equipment and signs. Tenant hereby assigns to Landlord all of its right, title and interest in and to any condemnation award payable to Tenant by the condemning authority as damages for the complete or partial taking of the estate vested in Tenant by this Lease. All other damages arising out of a complete or partial taking of the Premises which are sustained by Tenant and to which Tenant is legally entitled including, without limitation, moving expenses and damages for dislocation of Tenant's business, shall be paid to Tenant.

If this Lease is a sublease, Tenant's right to terminate this Lease pursuant to this section shall be conditioned on Landlord having a like right to terminate the Prime Lease. Any notice by Tenant of its election to terminate this Lease pursuant to this Section shall be given in sufficient time to enable Landlord to exercise its right to terminate the Prime Lease. Additionally, if this Lease is a sublease, and if the Prime Landlord under the Prime Lease elects to terminate this Lease due to any taking of the

7

Premises, or any part thereof, or a taking of any portion of the building, shopping center or land of which the Premises are a part, then this Lease shall terminate as of the date of termination of the Prime Lease.

**Default and Termination**

18.  (a)     In the event that Tenant shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by Tenant, or such a petition is filed against and consented to by Tenant, or is not dismissed within thirty (30) days, or if Tenant is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of Tenant or other custodian for Tenant's business or assets is filed and consented to by Tenant and is not dismissed within thirty (30) days, or a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against Tenant, or if the real or personal property of Tenant shall be sold after levy thereupon by any sheriff, marshal, or constable, then upon the occurrence of any of said events, Tenant shall be deemed to be in default under this Lease and all rights granted to Tenant hereunder shall thereupon terminate without any need for notice to Tenant and this Lease shall thereupon be terminated.

(b)     The Tenant shall be in default under this Lease:
  (1) If Tenant fails, refuses or neglects to pay promptly to Landlord any monies owing to Landlord on the date such payment is due;
  (2) If Tenant fails to submit when due any report or financial data which Landlord requires under this Lease; or
  (3) If Tenant fails to carry out in all respects any other of Tenant's obligations and agreements under this Lease, or under any equipment agreement, promissory note, conditional sales contract or other contract materially affecting the Shop to which Tenant is a party or by which Tenant is bound.

(c)     If Tenant fails to pay to Landlord when due any payments required under this Lease, Tenant agrees to pay interest on the unpaid amounts at the rate of 18% per annum or the highest rate allowed under applicable law, whichever is less, in addition to the unpaid amounts. Tenant shall also pay, upon demand, all of Landlord's costs, charges and expenses, including reasonable attorneys' fees, court costs and fees of agents and others retained by Landlord incident to the enforcement of any of Tenant's obligations hereunder whether or not a suit is commenced. Tenant shall also pay upon demand attorneys' fees and court costs incurred by Landlord in any litigation, negotiation or transaction in which Tenant causes Landlord, without Landlord's fault, to become involved or concerned.

(d)     If Tenant shall be in default under Paragraph 18(b)(1) of this Lease and such default shall not be cured within ten (10) days after receipt of a written notice to cure thereof from Landlord, then, in addition to all other remedies at law or in equity, Landlord may immediately terminate this Lease. In the event of any other default by Tenant under the terms of this Lease, and such default shall not be cured within thirty (30) days after receipt of written notice to cure thereof from Landlord, then in addition to all other remedies at law or in equity, Landlord may immediately terminate this Lease. If Landlord has given to Tenant two (2) separate notices because of two (2) distinct defaults in the case of nonpayment of Base Rent or Percentage Rent or Additional Rent in any Lease Year, Landlord thereafter shall no longer be required during the balance of the term of this Lease to give Tenant any additional written notice to cure such defaults before terminating this Lease. Termination of this Lease hereunder shall become effective immediately upon the date of receipt of a written notice of termination by Tenant.

(e)     Upon any termination of this Lease, Landlord may enter upon the Premises and repossess the same, and expel Tenant and those claiming under it, without being guilty of any manner of trespass, and without prejudice to any remedies which might otherwise be used for the event of default in question. In the case of any such termination, Tenant will indemnify Landlord against all loss or damage suffered by reason of the termination, including loss of rentals which would have otherwise been payable hereunder for the balance of the term had such termination not occurred and all costs of reletting the Premises; and

(f)     No right or remedy herein conferred upon or reserved to Landlord is exclusive of any other right or remedy herein or by law or equity provided or permitted; but each shall be cumulative of every other right or remedy given hereunder.

**Security Interest**

19.     As security for the faithful performance of all of Tenant's obligations under this Lease, Tenant hereby grants to Landlord a lien upon all property of Tenant now or hereafter located upon the Premises. If Tenant abandons or vacates the Premises or any substantial portion thereof or has failed to timely cure any default in the payment of any rentals, damage or other payments required by this Lease, Landlord may enter upon the Premises, by force if necessary, and take possession of all or any part of Tenant's property, moveable or immovable, and may sell all or any part of such property at a public or private sale or successive sales, without notice if permitted by law, to the highest bidder for cash, and may convey and deliver, on behalf of Tenant, all of Tenant's title and interest in the property sold to the highest bidder. The proceeds of the sale of the property shall be applied by Landlord toward the cost of the sale

8

and then toward the payment of all sums then due by the Tenant to Landlord under the terms of this Lease. In order to permit Tenant to finance the purchase of equipment to be placed upon the Premises, Landlord hereby subordinates any and all its rights pursuant to the lien herein granted by Tenant, to the lien granted by Tenant to any third party in connection with the original purchase of equipment, at the time such equipment is first placed upon the Premises during the term of this Lease.

### Rental and Notice Submission

20.    (a)    All rental payments are to be made to Landlord at Landlord's Rent Payment Address. Upon request by Landlord, Tenant shall make all payments required by this Lease by electronic funds transfer ("EFT"). Tenant shall provide Landlord with the authorizations and bank account data necessary to effectuate payment by EFT. Tenant shall also complete and deliver to Landlord such other forms as Landlord may from time to time require to effectuate any changes as necessary to maintain EFT capability. Landlord does not, by accepting payments via EFT, waive any of its right under this Lease. Tenant agrees (a) to give Landlord at least fourteen (14) days written notice (except in the case of emergency) before making any change to Tenant's EFT bank account, providing Landlord all information and specimens required for Landlord to change EFT to the new account; (b) to pay Landlord its then-current late fee, plus collection costs and reasonable attorney's fees, if Tenant's bank rejects Landlord's EFT request because of insufficient funds; and (c) upon Landlords demand, to replace EFT rejected by Tenant's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, cost of collection and attorneys fees.

(b)    Any notice required to be given to Landlord shall be sent by certified mail to Landlord at Landlord's Notice Address or at such other address as Landlord may from time to time designate in writing to Tenant by certified mail. Any notice required to be given to Tenant shall be sent by mail to Tenant at Tenant's Notice Address or at such other address as Tenant may from time to time designate in writing to Landlord by certified mail.

### Hazardous Substances

21.    Tenant covenants and agrees not to generate, store, handle or dispose of any Hazardous Substance in or upon the Premises during the term of the Lease. In the event, however, that any substance currently used in Tenant's business shall, during the Lease Term, become designated as a Hazardous Substance, then Tenant shall, to the extent practicable, discontinue use of the substance on the Premises. If it is not practicable for Tenant to discontinue such use, then Tenant agrees that it shall only continue use of the Hazardous Substance on the Premises in a manner consistent with all standards and regulations for the safe generation, use, storage and disposal of such Hazardous Substance promulgated by all governmental agencies having jurisdiction. Tenant shall indemnify and hold Landlord harmless from and against any and all demands, claims, enforcement actions, costs and expenses, including reasonable attorneys fees, arising out of the breach of this paragraph by Tenant. For purposes of this Section, a "Hazardous Substance" shall mean any petroleum product, asbestos product or other material, substance or waste which is recognized as being hazardous or dangerous to health or the environment by any federal, state or local authority having jurisdiction.

### Waivers

22.    One or more waivers of any covenant, condition or agreement herein contained shall not be construed as a waiver of a further breach of the same covenant, condition or agreement or of any other covenant, condition or agreement, and the consent or approval by Landlord to or of any act by Tenant requiring Landlord's consent or approval shall not be deemed to waive or render unnecessary Landlord's consent or approval to any subsequent similar act by Tenant. The receipt by Landlord of rental or other payments with knowledge of the breach by Tenant of any covenant of this Lease shall not be deemed a waiver of such breach. Except as expressly set forth in this Lease, neither party shall be liable to the other party, or to any insurance company (by way of subrogation or otherwise) insuring the other party, for any loss or damage to any building, structure or other tangible property, or losses under worker's compensation laws or benefits, even though such loss or damage might have been caused by the negligence of such party, its agents or employees, provided that such loss or damage is covered under any policy of insurance which Landlord or Tenant is required to maintain hereunder, or under any other policy of insurance maintained by Landlord or Tenant. Each party does hereby waive trial by jury in any action, proceeding or counterclaim arising out of or connected in any way with this Lease or Tenant's occupation of the Premises. Tenant, for itself and on behalf of all parties claiming by, through or under Tenant, to the fullest extent permitted by law, does hereby waive on behalf of all parties claiming by, through or under Tenant, to the fullest extent permitted by law, does hereby waive and surrender all rights of redemption, re-entry and/or repossession of the Premises under any present or future laws.

**Accord and Satisfaction**

No payment by Tenant or receipt by Landlord of a lesser amount than the rental and additional rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall nay endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or to pursue any other remedy provided in this Lease.

**Miscellaneous**

24.     (a)     All covenants, agreements, conditions and undertakings contained in this Lease shall extend to and be binding upon the legal representatives, successors and assigns of the respective parties hereto.

(b)     This Lease shall be void and of no effect if Landlord shall be unable to obtain the necessary permits, licenses and approvals from all public authorities for construction and development of the Premises in accordance with the plot plan and plans and specifications developed for the Premises. In said event, any monies deposited by Tenant shall be immediately returned by Landlord and the parties shall be relieved of all their obligations hereunder.

(c)     Nothing contained in this Lease shall render Landlord in any way a partner, joint venturer or associate with Tenant in the operation of the Premises or subject Landlord to any obligations, loss, charge or expense in connection with or arising from the operation of the Premises. Notice is hereby given to all whom it may concern of the foregoing.

10

**Landlord**

ATTEST:

**THIRD DUNKIN DONUTS REALTY, INC.**
a Massachusetts corporation

By: _____

_____
Arthur J. Anastos, Assistant Clerk

Donald Law, Director of Retail Operations

**Tenant**

ATTEST:

**GANPATI DONUTS, INC.**
a New York corporation

Ami Patel, Secretary    *ATTY. IN FACT.*

By: _____

Amish Patel, President

11

## GUARANTEE

The UNDERSIGNED, waiving demand and notice hereby, jointly and severally, unconditionally guarantee the performance of all duties and obligations of **GANPATI DONUTS, INC.** the Tenant under this **Lease**, and personally agree that said Lease shall be binding on each of us personally, as if each of us were the Tenant.

Signed, sealed and delivered in the presence of:

_____
Witness

_____
Amish Patel, individually

_____
Witness

_____
Ami Patel, individually
ATTY. IN FACT.

12

Addendum to Lease of Dunkin' Donuts /Baskin' Robbins Shop dated _____May 14_____, 2001 made by and between **THIRD DUNKIN' DONUTS REALTY, INC.** ("Landlord") and **GANPATI DONUTS, INC.** ("Tenant")

## ADDENDUM 25

It is understood and agreed that the Landlord herein is a sublandlord and grants this sublease under and by virtue of its rights under the Prime Lease. A copy of the Prime Lease is attached hereto as Schedule B. This Lease and all the rights of the parties hereunder are subject and subordinate to the Prime Lease. Each party agrees that it will not, by its act or omission to act, cause a default under the Prime Lease. In furtherance of the foregoing, the parties hereby confirm, each to the other, that it is not practical in this sublease agreement to enumerate all the rights and obligations of the parties under the Prime Lease and specifically to allocate those rights and obligations in this sublease agreement. Accordingly, in order to afford to Tenant the benefits of this sublease agreement, and in order to protect Landlord against a default by Tenant which might cause a default or event of default by Landlord under the Prime Lease, Landlord and Tenant agree as follows:

(a)    Except as otherwise specifically provided herein, Tenant shall perform all affirmative covenants and obligations under the Prime Lease and shall refrain from performing any act which is prohibited by the negative covenants of the Prime Lease. Tenant shall perform affirmative covenants and obligations which are also covenants and obligations of Landlord under the Prime Lease at least five (5) days prior to the date when Landlord's performance is required under the Prime Lease. Landlord shall have the right to enter the Premises to cure any default by Tenant under this Section.

(b)    All benefits inuring to Landlord as the tenant under the Prime Lease are retained by Landlord unless specifically granted to Tenant under this Lease. By way of example, but not limitation, any options to extend the term of the Prime Lease, or to purchase the premises demised under the Prime Lease, are retained by Landlord and may not be exercised by Tenant under any circumstances.

(c)    Landlord shall have no duty to perform any obligations of Prime Landlord. Landlord shall have no responsibility for, or be liable to Tenant for, any default, failure or delay on the part of Prime Landlord in the performance or observance by Prime Landlord of any of its obligations under the Prime Lease, nor shall such default by Prime Landlord affect this Lease or waive or defer the performance of any of Tenant's obligations hereunder. If, by the terms of the Prime Lease the Prime Landlord has assumed any of Tenant's obligations hereunder, such assumption shall only operate to limit Tenant's obligations as, when and to the extent that any such obligations are assumed and satisfied by Prime Landlord.

(d)    Landlord shall have such rights, and Tenant shall have such obligations and be bound by any provision, regarding penalties or remedies available upon a breach or default under the Prime Lease that may be more extensive or severe than those contained herein, regardless of whether such provisions are contained in the default section or any other portion of the Prime Lease. Where the provisions of the Prime Lease grant rights to the Prime Landlord, such rights shall also be deemed to be rights of Landlord herein with respect to the Premises.

(e)    Landlord makes no representation as to Prime Landlord's title to the Premises or right to lease the same or as to the existence of any liens or encumbrances thereon, and Landlord shall not be liable if Tenant's possession is affected, interrupted or terminated by reason of a defect in the Prime Landlord's title or by reason of any liens or encumbrances. Upon termination of this Lease, whether by lapse of time or otherwise, Tenant shall immediately yield up possession and surrender the Premises to Landlord in the condition required by the Prime Lease.

## ADDENDUM 26

In the event LESSEE fails to perform pursuant to the Promissory Note for Four Hundred Ten Thousand Five Hundred Dollars and 00/100 ($410,500.00) then DUNKIN' DONUTS INCORPORATED, BASKIN-ROBBINS USA CO., and LANDLORD shall have the right, in their sole and absolute discretion, to immediately terminate LESSEE'S Franchise Agreement and Lease of Dunkin' Donuts/Baskin-Robbins Shop, which Lease and Franchise Agreement shall be held by LESSOR in escrow pending performance by LESSEE.

**(Landlord)**

**THIRD DUNKIN' DONUTS REALTY, INC.**

By: _Donald A. Law_____
Donald Law, Director of Retail Operations

**(Tenant)**

**GANPATI DONUTS, INC.**

By: _____
Amish Patel, President

13

PC# 300392
Newburgh, NY

### *FIRST AMENDMENT TO LEASE OF DUNKIN' DONUTS SHOP*

This FIRST AMENDMENT TO LEASE OF DUNKIN' DONUTS SHOP made this __21__ day of __April__, 2005, by and between **THIRD DUNKIN' DONUTS REALTY, INC.,** a Massachusetts corporation having its principal office in Canton, Massachusetts (the "LESSOR"), and **GANPATI DONUTS, INC.** a New York corporation having its principal office in Newburgh, New York (the "LESSEE").

### WITNESSETH

*WHEREAS*, LESSOR and LESSEE did enter into a Lease of Dunkin' Donuts/Baskin' Robbins Shop dated May 14, 2001, for the premises located at 674 Broadway, Newburgh, New York (the "Original Lease"); and

*WHEREAS*, the parties have agreed to amend the Original Lease to exempt from the calculation of Percentage Rent annually the first $100,000.00 in Baskin-Robbins Gross Sales for a period of two (2) years, beginning April 16, 2005 provided, however, that LESSEE shall remain responsible for the payment of Percentage Rent on all Dunkin' Donuts Gross Sales.

### AGREEMENT

*NOW, THEREFORE*, in consideration of the mutual covenants herein contained and other valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     The above recitals are true and correct and, with all instruments referenced therein, are incorporated herein by reference.

2.      Paragraph 1.9 of the Original Lease is hereby deleted in its entirety and replaced with the following:

    (a)    Percentage Rent Rate for Baskin Robbins Gross Sales:

        (1)    Beginning on April 16, 2005 and continuing up through and including April 15, 2007, the Percentage Rent Rate applicable to the first $100,000.00 in annual Baskin Robbins Gross Sales shall be zero percent (0%) and the Percentage Rent Rate applicable to any Gross Sales exceeding $100,000.00 annually shall be nine and a quarter percent (9.25%).

        (2)    Effective April 16, 2007, the Percentage Rent Rate on all Baskin Robbins' Gross Sales, including the first $100,000.00 annually exempted by subsection (a), above, shall be nine and a quarter percent (9.25%).

    (b)    Percentage Rent Rate for Dunkin' Donuts Gross Sales:

        (1)    Notwithstanding anything to the contrary contained herein, the Percentage Rent Rate on all Dunkin' Donuts Gross Sales shall be nine and a quarter percent (9.25%).

3.      LESSEE does hereby release, remise and forever discharge LESSOR, its successors and assigns, parent, subsidiaries and affiliated corporations including but not limited to DUNKIN' DONUTS INCORPORATED, and officers, directors, agents, employees, and representatives, past and present, of and from any and all claims, demands, causes of action, suits, debts, dues, duties, sums of money, accounts, reckonings, covenants, contracts, agreements, promises, damages, judgments, extents, executions, liabilities and obligations, both contingent and fixed, known and unknown, of every kind and nature whatsoever in law or equity, or otherwise, under local, state or federal law, against LESSOR which LESSEE or its predecessors in interest ever had, now have, or which they, their heirs, executors, administrators, successors, or assigns hereafter can, shall, or may have, for, upon or by reason of any matter, cause, or thing whatsoever, from the beginning of the world to be date of these presents.

Without limiting the generality of the foregoing, but by way of example only, this Release shall apply to any and all state or federal antitrust claims or causes of action; state or federal securities law claims or causes of action; state or federal R.I.C.O. laws claims or causes of action; breach of contract claims or causes of action, claims or causes of action based in fraud or misrepresentation, breach of fiduciary duty, unfair trade practices (state or federal), and all other claims and causes of action whatsoever.

LESSEE further agrees to indemnify and hold harmless forever, LESSOR, its successors and assigns, subsidiary and affiliated corporations, officers, directors, agents, employees and representatives, past and present, against any and all claims or action which hereafter may be brought or instituted against any or all of them, or their successors and assigns, by or on behalf of anyone claiming under rights derived from LESSEE, or any of them, and arising out of or incidental to the matters to which this Release applies.

LESSEE represents and warrants that it has not made any assignment or any right, claim or cause or action covered by this Release to any other person, corporation or other legal entity.

LESSEE and LESSOR agree that this Release is not intended nor shall it be construed as an admission of any wrongdoing or liability, and that is shall not be admissible in evidence in any suit or proceeding whatsoever as evidence or admission of any liability.

4.    The Lease is hereby ratified, in full force and effect and without modification, except as expressly set forth in this Amendment. All defined terms used herein shall have the same meaning as set forth in the Lease. This Amendment is hereby attached to and made a part of the Original Lease.

*IN WITNESS WHEREOF, THE PARTIES HERETO HAVE HEREUNDER SET THEIR*

*HANDS AND SEALS THE DAY AND YEAR FIRST ABOVE WRITTEN.*

(LESSOR)

LESSOR:    THIRD DUNKIN' DONUTS REALTY, INC.

By: _____

Wendy Deas, Assistant Secretary

(LESSEE)

LESSEE:    GANPATI DONUTS, INC.

ATTEST:

_____

Ami Patel, Secretary

By: _____

Amish Patel, President

## PERSONAL GUARANTEE

The UNDERSIGNED, waiving demand and notice hereby, jointly and severally, unconditionally guarantee the performance of all duties and obligations of GANPATI DONUTS, INC., LESSEE, under this Amendment and personally agree that said lease shall be binding on us personally, as if we were the LESSEE.

_B. Suresh L_____

**Witness**
Print name: _BATTULA    SURESH_

_____

Amish Patel, Individually

_Radhika. Alla_____

**Witness**
Print name: _RADHIKA. ALLA_

_____

Ami Patel, Individually

# O'ROURKE & DEGEN, PLLC

### ATTORNEYS AT LAW
### 225 BROADWAY, SUITE 715
### NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

212-227-4530

FAX 212-385-9813

THOMAS H. O'ROURKE
1976 - 2005

April 1, 2008

BY FEDERAL EXPRESS AND FIRST CLASS MAIL

Ganpati Donuts, Inc.
d/b/a Dunkin' Donuts and Baskin-Robbins
676-682 Broadway
Newburgh, New York 12550

Re:  **Notice to Cure**
     **Dunkin' Donuts and Baskin-Robbins**
     PC:  300392 CUST:  20770
     Account Balance Due:  $68,817.11

Dear Franchisee:

Please be advised that this firm represents the interests of Dunkin' Donuts Franchised Restaurants LLC, successor in interest of Dunkin' Donuts Incorporated, and Baskin-Robbins Franchised Shops LLC, successor in interest of Baskin-Robbins USA, Co. (collectively "Dunkin' Brands") and DB Real Estate Assets I LLC ("DB Realty"), successor in interest of Third Dunkin' Donuts Realty, Inc., with respect to your failure to comply with the requirements of the Franchise Agreement and Lease listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Ganpati Donuts, Inc., Amish Patel, Ami Patel | Franchise Agreement 05/14/01 Lease 05/14/01 | 676-682 Broadway Newburgh, New York 12550 | DD, BR |

Pursuant to your Franchise Agreement and Lease, this Notice shall serve as **fifteen (15) days prior written notice that unless you cure your defaults, Dunkin' Donuts and Baskin-Robbins intends to terminate your franchise and lease** for your failure to report gross sales and to make the following payments **through April 1, 2008** (see annexed status report):

Ganpati Donuts, Inc.
April 1, 2008
Page 2

| ITEM | AMOUNT |
|---|---|
| Franchise Fees, Advertising Fees and other charges (Dunkin' Donuts) | $15,548.78 |
| Franchise Fees, Advertising Fees and other charges (Baskin-Robbins) | 529.16 |
| Rent and other charges | 5,000.00 |
| % Rent | 44,681.17 |
| Taxes and other charges | 5,000.00 |
| Collection Fee | 112.00 |
| TOTAL | $68,817.11 |

If you failed to provide Dunkin' Donuts and Baskin-Robbins with reports of your gross sales, as required by the Franchise Agreement and Lease, all, or a portion, of the outstanding Franchise Fees, Advertising Fees and Percentage Rent may have been estimated based upon your prior sales.

**You are required to cure these defaults within fifteen (15) days by mailing your certified check in the amount of $68,817.11 to Dunkin' Brands, Inc., P.O Box 2965, Carol Stream, Il 60132-2965. In addition, fax a copy of said check to Mr. Gary Zullig at 781-737-6212. If you do not make payment within fifteen (15) days of the date of the service of this Notice, DB Realty will commence summary proceedings under Real Property Actions and Proceedings Law, Article 7, to recover possession of the above premises.**

You are advised that if you dispute the claimed defaults and contend that this Notice is not justified, you must advise Dunkin' Brands and DB Realty in writing within seven (7) days of your receipt of this Notice of the substance of the dispute and provide Dunkin' Brands and DB Realty with any and all information supporting your claims. Dunkin' Brands and DB Realty will promptly review the substance of your dispute and make any adjustments that may be necessary to the amounts shown to be in default and notify you thereof. However, any dispute that you raise with respect to the amounts in default, or any claims that you might purport to have against Dunkin' Brands and DB Realty, will not excuse your obligation to pay the amounts owed to Dunkin' Brands and DB Realty as set out herein above; nor will such claims excuse your performance of your obligations under the Franchise Agreement and Lease or stay the time within which you must cure any defaults.

Ganpati Donuts, Inc.
April 1, 2008
Page 3

     This notice supplements any Notice(s) of Default and/or Termination previously sent, relating to this store.  This notice does not supersede any prior Notice, nor does it constitute a waiver of any rights pursuant to any Notice.  Failure to cure these defaults within fifteen (15) days of the receipt of this Notice, as well as your continued failure to make timely payments and to submit financial information, as required by your Franchise Agreement with Dunkin' Brands and your Lease with DB Realty, may result in termination of your Franchise Agreement and Lease.

     If payment has been made in full and all sales reports have been submitted to Dunkin' Brands, please disregard this notice.

                              Very truly yours,

                              RONALD D. DEGEN
RDD:rg
cc:  Mr. Gary Zullig, Collection Specialist
     Mr. Edward Simoes, Director of Franchise Services
     Mr. Dominic Laskero, Director of Franchise Services
     Mr. Richard Besgen, Operations Manager
     Mr. Kelly Byrnes, Operations Manager
     Amish Patel
     Ami Patel
     266 Main Street
     Cornwall, New York 12518

RUN DATE: 31-MAR-08

USER : GZULLIG

CUSTOMER: 3661
LOCATION:

Dunkin' Brands Inc
**ACCOUNTS RECEIVABLE STATUS REPORT**
AS OF:  2008/03/31 00:00:00

Gargati Donuts, Inc.
674 BROADWAY
NEWBURGH NY 12550-5130
20770

SHOP ADDRESS:
674 BROADWAY
NEWBURGH NY 12550-5130
20770

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | E/PAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1110001 | 10140 | | 403438788 | 03/13/2008 | E | 03/08/2008 | | 5900000 INDIRECT FUND INCOME | 373.21 NA | | |
| 1110001 | 10140 | | 403438788 | 03/13/2008 | E | 03/08/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 746.42 NA | | |
| 1110001 | 10140 | | 403438788 | 03/13/2008 | E | 03/08/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 746.42 NA | | |
| 1110001 | 10140 | | 403439628 | 03/20/2008 | E | 03/15/2008 | | 5900000 INDIRECT FUND INCOME | 373.21 NA | | |
| 1110001 | 10140 | | 403439628 | 03/20/2008 | E | 03/15/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 746.42 NA | | |
| 1110001 | 10140 | | 403439628 | 03/20/2008 | E | 03/15/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 746.42 NA | | |
| 1110001 | 10140 | | 403441250 | 03/27/2008 | E | 03/22/2008 | | 5900000 INDIRECT FUND INCOME | 404.23 NA | | |
| 1110001 | 10140 | | 403441250 | 03/27/2008 | E | 03/22/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 808.46 NA | | |
| 1110001 | 10140 | | 403441250 | 03/27/2008 | E | 03/22/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 808.46 NA | | |
| 1110001 | 10140 | | 403445102 | 04/03/2008 | E | 03/29/2008 | | 5900000 INDIRECT FUND INCOME | 404.23 NA | | |
| 1110001 | 10140 | | 403445102 | 04/03/2008 | E | 03/29/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 808.46 NA | | |
| 1110001 | 10140 | | 403445102 | 04/03/2008 | E | 03/29/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 808.46 NA | | |
| 1110001 | 10610 | | 403450746 | 03/13/2008 | E | 03/08/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1866.04 NA | | |
| 1110001 | 10610 | | 403451585 | 03/20/2008 | E | 03/15/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1866.04 NA | | |
| 1110001 | 10610 | | 403453206 | 03/27/2008 | E | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 2021.15 NA | | |
| 1110001 | 10610 | | 403457059 | 04/03/2008 | E | 03/29/2008 | | 5300000 CONTINUING FRANCHISE FEES | 2021.15 NA | | |

TOTAL FOR GL:  1110001   15,548.78

| 1120000 | 10620 | | 80142132 | 03/15/2008 | | 03/08/2008 | | Rent-Base | 5000.00 | | |

TOTAL FOR GL:  1120000   5,000.00

| 1122000 | 10620 | | 80110785 | 10/15/2007 | | 09/25/2007 | | Rent-Percentage | 5077.55 | | |
| 1122000 | 10620 | | 80114838 | 10/15/2007 | | 09/24/2007 | | Rent-Percentage | 104.77 | | |
| 1122000 | 10620 | | 80117006 | 11/15/2007 | | 10/27/2007 | | Rent-Percentage | 2890.21 | | |
| 1122000 | 10620 | | 80117007 | 11/15/2007 | | 10/26/2007 | | Rent-Percentage | 8148.49 | | |

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT EPAY | CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 300392 | 1122000 | 10620 | 800120983 | 11/15/2007 | | 10/25/2007 | | Rent-Percentage | 779.93 | | |
| 300392 | 1122000 | 10620 | 800122586 | 01/15/2008 | | 12/28/2007 | | Rent-Percentage | 7168.38 | | |
| 300392 | 1122000 | 10620 | 800122587 | 01/15/2008 | | 12/27/2007 | | Rent-Percentage | 8658.26 | | |
| 300392 | 1122000 | 10620 | 800126379 | 12/26/2007 | | 12/26/2007 | | Rent-Percentage | -124.42 | | |
| 300392 | 1122000 | 10620 | 800126380 | 12/26/2007 | | 12/26/2007 | | Rent-Percentage | -103.07 | | |
| 300392 | 1122000 | 10620 | 800128500 | 01/15/2008 | | 12/25/2007 | | Rent-Percentage | 13499.03 | | |
| 300392 | 1122000 | 10620 | 800132620 | 12/24/2007 | | 12/24/2007 | | Rent-Percentage | -1867.21 | | |
| 300392 | 1122000 | 10620 | 800133257 | 02/15/2008 | | 01/26/2008 | | Rent-Percentage | 2363.61 | | |
| 300392 | 1122000 | 10620 | 800134731 | 02/15/2008 | | 01/25/2008 | | Rent-Percentage | 6966.35 | | |
| 300392 | 1122000 | 10620 | 800138775 | 02/15/2008 | | 01/24/2008 | | Rent-Percentage | 1257.17 | | |
| 300392 | 1122000 | 10620 | 800140523 | 03/15/2008 | | 02/29/2008 | | Rent-Percentage-Percentage | 5537.88 | | |
| 300392 | 1122000 | 10620 | 800140524 | 04/15/2008 | | 03/28/2008 | | Rent-Percentage | 7151.91 | | |
| 300392 | 1122000 | 10620 | 800140803 | 04/15/2008 | | 03/27/2008 | | Rent-Percentage | 253.28 | | |
| 300392 | 1122000 | 10620 | 800144804 | 04/15/2008 | | 03/27/2008 | | Rent-Percentage | 2507.37 | | |
| 300392 | 1122000 | 10620 | 800146074 | 04/15/2008 | | 03/26/2008 | | Rent-Percentage | 7761.99 | | |

TOTAL FOR GL: 1122000   78,011.48

| 300392 | 1199008 | 10620 | 800142133 | 03/15/2008 | | 03/08/2008 | | Tax-Real Estate Tax | 2946.00 | | |

TOTAL FOR GL: 1199008   2946.00

TOTAL FOR BRAND :   DD   101,506.26

| 300392 | 1110001 | 20140 | 403432953 | 03/13/2008 | E | 03/08/2008 | | 5908000 ALLOCATION-NAF | 5.56 NA | | |
| 300392 | 1110001 | 20140 | 403432953 | 03/13/2008 | E | 03/08/2008 | | 5900000 INDIRECT FUND INCOME | 11.12 NA | | |
| 300392 | 1110001 | 20140 | 403432953 | 03/13/2008 | E | 03/08/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 16.68 NA | | |
| 300392 | 1110001 | 20310 | 403432955 | 03/13/2008 | E | 03/08/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 22.24 NA | | |

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DATE DATE | A/E DATE | TRANSACTION CHECK NO DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|
| 300392 | 1110001 | 20140 | 403433447 | 03/20/2008 E | 03/15/2008 | 590B000 ALLOCATION-NAF | 5.56 NA | | |
| 300392 | 1110001 | 20140 | 403433447 | 03/20/2008 E | 03/15/2008 | 5900000 INDIRECT FUND INCOME | 11.12 NA | | |
| 300392 | 1110001 | 20140 | 403433447 | 03/20/2008 E | 03/15/2008 | 5901000 NATIONAL ADVERTISING INCOME | 16.68 NA | | |
| 300392 | 1110001 | 20140 | 403433447 | 03/20/2008 E | 03/15/2008 | 5902000 DIRECT/REGIONAL FUND INCOME | 22.24 NA | | |
| 300392 | 1110001 | 20140 | 403434310 | 03/27/2008 E | 03/22/2008 | 590B000 ALLOCATION-NAF | 7.67 NA | | |
| 300392 | 1110001 | 20140 | 403434310 | 03/27/2008 E | 03/22/2008 | 5900000 INDIRECT FUND INCOME | 15.34 NA | | |
| 300392 | 1110001 | 20140 | 403434310 | 03/27/2008 E | 03/22/2008 | 5901000 NATIONAL ADVERTISING INCOME | 23.00 NA | | |
| 300392 | 1110001 | 20140 | 403434310 | 03/27/2008 E | 03/22/2008 | 5902000 DIRECT/REGIONAL FUND INCOME | 30.67 NA | | |
| 300392 | 1110001 | 20140 | 403435839 | 04/03/2008 E | 03/29/2008 | 590B000 ALLOCATION-NAF | 7.67 NA | | |
| 300392 | 1110001 | 20140 | 403435839 | 04/03/2008 E | 03/29/2008 | 5900000 INDIRECT FUND INCOME | 15.34 NA | | |
| 300392 | 1110001 | 20140 | 403435839 | 04/03/2008 E | 03/29/2008 | 5901000 NATIONAL ADVERTISING INCOME | 23.00 NA | | |
| 300392 | 1110001 | 20140 | 403435839 | 04/03/2008 E | 03/29/2008 | 5902000 DIRECT/REGIONAL FUND INCOME | 30.67 NA | | |
| 300392 | 1110001 | 20610 | 403462968 | 03/13/2008 E | 03/08/2008 | 5300000 CONTINUING FRANCHISE FEES | 55.61 NA | | |
| 300392 | 1110001 | 20610 | 403463461 | 03/20/2008 E | 03/15/2008 | 5300000 CONTINUING FRANCHISE FEES | 55.61 NA | | |
| 300392 | 1110001 | 20610 | 403464322 | 03/27/2008 E | 03/22/2008 | 5300000 CONTINUING FRANCHISE FEES | 76.69 NA | | |
| 300392 | 1110001 | 20610 | 403465848 | 04/03/2008 E | 03/29/2008 | 5300000 CONTINUING FRANCHISE FEES | 76.69 NA | | |

TOTAL FOR GL: 1110001 529.16

| 300392 | 1123000 | 90200 | e2134035 | 10/24/2007 | 10/24/2007 | RECEIPT - e2134035 | -10808.50 | | |
| 300392 | 1123000 | 90200 | e2122312 | 10/17/2007 | 10/17/2007 | RECEIPT - e2122312 | -11100.44 | | |
| 300392 | 1123000 | 90200 | 406932175 | 02/06/2008 | 02/06/2008 | RECEIPT - 406932175 | -11421.37 | | |

TOTAL FOR GL: 1123000 -33,330.31

TOTAL FOR BRAND : BR 529.16

TOTAL FOR BRAND : 90 -33,330.31

| PROFIT CENTER | CORP GL NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E DATE | TRANSACTION | CHECK NO | DESCRIPTION | AMOUNT BPAY | CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|

TOTAL FOR CUSTOMER :                                                   68,705.11

REPORT GRAND TOTAL :                                                   68,705.11

\* CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

**O'ROURKE & DEGEN, PLLC**
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
   NEW JERSEY

212-227-4530

FAX 212-385-9813

THOMAS H. O'ROURKE
1976 - 2005

April 1, 2008

BY FEDERAL EXPRESS

Shree Ram Donuts Inc.
d/b/a Dunkin' Donuts
73 North Plank Road
Newburgh, New York 12550

Re:  **Notice to Cure**
      **Dunkin' Donuts**
      PC:  301926 CUST:  55629
      Account Balance Due:  $16,192.25

Dear Franchisee:

Please be advised that this firm represents the interests of
Dunkin' Donuts Franchised Restaurants LLC ("Dunkin' Donuts"),
successor in interest to Dunkin' Donuts Incorporated, with
respect to your failure to comply with the requirements of the
Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Shree Ram Donuts Inc., Amish Patel, Ami Patel | Franchise Agreement 11/08/04 | 73 North Plank Road Newburgh, New York 12550 | DD |

Pursuant to your Franchise Agreement, this Notice shall
serve as **fifteen (15) days prior written notice that unless you
cure your defaults, Dunkin' Donuts intends to terminate your
franchise** for your failure to report gross sales and to make the
following payments **through April 1, 2008** (see annexed status
report):

ITEM                                    AMOUNT

Franchise Fees, Advertising Fees and
   other charges                    $10,222.16

Shree Ram Donuts Inc.
April 1, 2008
Page 2

|  | NSF Payments and Finance Charges | 5,858.09 |
|---|---|---|
|  | Collection Fee | 112.00 |
|  | TOTAL | $16,192.25 |

If you failed to provide Dunkin' Donuts with reports of your gross sales, as required by the Franchise Agreement, all, or a portion, of the outstanding Franchise Fees and Advertising Fees may have been estimated based upon your prior sales.

**You are required to cure these defaults within fifteen (15) days by mailing your certified check in the amount of $16,192.25 to Dunkin' Brands, Inc., P.O Box 2965, Carol Stream, Il 60132-2965. In addition, fax a copy of said check to Mr. Gary Zullig at 781-737-6212.**

You are advised that if you dispute the claimed defaults and contend that this Notice is not justified, you must advise Dunkin' Donuts in writing within seven (7) days of your receipt of this Notice of the substance of the dispute and provide Dunkin' Donuts with any and all information supporting your claims. Dunkin' Donuts will promptly review the substance of your dispute and make any adjustments that may be necessary to the amounts shown to be in default and notify you thereof. However, any dispute that you raise with respect to the amounts in default, or any claims that you might purport to have against Dunkin' Donuts, will not excuse your obligation to pay the amounts owed to Dunkin' Donuts as set out herein above; nor will such claims excuse your performance of your obligations under the Franchise Agreement or stay the time within which you must cure any defaults.

This notice supplements any Notice(s) of Default and/or Termination previously sent, relating to this store. This notice does not supersede any prior Notice, nor does it constitute a waiver of any rights pursuant to any Notice. Failure to cure these defaults within fifteen (15) days of the receipt of this Notice, as well as your continued failure to make timely payments and to submit financial information, as required by your Franchise Agreement with Dunkin' Donuts, may result in termination of your Franchise Agreement.

If payment has been made in full and all sales reports have

Shree Ram Donuts Inc.
April 1, 2008
Page 3

been submitted to Dunkin' Donuts, please disregard this notice.

Very truly yours,

RONALD D. DEGEN

RDD:rg
cc:  Mr. Gary Zullig, Collection Specialist
     Mr. Edward Simoes, Director of Franchise Services
     Mr. Richard Besgen, Operations Manager
     Amish Patel
     Ami Patel
     266 Main Street
     Cornwall, New York 12518

RUN DATE: 31-MAR-08

```
                              Dunkin' Brands Inc
                      *******************************
                      ACCOUNTS RECEIVABLE STATUS REPORT
                      AS OF:  2008/03/31 00:00:00
```

USER : GKILLIG

CUSTOMER: 7844
LOCATION:

Shree Ram Donuts, Inc.
266 MAIN ST
CORNWALL NY 12518

SHOP ADDRESS:
73 North Plank Rd
Newburgh NY 12550-3139
55629

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT EPAY | CONFIRM NO ID | INVOICE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 301926 | 1110001 | 10140 | 403302579 | 03/06/2008 | E | 03/01/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 381.46 NA | | |
| 301926 | 1110001 | 10140 | 403302579 | 03/06/2008 | E | 03/01/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 381.46 NA | | |
| 301926 | 1110001 | 10140 | 403302579 | 03/06/2008 | E | 03/01/2008 | | 5900000 INDIRECT FUND INCOME | 190.73 NA | | |
| 301926 | 1110001 | 10610 | 403315340 | 03/06/2008 | E | 03/01/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1125.30 NA | | |
| 301926 | 1110001 | 10140 | 403438851 | 03/13/2008 | E | 03/08/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 381.46 NA | | |
| 301926 | 1110001 | 10140 | 403438851 | 03/13/2008 | E | 03/08/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 381.46 NA | | |
| 301926 | 1110001 | 10140 | 403438851 | 03/13/2008 | E | 03/08/2008 | | 5900000 INDIRECT FUND INCOME | 190.73 NA | | |
| 301926 | 1110001 | 10140 | 403439755 | 03/20/2008 | E | 03/15/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 381.46 NA | | |
| 301926 | 1110001 | 10140 | 403439755 | 03/20/2008 | E | 03/15/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 381.46 NA | | |
| 301926 | 1110001 | 10140 | 403439755 | 03/20/2008 | E | 03/15/2008 | | 5900000 INDIRECT FUND INCOME | 190.73 NA | | |
| 301926 | 1110001 | 10140 | 403441533 | 03/27/2008 | E | 03/22/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 372.83 NA | | |
| 301926 | 1110001 | 10140 | 403441533 | 03/27/2008 | E | 03/22/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 372.83 NA | | |
| 301926 | 1110001 | 10140 | 403441533 | 03/27/2008 | E | 03/22/2008 | | 5900000 INDIRECT FUND INCOME | 186.41 NA | | |
| 301926 | 1110001 | 10140 | 403445548 | 04/03/2008 | E | 03/29/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 358.42 NA | | |
| 301926 | 1110001 | 10140 | 403445548 | 04/03/2008 | E | 03/29/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 358.42 NA | | |
| 301926 | 1110001 | 10140 | 403445548 | 04/03/2008 | E | 03/29/2008 | | 5900000 INDIRECT FUND INCOME | 179.21 NA | | |
| 301926 | 1110001 | 10610 | 403450809 | 03/13/2008 | E | 03/08/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1125.30 NA | | |
| 301926 | 1110001 | 10610 | 403457712 | 03/20/2008 | E | 03/15/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1125.30 NA | | |
| 301926 | 1110001 | 10610 | 403453489 | 03/27/2008 | E | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1099.84 NA | | |
| 301926 | 1110001 | 10610 | 403457505 | 04/03/2008 | E | 03/29/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1057.35 NA | | |
| 301926 | 1110001 | 10610 | 30002135g-03/22/2007 | | A | 03/17/2007 | 1110001 | Act FF NSF 03/17/07 | 1010.30 | | R |
| 301926 | 1110004 | 10140 | 300021336-03/22/2007 | | A | 03/17/2007 | | Act AF NSF 5902000 | 342.48 | | R |
| 301926 | 1110004 | 10140 | 300021336-03/22/2007 | | A | 03/17/2007 | | Act AF NSF 5901000 | 342.48 | | R |
| 301926 | 1110004 | 10140 | 300021336-03/22/2007 | | A | 03/17/2007 | | Act AF NSF 5900000 | 171.24 | | R |

TOTAL FOR GL:                                               10,222.16

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 300926 | 1110004 | 10610 | 300021360-03/17/2007 R | 03/17/2007 | | | NSF E1886179 Charge | | 50.00 | | |
| 300926 | 1110004 | 10140 | 300027898 08/23/2007 A | 08/18/2007 | | | Act AF 5900000 | | 193.67 | | |
| 300926 | 1110004 | 10140 | 300027898 08/23/2007 A | 08/18/2007 | | | Act AF 5901000 | | 387.33 | | |
| 300926 | 1110004 | 10140 | 300027898 08/23/2007 A | 08/18/2007 | | | Act AF 5902000 | | 387.33 | | |
| 300926 | 1110004 | 10610 | 300027899 08/23/2007 A | 08/18/2007 | | | Act FF 5300000 | | 1142.63 | | |
| 300926 | 1110004 | 10610 | 300027900 08/18/2007 | 08/18/2007 | | | Nsf E2067673 Charge | | 50.00 | | |
| 300926 | 1110004 | 10610 | 300040069 12/29/2007 | 12/29/2007 | | | Nsf E2237408 Charge | | 50.00 | | |
| 300926 | 1110004 | 10140 | 300040368 01/03/2008 A | 12/29/2007 | | | w/e 12/29/07 AF NSF rebill | | 793.87 | | |
| 300926 | 1110004 | 10610 | 300040388 01/03/2008 A | 12/29/2007 | | | w/e 12/29/07 FF rebill NSF | | 936.76 | | |

                                        TOTAL FOR GL:   1110004                5,858.09

                                        TOTAL FOR BRAND :   DD                16,080.25

                                        TOTAL FOR CUSTOMER :                  16,080.25

                                        REPORT GRAND TOTAL :                  16,080.25

**CAUTION** - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

**O'ROURKE & DEGEN, PLLC**
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

212-227-4530

FAX 212-385-9813

THOMAS H. O'ROURKE
1976 - 2005

April 1, 2008

BY FEDERAL EXPRESS

Laxmi Donuts, Inc.
d/b/a Dunkin' Donuts
1002 Route 94
Vails Gate, New York 12584

> Re: **Notice to Cure**
> **Dunkin' Donuts**
> **PC:  304729 CUST:  55630**
> **Account Balance Due:  $24,032.07**

Dear Franchisee:

Please be advised that this firm represents the interests of Dunkin' Donuts Franchised Restaurants LLC ("Dunkin' Donuts"), successor in interest to Dunkin' Donuts Incorporated, with respect to your failure to comply with the requirements of the Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Laxmi Donuts, Inc., Amish Patel, Ami Patel | Franchise Agreement 11/08/04 | 1002 Route 94 Vails Gate, New York 12584 | DD |

Pursuant to your Franchise Agreement, this Notice shall serve as **fifteen (15) days prior written notice that unless you cure your defaults, Dunkin' Donuts intends to terminate your franchise** for your failure to report gross sales and to make the following payments **through April 1, 2008** (see annexed status report):

> **ITEM**                                                        **AMOUNT**
>
> Franchise Fees, Advertising Fees and
>      other charges                                        $10,902.09

Laxmi Donuts, Inc.
April 1, 2008
Page 2

| | |
|---|---|
| NSF Payments and Finance Charges | 12,657.98 |
| E-Learning Fees | 360.00 |
| Collection Fee | 112.00 |
| TOTAL | $24,032.07 |

If you failed to provide Dunkin' Donuts with reports of your gross sales, as required by the Franchise Agreement, all, or a portion, of the outstanding Franchise Fees and Advertising Fees may have been estimated based upon your prior sales.

**You are required to cure these defaults within fifteen (15) days by mailing your certified check in the amount of $24,032.07 to Dunkin' Brands, Inc., P.O Box 2965, Carol Stream, Il 60132-2965. In addition, fax a copy of said check to Mr. Gary Zullig at 781-737-6212.**

You are advised that if you dispute the claimed defaults and contend that this Notice is not justified, you must advise Dunkin' Donuts in writing within seven (7) days of your receipt of this Notice of the substance of the dispute and provide Dunkin' Donuts with any and all information supporting your claims. Dunkin' Donuts will promptly review the substance of your dispute and make any adjustments that may be necessary to the amounts shown to be in default and notify you thereof. However, any dispute that you raise with respect to the amounts in default, or any claims that you might purport to have against Dunkin' Donuts, will not excuse your obligation to pay the amounts owed to Dunkin' Donuts as set out herein above; nor will such claims excuse your performance of your obligations under the Franchise Agreement or stay the time within which you must cure any defaults.

This notice supplements any Notice(s) of Default and/or Termination previously sent, relating to this store. This notice does not supersede any prior Notice, nor does it constitute a waiver of any rights pursuant to any Notice. Failure to cure these defaults within fifteen (15) days of the receipt of this Notice, as well as your continued failure to make timely payments and to submit financial information, as required by your Franchise Agreement with Dunkin' Donuts, may result in termination of your Franchise Agreement.

Laxmi Donuts, Inc.
April 1, 2008
Page 3

    If payment has been made in full and all sales reports have been submitted to Dunkin' Donuts, please disregard this notice.

                Very truly yours,

                *Ronald D. Degen*

RDD:rg            RONALD D. DEGEN
cc:  Mr. Gary Zullig, Collection Specialist
      Mr. Edward Simoes, Director of Franchise Services
      Mr. Richard Besgen, Operations Manager
      Amish Patel
      Ami Patel
      266 Main Street
      Cornwall, New York 12518

RUN DATE:   31-MAR-08
USER :      GZULLIG

Dunkin' Brands Inc
*********************
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF:      2008/03/31 00:00:00

CUSTOMER: 5259
LOCATION:

Laxmi Donuts, Inc.
1002 ROUTE 94
VAILS GATE NY 12584
55630

SHOP ADDRESS:
1002 ROUTE 94
VAILS GATE NY 12584
55630

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 304729 | 1110001 | 10140 | 401303224 | 03/06/2008 | E | 03/01/2008 | | 5900000 INDIRECT FUND INCOME | 226.81 | NA | |
| 304729 | 1110001 | 10140 | 401303224 | 03/06/2008 | E | 03/01/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 453.62 | NA | |
| 304729 | 1110001 | 10140 | 401303224 | 03/06/2008 | E | 03/01/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 453.62 | NA | |
| 304729 | 1110001 | 10610 | 403315985 | 03/06/2008 | E | 03/01/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1111.36 | NA | |
| 304729 | 1110001 | 10140 | 403438929 | 03/13/2008 | E | 03/08/2008 | | 5900000 INDIRECT FUND INCOME | 226.81 | NA | |
| 304729 | 1110001 | 10140 | 403438929 | 03/13/2008 | E | 03/08/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 453.62 | NA | |
| 304729 | 1110001 | 10140 | 403438929 | 03/13/2008 | E | 03/08/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 453.62 | NA | |
| 304729 | 1110001 | 10140 | 403439915 | 03/20/2008 | E | 03/15/2008 | | 5900000 INDIRECT FUND INCOME | 226.81 | NA | |
| 304729 | 1110001 | 10140 | 403439915 | 03/20/2008 | E | 03/15/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 453.62 | NA | |
| 304729 | 1110001 | 10140 | 403439915 | 03/20/2008 | E | 03/15/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 453.62 | NA | |
| 304729 | 1110001 | 10140 | 403441946 | 03/27/2008 | E | 03/22/2008 | | 5900000 INDIRECT FUND INCOME | 217.84 | NA | |
| 304729 | 1110001 | 10140 | 403441946 | 03/27/2008 | E | 03/22/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 435.69 | NA | |
| 304729 | 1110001 | 10140 | 403441946 | 03/27/2008 | E | 03/22/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 435.69 | NA | |
| 304729 | 1110001 | 10140 | 403446191 | 04/03/2008 | E | 03/29/2008 | | 5900000 INDIRECT FUND INCOME | 202.95 | NA | |
| 304729 | 1110001 | 10140 | 403446191 | 04/03/2008 | E | 03/29/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 405.90 | NA | |
| 304729 | 1110001 | 10140 | 403446191 | 04/03/2008 | E | 03/29/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 405.90 | NA | |
| 304729 | 1110001 | 10610 | 403450887 | 03/13/2008 | E | 03/08/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1111.36 | NA | |
| 304729 | 1110001 | 10610 | 403451872 | 03/20/2008 | E | 03/15/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1111.36 | NA | |
| 304729 | 1110001 | 10610 | 403453902 | 03/27/2008 | E | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1067.44 | NA | |
| 304729 | 1110001 | 10610 | 403458148 | 04/03/2008 | E | 03/29/2008 | | 5300000 CONTINUING FRANCHISE FEES | 994.45 | NA | |
|  |  |  |  |  |  | TOTAL FOR GL: | 1110001 |  | 10,902.09 | | |
| 304729 | 1110004 | 10140 | 300014231-11/22/2006 R | | A | 11/17/2006 | | ACT AF 5901000 | 215.66 | | |
| 304729 | 1110004 | 10140 | 300014231-11/22/2006 R | | A | 11/17/2006 | | ACT AF 5902000 | 431.32 | | |
| 304729 | 1110004 | 10140 | 300014233-11/22/2006 R | | A | 11/17/2006 | | ACT AF 5902000 | 431.32 | | |
| 304729 | 1110004 | 10610 | 300014232-11/02/2006 R | | A | 10/28/2006 | | ACT FRANCHISE FEES | 1056.74 | | |

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT EPAY | CONFIRM NO ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 304729 | 1110004 | 10610 | 300014233-10/28/2006 R | | | 10/28/2006 | | NSF E1719275 CHARGE | 50.00 | |
| 304729 | 1110004 | 10140 | 300029900 | 09/27/2007 | A | 09/22/2007 | | Act AF Nsf 5900000 | 203.32 | |
| 304729 | 1110004 | 10140 | 300029900 | 09/27/2007 | A | 09/22/2007 | | Act AF Nsf 5901000 | 406.63 | |
| 304729 | 1110004 | 10140 | 300029900 | 09/27/2007 | A | 09/22/2007 | | Act AF Nsf 5902000 | 406.63 | |
| 304729 | 1110004 | 10610 | 300029901 | 09/27/2007 | A | 09/22/2007 | | Act FF Nsf 5300000 | 996.25 | |
| 304729 | 1110004 | 10610 | 300029902 | 09/22/2007 | | 09/22/2007 | | Nsf E2109986 Charge | 50.00 | |
| 304729 | 1110004 | 10610 | 300032484 | 10/27/2007 | | 10/27/2007 | | NSF E2152059 Charge | 50.00 | |
| 304729 | 1110004 | 10610 | 300038273 | 12/22/2007 | | 12/22/2007 | | Nsf E2221546 Charge | 50.00 | |
| 304729 | 1110004 | 10610 | 300038274 | 12/08/2007 | | 12/08/2007 | | Nsf E221538 Charge | 50.00 | |
| 304729 | 1110004 | 10610 | 300038275 | 12/15/2007 | | 12/15/2007 | | Nsf E2221542 Charge | 50.00 | |
| 304729 | 1110004 | 10140 | 300040430 | 12/13/2007 | A | 12/08/2007 | | DD AF NSF rebill | 1031.52 | |
| 304729 | 1110004 | 10140 | 300040431 | 12/20/2007 | A | 12/15/2007 | | DD AF NSF rebill | 1044.27 | |
| 304729 | 1110004 | 10140 | 300040432 | 12/27/2007 | A | 12/22/2007 | | DD AF NSF rebill | 1017.08 | |
| 304729 | 1110004 | 10140 | 300040433 | 11/01/2007 | A | 10/27/2007 | | DD AF NSF rebill | 1053.65 | |
| 304729 | 1110004 | 10610 | 300040434 | 12/13/2007 | A | 12/08/2007 | | DD FF NSF rebill | 1010.88 | |
| 304729 | 1110004 | 10610 | 300040435 | 12/20/2007 | A | 12/15/2007 | | DD FF NSF rebill | 1023.39 | |
| 304729 | 1110004 | 10610 | 300040436 | 12/27/2007 | A | 12/22/2007 | | DD FF NSF rebill | 996.74 | |
| 304729 | 1110004 | 10610 | 300040437 | 11/01/2007 | A | 10/27/2007 | | DD FF NSF rebill | 1032.58 | |
| | | | | | | TOTAL FOR GL: | 1110004 | | 12,657.98 | |
| 304729 | 1130000 | 10610 | 300016135-01/01/2007 R | | | 01/01/2007 | | E-Learn 3rd Yr. Bill | 360.00 | |
| | | | | | | TOTAL FOR GL: | 1130000 | | 360.00 | |

| PROFIT GL | CORP | INVOICE | INVOICE | A/E | TRANSACTION CHECK NO | DESCRIPTION | AMOUNT EPAY | INVOICE |
|-----------|------|---------|---------|-----|----------------------|-------------|-------------|---------|
| CENTER | NUMBER | NUMBER | DUE DATE | | DATE | | | CONFIRM NO ID |

TOTAL FOR BRAND :    DD                                    23,920.07

TOTAL FOR CUSTOMER :                                       23,920.07

REPORT GRAND TOTAL :                                       23,920.07

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

**O'ROURKE & DEGEN, PLLC**
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

212-227-4530

Fax 212-385-9813

THOMAS H. O'ROURKE
1976 - 2005

April 1, 2008

<u>BY FEDERAL EXPRESS</u>

Krishna Donuts, Inc.
d/b/a Dunkin' Donuts
310 Main Street
Highland Falls, New York 10928

Re:  **Notice to Cure**
     **Dunkin' Donuts**
     PC:  330252 CUST:  55631
     Account Balance Due:  $7,165.44

Dear Franchisee:

Please be advised that this firm represents the interests of Dunkin' Donuts Franchised Restaurants LLC ("Dunkin' Donuts"), successor in interest to Dunkin' Donuts Incorporated, with respect to your failure to comply with the requirements of the Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Krishna Donuts, Inc., Amish Patel, Ami Patel | Franchise Agreement 11/08/04 | 310 Main Street Highland Falls, New York 10928 | DD |

Pursuant to your Franchise Agreement, this Notice shall serve as **fifteen (15) days prior written notice that unless you cure your defaults, Dunkin' Donuts intends to terminate your franchise** for your failure to report gross sales and to make the following payments **<u>through April 1, 2008</u>** (see annexed status report):

| ITEM | AMOUNT |
|---|---|
| Franchise Fees, Advertising Fees and     other charges | $ 4,832.28 |

Krishna Donuts, Inc.
April 1, 2008
Page 2

| | | |
|---|---|---|
| NSF Payments and Finance Charges | 2,221.16 |
| Collection Fee | 112.00 |
| TOTAL | $ 7,165.44 |

     If you failed to provide Dunkin' Donuts with reports of your gross sales, as required by the Franchise Agreement, all, or a portion, of the outstanding Franchise Fees and Advertising Fees may have been estimated based upon your prior sales.

     **You are required to cure these defaults within fifteen (15) days by mailing your certified check in the amount of $7,165.44 to Dunkin' Brands, Inc., P.O Box 2965, Carol Stream, Il 60132-2965. In addition, fax a copy of said check to Mr. Gary Zullig at 781-737-6212.**

     You are advised that if you dispute the claimed defaults and contend that this Notice is not justified, you must advise Dunkin' Donuts in writing within seven (7) days of your receipt of this Notice of the substance of the dispute and provide Dunkin' Donuts with any and all information supporting your claims. Dunkin' Donuts will promptly review the substance of your dispute and make any adjustments that may be necessary to the amounts shown to be in default and notify you thereof. However, any dispute that you raise with respect to the amounts in default, or any claims that you might purport to have against Dunkin' Donuts, will not excuse your obligation to pay the amounts owed to Dunkin' Donuts as set out herein above; nor will such claims excuse your performance of your obligations under the Franchise Agreement or stay the time within which you must cure any defaults.

     This notice supplements any Notice(s) of Default and/or Termination previously sent, relating to this store. This notice does not supersede any prior Notice, nor does it constitute a waiver of any rights pursuant to any Notice. Failure to cure these defaults within fifteen (15) days of the receipt of this Notice, as well as your continued failure to make timely payments and to submit financial information, as required by your Franchise Agreement with Dunkin' Donuts, may result in termination of your Franchise Agreement.

     If payment has been made in full and all sales reports have

Krishna Donuts, Inc.
April 1, 2008
Page 3

been submitted to Dunkin' Donuts, please disregard this notice.

Very truly yours,

RONALD D. DEGEN

RDD:rg
cc:  Mr. Gary Zullig, Collection Specialist
     Mr. Edward Simoes, Director of Franchise Services
     Mr. Richard Besgen, Operations Manager
     Amish Patel
     Ami Patel
     266 Main Street
     Cornwall, New York 12518

RUN DATE:   31-MAR-08

USER :   GSZDLLTG

Dunkin' Brands Inc
*******************************
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF:   2008/03/31 00:00:00

CUSTOMER: 5114
LOCATION:

Krishma Donuts, Inc.
266 MAIN ST
CORNWALL NY 12518

SHOP ADDRESS:
310 Main St
Highland Falls NY 10928-2103
55631

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DATE | A/R | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 330252 | 1110001 | 10140 | 403304142 | 03/06/2008 | B | 03/01/2008 | | 5900000 INDIRECT FUND INCOME | 89.16 NA | | |
| 330252 | 1110001 | 10140 | 403304142 | 03/06/2008 | B | 03/01/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 178.33 NA | | |
| 330252 | 1110001 | 10140 | 403304142 | 03/06/2008 | B | 03/01/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 178.33 NA | | |
| 330252 | 1110001 | 10615 | 403316903 | 03/06/2008 | E | 03/01/2008 | | 5300000 CONTINUING FRANCHISE FEES | 526.07 NA | | |
| 330252 | 1110001 | 10140 | 403439053 | 03/13/2008 | E | 03/08/2008 | | 5900000 INDIRECT FUND INCOME | 89.16 NA | | |
| 330252 | 1110001 | 10140 | 403439053 | 03/13/2008 | E | 03/08/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 178.33 NA | | |
| 330252 | 1110001 | 10140 | 403439053 | 03/13/2008 | E | 03/08/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 178.33 NA | | |
| 330252 | 1110001 | 10140 | 403440141 | 03/20/2008 | E | 03/15/2008 | | 5900000 INDIRECT FUND INCOME | 89.16 NA | | |
| 330252 | 1110001 | 10140 | 403440141 | 03/20/2008 | E | 03/15/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 178.33 NA | | |
| 330252 | 1110001 | 10140 | 403440141 | 03/20/2008 | E | 03/15/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 178.33 NA | | |
| 330252 | 1110001 | 10140 | 403442529 | 03/27/2008 | E | 03/22/2008 | | 5900000 INDIRECT FUND INCOME | 89.00 NA | | |
| 330252 | 1110001 | 10140 | 403442529 | 03/27/2008 | E | 03/22/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 178.00 NA | | |
| 330252 | 1110001 | 10140 | 403442529 | 03/27/2008 | E | 03/22/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 178.00 NA | | |
| 330252 | 1110001 | 10140 | 403447099 | 04/03/2008 | E | 03/29/2008 | | 5900000 INDIRECT FUND INCOME | 86.84 NA | | |
| 330252 | 1110001 | 10140 | 403447099 | 04/03/2008 | E | 03/29/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 173.67 NA | | |
| 330252 | 1110001 | 10140 | 403447099 | 04/03/2008 | E | 03/29/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 173.67 NA | | |
| 330252 | 1110001 | 10615 | 403451011 | 03/13/2008 | E | 03/08/2008 | | 5300000 CONTINUING FRANCHISE FEES | 526.07 NA | | |
| 330252 | 1110001 | 10615 | 403452098 | 03/20/2008 | E | 03/15/2008 | | 5300000 CONTINUING FRANCHISE FEES | 526.07 NA | | |
| 330252 | 1110001 | 10615 | 403454485 | 03/27/2008 | E | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 525.09 NA | | |
| 330252 | 1110001 | 10615 | 403459056 | 04/03/2008 | E | 03/29/2008 | | 5300000 CONTINUING FRANCHISE FEES | 512.34 NA | | |

TOTAL FOR GL:   1110001

4,832.28

| 330252 | 1110004 | 10615 | 300033315 | 10/25/2007 | | 10/25/2007 | | Nsf Ck 1537 Charge | 50.00 | | |
| 330252 | 1110004 | 10615 | 300031618 | 10/13/2007 | | 10/13/2007 | | NSF E2135320 Charge | 50.00 | | |
| 330252 | 1110004 | 10615 | 300040061 | 01/05/2008 | | 01/05/2008 | | Nsf E2231191 Charge | 50.00 | | |
| 330252 | 1110004 | 10140 | 300040408 | 01/10/2008 | A | 01/05/2008 | | DD AF NSF inv | 417.83 | | |
| 330252 | 1110004 | 10140 | 300040409 | 10/18/2007 | A | 10/13/2007 | | DD AF NSF rebill | 532.25 | | |

| PROFIT CENTER | GL CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E DATE | TRANSACTION | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 33692 | 1110004 10615 | 300040410 | 01/10/2008 | A | 01/05/2008 | | | DD FF NSF rebill | 493.04 | | |
| 33692 | 1110004 10615 | 300040411 | 10/18/2007 | A | 10/13/2007 | | | DD FF NSF rebill | 628.04 | | |

TOTAL FOR GL:    1110004                                            2,221.16
                                                                   ------------

TOTAL FOR BRAND :    DD                                             7,053.44
                                                                   ------------

TOTAL FOR CUSTOMER :                                               7,053.44
                                                                   ------------

REPORT GRAND TOTAL :                                              7,053.44
                                                                 ============

*CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

**O'ROURKE & DEGEN, PLLC**
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

212-227-4530

FAX 212-385-9813

THOMAS H. O'ROURKE
1976 - 2005

April 1, 2008

<u>BY FEDERAL EXPRESS</u>

Giatri Donuts, Inc.
d/b/a Dunkin' Donuts
45 Quaker Avenue
Cornwall, New York 12518

Re: **Notice to Cure**
**Dunkin' Donuts**
PC:  332132 CUST:  47659
Account Balance Due:  $14,265.37

Dear Franchisee:

Please be advised that this firm represents the interests of
Dunkin' Donuts Franchised Restaurants LLC ("Dunkin' Donuts"),
successor in interest to Dunkin' Donuts Incorporated, with
respect to your failure to comply with the requirements of the
Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Giatri Donuts, Inc., Amish Patel, Ami Patel | Franchise Agreement 11/08/04 | 45 Quaker Avenue Cornwall, New York 12518 | DD |

Pursuant to your Franchise Agreement, this Notice shall
serve as **fifteen (15) days prior written notice that unless you
cure your defaults, Dunkin' Donuts intends to terminate your
franchise** for your failure to report gross sales and to make the
following payments **through April 1, 2008** (see annexed status
report):

| <u>ITEM</u> | <u>AMOUNT</u> |
|---|---|
| Franchise Fees, Advertising Fees and other charges | $ 9,998.52 |

Giatri Donuts, Inc.
April 1, 2008
Page 2

|                                   |           |
| --------------------------------- | --------- |
| NSF Payments and Finance Charges  | 3,854.85  |
| E-Learning Fees                   | 300.00    |
| Collection Fee                    | 112.00    |
| TOTAL                             | $14,265.37 |

If you failed to provide Dunkin' Donuts with reports of your gross sales, as required by the Franchise Agreement, all, or a portion, of the outstanding Franchise Fees and Advertising Fees may have been estimated based upon your prior sales.

**You are required to cure these defaults within fifteen (15) days by mailing your certified check in the amount of $14,265.37 to Dunkin' Brands, Inc., P.O Box 2965, Carol Stream, Il 60132-2965.  In addition, fax a copy of said check to Mr. Gary Zullig at 781-737-6212.**

You are advised that if you dispute the claimed defaults and contend that this Notice is not justified, you must advise Dunkin' Donuts in writing within seven (7) days of your receipt of this Notice of the substance of the dispute and provide Dunkin' Donuts with any and all information supporting your claims.  Dunkin' Donuts will promptly review the substance of your dispute and make any adjustments that may be necessary to the amounts shown to be in default and notify you thereof. However, any dispute that you raise with respect to the amounts in default, or any claims that you might purport to have against Dunkin' Donuts, will not excuse your obligation to pay the amounts owed to Dunkin' Donuts as set out herein above; nor will such claims excuse your performance of your obligations under the Franchise Agreement or stay the time within which you must cure any defaults.

This notice supplements any Notice(s) of Default and/or Termination previously sent, relating to this store.  This notice does not supersede any prior Notice, nor does it constitute a waiver of any rights pursuant to any Notice.  Failure to cure these defaults within fifteen (15) days of the receipt of this Notice, as well as your continued failure to make timely payments and to submit financial information, as required by your Franchise Agreement with Dunkin' Donuts, may result in termination of your Franchise Agreement.

Giatri Donuts, Inc.
April 1, 2008
Page 3

    If payment has been made in full and all sales reports have
been submitted to Dunkin' Donuts, please disregard this notice.

                                    Very truly yours,

                                    *Ronald D. Degen*

RDD:rg                              RONALD D. DEGEN
cc:  Mr. Gary Zullig, Collection Specialist
     Mr. Edward Simoes, Director of Franchise Services
     Mr. Richard Besgen, Operations Manager
     Amish Patel
     Ami Patel
     266 Main Street
     Cornwall, New York 12518

Case 7:08-cv-04218-WCC   Document 5-7   Filed 05/07/2008   Page 8 of 5

```
RUN DATE:   31-MAR-08                                    Dunkin' Brands Inc
USER :                                        ***************************************
CUSTOMER:  3754   GZ1U1JO                     ACCOUNTS RECEIVABLE STATUS REPORT
LOCATION:                                     AS OF:   2008/03/31 00:00:00
```

Glatri Donuts, Inc.
45 QUAKER AVE
CORNWALL NY 12518-2127
47659

SHOP ADDRESS:
45 QUAKER AVE
CORNWALL NY 12518-2127
47659

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 32132 | 110001 | 10140 | 403304565 | 03/06/2008 | E | 03/01/2008 | | 5900000 INDIRECT FUND INCOME | 209.67 | NA | |
| 32132 | 110001 | 10140 | 403304565 | 03/06/2008 | E | 03/01/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 419.35 | NA | |
| 32132 | 110001 | 10140 | 403304565 | 03/06/2008 | E | 03/01/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 419.35 | NA | |
| 32132 | 110001 | 10610 | 403317325 | 03/06/2008 | E | 03/01/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1027.40 | NA | |
| 32132 | 110001 | 10140 | 403439119 | 03/13/2008 | E | 03/08/2008 | | 5900000 INDIRECT FUND INCOME | 209.67 | NA | |
| 32132 | 110001 | 10140 | 403439119 | 03/13/2008 | E | 03/08/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 419.35 | NA | |
| 32132 | 110001 | 10140 | 403439119 | 03/13/2008 | E | 03/08/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 419.35 | NA | |
| 44132 | 110001 | 10610 | 403439119 | 03/13/2008 | E | 03/08/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1027.40 | NA | |
| 32132 | 110001 | 10140 | 403442793 | 03/27/2008 | E | 03/22/2008 | | 5900000 INDIRECT FUND INCOME | 195.25 | NA | |
| 32132 | 110001 | 10140 | 403442793 | 03/27/2008 | E | 03/22/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 390.49 | NA | |
| 32132 | 110001 | 10140 | 403442793 | 03/27/2008 | E | 03/22/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 390.49 | NA | |
| 32132 | 110001 | 10610 | 403442793 | 03/27/2008 | E | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1027.40 | NA | |
| 32132 | 111001 | 10140 | 403447521 | 04/03/2008 | E | 03/29/2008 | | 5900000 INDIRECT FUND INCOME | 185.68 | NA | |
| 32132 | 111001 | 10140 | 403447521 | 04/03/2008 | E | 03/29/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 371.37 | NA | |
| 32132 | 111001 | 10140 | 403447521 | 04/03/2008 | E | 03/29/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 371.37 | NA | |
| 32132 | 111001 | 10610 | 403451077 | 03/13/2008 | E | 03/08/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1027.40 | NA | |
| 32132 | 111001 | 10610 | 403452216 | 03/20/2008 | E | 03/15/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1027.40 | NA | |
| 32132 | 111001 | 10610 | 403456748 | 03/27/2008 | E | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 956.71 | NA | |
| 32132 | 110001 | 10610 | 403459477 | 04/03/2008 | E | 03/29/2008 | | 5300000 CONTINUING FRANCHISE FEES | 909.85 | NA | |

```
                                                               TOTAL FOR GL:  1110001          9,998.52
                                                                                             ------------
```

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 32132 | 110004 | 10140 | 300029896 | 09/27/2007 | A | 09/22/2007 | | Act AF Nsf 5900000 | 190.26 | | |
| 32132 | 110004 | 10140 | 300029896 | 09/27/2007 | A | 09/22/2007 | | Act AF Nsf 5901000 | 380.53 | | |
| 32132 | 110004 | 10140 | 300029896 | 09/27/2007 | A | 09/22/2007 | | Act AF Nsf 5902000 | 380.53 | | |
| 32132 | 110004 | 10610 | 300029897 | 09/27/2007 | A | 09/22/2007 | | Act FF Nsf 5300000 | 932.29 | | |
| 32132 | 110004 | 10610 | 300029898 | 09/22/2007 | | 09/22/2007 | | Nsf EZ109834 Charge | 50.00 | | |
| 32132 | 110001 | 10140 | 300030448 | 10/04/2007 | A | 09/29/2007 | | Act AF Nsf 5900000 | 189.01 | | |

| PROFIT CENTER | GL CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 33212 | 1110004 10140 | 300030448 | 10/04/2007 | A | 09/29/2007 | | Act AF Nsf 5901000 | 378.03 | | |
| 33212 | 1110004 10140 | 300030448 | 10/04/2007 | A | 09/29/2007 | | Act AF Nsf 5902000 | 378.03 | | |
| 33212 | 1110004 10610 | 300030450 | 10/04/2007 | A | 09/29/2007 | | Act FF Nsf 5300000 | 926.17 | | |
| 33212 | 1110004 10610 | 300030453 | 09/29/2007 | | 09/29/2007 | | Nsf E2117891 Charge | 50.00 | | |

TOTAL FOR GL:    1110004                                                 3,854.85
                                                                  -------------

| 33632 | 1130000 10610 | 100003671 | 11/21/2007 | | 11/21/2007 | | E-Learning Renewal thru 5/31/2008 | 300.00 | | |

TOTAL FOR GL:    1130000                                                  300.00
                                                                  -------------

TOTAL FOR BRAND :    DD                                                14,153.37
                                                                  -------------

TOTAL FOR CUSTOMER :                                                   14,153.37
                                                                  -------------

REPORT GRAND TOTAL :                                                   14,153.37
                                                                  =============

*CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial
representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If
there are any questions, please refer them to your Collections Specialist.

## O'ROURKE & DEGEN, PLLC
#### ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

212-227-4530

FAX 212-385-9813

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
  NEW JERSEY

THOMAS H. O'ROURKE
1976 - 2005

April 1, 2008

**BY FEDERAL EXPRESS**

Shreeji Donuts, Inc.
d/b/a Dunkin' Donuts
122-126 South Robinson Avenue
Newburgh, New York 12550

Re:  **Notice to Cure**
     **Dunkin' Donuts**
     PC:  342639 CUST:  14300
     Account Balance Due:  $3,490.93

Dear Franchisee:

Please be advised that this firm represents the interests of Dunkin' Donuts Franchising LLC ("Dunkin' Donuts") with respect to your failure to comply with the requirements of the Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Shreeji Donuts, Inc., Amish Patel, Ami Patel | Franchise Agreement 05/17/07 | 122-126 South Robinson Avenue Newburgh, New York 12550 | DD |

Pursuant to your Franchise Agreement, this Notice shall serve as **fifteen (15) days prior written notice that unless you cure your defaults, Dunkin' Donuts intends to terminate your franchise** for your failure to report gross sales and to make the following payments **through April 1, 2008** (see annexed status report):

| ITEM | AMOUNT |
|---|---|
| Franchise Fees, Advertising Fees and other charges | $ 3,378.93 |

Shreeji Donuts, Inc.
April 1, 2008
Page 2

| | |
|---|---|
| Collection Fee | 112.00 |
| TOTAL | $ 3,490.93 |

If you failed to provide Dunkin' Donuts with reports of your gross sales, as required by the Franchise Agreement, all, or a portion, of the outstanding Franchise Fees and Advertising Fees may have been estimated based upon your prior sales.

**You are required to cure these defaults within fifteen (15) days by mailing your certified check in the amount of $3,490.93 to Dunkin' Brands, Inc., P.O Box 2965, Carol Stream, Il 60132-2965. In addition, fax a copy of said check to Mr. Gary Zullig at 781-737-6212.**

You are advised that if you dispute the claimed defaults and contend that this Notice is not justified, you must advise Dunkin' Donuts in writing within seven (7) days of your receipt of this Notice of the substance of the dispute and provide Dunkin' Donuts with any and all information supporting your claims. Dunkin' Donuts will promptly review the substance of your dispute and make any adjustments that may be necessary to the amounts shown to be in default and notify you thereof. However, any dispute that you raise with respect to the amounts in default, or any claims that you might purport to have against Dunkin' Donuts, will not excuse your obligation to pay the amounts owed to Dunkin' Donuts as set out herein above; nor will such claims excuse your performance of your obligations under the Franchise Agreement or stay the time within which you must cure any defaults.

This notice supplements any Notice(s) of Default and/or Termination previously sent, relating to this store. This notice does not supersede any prior Notice, nor does it constitute a waiver of any rights pursuant to any Notice. Failure to cure these defaults within fifteen (15) days of the receipt of this Notice, as well as your continued failure to make timely payments and to submit financial information, as required by your Franchise Agreement with Dunkin' Donuts, may result in termination of your Franchise Agreement.

Shreeji Donuts, Inc.
April 1, 2008
Page 3

    If payment has been made in full and all sales reports have
been submitted to Dunkin' Donuts, please disregard this notice.

                                 Very truly yours,

RDD:rg                          /RONALD D. DEGEN
cc:  Mr. Gary Zullig, Collection Specialist
     Mr. Edward Simoes, Director of Franchise Services
     Mr. Richard Besgen, Operations Manager
     Amish Patel
     Ami Patel
     266 Main Street
     Cornwall, New York 12518

RUN DATE:    31-MAR-06

USER:    GRILLIG

Dunkin' Brands Inc
**************************
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF:    2008/03/31 00:00:00

CUSTOMER: 14300
LOCATION:

Shreeji Donuts, Inc.
266 Main St
CORNWALL NY 12518

SHOP ADDRESS:
122 S. Robinson Ave
Newburgh NY 12550-5822

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 342639 | 1110001 | 10140 | 403444462 | 03/27/2008 | E | 03/22/2008 | | 5900000 INDIRECT FUND INCOME | 121.00 NA | | |
| 342639 | 1110001 | 10140 | 403444462 | 03/27/2008 | E | 03/22/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 242.00 NA | | |
| 342639 | 1110001 | 10140 | 403444462 | 03/27/2008 | E | 03/22/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 242.00 NA | | |
| 342639 | 1110001 | 10140 | 403449905 | 04/03/2008 | E | 03/29/2008 | | 5900000 INDIRECT FUND INCOME | 188.99 NA | | |
| 342639 | 1110001 | 10140 | 403449905 | 04/03/2008 | E | 03/29/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 377.99 NA | | |
| 342639 | 1110001 | 10140 | 403449905 | 04/03/2008 | E | 03/29/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 377.99 NA | | |
| 342639 | 1110001 | 10615 | 403456417 | 03/27/2008 | E | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 713.50 NA | | |
| 342639 | 1110001 | 10615 | 403461861 | 04/03/2008 | E | 03/29/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1115.06 NA | | |

TOTAL FOR GL:    1110001                                                          3,378.93
                                                                          ----------

TOTAL FOR BRAND :    DD                                                          3,378.93
                                                                          ----------

TOTAL FOR CUSTOMER :                                                          3,378.93
                                                                          ----------

REPORT GRAND TOTAL :                                                          3,378.93
                                                                          ==========

** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial
representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If
there are any questions, please refer them to your collections Specialist.

**O'ROURKE & DEGEN, PLLC**
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

**212-227-4530**

THOMAS H. O'ROURKE
1976 - 2005

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

FAX 212-385-9813

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

April 28, 2008


<u>BY FEDERAL EXPRESS AND FIRST CLASS MAIL</u>

Ganpati Donuts, Inc.
d/b/a Dunkin' Donuts and Baskin-Robbins
676-682 Broadway
Newburgh, New York 12550

Re:  **Notice of Termination**
     **Dunkin' Donuts and Baskin-Robbins**
     PC:  300392 CUST:  20770

Dear Franchisee:

Please be advised that this firm represents the interests of Dunkin' Donuts Franchised Restaurants LLC, successor in interest of Dunkin' Donuts Incorporated, and Baskin-Robbins Franchised Shops LLC, successor in interest of Baskin-Robbins USA, Co. (collectively "Dunkin' Brands") and DB Real Estate Assets I LLC, successor in interest of Third Dunkin' Donuts Realty, Inc. ("DD Realty") with respect to your failure to comply with the requirements of the Franchise Agreement and Lease listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Ganpati Donuts, Inc., Amish Patel, Ami Patel | Franchise Agreement 05/14/01 Lease 05/14/01 | 676-682 Broadway Newburgh, New York 12550 | DD, BR |

On or about April 2, 2008 you received written Notice to Cure (the "Notice") by overnight carrier under your Franchise Agreement with Dunkin' Brands and your Lease with DD Realty for failure to pay sums due under the Franchise Agreement and the Lease.  In the Notice you were advised that your Franchise Agreement and Lease would be terminated if you failed to cure the

Ganpati Donuts, Inc.
April 28, 2008
Page 2

defaults noted therein within fifteen (15) days after receiving
the Notice.  More than fifteen (15) days have passed since you
received the Notice and you have failed to cure the defaults
noted therein.

**This correspondence shall serve as notice of the termination
of your Franchise Agreement with Dunkin' Brands, effective
immediately.**

**This correspondence shall serve as notice of DD Realty's
termination of your Lease with DD Realty, effective immediately.
You are directed to vacate the subject premises immediately.**

Dunkin' Brands and DD Realty demand that you immediately pay
to them all damages that they have suffered as a result of your
defaults under the Franchise Agreement and Lease.  Please note,
however, that the payment and acceptance of such damages, or of
additional amounts due pursuant to the Franchise Agreement and
Lease, shall not constitute a "cure" or "waiver" of these
defaults preventing termination or requiring reinstatement of the
Franchise Agreement and Lease.

Dunkin' Brands demands that you, your agents, servants and
employees take such actions as are necessary to comply with your
post-termination obligations as set forth in the Franchise
Agreement, including, but not limited to, ceasing the use of any
methods associated with Dunkin' Brands, ceasing the use of any
and all trademarks, service marks, and all other proprietary
marks and methods of trade identification, and all trade secrets,
confidential information, signs, symbols and slogans belonging to
Dunkin' Brands.  Dunkin' Brands further demands that you
immediately cease use of, and return all Dunkin' Brands manuals
to Dunkin' Brands, and comply with the post-termination
obligations set forth in the Franchise Agreement.  In addition,
please make arrangements with your Operations Manager to
immediately de-identify your location of all signs, symbols,
slogans and proprietary marks belonging to Dunkin' Brands.

This notice supplements any Notice(s) of Default and/or
Termination previously sent, relating to this store.  This notice
does not supersede any prior Notice, nor does it constitute a
waiver of any rights pursuant to any Notice.

Ganpati Donuts, Inc.
April 28, 2008
Page 3

     You are advised that if you do not comply with the demands
set forth herein pursuant to the termination of your Franchise
Agreement and Lease, Dunkin' Brands and DD Realty will submit
this matter to a Court of competent jurisdiction to seek judicial
enforcement of the termination and your post-termination
obligations, as well as damages, recovery of the franchised
location, attorneys' fees, costs and interest.

                              Very truly yours,


RDD:rg                        /RONALD D. DEGEN
cc:  Arthur Anastos, Esq., Director and Managing Counsel
     Mr. Kevin Boylen, Finance Manager, Treasury Services
     Mr. Gary Zullig, Collection Specialist
     Mr. Edward Simoes, Director of Franchise Services
     Mr. Dominic Laskero, Director of Franchise Services
     Mr. Richard Besgen, Operations Manager
     Mr. Kelly Byrnes, Operations Manager
     Amish Patel
     Ami Patel
     266 Main Street
     Cornwall, New York 12518

O'ROURKE & DEGEN, PLLC
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

212-227-4530
━━
Fax 212-385-9813

THOMAS H. O'ROURKE
1976 - 2005

April 28, 2008

BY FEDERAL EXPRESS

Shree Ram Donuts Inc.
d/b/a Dunkin' Donuts
73 North Plank Road
Newburgh, New York 12550

Re:    **Notice of Termination
Dunkin' Donuts**
PC:  301926 CUST:  55629

Dear Franchisee:

   Please be advised that this firm represents the interests of Dunkin' Donuts Franchised Restaurants LLC ("Dunkin' Donuts"), successor in interest to Dunkin' Donuts Incorporated, with respect to your failure to comply with the requirements of the Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Shree Ram Donuts Inc., Amish Patel, Ami Patel | Franchise Agreement 11/08/04 | 73 North Plank Road Newburgh, New York 12550 | DD |

   On or about April 2, 2008 you received written Notice to Cure (the "Notice") by overnight carrier under your Franchise Agreement with Dunkin' Donuts for failure to pay sums due under the Franchise Agreement.  In that Notice you were advised that your Franchise Agreement would be terminated if you failed to cure the defaults noted therein within fifteen (15) days after receiving the Notice.  More than fifteen (15) days have passed since you received the Notice and you have failed to cure the defaults noted therein.

   **This correspondence shall serve as notice of the termination of your Franchise Agreement with Dunkin' Donuts, effective immediately.**

   Dunkin' Donuts demands that you immediately pay to Dunkin' Donuts all damages it has suffered as a result of your defaults under the Franchise Agreement.  Please note, however, that the

Shree Ram Donuts Inc.
April 28, 2008
Page 2

payment and acceptance of such damages, or of additional amounts
due pursuant to the Franchise Agreement, shall not constitute a
"cure" or "waiver" of these defaults preventing termination or
requiring reinstatement of the Franchise Agreement.

Dunkin' Donuts demands that you, your agents, servants and
employees take such actions as are necessary to comply with your
post-termination obligations as set forth in the Franchise
Agreement, including, but not limited to, ceasing the use of any
methods associated with Dunkin' Donuts, ceasing the use of any
and all trademarks, service marks, and all other proprietary
marks and methods of trade identification, and all trade secrets
of Dunkin' Donuts, confidential information, signs, symbols and
slogans belonging to Dunkin' Donuts. Dunkin' Donuts further
demands that you immediately cease use of, and return all Dunkin'
Donuts manuals to Dunkin' Donuts, and comply with the post-
termination obligations set forth in the Franchise Agreement. In
addition, please make arrangements with your Operations Manager
to immediately de-identify your location of all signs, symbols,
slogans and proprietary marks belonging to Dunkin' Donuts.

This notice supplements any Notice(s) of Default and/or
Termination previously sent, relating to this store. This notice
does not supersede any prior Notice, nor does it constitute a
waiver of any rights pursuant to any Notice.

You are advised that if you do not comply with the demands set
forth herein pursuant to the termination of your Franchise
Agreement, Dunkin' Donuts will submit this matter to a Court of
competent jurisdiction to seek judicial enforcement of the
termination and your post-termination obligations, as well as
damages, recovery of the franchised location, attorneys' fees,
costs and interest.

Very truly yours,

RONALD D. DEGEN

RDD:rg
cc:  Arthur Anastos, Esq., Director and Managing Counsel
     Mr. Kevin Boylen, Finance Manager, Treasury Services
     Mr. Gary Zullig, Collection Specialist
     Mr. Edward Simoes, Director of Franchise Services
     Mr. Richard Besgen, Operations Manager
     Amish Patel
     Ami Patel
     266 Main Street
     Cornwall, New York 12518

**O'ROURKE & DEGEN, PLLC**
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

212-227-4530

Fax 212-385-9813

THOMAS H. O'ROURKE
1976 - 2005

April 28, 2008

<u>BY FEDERAL EXPRESS</u>

Laxmi Donuts, Inc.
d/b/a Dunkin' Donuts
1002 Route 94
Vails Gate, New York 12584

> Re:  **Notice of Termination**
> **Dunkin' Donuts**
> PC:  304729 CUST:  55630

Dear Franchisee:

Please be advised that this firm represents the interests of Dunkin' Donuts Franchised Amish Patel, Ami Patel LLC ("Dunkin' Donuts"), successor in interest to Dunkin' Donuts Restaurants, with respect to your failure to comply with the requirements of the Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Laxmi Donuts, Inc., Incorporated | Franchise Agreement 11/08/04 | 1002 Route 94 Vails Gate, New York 12584 | DD |

On or about April 2, 2008 you received written Notice to Cure (the "Notice") by overnight carrier under your Franchise Agreement with Dunkin' Donuts for failure to pay sums due under the Franchise Agreement.  In that Notice you were advised that your Franchise Agreement would be terminated if you failed to cure the defaults noted therein within fifteen (15) days after receiving the Notice.  More than fifteen (15) days have passed since you received the Notice and you have failed to cure the defaults noted therein.

**This correspondence shall serve as notice of the termination of your Franchise Agreement with Dunkin' Donuts, effective immediately.**

Dunkin' Donuts demands that you immediately pay to Dunkin' Donuts all damages it has suffered as a result of your defaults under the Franchise Agreement.  Please note, however, that the

Laxmi Donuts, Inc.
April 28, 2008
Page 2

payment and acceptance of such damages, or of additional amounts
due pursuant to the Franchise Agreement, shall not constitute a
"cure" or "waiver" of these defaults preventing termination or
requiring reinstatement of the Franchise Agreement.

Dunkin' Donuts demands that you, your agents, servants and
employees take such actions as are necessary to comply with your
post-termination obligations as set forth in the Franchise
Agreement, including, but not limited to, ceasing the use of any
methods associated with Dunkin' Donuts, ceasing the use of any
and all trademarks, service marks, and all other proprietary
marks and methods of trade identification, and all trade secrets
of Dunkin' Donuts, confidential information, signs, symbols and
slogans belonging to Dunkin' Donuts. Dunkin' Donuts further
demands that you immediately cease use of, and return all Dunkin'
Donuts manuals to Dunkin' Donuts, and comply with the post-
termination obligations set forth in the Franchise Agreement. In
addition, please make arrangements with your Operations Manager
to immediately de-identify your location of all signs, symbols,
slogans and proprietary marks belonging to Dunkin' Donuts.

This notice supplements any Notice(s) of Default and/or
Termination previously sent, relating to this store. This notice
does not supersede any prior Notice, nor does it constitute a
waiver of any rights pursuant to any Notice.

You are advised that if you do not comply with the demands
set forth herein pursuant to the termination of your Franchise
Agreement, Dunkin' Donuts will submit this matter to a Court of
competent jurisdiction to seek judicial enforcement of the
termination and your post-termination obligations, as well as
damages, recovery of the franchised location, attorneys' fees,
costs and interest.

Very truly yours,

RONALD D. DEGEN

RDD:rg
cc: Arthur Anastos, Esq., Director and Managing Counsel
    Mr. Kevin Boylen, Finance Manager, Treasury Services
    Mr. Gary Zullig, Collection Specialist
    Mr. Edward Simoes, Director of Franchise Services
    Mr. Richard Besgen, Operations Manager
    Amish Patel
    Ami Patel
    266 Main Street
    Cornwall, New York 12518

## O'ROURKE & DEGEN, PLLC
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

**212-227-4530**

Fax 212-385-9813

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

THOMAS H. O'ROURKE
1976 - 2005

April 28, 2008

BY FEDERAL EXPRESS

Krishna Donuts, Inc.
d/b/a Dunkin' Donuts
310 Main Street
Highland Falls, New York 10928

Re:  **Notice of Termination
Dunkin' Donuts**
PC:  330252 CUST:  55631

Dear Franchisee:

Please be advised that this firm represents the interests of Dunkin' Donuts Franchised Restaurants LLC ("Dunkin' Donuts"), successor in interest to Dunkin' Donuts Incorporated, with respect to your failure to comply with the requirements of the Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Krishna Donuts, Inc., Amish Patel, Ami Patel | Franchise Agreement 11/08/04 | 310 Main Street Highland Falls, New York 10928 | DD |

On or about April 2, 2008 you received written Notice to Cure (the "Notice") by overnight carrier under your Franchise Agreement with Dunkin' Donuts for failure to pay sums due under the Franchise Agreement.  In that Notice you were advised that your Franchise Agreement would be terminated if you failed to cure the defaults noted therein within fifteen (15) days after receiving the Notice.  More than fifteen (15) days have passed since you received the Notice and you have failed to cure the defaults noted therein.

**This correspondence shall serve as notice of the termination of your Franchise Agreement with Dunkin' Donuts, effective immediately.**

Dunkin' Donuts demands that you immediately pay to Dunkin' Donuts all damages it has suffered as a result of your defaults under the Franchise Agreement.  Please note, however, that the

Krishna Donuts, Inc.
April 28, 2008
Page 2

payment and acceptance of such damages, or of additional amounts
due pursuant to the Franchise Agreement, shall not constitute a
"cure" or "waiver" of these defaults preventing termination or
requiring reinstatement of the Franchise Agreement.

Dunkin' Donuts demands that you, your agents, servants and
employees take such actions as are necessary to comply with your
post-termination obligations as set forth in the Franchise
Agreement, including, but not limited to, ceasing the use of any
methods associated with Dunkin' Donuts, ceasing the use of any
and all trademarks, service marks, and all other proprietary
marks and methods of trade identification, and all trade secrets
of Dunkin' Donuts, confidential information, signs, symbols and
slogans belonging to Dunkin' Donuts. Dunkin' Donuts further
demands that you immediately cease use of, and return all Dunkin'
Donuts manuals to Dunkin' Donuts, and comply with the post-
termination obligations set forth in the Franchise Agreement. In
addition, please make arrangements with your Operations Manager
to immediately de-identify your location of all signs, symbols,
slogans and proprietary marks belonging to Dunkin' Donuts.

This notice supplements any Notice(s) of Default and/or
Termination previously sent, relating to this store. This notice
does not supersede any prior Notice, nor does it constitute a
waiver of any rights pursuant to any Notice.

You are advised that if you do not comply with the demands
set forth herein pursuant to the termination of your Franchise
Agreement, Dunkin' Donuts will submit this matter to a Court of
competent jurisdiction to seek judicial enforcement of the
termination and your post-termination obligations, as well as
damages, recovery of the franchised location, attorneys' fees,
costs and interest.

Very truly yours,

RONALD D. DEGEN

RDD:rg
cc:  Arthur Anastos, Esq., Director and Managing Counsel
     Mr. Kevin Boylen, Finance Manager, Treasury Services
     Mr. Gary Zullig, Collection Specialist
     Mr. Edward Simoes, Director of Franchise Services
     Mr. Richard Besgen, Operations Manager
     Amish Patel
     Ami Patel
     266 Main Street
     Cornwall, New York 12518

## O'ROURKE & DEGEN, PLLC
### ATTORNEYS AT LAW
### 225 BROADWAY, SUITE 715
### NEW YORK, NY 10007

**212-227-4530**

Fax 212-385-9813

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

THOMAS H. O'ROURKE
1976 - 2005

April 28, 2008

<u>BY FEDERAL EXPRESS</u>

Giatri Donuts, Inc.
d/b/a Dunkin' Donuts
45 Quaker Avenue
Cornwall, New York 12518

Re: **Notice of Termination
Dunkin' Donuts**
PC: 332132 CUST: 47659

Dear Franchisee:

Please be advised that this firm represents the interests of Dunkin' Donuts Franchised Restaurants LLC ("Dunkin' Donuts"), successor in interest to Dunkin' Donuts Incorporated, with respect to your failure to comply with the requirements of the Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Giatri Donuts, Inc., Amish Patel, Ami Patel | Franchise Agreement 11/08/04 | 45 Quaker Avenue Cornwall, New York 12518 | DD |

On or about April 2, 2008 you received written Notice to Cure (the "Notice") by overnight carrier under your Franchise Agreement with Dunkin' Donuts for failure to pay sums due under the Franchise Agreement. In that Notice you were advised that your Franchise Agreement would be terminated if you failed to cure the defaults noted therein within fifteen (15) days after receiving the Notice. More than fifteen (15) days have passed since you received the Notice and you have failed to cure the defaults noted therein.

**This correspondence shall serve as notice of the termination of your Franchise Agreement with Dunkin' Donuts, effective immediately.**

Dunkin' Donuts demands that you immediately pay to Dunkin' Donuts all damages it has suffered as a result of your defaults under the Franchise Agreement. Please note, however, that the

Giatri Donuts, Inc.
April 28, 2008
Page 2

payment and acceptance of such damages, or of additional amounts
due pursuant to the Franchise Agreement, shall not constitute a
"cure" or "waiver" of these defaults preventing termination or
requiring reinstatement of the Franchise Agreement.

Dunkin' Donuts demands that you, your agents, servants and
employees take such actions as are necessary to comply with your
post-termination obligations as set forth in the Franchise
Agreement, including, but not limited to, ceasing the use of any
methods associated with Dunkin' Donuts, ceasing the use of any
and all trademarks, service marks, and all other proprietary
marks and methods of trade identification, and all trade secrets
of Dunkin' Donuts, confidential information, signs, symbols and
slogans belonging to Dunkin' Donuts. Dunkin' Donuts further
demands that you immediately cease use of, and return all Dunkin'
Donuts manuals to Dunkin' Donuts, and comply with the post-
termination obligations set forth in the Franchise Agreement. In
addition, please make arrangements with your Operations Manager
to immediately de-identify your location of all signs, symbols,
slogans and proprietary marks belonging to Dunkin' Donuts.

This notice supplements any Notice(s) of Default and/or
Termination previously sent, relating to this store. This notice
does not supersede any prior Notice, nor does it constitute a
waiver of any rights pursuant to any Notice.

You are advised that if you do not comply with the demands
set forth herein pursuant to the termination of your Franchise
Agreement, Dunkin' Donuts will submit this matter to a Court of
competent jurisdiction to seek judicial enforcement of the
termination and your post-termination obligations, as well as
damages, recovery of the franchised location, attorneys' fees,
costs and interest.

Very truly yours,

/RONALD D. DEGEN

RDD:rg
cc: Arthur Anastos, Esq., Director and Managing Counsel
    Mr. Kevin Boylen, Finance Manager, Treasury Services
    Mr. Gary Zullig, Collection Specialist
    Mr. Edward Simoes, Director of Franchise Services
    Mr. Richard Besgen, Operations Manager
    Amish Patel
    Ami Patel
    266 Main Street
    Cornwall, New York 12518

O'ROURKE & DEGEN, PLLC
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

212-227-4530

Fax 212-385-9813

THOMAS H. O'ROURKE
1976 - 2005

April 28, 2008

BY FEDERAL EXPRESS

Shreeji Donuts, Inc.
d/b/a Dunkin' Donuts
122-126 South Robinson Avenue
Newburgh, New York 12550

Re:  **Notice of Termination
Dunkin' Donuts**
PC:  342639 CUST:  14300

Dear Franchisee:

Please be advised that this firm represents the interests of Dunkin' Donuts Franchising LLC, with respect to your failure to comply with the requirements of the Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Shreeji Donuts, Inc., Amish Patel, Ami Patel | Franchise Agreement 05/17/07 | 122-126 South Robinson Avenue Newburgh, New York 12550 | DD |

On or about April 2, 2008 you received written Notice to Cure (the "Notice") by overnight carrier under your Franchise Agreement with Dunkin' Donuts for failure to pay sums due under the Franchise Agreement.  In that Notice you were advised that your Franchise Agreement would be terminated if you failed to cure the defaults noted therein within fifteen (15) days after receiving the Notice.  More than fifteen (15) days have passed since you received the Notice and you have failed to cure the defaults noted therein.

**This correspondence shall serve as notice of the termination of your Franchise Agreement with Dunkin' Donuts, effective immediately.**

Dunkin' Donuts demands that you immediately pay to Dunkin' Donuts all damages it has suffered as a result of your defaults under the Franchise Agreement.  Please note, however, that the

Shreeji Donuts, Inc.
April 28, 2008
Page 2

payment and acceptance of such damages, or of additional amounts
due pursuant to the Franchise Agreement, shall not constitute a
"cure" or "waiver" of these defaults preventing termination or
requiring reinstatement of the Franchise Agreement.

     Dunkin' Donuts demands that you, your agents, servants and
employees take such actions as are necessary to comply with your
post-termination obligations as set forth in the Franchise
Agreement, including, but not limited to, ceasing the use of any
methods associated with Dunkin' Donuts, ceasing the use of any
and all trademarks, service marks, and all other proprietary
marks and methods of trade identification, and all trade secrets
of Dunkin' Donuts, confidential information, signs, symbols and
slogans belonging to Dunkin' Donuts.  Dunkin' Donuts further
demands that you immediately cease use of, and return all Dunkin'
Donuts manuals to Dunkin' Donuts, and comply with the post-
termination obligations set forth in the Franchise Agreement.  In
addition, please make arrangements with your Operations Manager
to immediately de-identify your location of all signs, symbols,
slogans and proprietary marks belonging to Dunkin' Donuts.

     This notice supplements any Notice(s) of Default and/or
Termination previously sent, relating to this store.  This notice
does not supersede any prior Notice, nor does it constitute a
waiver of any rights pursuant to any Notice.

     You are advised that if you do not comply with the demands
set forth herein pursuant to the termination of your Franchise
Agreement, Dunkin' Donuts will submit this matter to a Court of
competent jurisdiction to seek judicial enforcement of the
termination and your post-termination obligations, as well as
damages, recovery of the franchised location, attorneys' fees,
costs and interest.

                              Very truly yours,

RDD:rg                        RONALD D. DEGEN
cc:  Arthur Anastos, Esq., Director and Managing Counsel
     Mr. Kevin Boylen, Finance Manager, Treasury Services
     Mr. Gary Zullig, Collection Specialist
     Mr. Edward Simoes, Director of Franchise Services
     Mr. Richard Besgen, Operations Manager
     Amish Patel
     Ami Patel
     266 Main Street
     Cornwall, New York 12518

RUN DATE: 28-APR-08
ORDER : 9219
CUSTOMER: 3661   GZILLIG
LOCATION:

Dunkin' Brands Inc
*****************
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF: 2008/04/28 00:00:00

Ganpati Donuts, Inc.
674 BROADWAY
NEWBURGH NY 12550-5130
20770

SHOP ADDRESS:
674 BROADWAY
NEWBURGH NY 12550-5130
20770

| PROFIT CENTER | GL NUMBER | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 110001 | 10610 | | 403595795 | 05/01/2008 | E | 04/26/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1772.70 | NA | |
| 110001 | 10610 | | 403591839 | 04/24/2008 | E | 04/19/2008 | | 5300000 CONTINUING FRANCHISE FEES | 2021.15 | NA | |
| 110001 | 10610 | | 403583918 | 05/01/2008 | E | 04/26/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 709.08 | NA | |
| 110001 | 10140 | | 403583918 | 05/01/2008 | E | 04/26/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 709.08 | NA | |
| 110001 | 10140 | | 403583918 | 05/01/2008 | E | 04/26/2008 | | 5900000 INDIRECT FUND INCOME | 354.54 | NA | |
| 110001 | 10140 | | 403579964 | 04/24/2008 | E | 04/19/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 808.46 | NA | |
| 110001 | 10140 | | 403579964 | 04/24/2008 | E | 04/19/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 808.46 | NA | |
| 110001 | 10140 | | 403579964 | 04/24/2008 | E | 04/19/2008 | | 5900000 INDIRECT FUND INCOME | 404.23 | NA | |
| 110001 | 10610 | | 403457059 | 04/03/2008 | E | 03/29/2008 | | 5300000 CONTINUING FRANCHISE FEES | 2021.15 | NA | |
| 110001 | 10610 | | 403453206 | 03/27/2008 | E | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 2021.15 | NA | |
| 110001 | 10610 | | 403451585 | 03/20/2008 | E | 03/15/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1866.04 | NA | |
| 110001 | 10140 | | 403445102 | 04/03/2008 | E | 03/29/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 808.46 | NA | |
| 110001 | 10140 | | 403445102 | 04/03/2008 | E | 03/29/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 808.46 | NA | |
| 110001 | 10140 | | 403445102 | 04/03/2008 | E | 03/29/2008 | | 5900000 INDIRECT FUND INCOME | 404.23 | NA | |
| 110001 | 10140 | | 403441250 | 03/27/2008 | E | 03/22/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 808.46 | NA | |
| 110001 | 10140 | | 403441250 | 03/27/2008 | E | 03/22/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 808.46 | NA | |
| 110001 | 10140 | | 403441250 | 03/27/2008 | E | 03/22/2008 | | 5900000 INDIRECT FUND INCOME | 404.23 | NA | |
| 110001 | 10140 | | 403439628 | 03/20/2008 | E | 03/15/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 746.42 | NA | |
| 110001 | 10140 | | 403439628 | 03/20/2008 | E | 03/15/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 746.42 | NA | |
| 110001 | 10140 | | 403439628 | 03/20/2008 | E | 03/15/2008 | | 5900000 INDIRECT FUND INCOME | 373.21 | NA | |

TOTAL FOR GL: 1110001     19,404.39

| PROFIT CENTER | GL NUMBER | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | TRANSACTION DATE | DESCRIPTION | AMOUNT |
|---|---|---|---|---|---|---|---|
| 1120000 | 10620 | | 300049051 | 04/18/2008 | 04/11/2008 | WTR/SWR 1/1/08-3/31/08 | 968.47 |
| 1120000 | 10620 | | 800147566 | 04/15/2008 | 04/08/2008 | Rent-Base | 5000.00 |

TOTAL FOR GL: 1120000     5,968.47

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 300392 | 1122000 | 10620 | 800110785 | 10/15/2007 | 09/25/2007 | | Rent-Percentage | 5077.55 | | |
| 300392 | 1122000 | 10620 | 800114838 | 10/15/2007 | 09/24/2007 | | Rent-Percentage | 104.77 | | |
| 300392 | 1122000 | 10620 | 800117006 | 11/15/2007 | 10/27/2007 | | Rent-Percentage | 2890.21 | | |
| 300392 | 1122000 | 10620 | 800117007 | 11/15/2007 | 10/26/2007 | | Rent-Percentage | 8148.49 | | |
| 300392 | 1122000 | 10620 | 800120983 | 11/15/2007 | 10/25/2007 | | Rent-Percentage | 779.93 | | |
| 300392 | 1122000 | 10620 | 800122586 | 01/15/2008 | 12/28/2007 | | Rent-Percentage | 7168.38 | | |
| 300392 | 1122000 | 10620 | 800122587 | 01/15/2008 | 12/27/2007 | | Rent-Percentage | 8658.26 | | |
| 300392 | 1122000 | 10620 | 800126379 | 12/26/2007 | 12/26/2007 | | Rent-Percentage | -124.42 | | |
| 300392 | 1122000 | 10620 | 800126380 | 12/26/2007 | 12/26/2007 | | Rent-Percentage | -103.07 | | |
| 300392 | 1122000 | 10620 | 800128500 | 01/15/2008 | 12/25/2007 | | Rent-Percentage | 13499.03 | | |
| 300392 | 1122000 | 10620 | 800132620 | 12/24/2007 | 12/24/2007 | | Rent-Percentage | -1867.21 | | |
| 300392 | 1122000 | 10620 | 800133257 | 02/15/2008 | 01/26/2008 | | Rent-Percentage | 2363.61 | | |
| 300392 | 1122000 | 10620 | 800134731 | 02/15/2008 | 01/24/2008 | | Rent-Percentage | 6966.35 | | |
| 300392 | 1122000 | 10620 | 800138775 | 02/15/2008 | 02/15/2008 | | Rent-Percentage | 1257.17 | | |
| 300392 | 1122000 | 10620 | 800140523 | 03/15/2008 | 02/29/2008 | | Rent-Percentage-Percentage | 5517.88 | | |
| 300392 | 1122000 | 10620 | 800140524 | 04/15/2008 | 03/28/2008 | | Rent-Percentage | 7151.91 | | |
| 300392 | 1122000 | 10620 | 800144803 | 04/15/2008 | 03/27/2008 | | Rent-Percentage | 253.28 | | |
| 300392 | 1122000 | 10620 | 800144804 | 04/15/2008 | 03/27/2008 | | Rent-Percentage | 2507.37 | | |
| 300392 | 1122000 | 10620 | 800146074 | 04/15/2008 | 03/26/2008 | | Rent-Percentage | 7761.99 | | |
| 300392 | 1122000 | 10620 | 800150926 | 05/15/2008 | 04/26/2008 | | Rent-Percentage | 9827.84 | | |

TOTAL FOR GL: 1122000   87,839.32

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 300392 | 1199008 | 10620 | 800147567 | 04/15/2008 | 04/08/2008 | | Tax-Real Estate Tax | 2946.00 | | |

TOTAL FOR GL: 1199008   2946.00

TOTAL FOR GL:   1199008   2,946.00

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 300392 | 1110001 | 20140 | 403433447 | 03/20/2008 | E | 03/15/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 22.26 NA | | |
| 300392 | 1110001 | 20140 | 403433447 | 03/20/2008 | E | 03/15/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 16.68 NA | | |
| 300392 | 1110001 | 20140 | 403433447 | 03/20/2008 | E | 03/15/2008 | | 5900000 INDIRECT FUND INCOME | 11.12 NA | | |
| 300392 | 1110001 | 20140 | 403433447 | 03/20/2008 | E | 03/15/2008 | | 5908000 ALLOCATION-NAF | 5.56 NA | | |
| | | | | | | TOTAL FOR BRAND : DD | | | 116,158.18 | | |
| 300392 | 1110001 | 20610 | 403463461 | 03/20/2008 | E | 03/15/2008 | | 5300000 CONTINUING FRANCHISE FEES | 55.61 NA | | |
| 300392 | 1110001 | 20610 | 403464322 | 03/27/2008 | E | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 76.69 NA | | |
| 300392 | 1110001 | 20610 | 403465848 | 04/03/2008 | E | 03/29/2008 | | 5300000 CONTINUING FRANCHISE FEES | 76.69 NA | | |
| 300392 | 1110001 | 20140 | 403435839 | 04/03/2008 | E | 03/29/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 30.67 NA | | |
| 300392 | 1110001 | 20140 | 403435839 | 04/03/2008 | E | 03/29/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 23.00 NA | | |
| 300392 | 1110001 | 20140 | 403435839 | 04/03/2008 | E | 03/29/2008 | | 5900000 INDIRECT FUND INCOME | 15.34 NA | | |
| 300392 | 1110001 | 20140 | 403435839 | 04/03/2008 | E | 03/29/2008 | | 5908000 ALLOCATION-NAF | 7.67 NA | | |
| 300392 | 1110001 | 20140 | 403434310 | 03/27/2008 | E | 03/22/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 30.67 NA | | |
| 300392 | 1110001 | 20140 | 403434310 | 03/27/2008 | E | 03/22/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 23.00 NA | | |
| 300392 | 1110001 | 20140 | 403434310 | 03/27/2008 | E | 03/22/2008 | | 5900000 INDIRECT FUND INCOME | 15.34 NA | | |
| 300392 | 1110001 | 20140 | 403434310 | 03/27/2008 | E | 03/22/2008 | | 5908000 ALLOCATION-NAF | 7.67 NA | | |
| 300392 | 1110001 | 20610 | 403603034 | 04/24/2008 | E | 04/19/2008 | | 5300000 CONTINUING FRANCHISE FEES | 76.69 NA | | |
| 300392 | 1110001 | 20610 | 403604566 | 05/01/2008 | E | 04/26/2008 | | 5300000 CONTINUING FRANCHISE FEES | 107.27 NA | | |
| 300392 | 1110001 | 20140 | 403574651 | 05/01/2008 | E | 04/26/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 42.91 NA | | |
| 300392 | 1110001 | 20140 | 403574651 | 05/01/2008 | E | 04/26/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 32.18 NA | | |
| 300392 | 1110001 | 20140 | 403574651 | 05/01/2008 | E | 04/26/2008 | | 5900000 INDIRECT FUND INCOME | 21.45 NA | | |
| 300392 | 1110001 | 20140 | 403574651 | 05/01/2008 | E | 04/26/2008 | | 5908000 ALLOCATION-NAF | 10.73 NA | | |
| 300392 | 1110001 | 20140 | 403573118 | 04/24/2008 | E | 04/19/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 30.67 NA | | |
| 300392 | 1110001 | 20140 | 403573118 | 04/24/2008 | E | 04/19/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 23.00 NA | | |
| 300392 | 1110001 | 20140 | 403573118 | 04/24/2008 | E | 04/19/2008 | | 5900000 INDIRECT FUND INCOME | 15.34 NA | | |
| 300392 | 1110001 | 20140 | 403573118 | 04/24/2008 | E | 04/19/2008 | | 5908000 ALLOCATION-NAF | 7.67 NA | | |
| | | | | | | TOTAL FOR GL: 1110001 | | | 785.86 | | |
| | | | | | | TOTAL FOR BRAND : BR | | | 785.86 | | |
| 300392 | 1123000 | 90200 | 406932175 | 02/06/2008 | | 02/06/2008 | | RECEIPT - 406932175 | -11421.37 | | |
| 300392 | 1123000 | 90200 | 507878242 | 04/16/2008 | | 04/16/2008 | | RECEIPT - 507878242 | -12291.61 | | |

Page 4 of 4

| PROFIT CENTER | GL CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E DATE | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 100392 1123000 90200 | e2122312 | 10/17/2007 | 10/17/2007 | | | RECEIPT - e2122312 | -11100.44 | | |
| 100392 1123000 90200 | e2134035 | 10/24/2007 | 10/24/2007 | | | RECEIPT - e2134035 | -10808.50 | | |
| | | | | | TOTAL FOR GL: 1123000 | | | -45,621.92 | | |
| | | | | | TOTAL FOR BRAND : 90 | | | -45,621.92 | | |
| | | | | | TOTAL FOR CUSTOMER : | | | 71,322.12 | | |
| | | | | | REPORT GRAND TOTAL : | | | 71,322.12 | | |

CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

RUN DATE: 28-APR-08
USER : GZULLIG
CUSTOMER: 7844
LOCATION:

**Dunkin' Brands Inc**
**ACCOUNTS RECEIVABLE STATUS REPORT**
AS OF:    2008/04/28 00:00:00

SHOP ADDRESS:
73 North Plank Rd
Newburgh NY 12550-3139

Shree Ram Donuts, Inc.
266 MAIN ST
CORNWALL NY 12518
55629

| PROFIT CENTER | GL NUMBER | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 301926 | 1110001 | 10610 | 403315340 | 03/06/2008 | E | 03/01/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1125.30 | | NA |
| 301926 | 1110001 | 10140 | 403302579 | 03/06/2008 | E | 03/01/2008 | | 5902020 DIRECT/REGIONAL FUND INCOME | 381.46 | | NA |
| 301926 | 1110001 | 10140 | 403302579 | 03/06/2008 | E | 03/01/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 381.46 | | NA |
| 301926 | 1110001 | 10140 | 403302579 | 03/06/2008 | E | 03/01/2008 | | 5900000 INDIRECT FUND INCOME | 190.73 | | NA |
| 301926 | 1110001 | 10140 | 403338851 | 03/13/2008 | E | 03/08/2008 | | 5902020 DIRECT/REGIONAL FUND INCOME | 381.46 | | NA |
| 301926 | 1110001 | 10140 | 403338851 | 03/13/2008 | E | 03/08/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 381.46 | | NA |
| 301926 | 1110001 | 10140 | 403338851 | 03/13/2008 | E | 03/08/2008 | | 5900000 INDIRECT FUND INCOME | 190.73 | | NA |
| 301926 | 1110001 | 10140 | 403339755 | 03/20/2008 | E | 03/15/2008 | | 5902020 DIRECT/REGIONAL FUND INCOME | 381.46 | | NA |
| 301926 | 1110001 | 10140 | 403339755 | 03/20/2008 | E | 03/15/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 381.46 | | NA |
| 301926 | 1110001 | 10140 | 403339755 | 03/20/2008 | E | 03/15/2008 | | 5900000 INDIRECT FUND INCOME | 190.73 | | NA |
| 301926 | 1110001 | 10140 | 403441533 | 03/27/2008 | E | 03/22/2008 | | 5902020 DIRECT/REGIONAL FUND INCOME | 372.83 | | NA |
| 301926 | 1110001 | 10140 | 403441533 | 03/27/2008 | E | 03/22/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 372.83 | | NA |
| 301926 | 1110001 | 10140 | 403441533 | 03/27/2008 | E | 03/22/2008 | | 5900000 INDIRECT FUND INCOME | 186.41 | | NA |
| 301926 | 1110001 | 10140 | 403445548 | 04/03/2008 | E | 03/29/2008 | | 5902020 DIRECT/REGIONAL FUND INCOME | 381.46 | | NA |
| 301926 | 1110001 | 10140 | 403445548 | 04/03/2008 | E | 03/29/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 381.46 | | NA |
| 301926 | 1110001 | 10140 | 403445548 | 04/03/2008 | E | 03/29/2008 | | 5900000 INDIRECT FUND INCOME | 190.73 | | NA |
| 301926 | 1110001 | 10610 | 403457505 | 04/03/2008 | E | 03/29/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1057.35 | | NA |
| 301926 | 1110001 | 10610 | 403343489 | 03/27/2008 | E | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1099.84 | | NA |
| 301926 | 1110001 | 10610 | 403451712 | 03/20/2008 | E | 03/15/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1125.30 | | NA |
| 301926 | 1110001 | 10610 | 403450809 | 03/13/2008 | E | 03/08/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1125.30 | | NA |
| 301926 | 1110001 | 10140 | 403578460 | 04/17/2008 | E | 04/12/2008 | | 5902020 DIRECT/REGIONAL FUND INCOME | 358.42 | | NA |
| 301926 | 1110001 | 10140 | 403578460 | 04/17/2008 | E | 04/12/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 358.42 | | NA |
| 301926 | 1110001 | 10140 | 403578460 | 04/17/2008 | E | 04/12/2008 | | 5900000 INDIRECT FUND INCOME | 179.21 | | NA |
| 301926 | 1110001 | 10140 | 403577745 | 04/10/2008 | E | 04/05/2008 | | 5902020 DIRECT/REGIONAL FUND INCOME | 358.42 | | NA |
| 301926 | 1110001 | 10140 | 403577745 | 04/10/2008 | E | 04/05/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 358.42 | | NA |
| 301926 | 1110001 | 10140 | 403577745 | 04/10/2008 | E | 04/05/2008 | | 5900000 INDIRECT FUND INCOME | 179.21 | | NA |
| 301926 | 1110001 | 10140 | 403580235 | 04/24/2008 | E | 04/19/2008 | | 5902020 DIRECT/REGIONAL FUND INCOME | 358.42 | | NA |
| 301926 | 1110001 | 10140 | 403580235 | 04/24/2008 | E | 04/19/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 358.42 | | NA |
| 301926 | 1110001 | 10140 | 403580235 | 04/24/2008 | E | 04/19/2008 | | 5900000 INDIRECT FUND INCOME | 179.21 | | NA |
| 301926 | 1110001 | 10140 | 403584359 | 05/01/2008 | E | 04/26/2008 | | 5902020 DIRECT/REGIONAL FUND INCOME | 358.42 | | NA |
| 301926 | 1110001 | 10140 | 403584359 | 05/01/2008 | E | 04/26/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 358.42 | | NA |
| 301926 | 1110001 | 10140 | 403584359 | 05/01/2008 | E | 04/26/2008 | | 5900000 INDIRECT FUND INCOME | 179.21 | | NA |

| PROFIT CENTER | GL CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 301926 | 1110001 10610 | 403589621 04/10/2008 | E | 04/05/2008 | | 5300000 CONTINING FRANCHISE FEES | 1057.35 NA | | |
| 301926 | 1110001 10610 | 403590336 04/17/2008 | E | 04/12/2008 | | 5300000 CONTINING FRANCHISE FEES | 1057.35 NA | | |
| 301926 | 1110001 10610 | 403592110 04/24/2008 | E | 04/19/2008 | | 5300000 CONTINING FRANCHISE FEES | 1057.35 NA | | |
| 301926 | 1110001 10610 | 403596236 05/01/2008 | E | 04/26/2008 | | 5300000 CONTINING FRANCHISE FEES | 1057.35 NA | | |
| | | | | TOTAL FOR GL: | 1110001 | | 18,035.76 | | |
| 301926 | 1110004 10140 | 100008546 02/16/2008 | A | 02/16/2008 | | NSF w/e 02/16/08 5900000 | 179.75 | | |
| 301926 | 1110004 10140 | 100008546 02/16/2008 | A | 02/16/2008 | | NSF w/e 02/16/08 5901000 | 359.50 | | |
| 301926 | 1110004 10140 | 100008546 02/16/2008 | A | 02/16/2008 | | NSF w/e 02/16/08 5902000 | 359.50 | | |
| 301926 | 1110004 10140 | 100008547 02/23/2008 | A | 02/23/2008 | | NSF w/e 02/23/08 5900000 | 179.21 | | |
| 301926 | 1110004 10140 | 100008547 02/23/2008 | A | 02/23/2008 | | NSF w/e 02/23/08 5901000 | 358.42 | | |
| 301926 | 1110004 10140 | 100008547 02/23/2008 | A | 02/23/2008 | | NSF w/e 02/23/08 5902000 | 358.42 | | |
| 301926 | 1110004 10610 | 100008558 02/23/2008 | A | 02/23/2008 | | NSF w/e 02/23/08 5300000 | 1060.52 | | |
| 301926 | 1110004 10610 | 100008557 02/16/2008 | A | 02/16/2008 | | NSF w/e 02/16/08 5300000 | 1057.35 | | |
| 301926 | 1110004 10610 | 100008573 02/16/2008 | | 02/16/2008 | | NSF w/e 02/16/08 Charge | 50.00 | | |
| 301926 | 1110004 10610 | 100008574 02/23/2008 | | 02/23/2008 | | NSF w/e 02/23/08 Charge | 50.00 | | |
| 301926 | 1110004 10140 | 300021356-03/17/2007 R | | 03/17/2007 | | Act AF NSF 5900000 | 171.24 | | |
| 301926 | 1110004 10140 | 300021356-03/17/2007 R | | 03/17/2007 | | Act AF NSF 5901000 | 342.48 | | |
| 301926 | 1110004 10140 | 300021356-03/17/2007 R | | 03/17/2007 | | Act AF NSF 5902000 | 342.48 | | |
| 301926 | 1110004 10610 | 300021359-03/17/2007 R | | 03/17/2007 | | Act FF NSF 03/17/07 | 1010.30 | | |
| 301926 | 1110004 10610 | 300021360-03/17/2007 R | | 03/17/2007 | | NSF E1886179 Charge | 50.00 | | |
| 301926 | 1110004 10140 | 300027898 08/23/2007 | A | 08/18/2007 | | Act AF 5900000 | 193.67 | | |
| 301926 | 1110004 10140 | 300027898 08/23/2007 | A | 08/18/2007 | | Act AF 5901000 | 387.33 | | |
| 301926 | 1110004 10140 | 300027898 08/23/2007 | A | 08/18/2007 | | Act AF 5902000 | 387.33 | | |
| 301926 | 1110004 10610 | 300027899 08/23/2007 | A | 08/18/2007 | | Act FF 5300000 | 1142.63 | | |
| 301926 | 1110004 10610 | 300027900 08/18/2007 | | 08/18/2007 | | Nsf E2067673 Charge | 50.00 | | |
| 301926 | 1110004 10610 | 300040069 12/29/2007 | | 12/29/2007 | | Nsf E2237408 Charge | 50.00 | | |
| 301926 | 1110004 10140 | 300040368 01/03/2008 | | 12/29/2007 | | w/e 12/29/07 AF NSF rebill | 793.87 | | |

| PROFIT CENTER | GL CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E TRANSACTION DATE | CHECK NO DESCRIPTION | AMOUNT | EPAY CONFIRM NO ID | INVOICE |
|---|---|---|---|---|---|---|---|---|
| 91926 | 111004 10610 | 300040388 | 01/03/2008 | A 12/29/2007 | w/e 12/29/07 FF rebill NSF | 936.76 | | |
| | | | | TOTAL FOR GL: | 1110004 | 9,870.76 | | |
| 91926 | 1110015 10210 | 300048175 | 04/01/2008 | 04/01/2008 | Atty Fee MTC Dec07 Inv#8032 O'R-D | 112.00 | | |
| | | | | TOTAL FOR GL: | 1110015 | 112.00 | | |
| | | | | | | 112.00 | | |
| 91926 | 1130000 10610 | 500012396 | 04/04/2008 | 04/04/2008 | Renewal of MOLA for Dunkin Donuts | 150.00 | | |
| | | | | TOTAL FOR GL: | 1130000 | 150.00 | | |
| | | | | TOTAL FOR BRAND : | DD | 28,168.52 | | |
| | | | | TOTAL FOR CUSTOMER : | | 28,168.52 | | |
| | | | | REPORT GRAND TOTAL : | | 28,168.52 | | |

CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

RUN DATE: 28-APR-08
USER : GZULLIG
CUSTOMER: 5259
LOCATION:

Dunkin' Brands Inc
**********************
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF: 2008/04/28 00:00:00

Laxmi Donuts, Inc.
1002 ROUTE 94
VAILS GATE NY 12584
55630

SHOP ADDRESS:
1002 ROUTE 94
VAILS GATE NY 12584
55630

Page 1 of 4

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 54729 | 11001 | 10610 | 403315985 | 05/06/2008 | E | 03/01/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1111.36 | NA | |
| 54729 | 11001 | 10140 | 403303224 | 03/06/2008 | E | 03/01/2008 | | 5900000 INDIRECT FUND INCOME | 226.81 | NA | |
| 54729 | 11001 | 10140 | 403303224 | 03/06/2008 | E | 03/01/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 453.62 | NA | |
| 54729 | 11001 | 10140 | 403303224 | 03/06/2008 | E | 03/01/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 453.62 | NA | |
| 54729 | 11001 | 10140 | 403438929 | 03/13/2008 | E | 03/08/2008 | | 5900000 INDIRECT FUND INCOME | 226.81 | NA | |
| 54729 | 11001 | 10140 | 403438929 | 03/13/2008 | E | 03/08/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 453.62 | NA | |
| 54729 | 11001 | 10140 | 403438929 | 03/13/2008 | E | 03/08/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 453.62 | NA | |
| 304729 | 11001 | 10140 | 403439915 | 03/20/2008 | E | 03/15/2008 | | 5900000 INDIRECT FUND INCOME | 226.81 | NA | |
| 304729 | 11001 | 10140 | 403439915 | 03/20/2008 | E | 03/15/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 453.62 | NA | |
| 54729 | 11001 | 10140 | 403439915 | 03/20/2008 | E | 03/15/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 453.62 | NA | |
| 304729 | 11001 | 10140 | 403441946 | 03/27/2008 | E | 03/22/2008 | | 5900000 INDIRECT FUND INCOME | 217.84 | NA | |
| 304729 | 11001 | 10140 | 403441946 | 03/27/2008 | E | 03/22/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 435.69 | NA | |
| 54729 | 11001 | 10140 | 403441946 | 03/27/2008 | E | 03/22/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 435.69 | NA | |
| 304729 | 11001 | 10610 | 403450887 | 03/13/2008 | E | 03/08/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1111.36 | NA | |
| 54729 | 11001 | 10610 | 403451872 | 03/27/2008 | E | 03/15/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1111.36 | NA | |
| 54729 | 11001 | 10610 | 403453902 | 03/27/2008 | E | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1067.44 | NA | |
| 54729 | 11001 | 10610 | 403458148 | 04/03/2008 | E | 03/29/2008 | | 5300000 CONTINUING FRANCHISE FEES | 994.45 | NA | |
| 54729 | 11001 | 10140 | 403577816 | 04/10/2008 | E | 04/05/2008 | | 5900000 INDIRECT FUND INCOME | 202.95 | NA | |
| 54729 | 11001 | 10140 | 403577816 | 04/10/2008 | E | 04/05/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 405.90 | NA | |
| 54729 | 11001 | 10140 | 403577816 | 04/10/2008 | E | 04/05/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 405.90 | NA | |
| 54729 | 11001 | 10140 | 403578614 | 04/17/2008 | E | 04/12/2008 | | 5900000 INDIRECT FUND INCOME | 202.95 | NA | |
| 54729 | 11001 | 10140 | 403578614 | 04/17/2008 | E | 04/12/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 405.90 | NA | |
| 54729 | 11001 | 10140 | 403578614 | 04/17/2008 | E | 04/12/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 405.90 | NA | |
| 304729 | 11001 | 10140 | 403580644 | 04/24/2008 | E | 04/19/2008 | | 5900000 INDIRECT FUND INCOME | 202.95 | NA | |
| 304729 | 11001 | 10140 | 403580644 | 04/24/2008 | E | 04/19/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 405.90 | NA | |
| 304729 | 11001 | 10140 | 403580644 | 04/24/2008 | E | 04/19/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 405.90 | NA | |
| 304729 | 11001 | 10140 | 403585000 | 05/01/2008 | E | 04/26/2008 | | 5900000 INDIRECT FUND INCOME | 202.95 | NA | |
| 304729 | 11001 | 10140 | 403585000 | 05/01/2008 | E | 04/26/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 405.90 | NA | |
| 304729 | 11001 | 10140 | 403585000 | 05/01/2008 | E | 04/26/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 405.90 | NA | |

| PROFIT CENTER | GL CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 304729 | 1110001 10610 | 403596877 | 05/01/2008 | E | 04/26/2008 | | 5300000 CONTINUING FRANCHISE FEES | 994.45 NA | | |
| 304729 | 1110001 10610 | 403592513 | 04/24/2008 | E | 04/19/2008 | | 5300000 CONTINUING FRANCHISE FEES | 994.45 NA | | |
| 304729 | 1110001 10610 | 403590490 | 04/17/2008 | E | 04/12/2008 | | 5300000 CONTINUING FRANCHISE FEES | 994.45 NA | | |
| 304729 | 1110001 10610 | 403589692 | 04/10/2008 | E | 04/05/2008 | | 5300000 CONTINUING FRANCHISE FEES | 994.45 NA | | |
| | | | | | | | TOTAL FOR GL: 1110001 | 18,938.89 | | |
| 304729 | 1110004 10610 | 100008549 | 02/16/2008 | A | 02/16/2008 | | NSF w/e 02/16/08 5300000 | 214.98 | | |
| 304729 | 1110004 10140 | 100008549 | 02/16/2008 | A | 02/16/2008 | | NSF w/e 02/16/08 5900000 | 429.96 | | |
| 304729 | 1110004 10140 | 100008549 | 02/16/2008 | A | 02/16/2008 | | NSF w/e 02/16/08 5901000 | 429.96 | | |
| 304729 | 1110004 10140 | 100008549 | 02/16/2008 | A | 02/16/2008 | | NSF w/e 02/16/08 5902000 | 429.96 | | |
| 304729 | 1110004 10140 | 100008550 | 02/23/2008 | A | 02/23/2008 | | NSF w/e 02/23/08 5900000 | 202.95 | | |
| 304729 | 1110004 10140 | 100008550 | 02/23/2008 | A | 02/23/2008 | | NSF w/e 02/23/08 5901000 | 405.90 | | |
| 304729 | 1110004 10140 | 100008550 | 02/23/2008 | A | 02/23/2008 | | NSF w/e 02/23/08 5902000 | 405.90 | | |
| 304729 | 1110004 10610 | 100008560 | 02/23/2008 | A | 02/23/2008 | | NSF w/e 02/23/08 5300000 | 994.45 | | |
| 304729 | 1110004 10610 | 100008561 | 02/16/2008 | A | 02/16/2008 | | NSF w/e 02/16/08 5300000 | 1053.40 | | |
| 304729 | 1110004 10610 | 100008576 | 02/16/2008 | | 02/16/2008 | | NSF w/e 02/16/08 Charge | 50.00 | | |
| 304729 | 1110004 10610 | 100008577 | 04/02/2008 | | 04/02/2008 | | NSF w/e 04/02/08 Charge | 50.00 | | |
| 304729 | 1110004 10610 | 100008578 | 02/23/2008 | | 02/23/2008 | | NSF w/e 02/23/08 Charge | 50.00 | | |
| 304729 | 1110004 10140 | 300014231-11/22/2006 | | A R | 11/17/2006 | | ACT AF 5901000 | 215.66 | | |
| 304729 | 1110004 10140 | 300014231-11/22/2006 | | A R | 11/17/2006 | | ACT AF 5902000 | 431.32 | | |
| 304729 | 1110004 10140 | 300014231-11/22/2006 | | A R | 11/17/2006 | | ACT AF 5902000 | 431.32 | | |
| 304729 | 1110004 10610 | 300014232-11/02/2006 | | A R | 10/28/2006 | | ACT FRANCHISE FEEE | 1056.74 | | |
| 304729 | 1110004 10610 | 300014233-10/28/2006 | | A R | 10/28/2006 | | NSF E1713275 CHARGE | 50.00 | | |
| 304729 | 1110004 10140 | 300029900 | 09/27/2007 | A | 09/22/2007 | | Act AF Nsf 5900000 | 203.32 | | |
| 304729 | 1110004 10140 | 300029900 | 09/27/2007 | A | 09/22/2007 | | Act AF Nsf 5901000 | 406.63 | | |
| 304729 | 1110004 10140 | 300029900 | 09/27/2007 | A | 09/22/2007 | | Act AF Nsf 5902000 | 406.63 | | |
| 304729 | 1110004 10610 | 300029901 | 09/27/2007 | | 09/22/2007 | | Act FF Nsf 5300000 | 996.25 | | |
| 304729 | 1110004 10610 | 300029902 | 09/22/2007 | | 09/22/2007 | | Nsf E2109986 Charge | 50.00 | | |
| 304729 | 1110004 10610 | 300032484 | 10/27/2007 | | 10/27/2007 | | NSF E2152059 Charge | 50.00 | | |

| PROFIT CENTER | GL CORP | INVOICE NUMBER | INVOICE DUE DATE | A/E TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|
| 304729 | 111004 10610 | 300038273 | 12/22/2007 | 12/22/2007 | | Nsf E2221546 Charge | 50.00 | | |
| 304729 | 111004 10610 | 300038274 | 12/08/2007 | 12/08/2007 | | Nsf E221538 Charge | 50.00 | | |
| 304729 | 111004 10610 | 300038275 | 12/15/2007 | 12/15/2007 | | Nsf E2221542 Charge | 50.00 | | |
| 304729 | 111004 10140 | 300040430 | 12/13/2007 | 12/08/2007 | | DD AF NSF rebill | 1031.52 | | |
| 304729 | 111004 10140 | 300040431 | 12/20/2007 A | 12/15/2007 | | DD AF NSF rebill | 1044.27 | | |
| 304729 | 111004 10140 | 300040432 | 12/27/2007 A | 12/22/2007 | | DD AF NSF rebill | 1017.08 | | |
| 304729 | 111004 10140 | 300040433 | 11/01/2007 A | 10/27/2007 | | DD AF NSF rebill | 1053.65 | | |
| 304729 | 111004 10610 | 300040434 | 12/13/2007 A | 12/08/2007 | | DD FF NSF rebill | 1010.88 | | |
| 304729 | 111004 10610 | 300040435 | 12/20/2007 A | 12/15/2007 | | DD FF NSF rebill | 1023.39 | | |
| 304729 | 111004 10610 | 300040436 | 12/27/2007 A | 12/22/2007 | | DD FF NSF rebill | 996.74 | | |
| 304729 | 111004 10610 | 300040437 | 11/01/2007 A | 10/27/2007 | | DD FF NSF rebill | 1032.58 | | |
| | | | | | | TOTAL FOR GL: | 1110004 | 16,945.48 | |
| 304729 | 111015 10210 | 300048209 | 04/02/2008 | 04/02/2008 | | Atty Fee NTC Dec07 Inv#8034 O'R-D | 112.00 | | |
| | | | | | | TOTAL FOR GL: | 1110015 | 112.00 | |
| 304729 | 113000 10610 | 300016135-01/01/2007 R | 01/01/2007 | | | E-Learn 3rd Yr. Bill | 360.00 | | |
| 304729 | 113000 10610 | 500012415 | 04/04/2008 | 04/04/2008 | | Renewal of MOJA for Dunkin Donuts | 150.00 | | |
| | | | | | | TOTAL FOR GL: | 1130000 | 510.00 | |
| | | | | | | TOTAL FOR BRAND : | DD | 36,506.37 | |

Page 4 of 4

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|

TOTAL FOR CUSTOMER :                     36,506.37

REPORT GRAND TOTAL :                     36,506.37
                                         ================

CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

RUN DATE: 28-APR-08

CUSTOMER: 5114
ORDER: 19
LOCATION:

Krishna Donuts, Inc.
266 MAIN ST
CORNWALL NY 12518

**Dunkin' Brands Inc**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF: 2008/04/28 00:01:00

SHOP ADDRESS:
310 MAIN ST
Highland Falls NY 10928-2103
55631

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 10252 | 111001 | 10140 | 403304142 | 03/06/2008 | E | 03/01/2008 | 5902000 DIRECT/REGIONAL FUND INCOME | 178.33 | NA | |
| 10252 | 111001 | 10140 | 403304142 | 03/06/2008 | E | 03/01/2008 | 5901000 NATIONAL ADVERTISING INCOME | 178.33 | NA | |
| 10252 | 111001 | 10140 | 403304142 | 03/06/2008 | E | 03/01/2008 | 5900000 INDIRECT FUND INCOME | 89.16 | NA | |
| 10252 | 111001 | 10615 | 403316903 | 03/06/2008 | E | 03/01/2008 | 5300000 CONTINUING FRANCHISE FEES | 526.07 | NA | |
| 10252 | 111001 | 10140 | 403439053 | 03/13/2008 | E | 03/08/2008 | 5902000 DIRECT/REGIONAL FUND INCOME | 178.33 | NA | |
| 10252 | 111001 | 10140 | 403439053 | 03/13/2008 | E | 03/08/2008 | 5901000 NATIONAL ADVERTISING INCOME | 178.33 | NA | |
| 10252 | 111001 | 10140 | 403439053 | 03/13/2008 | E | 03/08/2008 | 5900000 INDIRECT FUND INCOME | 89.16 | NA | |
| 10252 | 111001 | 10140 | 403442529 | 03/20/2008 | E | 03/15/2008 | 5902000 DIRECT/REGIONAL FUND INCOME | 178.00 | NA | |
| 10252 | 111001 | 10140 | 403442529 | 03/20/2008 | E | 03/15/2008 | 5901000 NATIONAL ADVERTISING INCOME | 178.00 | NA | |
| 10252 | 111001 | 10140 | 403442529 | 03/20/2008 | E | 03/15/2008 | 5900000 INDIRECT FUND INCOME | 89.00 | NA | |
| 330252 | 111001 | 10140 | 403440141 | 03/27/2008 | E | 03/22/2008 | 5902000 DIRECT/REGIONAL FUND INCOME | 178.00 | NA | |
| 330252 | 111001 | 10140 | 403440141 | 03/27/2008 | E | 03/22/2008 | 5901000 NATIONAL ADVERTISING INCOME | 178.00 | NA | |
| 330252 | 111001 | 10140 | 403440141 | 03/27/2008 | E | 03/22/2008 | 5900000 INDIRECT FUND INCOME | 89.00 | NA | |
| 330252 | 111001 | 10140 | 403447099 | 04/03/2008 | E | 03/29/2008 | 5902000 DIRECT/REGIONAL FUND INCOME | 173.67 | NA | |
| 330252 | 111001 | 10140 | 403447099 | 04/03/2008 | E | 03/29/2008 | 5901000 NATIONAL ADVERTISING INCOME | 173.67 | NA | |
| 330252 | 111001 | 10140 | 403447099 | 04/03/2008 | E | 03/29/2008 | 5900000 INDIRECT FUND INCOME | 86.84 | NA | |
| 330252 | 111001 | 10615 | 403459056 | 04/03/2008 | E | 03/29/2008 | 5300000 CONTINUING FRANCHISE FEES | 512.34 | NA | |
| 330252 | 111001 | 10615 | 403454085 | 03/27/2008 | E | 03/22/2008 | 5300000 CONTINUING FRANCHISE FEES | 525.09 | NA | |
| 330252 | 111001 | 10615 | 403452098 | 03/20/2008 | E | 03/15/2008 | 5300000 CONTINUING FRANCHISE FEES | 526.07 | NA | |
| 330252 | 111001 | 10615 | 403451021 | 03/13/2008 | E | 03/08/2008 | 5300000 CONTINUING FRANCHISE FEES | 526.07 | NA | |
| 330252 | 111001 | 10140 | 403581241 | 04/24/2008 | E | 04/19/2008 | 5902000 DIRECT/REGIONAL FUND INCOME | 173.67 | NA | |
| 330252 | 111001 | 10140 | 403578844 | 04/17/2008 | E | 04/12/2008 | 5901000 NATIONAL ADVERTISING INCOME | 173.67 | NA | |
| 330252 | 111001 | 10140 | 403578844 | 04/17/2008 | E | 04/12/2008 | 5902000 DIRECT/REGIONAL FUND INCOME | 173.67 | NA | |
| 330252 | 111001 | 10140 | 403577935 | 04/10/2008 | E | 04/05/2008 | 5900000 INDIRECT FUND INCOME | 86.84 | NA | |
| 330252 | 111001 | 10140 | 403577935 | 04/10/2008 | E | 04/05/2008 | 5901000 NATIONAL ADVERTISING INCOME | 173.67 | NA | |
| 330252 | 111001 | 10140 | 403577935 | 04/10/2008 | E | 04/05/2008 | 5902000 DIRECT/REGIONAL FUND INCOME | 173.67 | NA | |
| 330252 | 111001 | 10140 | 403585901 | 05/01/2008 | E | 04/26/2008 | 5900000 INDIRECT FUND INCOME | 86.84 | NA | |
| 330252 | 111001 | 10140 | 403585901 | 05/01/2008 | E | 04/26/2008 | 5901000 NATIONAL ADVERTISING INCOME | 173.67 | NA | |
| 330252 | 111001 | 10140 | 403585901 | 05/01/2008 | E | 04/26/2008 | 5902000 DIRECT/REGIONAL FUND INCOME | 173.67 | NA | |

| PROFIT CENTER | GL CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 350252 | 1110001 10615 | 403597778 | 05/01/2008 | E | 04/26/2008 | | 5300000 CONTINING FRANCHISE FEES | 512.34 NA | | |
| 350252 | 1110001 10615 | 403593116 | 04/24/2008 | E | 04/19/2008 | | 5300000 CONTINING FRANCHISE FEES | 512.34 NA | | |
| 350252 | 1110001 10615 | 403590720 | 04/17/2008 | E | 04/12/2008 | | 5300000 CONTINING FRANCHISE FEES | 512.34 NA | | |
| 350252 | 1110001 10615 | 403589811 | 04/10/2008 | E | 04/05/2008 | | 5300000 CONTINING FRANCHISE FEES | 512.34 NA | | |
| | | | | | | | TOTAL FOR GL: | 1110001 | | 8,618.36 |
| 350252 | 1110004 10615 | 300033315 | 10/25/2007 | | 10/25/2007 | | Nsf Ck 1537 Charge | 50.00 | | |
| 350252 | 1110004 10615 | 300031618 | 10/13/2007 | | 10/13/2007 | | NSF E2135320 Charge | 50.00 | | |
| 350252 | 1110004 10615 | 300040061 | 01/05/2008 | | 01/05/2008 | | Nsf E2231191 Charge | 50.00 | | |
| 350252 | 1110004 10140 | 300040408 | 01/10/2008 | A | 01/05/2008 | | DD AF NSF inv | 417.83 | | |
| 350252 | 1110004 10140 | 300040409 | 10/18/2007 | A | 10/13/2007 | | DD AF NSF rebill | 532.25 | | |
| 350252 | 1110004 10615 | 300040410 | 01/10/2008 | A | 01/05/2008 | | DD FF NSF rebill | 493.04 | | |
| 350252 | 1110004 10615 | 300040411 | 10/18/2007 | A | 10/13/2007 | | DD FF NSF rebill | 628.04 | | |
| | | | | | | | TOTAL FOR GL: | 1110004 | | 2,221.16 |
| 350252 | 1110015 10210 | 300048210 | 04/02/2008 | | 04/02/2008 | | Atty Fee NTC Dec07 Inv#8035 O'R-D | 112.00 | | |
| | | | | | | | TOTAL FOR GL: | 1110015 | | 112.00 |
| | | | | | | | TOTAL FOR BRAND : | DD | | 10,951.52 |
| | | | | | | | TOTAL FOR CUSTOMER : | | | 10,951.52 |

REPORT GRAND TOTAL :

=============================

10,951.52

=============================

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

Case 7:08-cv-02218-WCC Document 22 Filed 05/07/2008 Page 15 of 49

```
RUN DATE: 28-APR-08                                    Dunkin' Brands Inc
USER :    GZILLIG                          ***********************
                                           ACCOUNTS RECEIVABLE STATUS REPORT
CUSTOMER: 3754                             AS OF:  2008/04/28 00:00:00
LOCATION:
```

| LOCATION: | | | SHIP ADDRESS: |
|---|---|---|---|
| Giatri Donuts, Inc. | | | 45 QUAKER AVE |
| 45 QUAKER AVE | | | CORNWALL NY 12518-2127 |
| CORNWALL NY 12518-2127 | | | 47659 |
| 47659 | | | |

| PROFIT CENTER | GL NUMBER | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 112112 | 111001 | 10610 | 403317326 | 03/06/2008 | | 03/01/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1027.40 NA | | |
| 112112 | 111001 | 10140 | 403304565 | 03/06/2008 | E | 03/01/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 419.35 NA | | |
| 112112 | 111001 | 10140 | 403304565 | 03/06/2008 | E | 03/01/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 419.35 NA | | |
| 112112 | 111001 | 10140 | 403304565 | 03/06/2008 | E | 03/01/2008 | | 5900000 INDIRECT FUND INCOME | 209.67 NA | | |
| 112112 | 111001 | 10140 | 403493119 | 03/13/2008 | E | 03/08/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 419.35 NA | | |
| 112112 | 111001 | 10140 | 403493119 | 03/13/2008 | E | 03/08/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 419.35 NA | | |
| 112112 | 111001 | 10140 | 403493119 | 03/13/2008 | E | 03/08/2008 | | 5900000 INDIRECT FUND INCOME | 209.67 NA | | |
| 112112 | 111001 | 10140 | 403442793 | 03/27/2008 | E | 03/22/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 390.49 NA | | |
| 112112 | 111001 | 10140 | 403442793 | 03/27/2008 | E | 03/22/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 390.49 NA | | |
| 112112 | 111001 | 10140 | 403442793 | 03/27/2008 | E | 03/22/2008 | | 5900000 INDIRECT FUND INCOME | 195.25 NA | | |
| 112112 | 111001 | 10140 | 403440259 | 03/20/2008 | E | 03/15/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 419.35 NA | | |
| 112112 | 111001 | 10140 | 403440259 | 03/20/2008 | E | 03/15/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 419.35 NA | | |
| 112112 | 111001 | 10140 | 403440259 | 03/20/2008 | E | 03/15/2008 | | 5900000 INDIRECT FUND INCOME | 209.67 NA | | |
| 112112 | 111001 | 10610 | 403451077 | 03/13/2008 | | 03/08/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1027.40 NA | | |
| 112112 | 111001 | 10140 | 403447521 | 04/03/2008 | E | 03/29/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 371.37 NA | | |
| 112112 | 111001 | 10140 | 403447521 | 04/03/2008 | E | 03/29/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 371.37 NA | | |
| 112112 | 111001 | 10140 | 403447521 | 04/03/2008 | E | 03/29/2008 | | 5900000 INDIRECT FUND INCOME | 185.68 NA | | |
| 112112 | 111001 | 10610 | 403452216 | 03/20/2008 | | 03/15/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1027.40 NA | | |
| 112112 | 111001 | 10610 | 403454748 | 03/27/2008 | | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 956.71 NA | | |
| 112112 | 111001 | 10610 | 403459477 | 04/03/2008 | | 03/29/2008 | | 5300000 CONTINUING FRANCHISE FEES | 909.85 NA | | |
| 112112 | 111001 | 10140 | 403577983 | 04/10/2008 | E | 04/05/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 371.37 NA | | |
| 112112 | 111001 | 10140 | 403577983 | 04/10/2008 | E | 04/05/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 371.37 NA | | |
| 112112 | 111001 | 10140 | 403577983 | 04/10/2008 | E | 04/05/2008 | | 5900000 INDIRECT FUND INCOME | 185.68 NA | | |
| 112112 | 111001 | 10140 | 403578947 | 04/17/2008 | E | 04/12/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 371.37 NA | | |
| 112112 | 111001 | 10140 | 403578947 | 04/17/2008 | E | 04/12/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 371.37 NA | | |
| 112112 | 111001 | 10140 | 403578947 | 04/17/2008 | E | 04/12/2008 | | 5900000 INDIRECT FUND INCOME | 185.68 NA | | |
| 112112 | 111001 | 10140 | 403581521 | 04/24/2008 | E | 04/19/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 371.37 NA | | |
| 112112 | 111001 | 10140 | 403581521 | 04/24/2008 | E | 04/19/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 371.37 NA | | |
| 112112 | 111001 | 10140 | 403581521 | 04/24/2008 | E | 04/19/2008 | | 5900000 INDIRECT FUND INCOME | 185.68 NA | | |
| 112112 | 111001 | 10140 | 403586324 | 05/01/2008 | E | 04/26/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 371.37 NA | | |
| 112112 | 111001 | 10140 | 403586324 | 05/01/2008 | E | 04/26/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 371.37 NA | | |
| 112112 | 111001 | 10140 | 403586324 | 05/01/2008 | E | 04/26/2008 | | 5900000 INDIRECT FUND INCOME | 185.68 NA | | |

| PROFIT CENTER | GL CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/B | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 332132 | 1110001 10610 | 403589859 | 04/10/2008 | E | 04/05/2008 | | 5300000 CONTINUING FRANCHISE FEES | 909.85 | NA | |
| 332132 | 1110001 10610 | 403590823 | 04/17/2008 | E | 04/12/2008 | | 5300000 CONTINUING FRANCHISE FEES | 909.85 | NA | |
| 332132 | 1110001 10610 | 403593395 | 04/24/2008 | E | 04/19/2008 | | 5300000 CONTINUING FRANCHISE FEES | 909.85 | NA | |
| 332132 | 1110001 10610 | 403598200 | 05/01/2008 | E | 04/26/2008 | | 5300000 CONTINUING FRANCHISE FEES | 909.85 | NA | |
| | | | | | | TOTAL FOR GL: | 1110001 | 17,351.60 | | |
| 332132 | 1110004 10140 | 300029896 | 09/27/2007 | A | 09/22/2007 | | Act AF Nsf 5900000 | 190.26 | | |
| 332132 | 1110004 10140 | 300029896 | 09/27/2007 | A | 09/22/2007 | | Act AF Nsf 5901000 | 380.53 | | |
| 332132 | 1110004 10140 | 300029896 | 09/27/2007 | A | 09/22/2007 | | Act AF Nsf 5902000 | 380.53 | | |
| 332132 | 1110004 10610 | 300029897 | 09/27/2007 | A | 09/22/2007 | | Act FF Nsf 5300000 | 932.29 | | |
| 332132 | 1110004 10610 | 300029898 | 09/22/2007 | | 09/22/2007 | | Nsf E2109834 Charge | 50.00 | | |
| 332132 | 1110004 10140 | 300030448 | 10/04/2007 | A | 09/29/2007 | | Act AF Nsf 5900000 | 189.01 | | |
| 332132 | 1110004 10140 | 300030448 | 10/04/2007 | A | 09/29/2007 | | Act AF Nsf 5901000 | 378.03 | | |
| 332132 | 1110004 10140 | 300030448 | 10/04/2007 | A | 09/29/2007 | | Act AF Nsf 5902000 | 378.03 | | |
| 332132 | 1110004 10610 | 300030450 | 10/04/2007 | A | 09/29/2007 | | Act FF Nsf 5300000 | 926.17 | | |
| 332132 | 1110004 10610 | 300030453 | 09/29/2007 | | 09/29/2007 | | Nsf E2117891 Charge | 50.00 | | |
| | | | | | | TOTAL FOR GL: | 1110004 | 3,854.85 | | |
| 332132 | 1110015 10210 | 300048211 | 04/02/2008 | | 04/02/2008 | | Atty Fee NYC Dec07 Inv#8036 O'R-D | 112.00 | | |
| | | | | | | TOTAL FOR GL: | 1110015 | 112.00 | | |
| 332132 | 1130000 10610 | 100003671 | 11/21/2007 | | 11/21/2007 | | E-Learning Renewal thru 5/31/2008 | 300.00 | | |
| | | | | | | TOTAL FOR GL: | 1130000 | 300.00 | | |

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R DATE | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|

TOTAL FOR BRAND :   ID        21,618.45

TOTAL FOR CUSTOMER :        21,618.45

REPORT GRAND TOTAL :        21,618.45

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

Case 7:08-cv-04218-WCC    Document 15-5    Filed 05/07/2008    Page 18 of 19

RUN DATE: 28-APR-08

Dunkin' Brands Inc
*********************
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF: 2008/04/28 00:00:00

USER : GZILLIG
CUSTOMER: 14300
LOCATION:

Shreeji Donuts, Inc.
266 Main St
CORNWALL NY 12518

SHOP ADDRESS:
122 S. Robinson Ave
Newburgh NY 12550-5822

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52639 | 1110001 | 10140 | 403444462 | 03/27/2008 | E | 03/22/2008 | | 5900000 INDIRECT FUND INCOME | 121.00 | NA | |
| 52639 | 1110001 | 10140 | 403444462 | 03/27/2008 | E | 03/22/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 242.00 | NA | |
| 52639 | 1110001 | 10140 | 403444462 | 03/27/2008 | E | 03/22/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 242.00 | NA | |
| 52639 | 1110001 | 10140 | 403449905 | 04/03/2008 | E | 03/29/2008 | | 5900000 INDIRECT FUND INCOME | 188.99 | NA | |
| 52639 | 1110001 | 10140 | 403449905 | 04/03/2008 | E | 03/29/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 377.99 | NA | |
| 52639 | 1110001 | 10140 | 403449905 | 04/03/2008 | E | 03/29/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 377.99 | NA | |
| 52639 | 1110001 | 10615 | 403456417 | 03/27/2008 | E | 03/22/2008 | | 5300000 CONTINUING FRANCHISE FEES | 713.90 | NA | |
| 342639 | 1110001 | 10615 | 403461861 | 04/03/2008 | E | 03/29/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1115.06 | NA | |
| 342639 | 1110001 | 10140 | 403578237 | 04/10/2008 | E | 04/05/2008 | | 5900000 INDIRECT FUND INCOME | 188.99 | NA | |
| 342639 | 1110001 | 10140 | 403578237 | 04/10/2008 | E | 04/05/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 377.99 | NA | |
| 342639 | 1110001 | 10140 | 403578237 | 04/10/2008 | E | 04/05/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 377.99 | NA | |
| 342639 | 1110001 | 10140 | 403579661 | 04/17/2008 | E | 04/12/2008 | | 5900000 INDIRECT FUND INCOME | 188.99 | NA | |
| 342639 | 1110001 | 10140 | 403579661 | 04/17/2008 | E | 04/12/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 377.99 | NA | |
| 342639 | 1110001 | 10140 | 403579661 | 04/17/2008 | E | 04/12/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 377.99 | NA | |
| 342639 | 1110001 | 10140 | 403583228 | 04/24/2008 | E | 04/19/2008 | | 5900000 INDIRECT FUND INCOME | 188.99 | NA | |
| 342639 | 1110001 | 10140 | 403583228 | 04/24/2008 | E | 04/19/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 377.99 | NA | |
| 342639 | 1110001 | 10140 | 403583228 | 04/24/2008 | E | 04/19/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 377.99 | NA | |
| 342639 | 1110001 | 10140 | 403588704 | 05/01/2008 | E | 04/26/2008 | | 5900000 INDIRECT FUND INCOME | 188.99 | NA | |
| 342639 | 1110001 | 10140 | 403588704 | 05/01/2008 | E | 04/26/2008 | | 5901000 NATIONAL ADVERTISING INCOME | 377.99 | NA | |
| 342639 | 1110001 | 10140 | 403588704 | 05/01/2008 | E | 04/26/2008 | | 5902000 DIRECT/REGIONAL FUND INCOME | 377.99 | NA | |
| 342639 | 1110001 | 10615 | 403590113 | 04/10/2008 | E | 04/05/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1115.06 | NA | |
| 342639 | 1110001 | 10615 | 403591536 | 04/17/2008 | E | 04/12/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1115.06 | NA | |
| 342639 | 1110001 | 10615 | 403595102 | 04/24/2008 | E | 04/19/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1115.06 | NA | |
| 342639 | 1110001 | 10615 | 403600580 | 05/01/2008 | E | 04/26/2008 | | 5300000 CONTINUING FRANCHISE FEES | 1115.06 | NA | |

TOTAL FOR GL: 1110001    11,639.05

------------
11,639.05
------------

Page 2 of 2

| PROFIT CENTER | GL CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|

TOTAL FOR BRAND : DD

---------------
11,619.05
---------------

TOTAL FOR CUSTOMER :

---------------
11,619.05
---------------

REPORT GRAND TOTAL :

=================
11,619.05
=================

CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.





UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DUNKIN' DONUTS INCORPORATED;
BASKIN-ROBBINS USA, CO.; TOGO'S
EATERIES, INC.; AND THIRD DUNKIN'
DONUTS REALTY, INC.,

        Plaintiffs,

    -against-                          02-CV-857
                                         (LEK/RFT)

JAS DONUT, INC.; RED HOOK
DONUTS, INC.; JENKIN DONUTS, INC.;
BROADWAY DONUTS, LLC; JAMES
STEFANOWICZ; AND BRIDGETT
STEFANOWICZ,

        Defendants.

_____

### MEMORANDUM-DECISION AND ORDER

Presently before the Court are two motions by Plaintiffs Dunkin' Donuts, Inc. ("Dunkin'

Donuts"), Baskin-Robbins USA, Co. ("Baskin-Robbins"), Togo's Eateries, Inc. ("Togo's"), and Third

Dunkin' Donuts Realty, Inc. ("Third Dunkin' Donuts Realty") (collectively, "Plaintiffs"). The first is

for the entry of a default judgment against Defendants JAS Donut, Inc., Red Hook Donuts, Inc.,

Jenkin Donuts, Inc., Broadway Donuts, LLC, James Stefanowicz, and Bridgett Stefanowicz

(collectively, "Defendants") for failure to answer or otherwise respond to Plaintiff's Complaint. The

second motion is for a preliminary injunction (i) enjoining Defendants from using Plaintiffs'

trademarks, trade name and trade dress; (ii) ordering Defendants to perform their post-termination

obligations under the franchise agreements with Plaintiffs; and (iii) ordering Defendant JAS Donut,

Inc. to perform its post-termination obligations under its lease and to surrender possession of its store

to Third Dunkin' Donuts Reality, Inc.

## I.    Background

Plaintiffs Dunkin' Donuts, Baskin-Robbins, and Togo's are franchisors of Dunkin' Donuts,

Baskin-Robbins, and Togo's franchises and the owners or exclusive licensees of their trademarks.

Plaintiff Third Dunkin' Donuts Realty, Inc. leases the premises of a combination Dunkin'

Donuts/Baskin-Robbins/Togo's franchise (the "Trombo") to Defendant JAS Donut, Inc. Defendants

are franchisees of three Dunkin' Donuts franchises and the Trombo. These franchises are operated

pursuant to four different franchise agreements (collectively the "Franchise Agreements").[1]  On

February 28, 2002, Plaintiffs and Defendants entered into a settlement agreement (the "Settlement

Agreement") under which Defendants agreed to pay Plaintiffs overdue obligations totaling

$87,184.52 in 36 monthly payments while remaining current in their obligations to Plaintiffs.

---

[1]A Dunkin' Donuts store is operated at 297 Wall Street in Kingston, New York pursuant
to a franchise agreement between Dunkin' Donuts and Jenkin Donuts and James S. Stefanowicz,
entered into on June 1, 1991. The Dunkin' Donuts store located at 112 South Broadway in Red
Hook, New York is operated pursuant to a franchise agreement between Dunkin Donuts and Red
Hook Donuts and James Stefanowicz, entered into on August 1, 1994.  A third Dunkin' Donuts
store is operated at 575 Broadway in Kingston, New York pursuant to a franchise agreement
between Dunkin' Donuts and Broadway Donuts LLC, entered into on July 28, 1997.  Finally, the
Trombo is operated at 585 Ulster Avenue in Kingston, New York pursuant to a franchise
agreement between Dunkin' Donuts, Baskin-Robbins, and Togo's and JAS Donuts Inc., entered
into on July 11, 2001.

Defendants failed to make the required payments under the Settlement Agreement. On May 21, 2002, Plaintiffs sent Defendants notices of their failure to fulfill their obligations under the Franchise Agreements, the Trombo lease, and the Settlement Agreement. These notices went unanswered. On June 20, 2002, Defendants were notified that the Franchise Agreements and Trombo lease had been terminated because of Defendants' failure to cure the defaults.

On June 28, 2002, Plaintiffs filed the present action, alleging that Defendants (i) breached their contractual obligations to Plaintiffs; (ii) are infringing and diluting Plaintiffs' trademarks; and (iii) are engaging in unfair competition. On August 28, 2002, in light of Defendant's failure to respond to the Complaint, the Clerk entered the default of Defendants. On the same day, Plaintiffs requested that a default judgment be entered against Defendants and moved for the issuance of a preliminary injunction. Defendants then filed an Answer, an Attorney Affirmation opposing the request for the entry of a default judgment, and a Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction. Oral argument on the preliminary injunction motion was heard on December 12, 2002.

**II. Discussion**

**A.    Preliminary Injunction**

1.    Legal Standard

"'A party seeking a preliminary injunction must establish irreparable harm and either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor.'" Pogliani v. U.S. Army Corps of Engineers, 306 F.3d 1235, 1238 (2d Cir. 2002) (per curiam) (quoting Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002)). When a preliminary injunction will alter the status quo or "will provide the movant with

3

substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," a heightened standard is applied. Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 33-34 (2d Cir. 1995). Under this heightened standard, an injunction should issue "'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" Tom Doherty Assocs., 60 F.3d at 34 (quoting Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985)). In the present case, Plaintiffs seek (i) to bar Defendants from using its trademarks, trade name, and trade dress during the pendency of this action; and (ii) to compel Plaintiffs to vacate the Trombo premises. Because such an injunction would alter the status quo, this Court will apply the heightened standard.

"A decision to grant or deny a preliminary injunction is committed to the discretion of the district court." Polymer Technology Corp. v. Mimran, 37 F.3d 74, 78 (2d Cir. 1994) (citing Coca-Cola Co. v. Tropicana Prods., Inc., 690 F.2d 312, 315 (2d Cir. 1982)). The Second Circuit will "review the grant of a preliminary injunction for an abuse of discretion, and 'will reverse the district court only if it relied on clearly erroneous findings of fact, misapprehended the law, or erred in formulating the injunction.'" Maryland Casualty Co. v. Realty Advisory Bd. On Labor Relations, 107 F.3d 979, 984 (2d Cir. 1997) (quoting Int'l Dairy Food Ass'n v. Amestoy, 92 F.3d 67, 70 (2d Cir. 1996)).

1.    Irreparable Harm

    a. Defendants' Use of Plaintiffs' Trademarks

Plaintiffs contend that they will suffer irreparable harm if Defendants use Plaintiffs trademarks without authorization during the pendency of this action. A trademark owner may establish that it will suffer irreparable harm by showing that the defendant's use of the mark is

4

unlawful and is likely to confuse customers as to the sponsorship of the trademarked product.  See Church of Scientology Int'l v. Elmira Mission, 794 F.2d 38, 43 (2d Cir. 1986) ("When in the licensing context unlawful use and consumer confusion have been demonstrated, a finding of irreparable harm is automatic.")

Under the Franchise Agreements, Defendants are obliged to cease using Plaintiffs trademarks upon the valid termination of the Franchise Agreements.  Defendants argue that the termination of the Franchise Agreement was wrongful because "they had been fraudulently induced into entering the [Trombo] franchise agreement and lease and that, as a result thereof, they have been unable (not unwilling) to pay all of their royalties and advertising fees."  (Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction at 6 (emphasis in original).)  In other words, Defendants contend that because Plaintiffs fraudulently induced then into entering into an agreement under which they incurred losses that prevented them from fulfilling their contractual obligations to Plaintiffs, Plaintiffs' termination of the Franchise Agreements was invalid.  However, Plaintiffs have offered little more than bare accusations of fraud.  They have failed to identify the content of the alleged misrepresentations, who made them, or when they were made.  In addition, Plaintiffs note that Defendant James Stefanowicz signed a receipt for the Uniform Franchise Offering Circular which states that Plaintiffs make no projections of future sales, costs, or profits.  Plaintiffs' fraudulent inducement counterclaim does not militate in favor of a finding that the Franchise Agreements were wrongfully terminated.

Defendants also maintain (i) that the non-payment of their contractual obligations may not constitute a material breach; (ii) that Plaintiffs have acquiesced in Defendants' use of Plaintiffs' trademarks by recently accepting some franchise fees from Defendants; and (iii) that Plaintiffs have

5

acted with "unclean hands." None of these arguments are convincing. Non-payment of franchise fees clearly constitutes a material breach of a franchise agreement. The Franchise Agreements expressly provide that Plaintiffs' acceptance of Defendants' payments following Defendants' breach of the Franchise Agreements does not waive the breach. Finally, Defendants do not explain how Plaintiffs have acted with unclean hands. It is therefore likely that the Franchise Agreements were lawfully terminated.

When a former licensee of a trademark continues to use the trademark after the valid revocation of the licensing agreement, customers are likely to be confused. Defendants' customers are bound to associate products bearing Plaintiffs' trademarks with Plaintiffs. Thus, if Defendants continue to use Plaintiffs' trademarks, customers are apt to draw the erroneous conclusion that Plaintiffs sponsor Defendants' products. See Church of Scientology, 794 F.2d at 44; see also Southland Corp. v. Froelich, 41 F. Supp.2d 227, 243 (E.D.N.Y. 1999) (collecting cases).

In sum, the Court finds that Defendants' use of Plaintiffs' trademarks is unauthorized and likely to create customer confusion. Accordingly, Plaintiffs have clearly established that they will suffer irreparable harm if Defendants are not enjoined from using Plaintiffs' trademarks.

b. Defendants' Occupation of the Trombo Premises

Defendants maintain that "[b]y enforcing the terms of the [Trombo] Lease, this Court will prevent customer confusion and the loss of goodwill that will necessarily flow from the elimination of the [Trombo] Premises as the site of a Dunkin' Donuts/Baskin-Robbins/Togo's store." (Plaintiffs' Memorandum of Law in Support of their Motion for a Preliminary Injunction at 22.) The Court agrees. The Trombo lease provides that Defendants must use the premises for the operation of the Trombo. The lease also provides that Plaintiff Third Dunkin' Donuts Realty is entitled to terminate

6

the lease and repossess the premises upon Defendants' default under the lease. For the reasons set forth in the preceding section, customer confusion will likely result from Defendants' operation of the Trombo without Plaintiffs' authorization. If Defendants are enjoined from using Plaintiffs' trademarks, it is doubtful that Plaintiffs could use the Trombo premises in a way that did not violate the injunction. Moreover, even if Defendants could use these premises in a non-infringing manner, Plaintiffs are likely to suffer a loss of goodwill as a result of the elimination of the Trombo. The Court therefore finds that if Plaintiffs lawfully terminated the Trombo lease, they will suffer irreparable harm from Defendants' occupation of the Trombo site. Cf. The Southland Corp v. Forelich, 41 F.Supp.2d 227, 242-43 (E.D.N.Y. 1999) (finding that franchisor will suffer irreparable harm to its property rights if the franchisee continues to occupy leased premises after the valid termination of the lease).

It is undisputed that Defendants have failed to meet their obligations under the Trombo lease. It is also undisputed that Plaintiffs have the right to repossess the premises upon Defendants' breach of the lease. In addition, for the reasons given above, Defendants' arguments that they were fraudulently induced into signing the Trombo franchise agreement, that their breach was not material, that Plaintiffs acquiesced, or that Plaintiffs acted with unclean hands does not forcefully counter Plaintiffs' argument that the Trombo lease was lawfully terminated. It therefore appears that Plaintiffs' termination of the Trombo lease was lawful. Consequently, Plaintiffs have clearly established that they will suffer irreparable harm if Defendants continue to occupy the Trombo site.

     c. Performance of Post-Termination Obligations

Plaintiffs move for an injunction compelling Defendants "to perform their post-termination obligations" under the Franchise Agreements and the Trombo lease. (Order to Show Cause at 2.)

However, Plaintiffs have limited their discussion of irreparable harm to harm that will result from Defendants' trademark, service mark, and trade dress infringement and Defendants' occupation of the Trombo premises.  Accordingly, to the extent that Plaintiffs' motion for a preliminary injunction requests anything other than an injunction (i) enjoining Defendants, their employees, agents, servants, and persons acting on their behalf from using the Plaintiffs' trademarks, trade name, and trade dress; and (ii) compelling Defendants to vacate the Trombo premises, the motion is denied.

2.    Likelihood of Success on the Merits

a.    Trademark Claim

Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)(a)) provides:

> Any person who shall, without the consent of the registrant use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant. . . .

15 U.S.C. § 1114(1)(a).  A claim brought under § 32 of the Lanham Act is likely to succeed on the merits where the plaintiff establishes that the defendant's use of the plaintiff's mark will lead to customer confusion.  See Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 73 (2d Cir. 1988) ("In a Lanham Act case a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm, assuming that the plaintiff has a protectible mark.") (citations omitted).  As discussed above, Plaintiffs have established that Defendants' use of Plaintiffs' marks will create customer confusion.  Consequently, Plaintiffs are likely to succeed on their Lanham Act claim.

Because Plaintiffs have established that they will suffer irreparable harm if Defendants are not enjoined from using Plaintiffs' trademarks, service marks, and trade dress during the pendency of this action and that they are likely to succeed on their Lanham Act claims, this Court finds that Plaintiffs

8

have made a clear showing that they are entitled to a preliminary injunction enjoining Defendants, their employees, agents, servants, and persons acting on their behalf from using Plaintiffs' trademarks, trade name, and trade dress.[2]

### b. Breach of Lease Claim

As explained above, Defendants concede that they have not made the payments required under the Trombo lease and their affirmative defenses and counterclaim do not forcefully challenge Plaintiffs' argument that the Trombo lease was lawfully terminated. Accordingly, Plaintiffs have demonstrated that they are likely to succeed on their breach of lease claim.

Because Plaintiffs have established that they will suffer irreparable harm if Defendants are not enjoined from occupying the Trombo premises and that they are likely to succeed on their breach of lease claim, this Court finds that Plaintiffs have made a clear showing that they are entitled to a preliminary injunction ordering Defendants to vacate the Trombo premises and to surrender possession thereof to Third Dunkin' Donuts Realty, Inc.

## B. Default Judgment

Under Rule 55(a) of the Federal Rules of Civil Procedure, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." Fed.R.Civ.P. 55(a). On August 28, 2002, the clerk entered Defendants' default. Under Rule 55(c), the Court may set aside an entry of default "[f]or good cause." Fed.R.Civ.P. 55(c).[3] "In determining

---

[2]In light of this holding, it is not necessary for the Court to determine whether Plaintiffs are likely to succeed on their breach of contract and unfair competition claims.

[3]The Court construes the Affirmation of Attorney (Docket No. 7) as a request to set aside
(continued...)

9

whether to set aside a party's default, the district court should consider principally '(1) whether the

default was willful; (2) whether setting aside the default would prejudice the adversary; and (3)

whether a meritorious defense is presented.'" Powerserve Int'l, Inc. v. Lavi, 239 F.3d 508, 514 (2d

Cir. 2001) (citing Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir.1993)). Courts may also

consider additional equitable factors, such as whether the failure to comply with a procedural rule

"was a mistake made in good faith and whether the entry of default would bring about a harsh or

unfair result." Enron Oil Corp., 10 F.3d at 96 (citing Sony Corp. v. Elm States Elecs., Inc. 800 F.2d

317, 320 (2d Cir. 1986)). "[B]ecause defaults are generally disfavored and are reserved for rare

occasions, when doubt exists as to whether a default should be granted or vacated, the doubt should

be resolved in favor of the defaulting party." Enron Oil Corp., 10 F.3d at 96.

The Second Circuit has "interpreted 'willfulness,' in the context of a default, to refer to

conduct that is more than merely negligent or careless." S.E.C. v. McNulty, 137 F.3d 732, 738 (2d

Cir. 1998) (citations omitted). The Defendants note that the lawyer whom they have previously

retained does not practice in federal court. They also state that when they received the Complaint,

they were in the process of negotiating the sale of the franchises, which could have mooted Plaintiffs'

claims. However, on August 20, 2002, the potential buyers decided not to purchase the franchises.

Plaintiffs then actively sought legal counsel to respond to Plaintiff's Complaint, but found it difficult

to locate an attorney who practiced in federal court. Plaintiffs finally retained an attorney in this

matter in mid-September and an answer was filed on September 23. Thus, Defendants' answer was

filed approximately nine weeks late. The Court finds that the circumstances surrounding the late

---

³(...continued)
the default entry and Plaintiffs' Reply Memorandum of Law in Support of their Application for a
Default Judgment (Docket No. 10) as Plaintiffs' opposition to Defendants' request.

10

filing of Defendants' Answer demonstrate that the Defendants' conduct was merely negligent or careless and was not egregious or intended to obstruct.

In their Answer, Defendants assert affirmative defenses and a counterclaim. In the context of a motion to vacate an entry of default, a defendant need not establish that his defense "will carry the day." Enron Oil Corp., 10 F.3d at 98. Rather, the defendant must show that "the evidence submitted, if proven at trial, would constitute a complete defense." Id. Defendants' affirmative defenses and counterclaim are "sketchy and may not survive the rigors of an attack by motion or trial." Nat'l Union Fire Insurance Co. of Pittsburgh v. Saunders, No. 88-Civ.-6580, 1992 WL 80732, at *2 (S.D.N.Y. April 6, 1992). However, in light of the strong preference for adjudicating cases on the merits, the Court finds that Defendants have presented a "meritorious defense."

Finally, Plaintiffs will not be prejudiced if the Court vacates the entry of default. Plaintiffs' have suffered little delay from the lateness of Defendants' Answer. More importantly, the preliminary injunction will prevent Defendants' from causing any harm to Plaintiffs' trademarks while the action is pending. Accordingly, Plaintiffs' request for a default judgment is denied and the default entry shall be vacated.

**III     CONCLUSION**

For the reasons stated above, it is hereby:

ORDERED, that Plaintiff's Request for Default Judgment is **DENIED**; and it is further

ORDERED, that the Clerk **VACATE** the default entered on August 28, 2002; and it is further

ORDERED, that Defendants, their employees, agents, servants, and persons acting on their behalf are enjoined from using Plaintiffs' trademarks, trade name, and trade dress; and it is further

ORDERED, that Defendants vacate the Trombo premises and surrender possession thereof to

11

Third Dunkin' Donuts Realty, Inc. within fifteen (15) days from the date of filing of this Order, and it is further

ORDERED that the Clerk of the Court shall serve copies of this order by regular mail upon the parties to this action.

IT IS SO ORDERED.

DATED:      December *30*, 2002
            Albany, New York

HONORABLE LAWRENCE E. KAHN
UNITED STATES DISTRICT JUDGE

1998 WL 160823
**(Cite as: 1998 WL 160823 (N.D.N.Y.))**

**C**
Only the Westlaw citation is currently available.


United States District Court, N.D. New York.

DUNKIN' DONUTS INCORPORATED, a Delaware corporation, Plaintiff,
v.
DOWCO, INC., a New York corporation, Richard B. Cowles, Edith D. Cowles,
Charles E. Dowse, Najib Georges and Tri-Star Holding Corporation, Defendants.

**No. CIV. 5:98-CV-166.**

March 31, 1998.

Hancock & Estabrook, LLP, Attorneys for plaintiff, Syracuse, David E. Peebles, Esq.

Schmeltzer, Aptaker & Shepard, PC, Attorneys for plaintiff, Washington, DC, Stephen Horn, Esq., Robert L. Zisk, Esq., Steven A. Browne, Esq.

Holmberg, Galbraith, Holmberg & Orkin, Attorneys for defendants, Ithaca, Dirk A. Galbraith, Esq., of Counsel.


INTRODUCTION

POOLER, D.J.

**\*1** By an order to show cause application dated February 11, 1998, plaintiff Dunkin Donuts, Inc. sought a preliminary injunction against defendants Dowco, Inc., et al. (collectively, "Dowco"). After approving an accelerated briefing schedule, I heard oral argument on the motion on March 2, 1998. Dkt. No. 6.

BACKGROUND

Plaintiff is a franchisor of well-known donut shops located throughout the United States. Defendants are former franchisees of three Dunkin Donut shops located in Ithaca and Dryden, New York. Richard B. and Edith D. Cowles were shareholders, officers and directors of Dowco, Inc., which had a franchise relationship with plaintiff. Richard B. Cowles Aff., Dkt. No. 10, ¶ 4. By franchise agreements dated October 25, 1990, Dowco operated two Dunkin Donuts shops in Ithaca, New York. Dkt. No. 4, Ex. F. By a franchise agreement

dated September 7, 1994, Dowco operated a Dunkin Donuts shop at 89 North Street in Dryden, New York. *Id.* Ex. B. Dowco leased the Dryden shop premises from Tri-Star Holding Corp., of which Edith Cowles is the sole shareholder, officer and director. Cowles Aff., Dkt. No. 10, ¶¶ 3, 5. *See also* Dkt. No. 4, Ex. C (lease agreement). The lease between Tri-Star Holding Corp. and Dowco was for a term of twenty years commencing on October 1, 1994. Dkt. No. 4, Ex. C at ¶ 2.

Defendants do not dispute that on October 4, 1994, they received via fax a blank form lease option agreement and assignment of lease from Dunkin Donuts. Cowles Aff., Dkt. No. 10, ¶ 13. The Cowles completed the forms, signed them on behalf of both Dowco and Tri-Star Holding Corp., and faxed them back to Dunkin Donuts' offices. *Id.* Richard Cowles claims that neither he nor his wife read the contracts they signed. *Id.* Nearly a month later, Lawrence C. Foster of Dunkin Donuts sent Richard and Edith Cowles hard copies of the same documents and requested that they sign and return the contracts. *Id.* ¶ 15 & Ex. C. Richard Cowles at that time declined to sign the hard copies. *Id.* ¶ 16. There is no dispute that Dunkin Donuts never signed and executed the documents it now seeks to enforce. Dkt. No. 4, Exs. D & E. Most generally, the lease option agreement provides that if Dowco's franchise with Dunkin Donuts terminates, then landlord Tri-Star Holding Corp. shall give Dunkin Donuts the option of assuming Dowco's lease and continuing to operate a Dunkin Donuts shop at the Dryden location. *Id.* Ex. D.

Although the parties dispute the circumstances under which their relationship deteriorated and ended, there is no question that Dunkin Donuts terminated all three of the Dowco franchises on December 9, 1997. Dkt. No. 4, Ex. F. By letter dated January 9, 1998, Dowco notified Dunkin Donuts that landlord Tri-Star Holding Corp. had terminated the "month to month" leases on all three of the former Dunkin Donut shop locations effective January 31, 1998. *Id.* Ex. H. Plaintiff also received a notice dated January 16, 1998, that Dowco's assets would be sold to Vermont Mountain Coffee Shoppes, Inc., ("Vermont Mountain") on January 31, 1998. *Id.* Ex. I. Although plaintiffs suggest a business relationship between defendants and Vermont Mountain, Richard Cowles states that "[n]either [his] wife nor [he] own any corporate stock of Vermont Mountain Coffee Shoppes, Inc., nor are [they] officers, directors or employees of that corporation." Cowles Aff., Dkt. No. 10, ¶ 7. The three former Dunkin Donuts shops in Ithaca and Dryden began operating as Vermont Mountain shops in the beginning of February 1998.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**\*2** On January 23, 1998, Dunkin Donuts sent Tri-Star Holding Corp. and Dowco, Inc. notices of election under the lease option agreement for the Dryden shop location. Dkt. No. 4, Exs. J & K. Defendants responded by letter dated January 27, 1998, that no lease option agreement was in force between the parties. *Id.* Ex. L. Plaintiffs sent a second notice to defendants on February 5, 1998. *Id.* Ex. M.

Dunkin Donuts filed this lawsuit on January 30, 1998, seeking injunctive relief. Dkt. No. 1. Plaintiffs filed an amended complaint on February 10, 1998. Dkt. No. 3. Defendants filed an answer on February 23, 1998, and asserted a counterclaim alleging that Dunkin Donuts committed antitrust violations during the course of their franchise relationship. Dkt. No. 9.

DISCUSSION
I. Preliminary injunction standard

The granting of a preliminary injunction is a "drastic" remedy, but it is well within the discretion of the court. *Borey v. National Union Fire Ins. Co.,* 934 F.2d 30, 33 (2d Cir.1991). A party seeking a preliminary injunction must show (1) that it is likely to suffer possible irreparable injury if the injunction is not granted and (2) either (a) a likelihood of success on the merits of the case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. [FN1] *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990).

> FN1. Defendants offer a slightly different preliminary injunction standard incorporating, among other things, consideration of the public interest in granting or denying relief. However, defendant has not cited Second Circuit case law in support of its formulation. *See Aoude v. Mobil Oil Corp.,* 862 F.2d 890, 892 (1st Cir.1988).

The threshold issue under this analysis is the determination regarding irreparable harm. This requirement is the "single most important prerequisite" for the issuance of injunctive relief and must be satisfied before the other issues in the preliminary injunction standard are addressed. *Id.* at 907 (quotation omitted); *see also Borey,* 934 F.2d at 34. The moving party must show that the irreparable harm is imminent rather than remote or speculative, and it must demonstrate that the injury is "one incapable of being fully remedied by monetary damages." *Reuters,* 903 F.2d at 907. In general, monetary loss will not constitute irreparable harm. *Borey,* 934 F.2d at 34;

*JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990). The second preliminary injunction requirement, concerning likelihood of success on the merits, requires examination of the parties' underlying dispute. *See Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 972-74 (2d Cir.1989).

Plaintiff acknowledges that its injunction might be characterized as a mandatory injunction. A mandatory injunction requires a heightened analysis of the merits of the underlying claim so that the movant must demonstrate a greater likelihood of success by a clear or substantial showing. *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 34 (2d Cir.1995). While the typical preliminary injunction is prohibitory and seeks to maintain the status quo, a mandatory injunction "is said to alter the status quo by commanding some positive act." *Id.* Although Dunkin Donuts claims that it seeks to maintain the status quo of a Dunkin Donuts shop at the Dryden location, it also is true that plaintiff seeks the positive act of specific performance of the lease option agreement. The Second Circuit has held that the view of the "status quo" may vary based on the party's perspective. *Id.* More helpful is the consideration that heightened scrutiny is required "where an injunction--whether or not mandatory--will provide the movant with substantially 'all the relief that is sought.' " *Id.* (quotation and citation omitted). The specific performance plaintiff seeks to achieve through its request for a preliminary injunction most likely would afford Dunkin Donuts with substantially all of the relief it sought in its federal complaint. Therefore, I will apply the mandatory injunction standard.

II. Irreparable injury

**\*3** Dunkin Donuts claims irreparable injury due to lost goodwill in the Dryden, New York market. Plaintiff claims not only that it has lost its only outlet in that locality but also that customer confusion is likely because a coffee shop selling substantially identical products replaced the Dunkin Donuts shop. Dowco responds that plaintiff failed to show irreparable harm because the Vermont Mountain coffee shop is not operating using Dunkin Donuts signs or symbols, is not competing with Dunkin Donuts, and offers a different menu.

Both lost good will and customer confusion can establish the irreparable injury necessary for injunctive relief. *Adirondack Appliance Repair, Inc. v. Adirondack Appliance Parts, Inc.,* 148 A.D.2d 796, 538 N.Y.S.2d 118, 120 (3d Dep't 1989). Irreparable injury also is established where a potential tenant shows that a location is "uniquely suited to its needs in terms of size and location." *Workbench, Inc. v. Syblin Realty*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*Corp.*, 140 A.D.2d 693, 528 N.Y.S.2d 888, 891 (2d Dep't 1988). Therefore, defendants' contention during oral argument that Dunkin Donuts may avoid harm simply by maintaining its presence with another franchisee in the market is unavailing.

 Plaintiff submitted evidence regarding the strength of its trademark and the efforts Dunkin Donuts expended to promote the mark. For example, plaintiff spent $56 million on national advertising and promotion in fiscal year 1996. Laudermilk Cert., Dkt. No. 4, ¶ 6. There is no question that loss of the Dryden shop location eliminates the presence of Dunkin Donuts from the Ithaca- Dryden market and that the location was tailored for a Dunkin Donuts store. In addition, Dunkin Donuts submitted evidence that the products in the Vermont Mountain shops are substantially similar to those of Dunkin Donuts, Dreyfus Cert., Dkt. No. 4, ¶ 4, that the Vermont Mountain shops look like the old Dunkin Donuts shops without the trademark signs, *id.* ¶ 5, and that the new shops are utilizing the former telephone listing of the Dunkin Donuts stores. *Id.* ¶ 6. During oral argument, counsel for defendants conceded the latter two facts.  Although Cowles stated that the products in the Vermont Mountain and Dunkin Donuts stores are "materially different," the newspaper article he cites in support of this position in fact stresses the similarity between the two shops' fare. Cowles Aff., Dkt. No. 10, ¶ 6 & Ex. A.

 Plaintiff also notes that it has a legitimate and reasonable interest in limiting defendants' ability to operate, or in this case facilitate the operation of, a substantially similar restaurant in the same location as the former Dunkin Donuts shop because plaintiff has an "interest in protecting its know-how and ... its ability to install another franchise in the same territory." *Carvel Corp. v. Eisenberg*, 692 F.Supp. 182, 186 (S.D.N.Y.1988) (applying New York law and upholding restrictive covenant in franchise agreement). Considering the record evidence, I find that plaintiff established the element of irreparable harm because it has a legitimate interest in protecting its presence in the Dryden market, consumer confusion is likely, and plaintiff risks losing good will.  Dunkin Donuts has demonstrated an actual and imminent injury to its business in the relevant market.  *See Tom Doherty Assocs.,* 60 F.3d at 37 (holding that irreparable harm exists where a party is threatened with the loss of an ongoing business).

III. Likelihood of success

**\*4** Defendants focused considerable attention on their position that Dunkin Donuts is not likely to succeed on the merits of its underlying contract action because the parties did not have a valid and enforceable lease option

agreement for the Dryden store.  Dowco characterizes the agreement as a bilateral executory contract with future performance by either party.  As explained more fully below, this characterization is incorrect, and the agreement is best described as a unilateral option contract

 Under New York law, a unilateral option agreement need only be signed by the party against whom it is enforced, and the unilateral agreement "ripens into a fully enforceable bilateral contract" after the optionee gives notice of its intent to exercise the option. *Kaplan v. Lippman*, 75 N.Y.2d 320, 552 N.Y.S.2d 903, 905, 552 N.E.2d 151 (1990) (*per curiam* ).  An option agreement requires the optionor to hold an offer open, and "until the optionee gives notice of his intent to exercise the option, the optionee is free to accept or reject the terms of the option." *Id.* Dowco's attempt to distinguish *Kaplan* because both parties in that case had executed a sublease which contained the option agreement is misguided.  The Court of Appeals separated the two agreements in its analysis and held that the option contract was valid because (1) it was written;  and (2) it was signed by the party to be charged. *Id.* Both requirements are met here as well.

 Contrary to defendants' arguments, the option contract by its terms is not bilateral because its provisions regarding any obligations of Dunkin Donuts, such as the payment of rent, flow from plaintiff exercising its option. *Id.* ¶¶ 4.0-4.4. Only after Dunkin Donuts exercised its option did the agreement ripen into an enforceable bilateral contract.   Finally, defendants argue that their agreement with Dunkin Donuts was not an enforceable contract because it lacked consideration.  The agreement on its face recites consideration of Dunkin Donuts' grant of a franchise to Dowco and its approval of the location for the franchised shop. Cowles Aff., Dkt. No. 10, Ex. C. The franchise agreement between Dowco and Dunkin Donuts requires the franchisee to grant a lease option.  Dkt. No. 4, Ex. B ¶ 5.M. I disagree with defendants' assertion that no valid consideration exists because the parties to the various agreements are not identical.  The underlying franchise agreement is between Dunkin Donuts and Dowco.  The lease option is among Dowco, Dunkin Donuts and Tri-Star Holding Corp., and Dowco also assigned its leasehold interest in the Dryden location to Dunkin Donuts.  Dkt. No. 4 Exs. B, D & E. These agreements taken together sufficiently link landlord Tri-Star Holding Corp. to franchisee and tenant Dowco. As noted above, Dunkin Donuts' agreement to pay rent to Tri-Star is triggered only after plaintiff exercises its option, ripening the contract into a bilateral agreement with sufficient consideration and mutual obligations.

**\*5** Dowco also argues that the intent of the parties, as

evidenced by their normal course of dealing, was to have an agreement that both parties executed before it became enforceable.   However, this argument is unavailing in light of the uncontroverted evidence that Richard and Edith Cowles signed the faxed lease option agreement and that Dunkin Donuts complied with the terms necessary to exercise the option.   I therefore decline to conduct an evidentiary hearing on the issue of intent.

 Consequently, based on the evidence before me, I find that Dunkin Donuts made a clear showing of a likelihood of success on the merits of its claim enforcing the lease option agreement.  Even under the heightened scrutiny of a mandatory injunction standard, plaintiff demonstrated that injunctive relief is appropriate in this case.   My decision to grant a preliminary injunction of course is not a final determination in this case.

 As noted above, Dowco in its answer to plaintiff's complaint asserted a counterclaim charging that plaintiff committed antitrust violations by attempting an illegal tying arrangement between franchisees' sale of bagels and their purchase of particular bagel ovens. [FN2] Dkt. No. 9 at 4-8.   In its memorandum of law concerning Dunkin Donuts' request for injunctive relief, Dowco argues the merits of this counterclaim in an apparent attempt to show that the balance of hardships does not favor plaintiff.   However, other than the parties involved, there is no legal or factual relationship between the lease option contract claim and the antitrust counterclaim.  *Cf. Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.,* 754 F.2d 91, 95 (2d Cir.1985) (considering allegations of illegal tying arrangement as a complete defense to plaintiff's trademark infringement claims and attendant preliminary injunction request). Without passing on the merits of Dowco's counterclaim, I do not consider it relevant to Dunkin Donut's request for specific performance of the lease option agreement.

FN2. There is little question that product tying can constitute a violation of the federal Sherman Act. An illegal tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.,* 880 F.2d 1514, 1516 (2d Cir.1989) (quotation and citation omitted). Antitrust concerns exist where one party uses its market power to force a consumer to purchase a second, or "tied" product. *Id.*

CONCLUSION

 For the foregoing reasons, plaintiff's motion for a preliminary injunction is granted, and defendants are ordered to specifically perform their obligations under the lease option agreement dated October 4, 1994.

 IT IS SO ORDERED.

1998 WL 160823, 1998 WL 160823 (N.D.N.Y.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1996 WL 165518
**(Cite as: 1996 WL 165518 (E.D.Pa.))**

**C**
Only the Westlaw citation is currently available.


United States District Court, E.D. Pennsylvania.

RITA'S WATER ICE FRANCHISE CORP.
v.
DBI INVESTMENT CORP. et al.

**No. 96-306**

April 8, 1996.


MEMORANDUM AND ORDER

SHAPIRO, J.

**\*1** Plaintiff, Rita's Water Ice Franchise Corporation ("Rita's"), alleges breach of a franchise agreement by defendants DBI Investment Corporation, Scott Irrgang, and Denise Irrgang.  Rita's avers that defendants breached the franchise agreement by using its proprietary marks and trade dress without authorization and by selling unauthorized products.  Rita's motion for a temporary restraining order was denied as moot after a conference call with the parties.  Rita's now seeks a preliminary injunction;  a hearing was held on February 27, 1996.    At the hearing, defendants agreed to discontinue the use of Rita's trademark and trade dress and agreed to an order so providing;  the only remaining issue is the enforceability of the covenant not to compete contained in the franchise agreement.  The parties submitted post-hearing memoranda on that issue.

 The court will order defendants to discontinue use of Rita's trademark and trade dress and grant Rita's motion for a preliminary injunction to enforce the covenant not to compete pending a decision or award pursuant to arbitration in accordance with the franchise agreement.  The following are the court's findings of fact and conclusions of law.

FINDINGS OF FACT

 1. Rita's Water Ice Franchise Corporation ("Rita's") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business in the Eastern District of Pennsylvania.  Rita's franchisees operate Rita's Water Ice shops along the northeast corridor through 71 franchised locations, five of which are located in Florida.

 2. Rita's is the owner of trade and service marks and has registered the marks in the United States Patent and Trademark Office.   A Rita's franchisee is licensed to use the marks in the operation of its franchised business.

 3. DBI Investment Corporation is a corporation organized and existing under the laws of the State of Florida with a principal place of business in Jupiter, Florida.

 4. Scott and Denise Irrgang, citizens of Florida and the owners of DBI Investment Corporation, guaranteed the obligations of DBI Investment Corporation.

 5. On January 28, 1994, Rita's and DBI Investment Corp. entered into a franchise agreement granting defendants the right to operate a Rita's shop at 150 Indian Town Road, Jupiter, Florida, 33477.

 6. On October 21, 1994, Rita's and DBI Investment Corp. entered into a franchise agreement granting defendants the right to operate a Rita's shop at 1454 Tenth Street, Lake Park, Florida 33477.

 7. Each franchise agreement was signed in Philadelphia.

 8. Each franchise agreement is governed by Pennsylvania law and provides for venue in the Eastern District of Pennsylvania for preliminary injunctive relief and for enforcement of rights under the Lanham Act. Each franchise agreement provides that all other disputes, including permanent injunctive relief and damages, are to be arbitrated before the American Arbitration Association in Philadelphia.  *See* Franchise Agreement, Articles XXI-XXIII.

 **\*2** 9. Defendants began to operate each Rita's shop soon after signing the respective franchise agreements.

 10. Before opening the Rita's shops, defendants received training in the Rita's shop operation.

 11.  Each franchise agreement contains a post-termination, noncompetition covenant stating that:  For a period of eighteen (18) months following termination or expiration of this Agreement, or a partner or shareholder's interest in the franchise, regardless of the cause of termination, neither Franchisee nor such partner or shareholder shall

directly or indirectly, for itself or through, on behalf of, or in conjunction with any other person, partnership, corporation, or other unincorporated business, own, maintain, engage in, be employed by, or have any interest in any business specializing in whole or in part or in any way related to or connected with the frozen confection business within a radius of one and one half (1.5) miles of any System shop, including Franchisee's former Shop.

Franchise Agreement, Article XX.

12. Each franchise agreement requires that the franchisee sell only approved products and that "[a]ll containers, cartons, bags, napkins, and other paper goods and packaging used in the dispensing or sale of the water ice and other food or beverage products" bear the proprietary marks of Rita's; unapproved sources of supply are not permitted. Article XI.E, G, and H.

13. Article XVIII.C of each franchise agreement authorizes Rita's to terminate the agreement without opportunity to cure if the franchisee fails to offer all required products and services, or if franchisee offers unauthorized products or services, or it franchisee fails to use the proprietary marks in the manner and for the purposes specified by the company.

14. Each franchise agreement requires the italian ice mix to be purchased only through Rita's designated supplier. The franchise royalty is collected at the time the proprietary mix is purchased by franchisees from Rita's.

15. Rita's gave written notice of default on May 18, 1995 to DBI Investment Corporation for use of altered recipes and flavors. The default was not cured.

16. On or about January 10, 1996, Dennis Gillen, a representative of Rita's, observed hot dogs cooking and advertised for sale and other unauthorized products on the premises. Defendants were also using unauthorized product, ingredients, and flavors for sale of italian ice at defendants' Rita's shops.

17. The franchise agreements were terminated on February 9, 1996.

18. At the hearing, defendants agreed to change the name of their shops and remove all remaining Rita's trade dress, including a distinctive awning.

19. Defendants continue to operate the two former Rita's shops in a substantially similar manner as they did as Rita's franchisees, without Rita's service marks and logo.

20. Each franchise agreement provides that the good will arising from the use of Rita's proprietary mark belongs to Rita's and not the defendants. Franchise Agreement, Article VI.D.

*3 21. Rita's had approved defendants' sites after conducting demographic and marketing studies; defendants' shops were located in target market areas for Rita's expansion.

22. Rita's has five franchises operating in Florida and has commitments from franchisees to open eighteen more units.

23. It would take eighteen months to establish another franchise operation in the Jupiter area, absent competition from defendants.

24. Marketing studies show that customers are drawn to a Rita's shop from a three mile radius.

25. Rita's financed extensive advertising in the market area of defendants' shops.

26. Rita's conducted marketing studies and shared the information it obtained regarding business developments, marketing strategies, and competition with its franchisees.

27. Defendants have not submitted financial statements to plaintiff as required under the franchise agreements.

28. Rita's estimates defendants' annual profits at $50,000 per shop.

29. Defendants introduced no testimony or other evidence that they would suffer harm if not permitted to operate a Rita's shop or business specializing in frozen confections within a 1.5 mile radius of defendants' former shops.

DISCUSSION

On a motion for a preliminary injunction, the court must consider four factors: (1) the likelihood that the applicant will prevail on the merits at the final hearing; (2) the extent to which the movants are irreparably harmed by the conduct complained of; (3) the extent to which defendants will suffer irreparable harm if preliminarily enjoined; and (4) the public interest. *S & R v. Jiffy Lube International, Inc.,* 968 F.2d 371, 374 (3d Cir.1992). The franchise agreements are governed by Pennsylvania law. Franchise Agreement, Article XXIII.

The plaintiff is likely to prevail on the merits at the final arbitration hearing. An enforceable restrictive

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

covenant in the franchise context must satisfy three requirements: (1) the covenant must relate to either a contract for sale of goodwill or other subject property; (2) the covenant must be supported by adequate consideration; and (3) the covenant must be reasonably limited in both time and territory. *Piercing Pagoda, Inc. v. Hoffner,* 351 A.2d 207, 210 (1976) (citing cases). A franchisor has a protectible interest in the sale of a franchise because of expenditures made by a franchisor for market development and training, the grant of an exclusive sales area, and permission to use the franchisor's name. *Id.* at 211; *Sparks Tune-Up, Inc. v. White,* 1989 WL 41321 (E.D. Pa. April 18, 1989) (franchisor's interest in expertise, training, logo, name, advertising assistance, and exclusivity rights may be protected by covenant not to compete); *see Novus Franchising, Inc. v. Taylor,* 795 F.Supp. 122 (M.D.Pa.1992) (name and method of operation carries a quantum of value and goodwill). Here, plaintiffs introduced evidence of these factors sufficient to establish a protectible interest in the franchise. Adequate consideration exists for the restrictive covenant; the covenant was a condition to the original grant of the franchise, and defendant received the benefits of the franchise agreement as consideration.

**\*4** The restrictions of the covenant are appropriately limited in time and territory. Plaintiff's president, Robert Tumolo, testified credibly that eighteen months is the approximate length of time it would take to establish a new franchise in the area without competition from defendants. *See Novus* at 128 (time necessary to "seek, train, and bring up to speed replacement franchises" found reasonable); *see also Jiffy Lube International, Inc. v. Weiss Brothers, Inc. et al.,* 834 F. Supp. 683, 692 (D.N.J.1993) (adjusting length of time in restrictive covenant from three years to ten months to correlate with the time necessary for franchisor to set up a new franchise in the area). A time period of eighteen months is reasonable.

Rita's research revealed that customers were drawn from an approximate three mile radius. *See Piercing Pagoda,* 351 A.2d at 212 (covenant with thirty mile radius reasonably necessary for protection of the franchisor). A restriction to a radius of one and one half miles of any Rita's including defendants' former shops is reasonable.

The covenant is also reasonably limited in scope. The franchise agreement was for the operation of a business selling water ice and related products. The defendants received the benefit of Rita's expertise and the use of Rita's name in connection with the frozen confection business. Tumolo testified that "frozen confections" were the natural and anticipated product line sold by Rita's. Protection of the products for which the name

and good will of Rita's has value is reasonable in the context of a covenant not to compete.

Rita's is irreparably harmed by defendants' violation of the franchise agreement. Rita's has an interest in the good will its franchise has created as well as an interest in being able to place a new franchise in the area as quickly as possible.

As stated in *Piercing Pagoda,* "[t]he covenant faces the economic reality that continued operation of [the former franchisee's] store subsequent to termination of the agreement would adversely affect the ability of the franchisor to secure another franchisee in the same territory." 351 A.2d at 212.

Defendants cite *In re: Arthur Treacher's Franchise Litigation,* 537 F.Supp. 311 (E.D Pa.1982), in support of their position that a preliminary injunction should be denied because Rita's is not in a position to refranchise in the area. However, the facts in *Arthur Treacher's* are distinguishable. There, the franchisor, involved in significant litigation with its franchisees, had recently terminated the licenses of over 200 stores; it was on the verge of bankruptcy. Here, another potential franchisee had expressed interest in the area of defendant's former franchise. Until the termination of the franchise agreement, defendants had territorial protection and development rights. Rita's has an interest in expansion and desires a presence in the market; competition from the former franchisee would lead to significant harm.

**\*5** Furthermore, the franchise agreements at issue are similar to the agreements signed with other franchisees. If plaintiff is unable to enforce this restrictive covenant against these defendants, the values of all its franchises are lowered. Other franchisees might violate their franchise agreements in similar ways and use Rita's good will to establish competing businesses.

Defendants did not appear at the hearing or present evidence but there is no doubt that the defendants will suffer some harm if a preliminary injunction is issued. However, the harm to defendants is of their own making. Defendants breached the terms of the franchise agreement by selling unauthorized products, using Rita's service marks and trade dress, and altering Rita's recipes. A preliminary injunction will not impose a hardship on defendants beyond that necessary to protect plaintiff's contractual interests. Moreover, enforcing the restrictive covenant does not force the defendants to go out of business at their present locations; defendants may still sell snack foods such as hot dogs, chips, and soda.

Although not heavily implicated in the instant case, the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

public interest supports contractual enforcement by preventing competition in violation of a valid restrictive covenant.

The court will grant Rita's relief in accordance with the terms of the attached order. The court orders the termination of the franchise agreements, and permanently enjoins defendants from violating the Lanham Act. Under the terms of the franchise agreements, the court has jurisdiction over the restrictive covenants only for purposes of considering preliminary relief. Franchise Agreement, Article XXI. Plaintiff has filed with the American Arbitration Association in Philadelphia; the arbitrator[s] will render a final decision on the merits.

The court will require plaintiffs to post a bond in the amount of $100,000, in accordance with the terms of Fed.R.Civ.P. 65(c), to cover potential damages suffered by defendants if they have been wrongfully enjoined. This amount is based on the plaintiff's estimate of defendants' annual profits at $50,000 per shop; defendants did not introduce any evidence regarding their profits.

Any facts in the Discussion section not set forth in the Findings of Fact are incorporated therein.

## CONCLUSIONS OF LAW

1. Defendants violated the franchise agreement by selling unauthorized products, using Rita's service marks and trade dress, and altering Rita's formulas.

2. Rita's is likely to succeed on the merits because the restrictive covenant relates to a protectible interest, is supported by consideration, and is reasonable in both time and territory.

3. Rita's will suffer irreparable harm if the covenant is not enforced; the established harm to Rita's outweighs the foreseeable harm to the defendants.

4. The public interest supports enforcement of the covenant.

An appropriate order follows.

## ORDER

AND NOW this 8th day of April, 1996 it is ORDERED that:

**\*6** 1) The franchise agreements are deemed terminated on February 9, 1996.

2) Pursuant to the Lanham Act, defendants are permanently enjoined from using the "Rita's Water Ice"

and "Rita's Italian Ice" trademarks.

3) Pending the final award of the arbitrators, defendants, their officers, agents, employees, representatives, and all persons in active concert or participation with them are enjoined from operating a business specializing in frozen confections at or within 1.5 miles of 150 Indiantown Road, Jupiter, Florida, 33477, and at or within 1.5 miles of 1454 10th Street, Lake Park, Florida, 33477, for a period of eighteen months from the termination of the franchise agreement or a decision or award of the arbitrators, whichever is earlier.

4) The preliminary injunction is effective upon plaintiffs' posting a bond in the amount of $100,000 in accordance with Fed.R.Civ.P. 65(c).

5) The clerk is directed to mark this case administratively closed.

1996 WL 165518, 1996 WL 165518 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify, under penalty perjury, that on May 7, 2008 Plaintiffs' Order to Show Cause, Certification Pursuant to Local Rule 6.1(d), Memorandum of Law and Certifications and Exhibits were served by overnight carrier for next business day delivery addressed to each of the following:

Ganpati Donuts, Inc.
dba Dunkin' Donuts/Baskin-Robbins
676-682 Broadway,
Newburgh, New York 12550

Shree Ram Donuts, Inc.
d/b/a Dunkin' Donuts
201 North Plank Road
Newburgh, New York 12550

Laxmi Donuts, Inc.
d/b/a Dunkin' Donuts
1002 Route 94
Vails Gate, New York 12584

Krishna Donuts, Inc.
d/b/a Dunkin' Donuts
310 Main Street
Highland Falls, New York 10928

Giatri Donuts Inc.
d/b/a Dunkin' Donuts
45 Quaker Avenue
Cornwall, New York 12518

Shreeji Donuts, Inc.
d/b/a Dunkin' Donuts
122-126 South Robinson Avenue
Newburgh, New York 12550

Amish Patel
266 Main Street
Cornwall, New York 12518

Ami Patel
15 Parks Wood Drive
Cornwall, New York 12518

Dated: May 7, 2008

 /s/ Ronald D. Degen
**RONALD D. DEGEN**